1                    UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS

3
                                    Civil No. 07-cv-12062-MLW
4

5

6   UNITED STATES OF AMERICA,
                    Petitioner
7
    vs.
8

9   ANDREW M. SWARM,
                    Respondent
10

11

12                       * * * * * * * * *

13
                        For Hearing Before:
14                     Chief Judge Mark L. Wolf

15

16      18:4248(a) Commitment of Sexually Dangerous Person

17

18                      United States District Court
                        District of Massachusetts (Boston.)
19                      One Courthouse Way
                        Boston, Massachusetts 02210
20                      Monday, January 10, 2011

21                          * * * * * * * *
22
                    REPORTER: RICHARD H. ROMANOW, RPR
23                        Official Court Reporter
                      United States District Court
24      One Courthouse Way, Room 5200, Boston, MA 02210
                        bulldog@richromanow.com
25

```
 1                    A P P E A R A N C E S

 2

 3   EVE A. PIEMONTE-STACEY, ESQ.
     ROSEMARY CONNOLLY, ESQ.
 4      United States Attorney's Office
        One Courthouse Way, Suite 9200
 5      Boston, Massachusetts 02210
        (617) 748-3265
 6      Email: eve.stacey@usdoj.gov
        For the Petitioner
 7

 8   TIMOTHY G. WATKINS, ESQ.
     IAN GOLD, ESQ.
 9      Federal Defender's Office
        51 Sleeper Street, 5th Floor
10      Boston, Massachusetts 02210
        (617) 223-8061
11      Email: Timothy_watkins@fd.org
               Ian_gold@fd.org
12      For the Respondent

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                       I N D E X

 2

 3    OPENING STATEMENT BY MS. PIEMONTE-STACEY......... 22

 4    OPENING STATEMENT BY MR. WATKINS................. 30

 5

 6    WITNESS                 DIRECT  CROSS  REDIRECT  RECROSS

 7

 8    DR. BARRY J. MILLS

 9        By Mr. Watkins:      47

10        By Ms. Stacey:               106

11

12

13

14                    E X H I B I T S

15

16        EXHIBITS 1 through 35.......................... 21

17        EXHIBIT 36.................................... 22

18

19

20

21

22

23

24

25
```

```
 1                     P R O C E E D I N G S
 2                (Begins, 9:00 a.m.)
 3                THE CLERK:  This is Civil Action Number
 4     07-12062, the United States vs. Andrew Swarm.  The Court
 5     is in session.  You may be seated.
 6                THE COURT:  Good morning.  Would counsel
 7     please identify themselves for the Court and for the
 8     record.
 9                MS. CONNOLLY:  Rosemary Connolly for the
10     United States of America.
11                MS. PIEMONTE-STACEY:  Good morning, your
12     Honor.  Eve Piemonte-Stacey for the United States.
13                MR. WATKINS:  Good morning, your Honor.  Tim
14     Watkins, Federal Public Defender's Office.  Ian Gold is
15     with me at counsel table.
16                THE COURT:  All right.  I'm told that
17     Mr. Swarm's delayed in delivery, but we're not going to
18     start immediately by taking testimony, and given the
19     limited availability usually of the expert's time, I'd
20     like to go over some of these legal issues before we get
21     Mr. Swarm.
22           Is that acceptable, Mr. Watkins?
23                MR. WATKINS:  That's fine, your Honor.
24                (Pause.)
25                THE COURT:  All right.  Did you each receive
```

1  Dr. Saleh's supplemental report yesterday?

2            MS. CONNOLLY:  Yes, your Honor.

3            MR. WATKINS:  Yes, your Honor.

4            THE COURT:  The Government pointed out to

5  Mr. O'Leary something that I noticed, that he didn't, as

6  ordered back in October, address the implications of the

7  Bureau of Prisons' guidelines on pharmacological

8  treatment.  There's something else that he didn't

9  address and it's understandable, I think, because when

10  he was originally appointed this issue hadn't been in

11  sharp focus for me and perhaps for counsel, and that is

12  the implications of the conditions of supervised

13  release.

14       As I read Dr. Saleh's report, he is of the view

15  that Mr. Swarm will be sexually dangerous to the extent

16  he's untreated, but he didn't address the conditions of

17  supervised -- well, he also assumed that Mr. Swarm would

18  have free access to prepubescent children.  The

19  conditions of supervised release prohibit that, as I

20  read them, "permit probation to prescribe home detention

21  full time and require participation in a sex offender

22  treatment program."

23       So my present inclination is to issue an order

24  this afternoon to Dr. Saleh telling him to be prepared

25  to address in his testimony these two issues, because he

 1    may testify as soon as tomorrow.  So I don't know that a

 2    supplementary report is something out of order.

 3          But what's your thinking on that?

 4          MR. WATKINS:  Perhaps I'll go first, your

 5    Honor.  There are two issues there.  First, the

 6    pharmacological report.  I think that is something that

 7    I think Dr. Saleh should at least be aware of that is

 8    coming up during his testimony.  As the Court may

 9    recall, I've actually responded or requested that those

10    -- that that policy go to Dr. Saleh as well as

11    Dr. Mills.  So I think that truly would be a surprise.

12          I think there is no need for a supplemental report

13    as far as the conditions.  We touched on it during the

14    deposition.  I think Dr. Saleh will be ready to

15    testify.  Now, whether a short order to the doctor to

16    let him know and remind him that, indeed, we're both

17    going to be requesting that and perhaps the Court's

18    requesting that --

19          THE COURT:  But this -- it's hard for me, you

20    know, not to look at the Federal Public Defender's

21    Office and remember I'm not conducting a criminal trial,

22    but I'm not, and, you know, I think we have a shared

23    interest in getting out the information that's necessary

24    for the parties to make fully-informed decisions on the

25    positions they want to advocate and for me to decide

1   what I need to decide.  Um, Dr. Mills touches, I think,

2   on these things.  I believe he expressed the view that

3   treatment in the community was likely to be more

4   promising than treatment in prison, for example.  But I

5   want to be as transparent as possible.  This is

6   important for me, in my current conception, which may

7   evolve.

8          But, one, there's 4 years and 8 months, I think,

9   of supervised release that you agree hasn't started

10  running yet.  So if Mr. Swarm is released, he's on

11  supervised release, he's subject to home detention or

12  inpatient treatment, and is required -- I think the

13  second version that can be amplified, of the conditions

14  of supervised release, say to "participate" in a

15  program, don't say to "complete" a program, but I think

16  it's the same thing.  But, you know, in the opinion of

17  these experts, would he have serious difficulty in

18  refraining while he's on supervised release?  If he

19  successfully completes the program -- a program, you

20  know, what's their prediction of his danger after that

21  including when he's off the supervised release?  These

22  are questions that I have at the moment.  And I think

23  I'm going to want to hear from a probation officer --

24         What is it, the Northern District of New York or

25  the Western District of New York?

1              MS. CONNOLLY:  I believe it's the Northern

2    District, your Honor.

3              THE COURT:  -- because I think the Government

4    is right that I should focus on the existing conditions

5    of release, of supervised release, but they could change

6    before I end this trial.  If Mr. Swarm is agreeable to

7    some pharmacological treatment as a condition of

8    supervised release, you know, the probation office --

9    I'd like to know from the probation office in New York,

10   you know (a) whether they -- whether it would be

11   agreeable and (b) you know, do they have programs they

12   could put him in or what kind of program would they put

13   him in?

14             MS. CONNOLLY:  Your Honor, if I may address

15   the pharmacological issue?

16         One thing that I detected in both Dr. Mills' and

17   Dr. Saleh's report is that everyone is making an

18   assumption or they haven't really -- um, they're basing

19   an assumption on whether or not he would actually be a

20   suitable candidate for pharmacological treatment.  And I

21   think there has to be a medical workup between his

22   thyroid condition and his diabetes to see if he could

23   even withstand this kind of a program.

24             THE COURT:  I think Dr. Mills expressed the

25   view that he could not or that he wasn't a good

 1   candidate.

 2           MS. CONNOLLY:  That's exactly what he said and

 3   Dr. Saleh just said "suffice it to say, assume he is."

 4   So I think it's almost speculative to say whether or not

 5   pharmacological treatment could be a condition of

 6   supervised release or any treatment.

 7           THE COURT:  Well, my view, at the moment, is

 8   that we don't know.

 9           MS. CONNOLLY:  Exactly.

10           THE COURT:  This is why I want to have this

11   colloquy with you because I would like this developed in

12   the evidence, um, Dr. Mills' view, Dr. Saleh's view, and

13   it's -- you know, it's conceivable to me that if

14   Dr. Mills goes back to California, that we might do it

15   on the telephone.  You know, if something comes back

16   from the probation department that more information will

17   be helpful on, um -- well, I want that information.  But

18   it couldn't -- I think I have to -- the conditions of

19   supervised release have to be feasible.

20           MS. CONNOLLY:  Correct.

21           THE COURT:  I'm not going to order something

22   or rely on something that can't be done.  And we'll get

23   to this in a moment, but --

24       All right.  So I want you and Dr. Mills to

25   question about, in more detail, the implications of the

1  conditions of supervised release and the sort of

2  eligibility for pharmacological treatment, and I'm going

3  to have to be educated on what "pharmacological

4  treatment" means.  Are these shots or something that one

5  gets indefinitely or -- you know, at one time there was

6  a discussion about something called "chemical

7  castration" which communicated to me, you know, some

8  sort of permanent effect from the treatment.

9          MR. WATKINS:  I think that's certainly what we

10  intended.  I should just alert the Court that Dr. Saleh,

11  that that's a particular area of expertise for him, that

12  he is indeed an M.D., a psychiatrist, and he talks about

13  that in great length.  I was trying to get his CV up,

14  but I think he's written articles concerning chemical

15  treatment.

16      So while I do expect to speak with Dr. Mills a

17  little bit, I don't think that he has a lot of

18  experience with that.  You might hear more when

19  Dr. Saleh comes.  Which is why there were particular --

20  at least I was particularly interested in having

21  Dr. Saleh take a look at the BOP's pharmacological

22  guidelines and kind of set them against what he knows.

23          THE COURT:  All right.  So I'll issue that

24  order after court today.

25      Another legal question that came to mind as I was

1    reading your trial briefs that I'll mention to you.

2    Mr. Swarm has a conviction for -- a state conviction for

3    actually abusing a minor and his felony conviction was

4    for possession of child pornography.  I've discussed the

5    legal framework that I intend to apply here, in

6    *Wilkinson,* and I had to figure it out for myself, and

7    that's my present state of mind.  So I think he has a

8    qualifying conviction.

9         It's an open question in my mind, as a matter of

10   law, as well as a matter of fact, whether possession of

11   child pornography or the risk of a future possession of

12   child pornography could be the required sexually violent

13   conduct for child molestation.  I think some of the

14   cases in this district have treated a conviction for

15   possession of child pornography as sexually violent

16   conduct qualifying somebody for the Adam Walsh Act.

17        I wonder if it should be treated, you know,

18   categorically.  I mean, if the testimony is that he is

19   at high risk of looking at this illegal stuff again, is

20   that legally sufficient to prove?  Does it have to be

21   something involving actual -- does he have to be at a

22   high risk of actually doing something violent?

23             MR. WATKINS:  There's two questions there and

24   the first one is whether possession of child pornography

25   is a qualifying conviction?  I may be speaking out of

1    turn, but I know we looked at this, now years ago, at

2    the beginning of the litigation in all SDP cases.  I'm

3    fairly certain the conclusion we came to is, "Yes, it

4    is."  I think it probably flows from the fact that

5    Congress has delineated possession of child porn as a

6    crime of violence, oddly enough, for purposes of the

7    bail statute particularly and for purposes of a number

8    of other statutes.  I think because of that -- and

9    again, I'm just trying to remember how we came to the

10   conclusion that there wasn't really a fight there.  Um,

11   I believe from that flows the fact that it is a

12   qualifying conviction for purposes of the Adam Walsh

13   Act.  And we're not disputing that at this point.

14            THE COURT:  Well -- but my point's -- that's

15   not a material point, I don't think, because you do

16   agree that he qualifies for analysis under the Adam

17   Walsh Act and, in my view, he would even if he didn't

18   have a federal conviction for possession of child

19   pornography because he has a state conviction for abuse

20   and he's admitted some things as well and you don't even

21   need a conviction.  But then go around, you know, to the

22   ultimate question, um, that there has to be clear and

23   convincing evidence that he will have substantial

24   difficulty in refraining from sexually violent conduct

25   or child molestation, I think is what the statute says,

1   and at this point, not having heard the evidence, I'm

2   wondering whether it would be sufficient for the

3   government to prove just that he would have substantial

4   difficulty in refraining from looking at child

5   pornography as opposed to touching somebody again?

6            MR. WATKINS:  It's an interesting question.  I

7   don't think that the Government has gone down that

8   particular route.  I think they're throwing it all in,

9   um, a wider basket than that.

10           I should note that, as part of the conditions of

11   release, certainly he doesn't have access, unauthorized

12   access to a computer, and as the Court knows, probation

13   has become very, very good at enforcing those kinds of

14   conditions through a variety of tools.

15           THE COURT:  Does the Government anticipate

16   arguing that it would be sufficient to prove only that

17   he's -- that he'll have substantial difficulty in

18   refraining from looking at child pornography?

19           MS. PIEMONTE-STACEY:  We don't anticipate

20   making that argument, your Honor.  In addition to the

21   child porn, we expect the evidence will show that he's

22   at risk to actually molest children if released.

23           THE COURT:  All right.

24           So the first two witnesses are going to be

25   Dr. Mills and Dr. Saleh.

1          MS. CONNOLLY:  No, your Honor.  Dr. Saleh is

2     Wednesday.  Dr. Mills is Monday.  Mr. Michael Pierce

3     from the probation office and --

4          THE COURT:  Why is Dr. -- did we agree on this

5     back in December?

6          MS. PIEMONTE-STACEY:  I don't think Dr. Saleh

7     is available on the 11th.

8          THE COURT:  Oh, is that right?

9          MS. PIEMONTE-STACEY:  He had informed the

10    Court that he was under a subpoena in another court on

11    the 11th.

12         THE COURT:  All right.  Thank you.  I missed

13    that.

14         So we're going to hear from Dr. Mills and then who

15    is going to be the next witness?

16         MS. CONNOLLY:  Michael Pierce, a probation

17    officer from the Northern District of New York, and then

18    depending on --

19         THE COURT:  And he will be here in person?

20         MS. CONNOLLY:  Yes, he will be here in

21    person.  And then depending on time, Dr. Ferraro, who

22    had done the precertification examination at Devens back

23    in 2006 -- 2007.

24         THE COURT:  All right.  And what will be the

25    essence of Dr. Ferraro's testimony?

1      MS. CONNOLLY:  The essence of her opinion will

2  be that she certified him as sexually dangerous.

3      THE COURT:  Well, I don't know if I'm going to

4  let her give that opinion.  Um, I think this is

5  contested.  If he made certain admissions, his

6  statements may come in.

7      MS. CONNOLLY:  Yes.  And she did have an

8  interview with him and took admissions from him and

9  wrote them into her report.

10      THE COURT:  Right, but she's not --

11      MS. CONNOLLY:  She's not offering expert

12  testimony, your Honor, no.

13      THE COURT:  All right.  So she's --

14      MS. CONNOLLY:  It's a factual -- it's a

15  factual witness based on her interviews and interaction

16  with Mr. Swarm.

17      THE COURT:  And is there an objection to her

18  giving that testimony?

19      MR. WATKINS:  No, your Honor.  I would expect

20  it to be fairly short.  I told the Government I'm

21  willing to stipulate to that part of her report which

22  includes those statements, but they've indicated they

23  want her as a live witness.  I suppose that's their

24  prerogative.  But I do expect to be fairly quick with

25  her.

 1              THE COURT:  The Supreme Court in *Old Chief*

 2     said that the parties don't have to rely on

 3     stipulations, but if it's quick, it's okay.

 4          All right.  So the witnesses are Mills -- please

 5     tell me the probation officer's name again?

 6              MS. CONNOLLY:  I'm sorry.  Michael Pierce.

 7              THE COURT:  Pierce, tomorrow.

 8              MS. CONNOLLY:  And then, I believe on

 9     Wednesday, we have Dr. Saleh.

10              THE COURT:  Yes.

11              MS. CONNOLLY:  Then Sarah Walsh, and that's

12     the video.

13              THE COURT:  Remind me of who she is, please?

14              MS. CONNOLLY:  Um, Sarah Walsh, is the

15     licensed social worker who treated Mr. Swarm in New York

16     when he was under supervised terms of release.  Sarah

17     Walsh, Family and Children's Society.  She's the video

18     deponent.  And that's on the 13th.  And I think that

19     would be the conclusion of the evidence that the

20     Government would offer.

21              THE COURT:  Okay.  And you think that evidence

22     can be concluded this week?  We're not going to sit on

23     Friday.  But by the 13th?

24              MS. CONNOLLY:  Yes, we would expect to.  Yes,

25     your Honor.

1          THE COURT:  Okay.

2          MR. WATKINS:  Your Honor, I was wondering

3    whether I -- depending on when Mr. Swarm gets here, I'm

4    not sure that Dr. Mills is going to be -- at least for

5    my direct, is going to go longer than this morning,

6    which means we may come up short tomorrow.  I'm

7    wondering whether Ms. Walsh might be available to

8    testify by video tomorrow rather than waiting until

9    Thursday?

10         THE COURT:  Why doesn't the Government check

11   on that later today, so we can use the time.

12         Okay.  And, Mr. Watkins, what's your batting

13   order?

14         MR. WATKINS:  Um, after Dr. Saleh testifies,

15   Mr. Swarm and, provisionally, Dr. Hernandez, from the

16   Bureau of Prisons, depending on the Court's inclination

17   to let him testify or not.  But it would be the opposite

18   way around, I would prefer to have Mr. Swarm go last,

19   but I'm not terribly wedded to that position because

20   I --

21         THE COURT:  Well, my present sense is as

22   follows.  I have the renewed request for Dr. Phenix's

23   testimony.  It hasn't been mentioned today.  It's still

24   my inclination to exclude Dr. Phenix.

25         Does the government still -- in view of -- well,

1   part of the reason the Government was advocating that I

2   hear from Dr. Phenix is you didn't know what Dr. Saleh

3   was going to say.  Are you still asking for Dr. Phenix

4   to testify?

5           MS. PIEMONTE-STACEY:  Yes, your Honor.

6           THE COURT:  Well, I'm going to reserve final

7   judgment on that until after we hear from Dr. Saleh.  I

8   continue to think that my analysis in the February 14,

9   2008 decision was correct and that the Adam Walsh Act

10  doesn't -- when it talks about examiners, doesn't

11  contemplate the parties will each have their own

12  experts.  I do assume -- I do understand I may be wrong

13  on that.

14      I assume, in any event, that I have the discretion

15  to let her testify, but I haven't been told yet what

16  Dr. Phenix would tell me that Dr. Saleh is not expected

17  to tell me and I've asked a couple of times.  As I see,

18  at the moment, it, at most, would be cumulative and I

19  would exclude it as an exercise of discretion under Rule

20  403 both because of unfair prejudice -- the Act doesn't

21  contemplate the Government putting on an expert, for

22  reasons I described in February of 2008 in my written

23  decision, and it would be cumulative, so any probative

24  value -- which I don't discern at the moment, because it

25  hasn't been pointed out to me, um, would be

1    substantially outweighed by the risk of unfair prejudice

2    and waste of time.  But the Government, if it wishes,

3    can ask me to focus on that again after I hear from

4    Dr. Saleh.

5         I'm likely to find that the Adam Walsh Act is

6    civil and not unconstitutional because of the difficulty

7    of predicting future dangerousness, but I'll build in

8    some time for you to argue on those remaining aspects of

9    the motion to dismiss.

10        I think it would be helpful to me to have some

11   brief openings.  Ordinarily I impose time limits in

12   civil cases based on the estimates.  It sounds to me

13   like you've just told me that this should take no more

14   than five four-hour days to try, and usually we take a

15   break.  So roughly 20 hours.  And I have the discretion

16   to give you more time even on that.  So I'll say,

17   provisionally, that you each have ten hours to present

18   your case.

19        But the experts may take longer than you think.

20   This is unfamiliar territory still.  So if we go six

21   days and not five, or seven days, I've left enough time

22   for it.  Okay?  But Mr. O'Leary and Mr. Hohler, who is

23   his successor, and that's why they're both sitting

24   there, um -- and Mr. O'Leary is going to the Court of

25   Appeals, um, they'll let you know how much time you have

1    left on the assumption that you have 10 hours each.  But

2    I'll be quite liberal in giving you more time.  I really

3    do want to hear all of this.

4         All right.

5              (Mr. Swarm enters.)

6         THE COURT:  Okay.  Mr. Swarm has arrived.

7    We've just been speaking about legal issues.  And,

8    actually, since this isn't a criminal case, he wouldn't

9    have a constitutional right to be present, as I

10   understand it, in any event, but I do want him here.

11        And I would like some brief openings from the

12   parties.  The trial briefs were very helpful.  But I do

13   want to get focused on this.  And then I'd like to go to

14   Dr. Mills.

15        Is there anything I should hear before you make

16   those openings?

17             MS. PIEMONTE-STACEY:  No, your Honor.

18             MR. WATKINS:  Your Honor, there are a couple

19   of exhibits still in dispute, but I think we can address

20   those as we --

21             THE COURT:  Are any of them going to come up

22   with Dr. Mills?

23             MR. WATKINS:  I don't believe so, no.

24             THE COURT:  All right.  We'll talk about

25   those.  I -- at the moment I don't believe -- I think

1    it's the SORA exhibit that's offered under Rule 8038 and

2    201, is that right?  I don't believe it's admissible

3    under either of those rules of evidence, for reasons

4    I'll explain, and I'll give you a chance to be heard on

5    it.

6         What's the other?  Okay, the others are not going

7    to come up with Dr. Mills.  We'll get to them.

8              MS. CONNOLLY:  Your Honor, just one

9    housekeeping matter.  To the extent the parties agreed

10   to 35 exhibits so far, may they be moved into evidence,

11   Exhibits 1 through 35?

12             THE COURT:  Yes.

13             (Pause.)

14             THE COURT:  There's now 36?

15             MS. CONNOLLY:  Well, 36 is going to be the

16   updated CV of Dr. Mills and 37 will be the updated

17   resume or CV of Dr. Saleh.  But we don't have those

18   yet.  We're hoping they're going to bring those with

19   them.

20             THE COURT:  All right.  1 to 35 are now

21   admitted.

22             MS. CONNOLLY:  Thank you, your Honor.

23             THE COURT:  Thank you.

24             (Exhibits 1 through 35, marked.)

25             THE COURT:  Okay.  We've marked Dr. Mills' as

1   Exhibit 36.  Mr. O'Leary obtained it.

2                   (Exhibit 36, marked.)

3                   THE COURT:  All right.  Is there something

4   else, Mr. Watkins, before the opening?

5                   MR. WATKINS:  No, that was what I was going to

6   ask about, is whether we have the CVs yet.

7                   THE COURT:  All right.

8        The Government has the burden of proof, so, I

9   assume, the government will go first.

10                  MS. PIEMONTE-STACEY:  Thank you, your Honor.

11  Um, very briefly.

12

13  OPENING STATEMENT BY MS. PIEMONTE-STACEY:

14       Mr. Swarm is a sexually dangerous person, as the

15  evidence will show.

16                  (Courtroom lights dim, then return, suddenly.)

17                  MS. PIEMONTE-STACEY:  I hope that wasn't a

18  sign from above.

19       But, your Honor, he is and remains a sex offender

20  who has never successfully completed sex offender

21  treatment.  He was on supervised release in 2007 --

22                  THE COURT:  I'm sorry to interrupt you, but,

23  again, this is an iterative process.  I think it just

24  may have been a misstatement in the Government's trial

25  brief, but I think it's important we not proceed based

 1    on a misconception.  At one point, um, the Government

 2    says, and I think it's on Page 3 of your brief, that

 3    Mr. Swarm has been unable or unwilling to successfully

 4    complete sex offender treatment.

 5         If he's unable -- well, that may be okay with

 6    regard to why he didn't complete it, but ultimately I'm

 7    going to have to decide whether there's a substantial

 8    risk that he's unable to restrain himself and not merely

 9    that he's unwilling to.  And reading that iteration of

10    the issue prompted me to say that.

11         But, you know, if he's been unwilling to do the

12    treatment, um, I guess that's a historic fact.

13              MS. PIEMONTE-STACEY:  It is.  It was meant as

14    a historic fact, your Honor.  So my apologies if it came

15    off any other way.

16              THE COURT:  Well, I probably misconstrued it.

17    But go ahead.

18              MS. PIEMONTE-STACEY:  But he was on supervised

19    release and -- after he pled guilty to receipt and

20    possession of child pornography.  And one of the terms

21    of his release, conditions of his release was that he

22    stay away from minor children, and he violated that

23    condition knowing -- knowing the harsh results that

24    happen from violating that condition.  He was in the

25    presence of small children without supervision.  He's

1    then committed and then --

2            THE COURT:  What were the facts of that?  Was

3    he in the presence of several small children or just

4    one?

5            MS. PIEMONTE-STACEY:  There was more than one

6    incident, your Honor, and I think the testimony will

7    show that.

8            THE COURT:  Well, what is he going to tell

9    me?

10           MS. PIEMONTE-STACEY:  Well, through

11   Mr. Swarm's admissions, but basically he was at a house

12   where -- of a friend where small children were.  He was

13   at a wedding and had an interaction with small children

14   in the parking lot.  He was at -- it's incidents such as

15   those.  Um, those were a couple of examples.  And he

16   ultimately admitted being in the presence of these

17   children without the appropriate supervision from

18   probation.

19       So as this Court is well aware, we have to prove

20   the three elements, that he's engaged in or attempted to

21   engage in sexually violent conduct or child molestation

22   in the past, that he suffers from a serious mental

23   illness, abnormality or disorder, and in this case, it's

24   pedophilia, and as a result of -- as well as his

25   personality disorder NOS, and as a result of which he

will have serious difficulty in refraining from sexually violent conduct or child molestation if he's released.

As to his past acts of child molestation, as the Court heard this morning, there's no dispute.  He pled guilty to the receipt and possession of child pornography.  In 1994, he was charged with endangering the welfare of a child and attempted sexual abuse.  And he pled guilty to attempting to committing both of those crimes.  In that case the victim was his 11-year-old step-niece.  In 2000, he pled guilty to receipt and possession of child pornography.  He was sentenced.  He ordered three videos of prepubescent children and they were engaged in hardcore sexual activity with adults. Those children were between the ages of 6 and 9, your Honor.  And when a search warrant was executed at his home in connection with the delivery of those three videos, that's when the authorities located over 60 marijuana plants as well as more than -- about 300 additional images of child pornography involving prepubescent children.

Both Dr. Mills and Dr. Saleh have diagnosed Mr. Swarm with pedophilia and personality disorder not otherwise specified.  The evidence will show that Mr. Swarm has had this life-long attraction to prepubescent girls and that he hasn't successfully

completed sex offender treatment, so he doesn't have the
tools to manage this life-long attraction to
prepubescent children.

People like Mr. Swarm -- and I believe this is in
Dr. Mills' report and it will come out in his testimony,
but people like Mr. Swarm who have this personality
disorder, they fail to conform to social norms by
repeatedly performing acts that are grounds for arrest,
are deceitful --

THE COURT:  The personality disorder?

MS. PIEMONTE-STACEY:  Yes.  -- are deceitful,
impulsive, with reckless disregard for the safety of
others, are consistently irresponsible and possess a
lack of remorse.  So when you take the paraphilia -- um,
the sexual deviance of pedophilia coupled with this
personality disorder, we say it is a serious mental
illness, abnormality or disorder, the result of which he
will be unable to refrain -- I'm sorry, your Honor?

THE COURT:  A couple of things, and I say this
so you can have them in mind when you question the
experts, particularly.

In my view -- and I know in his report Dr. Mills
talks about this, but in my view something can be a
mental illness, or in terms of the statute, a mental
abnormality and not be severe, but that's a fact -- the

1    severity is a fact to be determined in this proceeding.

2    Do you agree with that?

3            MS. PIEMONTE-STACEY:  Yes, your Honor.

4            THE COURT:  Okay.  So the intensity of it is

5    going to be an issue that I'll need evidence on.  I

6    wouldn't -- I'm not inclined to think I should treat

7    pedophilia as categorically as severe a problem.  It

8    depends on the circumstances of the particular person.

9    And, as I understand it, you agree with that.

10           In *Wilkinson* I found that antisocial personality

11   disorder generally was not the type of disorder that

12   could subject somebody to civil commitment and I found,

13   in addition, particularly with regard to *Wilkinson*, it

14   wasn't a mental illness that caused him substantial

15   difficulty in refraining, because there I was educated

16   to understand that antisocial personality disorder was

17   more voluntary -- well, it was essentially voluntary

18   cognitively, it wasn't -- it was diagnosed by describing

19   historic behavior, not by -- including crimes that might

20   have been voluntarily committed or committed as a result

21   of drug abuse.

22           Is personality disorder otherwise specified, is it

23   your argument that it alone would be something that

24   qualified or caused Mr. Swarm to be civilly committed or

25   just that, in conjunction with his pedophilia, it

magnifies the risk that exists with pedophilia

generally?

            MS. PIEMONTE-STACEY:  It's in conjunction with

his pedophilia, your Honor.  I think, you know, the

Court has made its decision clear in terms of the

antisocial personality disorder and there's disagreement

in the field as between experts as to whether antisocial

personality disorder alone is enough.  In fact, Dr. Amy

Phenix would say it is not, it is not enough.

Antisocial alone is not enough.

      So there's reasonable disagreement in the field.

But in this case an untreated or, um, an untreated sex

offender who has the sexual deviance of pedophilia,

coupled with this personality disorder, um, is what

makes it a serious mental illness, abnormality, or

disorder in this case.

      Finally, your Honor, the evidence will show,

again, through testimony, through the documents, that

Mr. Swarm will have serious difficulty in refraining

from sexually violent conduct or child molestation if he

is released.  He has shown a failure to comply with

critical conditions of supervised release.  He has

reported an ongoing sexual interest in prepubescent

girls.  He's tried and failed twice at sex offender

treatment, outpatient.  He blames others for these

1  offenses and he continues to minimize these offenses.

2  He's been noncompliant with therapy, he's been

3  noncompliant with medication.

4      And so, as a result of all these factors, the

5  Government believes it proves by clear and convincing

6  evidence that Mr. Swarm will have serious difficulty

7  refraining from sexually violent conduct or child

8  molestation, if released, and that he remains a sexually

9  dangerous person.  Thank you.

10              THE COURT:  Thank you.

11              MR. WATKINS:  Your Honor, before I get going,

12  I just want to make something clear, because I think

13  we're already getting confused.  There's been no

14  diagnosis of Mr. Swarm as having antisocial personality

15  disorder.  I think, um, what you're going to get from

16  Dr. Mills is a borderline personality.

17      It is easy for us nonexperts to start bandying

18  about the terms, but those are very, very different

19  things with very, very different indications.  I think

20  we'll go through that with Dr. Mills a little more when

21  he testifies, but I think it's prudent to be clear

22  exactly what's going on here, because what Dr. Mills

23  will tell us is that there are a lot of different kinds

24  of personality disorders, some more severe, um, some

25  less severe, all with different facets and this is not

1    antisocial personality disorder.  I don't believe either

2    of the experts are going to testify to that.

3

4    OPENING STATEMENT BY MR. WATKINS:

5         Your Honor, the background is that Mr. Swarm grew

6    up in a pretty dysfunctional family as both the experts

7    and the records indicate.  That dysfunction left him

8    socially awkward, really having difficulty connecting

9    with peers his own age, particularly girls, while he was

10   in high school.  And that's reflected in his first

11   sexual experience, while a senior in high school he got

12   involved in a relationship with a younger girl, 13 years

13   old at the time that they began experimenting with sex,

14   um, and it's certainly irresponsible and certainly very,

15   very troubling given the age --

16        THE COURT:  Excuse me just a minute.  As you

17   know, it's not my regular courtroom.  Something is

18   happening with my chair.

19        (Pause.)

20        THE COURT:  Go ahead.

21        MR. WATKINS:  -- it's certainly very troubling

22   given the age difference, but notwithstanding that

23   troubling aspect, it does appear that this relationship

24   was quite mutual, it wasn't the kinds of grooming and

25   predatory kinds of behavior that we sometimes think of

1    when we talk about child molestation.  And indeed this

2    particular relationship appears to have been condoned by

3    his peers in the community in which they lived.

4         That relationship went on for a period of time

5    into Mr. Swarm's early 20s and into the woman's late

6    teens, but it did break up.  It left Mr. Swarm quite

7    emotionally devastated.  And you're going to hear about

8    some of the nonsexual offenses in his early 20s, acting

9    out, public drunkenness, things of that nature, and some

10   of the things that flow from that.  What his upbringing

11   and that relationship left him with was a difficulty in

12   making emotional bonds with people, and particularly

13   with other women.

14        At age 30, that really did reach a crisis point

15   when he made an emotional connection with a step-niece

16   for whom he was baby-sitting.  She was far too young to

17   get involved in any kind of relationship, nevertheless

18   there was an emotional connection, and Mr. Swarm

19   struggled with that connection and the implications of

20   what it meant and particularly the kinds of sexual

21   feelings that he began and recognized were quite wrong.

22        What he did on that occasion and what you're going

23   to hear during trial is a man who always struggles with

24   these kinds of feelings and also is able to take

25   measures, many of them measures that we would not take

1    or we can question, but measures that he took to

2    sabotage and make sure that, um, sexual conduct did not

3    take place.

4              THE COURT:  And some examples are?

5              MR. WATKINS:  Well, in 1994, for example, the

6    government talked about that being molestation, but

7    actually what he pled to, the Court will hear, are two

8    counts of attempted sexual abuse and attempted

9    endangerment of a child, all stemming from the same

10   incident.  The reason it's charged as attempt is because

11   Mr. Swarm went up to the girl, gave her a note, a fairly

12   specific note saying "I have these feelings for you,

13   they're wrong feelings and I'm worried about them, and I

14   don't think I should be around you anymore.  I want you

15   to give this note to your parents so that they

16   understand what's going on here.  I don't know what else

17   to do."  And indeed that's what happened, the note went

18   to the parents, the parents went to the police.  So this

19   was really -- and I should say that Mr. Swarm admitted

20   to the police and explained exactly what was going on,

21   exactly why he had written the note and did take

22   efforts, in fact, to sabotage it.

23        And that is really the pattern of what you're

24   going to hear.  There's no allegation here that there's

25   the kinds of penetration or the kinds of production of

1   child pornography, things of that nature, very

2   predatory-kinds of acts here.  What happens is that

3   Mr. Swarm makes an emotional connection, recognizes the

4   connection, and then takes steps, albeit steps that, at

5   least at the time, were not the best steps or even good

6   steps to take, but steps to minimize and to ameliorate

7   any kind of damage that he might cause, and indeed to

8   sabotage himself.

9        And he was often successful, sometimes not so

10  much, but he was successful at battling these feelings

11  that he had and, um, the difficulty in making emotional

12  connections.  He did go to therapy.  He did -- he was

13  able to find tools from therapy in order to help himself

14  over the years.

15       One of the things that he did -- and, again, it's

16  troubling, but it is a fact, was thinking that having

17  another release would be a helpful tool for him to avoid

18  getting the emotional contact and into, um, difficult

19  situations, um, is he turned to a collection of child

20  pornography -- and this was in addition to adult

21  pornography that he had on the computer, and as the

22  Court has seen, this is not -- unfortunately an unusual

23  kind of circumstance where an individual starts

24  collecting adult pornography on the computer.  Mr. Swarm

25  did, indeed, collect child pornography as part of his

1  misguided, really, way of thinking that this was better

2  in some measure than being around children.  And at the

3  time -- and he feels much differently now, but at the

4  time he thought, um -- he gave various kinds of

5  explanations of why it was that that was a better thing,

6  a lesser of two evils, to collect child pornography.

7       And he recognizes now that that's quite wrong and

8  you're going to hear not from him, but from a therapist,

9  in a later age, that he does recognize the difficulty

10  and the really, um, disordered thinking that he had at

11  that time.

12       THE COURT:  I'm sorry.  I'm going to hear from

13  who on that?

14       MR. WATKINS:  I expect Sarah Walsh will talk

15  about that insight.  That's the Family and Children's

16  Society treatment provider.  Um, Mr. Swarm received

17  treatment there during the period of time that he was on

18  supervised release.  I think she'll begin to talk about

19  that.  I think you'll hear that from the experts in

20  their interviews of him, more insight about what he did

21  in understanding how terrible even a collection

22  seemingly -- well, that a collection of child

23  pornography can be.  And you'll certainly hear from

24  Mr. Swarm himself.

25       He was sentenced in 2000 to 78 months'

imprisonment in the Bureau of Prisons.  That Judge
Skullen, of the Northern District of New York,
recommended that he go into what was then the Butner Sex
Offender Treatment Program, but for reasons that are
still unclear there's no mention in the records from the
Bureau of Prisons why he was not put into any kind of
program while he was there.  Whether that was a space
thing or something else, we simply don't know.  The
records do not reflect why that did not happen.

Instead, he went to Fort Dix in New Jersey and
served his entire sentence there, was offered the usual
kinds of counseling that one gets in the Bureau of
Prisons.  He took advantage of that to some point, but
found it was not particularly useful in the milieu in
which he was, except for on one occasion where indeed he
was suicidal as a result of -- or seemed to be suicidal
for a few days as a result of a particularly traumatic
incident at home when his dog was taken to be euthanized
at a dog shelter.  But beyond that, what you're going to
hear is that Mr. Swarm did conform his behavior to the
Bureau of Prisons' policy.

I don't believe there are any disciplinary reports
at all against him.  I think, um, he was caught smoking
in an unauthorized area.  I think that is the sum total
of his disciplinary history over the course of six and a

1    half years.  So it was certainly the case that he was

2    quite able to conform his conduct while in the Bureau of

3    Prisons.

4         Once released, um, he was released on what --

5    well, the initial judgment had the conditions of

6    release.  As is happening really every year now as the

7    probation department gets more up to date with the tools

8    that they have, immediately upon release his probation

9    officer moved to modify the conditions of release to add

10   fairly specific kinds of conditions.  They went to

11   Mr. Swarm, the probation department did, and asked him

12   to consent to those modifications, um, which he did, and

13   what you're going to hear is that that began a period of

14   time when he was quite compliant with the directions of

15   his probation officer.  And you're going to hear, I

16   believe, that they did have quite a focus on him, but

17   perhaps not for the first two or three months.  Um,

18   there was a time where -- there was a question where he

19   was going to be supervised, whether it's going to be out

20   of the Syracuse office or out of the Binghamton office,

21   but once that's resolved, um, the probation officer --

22             THE COURT:  I'm sorry.  Why don't you finish.

23             MR. WATKINS:  Oh, I'm sorry.  -- the probation

24   officer directed him to a treatment program, who

25   evaluated him -- actually had evaluated him before the

1   end of his sentence, and they took him in and he began

2   treatment.

3        Admittedly everybody involved, the probation

4   office, the treatment program, was skeptical, um,

5   cautiously optimistic, but skeptical about Mr. Swarm's

6   ability to engage in treatment.  Again, this was an

7   individual who in the past had sought out treatment and

8   had not always completed it, and didn't think

9   necessarily that he needed it.  But against, um, all

10  odds, he flourished, to a certain extent, in the

11  treatment groups, which was no small matter for

12  Mr. Swarm, an individual raised in the Catholic

13  tradition and also raised in a family milieau which --

14  well, that what is private is private.

15       What he was forced to do there was to go into

16  group therapy, talk about some of the acts he did and

17  some of the feelings he did, and the reports you're

18  going to see, as time goes along, um, was that he became

19  engaged in that and, indeed, was able to open up.

20  Again, it's not the heavens opening up and some kind of

21  epiphany, but there was marked improvement as Mr. Swarm

22  went along.

23       At the same time the probation department was

24  monitoring him, um, at the monthly supervision reports,

25  all of which Mr. Swarm turned in.  He was -- he had to

1    live in his father's home, with whom he was estranged,

2    before his conviction.  The reason he had to move in

3    there was because of the New York sex offender residency

4    requirements would not allow him to live in his mother's

5    home where he lived all along.  Really what you saw was

6    Mr. Swarm quite isolated in Marathon, New York, quite

7    rural, with very little to do.  His physical

8    circumstances don't allow him to work.  So he was

9    monitored by the probation department and compliant with

10   all of the usual conditions of probation.  And that

11   continued on for many months.

12           THE COURT:  Actually let me interrupt you for

13   a moment.  As you were speaking, it occurred to me that

14   it may be desirable to send Dr. Mills and Dr. Saleh's

15   reports to Mr. Price -- I think it is?

16           MR. WATKINS:  Pierce.

17           THE COURT:  Sorry.  -- before he testifies,

18   because I'm going to be interested in knowing whether

19   probation, um, has the -- in New York, has the ability

20   to provide the kind of treatment that either or both of

21   them are saying is necessary.  And it now would include,

22   if it was medically justified, the pharmacological

23   treatment.

24        Do you have a problem with --

25           MR. WATKINS:  I would -- my sense, reviewing

1    this case and speaking with Mr. Pierce for a short

2    period of time, he is very -- I don't know if he's a

3    specialist in this, but he's very, um -- what is the

4    word?  -- experienced in, um, the kinds of conditions

5    and the like.  I'm quite sure he'll have ready answers.

6    But I think, um, sending the reports to him can't hurt.

7                THE COURT:  Does the Government agree?

8                MS. CONNOLLY:  Fine, your Honor.  I know he's

9    on his way up today, so we wouldn't be able to get him

10   the reports until tonight.

11               THE COURT:  Okay.  But do you expect to see

12   him?

13               MS. CONNOLLY:  Tonight.

14               THE COURT:  All right.  I'll give you an

15   order.  Please give him the two reports that Mills -- or

16   the two reports that Saleh wrote, and tell him I'm going

17   to ask whether his office would have the capacity to

18   arrange the kind of treatment that either or both say

19   would be desirable, including the pharmacological

20   treatment if it was medically justified, because that's

21   something he should be prepared to testify about

22   tomorrow.  I suspect that my friend, Judge Skullen,

23   would be responsive if his probation department

24   recommended something for Mr. Swarm.

25        Go ahead.

1          MR. WATKINS:  The difficulty was that,

2     particularly in the summer of 2006, there were bumps in

3     the road, there was contact with, um, children that

4     clearly violated his probation conditions.  Having said

5     that --

6          THE COURT:  When you say "contact," are you

7     talking about being in the vicinity of children or

8     physical contact?

9          MR. WATKINS:  No, he would be in the vicinity

10    of children.  There was not physical contact as we might

11    imagine when we talk about contact offenses with

12    children.  There was an incident where the child of a

13    friend came up and hugged him while that friend was

14    close by.  There was also a time when I believe while

15    Mr. Swarm was waiting for somebody in a chair, a child

16    jumped up in his lap.

17         So was there physical contact?  Indeed there was

18    physical contact.  Was it what we all are concerned

19    about as far as risk?  That's a question the Court can

20    answer, I think, after it hears.  Because one could --

21    while it was certainly something that Mr. Swarm should

22    have guarded against all along, one could see it as

23    incidental contact that certainly is regrettable that it

24    happened, and more importantly that Mr. Swarm should

25    have immediately reported to his probation officer,

1    which he did not, and that was the basis for the

2    violation.  But the violation was for Grade C offenses,

3    it was not for any kind of criminal conduct, it was for

4    failing to report this incidental conduct or failing to

5    report things that happened while he was out there.

6         He was in possession of adult pornography and,

7    again, that is something, Mr. Swarm will tell you, came

8    to him by happenstance.  Again, he should have reported

9    it, he should have turned away, he didn't.  It was a

10   bump in the road.  He did not tell his probation officer

11   until it came time to do that.  And by "time," I mean he

12   was encouraged to share in his group sessions when

13   things would go wrong, when he backslid, and indeed he

14   reported that, albeit on -- I'm sorry?

15              THE COURT:  Go ahead.

16              MR. WATKINS:  And what you're going to hear

17   from Mr. Pierce and the probation department is their

18   view that he did that only because there was an

19   impending polygraph exam which he knew he would fail if

20   he didn't disclose about that.  But nevertheless he

21   chose to and did relate those incidents and talked about

22   those to his probation officer.

23        Again, red flags and worthy of sanction?  That's

24   exactly what happened here is that the probation

25   department moved to sanction him before Judge Skullen of

1    Grade C offenses, a guideline sentencing range of 3 to 9

2    months, Judge Skullen chose 4 months, and then the

3    conditions of release, which were more severe for the

4    next time around, are quite in line with the kind of

5    sanctions that this court or any court would do to make

6    somebody understand, who is capable of understanding,

7    that you may think it's a small thing to be, you know,

8    or have incidental conduct -- um, contact with a child

9    and not report it, but, you know, in your circumstances

10   you have to be better than that, you have to be 100

11   percent compliant.  And that was what the sanction was.

12        What you're going to hear, I think, from

13   Mr. Pierce and from Ms. Walsh, when she testifies, is

14   they were fully ready to take him out on those

15   conditions once he was released from those four months,

16   that four-month sentence, and begin anew with him,

17   again, with a higher level of supervision that --

18   perhaps the electronic monitoring or perhaps even some

19   kind of GPS device, or perhaps inpatient treatment, but

20   they were ready to work with him again.  This was not a

21   person for whom at least people were putting up stop

22   signs and saying "This is not somebody who is going to

23   be able to function in society."

24        And that's what brought him into the, um, Bureau

25   of Prisons' custody.  For better or for worse that four

1    months occurred at the same time that the Bureau of

2    Prisons began implementing the Adam Walsh Act, and here

3    we are.

4         I think actually factually there's not going to be

5    a lot of dispute, as it seems is the case with these

6    cases, with the sexually dangerous person cases, it

7    really is what can one infer, or more precisely, what

8    can one predict on the basis of these signs that we

9    have, and is it enough to convince someone that there's

10   an unacceptable risk going forward.

11        The experts come at it from two different angles.

12   Dr. Saleh and Dr. Mills come at it from very different

13   kinds of angles and they come out with different

14   conclusions at the end.  I'm going to hazard a guess

15   that by the end of the trial, the Court's going to hear

16   that their positions are not terribly different, um,

17   when it comes down to it.  I think they will both say

18   that pedophilia is a very, very difficult kind of

19   diagnosis both to make, and once made, to predict what

20   is the best course of action for somebody.  But they

21   will also say that, um, treatment, um, and just putting

22   somebody away for the rest of their life, is probably

23   not the most efficient way or the necessary way to deal

24   with it, that there are other ways to go at that.

25        I think that is what, as the Court has already

1       indicated, that's where the action is going to be, is

2       whether this court can see, as Mr. Swarm goes out for

3       the next 5 years, until he's 50 years old, um, will the

4       conditions -- will what the probation department has in

5       store for him for the next five years be enough to

6       ameliorate the risk?  I think the Court's going to find

7       that it is more than enough and that, for that reason,

8       that Mr. Swarm should not be committed.

9              THE COURT:  And just to tease this out a

10      little further, he's got 4 years and 8 months of

11      supervised release and then, in my mind, the question

12      will be -- will he make enough progress in treatment

13      that it won't be a substantial -- you know, there won't

14      be the required risk that he'll have substantial

15      difficulty in refraining when he's off the supervised

16      release?  Is that a reasonable iteration of the issue?

17             MR. WATKINS:  It is, your Honor.  I should

18      just -- just to be clear, for some reason, and I don't

19      know why, but it's 4 years 6 months, even though that

20      the imposition was 4 months, that he could have done 4

21      years and 8 months.

22             THE COURT:  I see.

23             MR. WATKINS:  It's 4 years and 6 months.

24      I think, as a practical matter, and again you'll

25      hear this both from Dr. Mills and Dr. Saleh, um, that

```
1   age is going to start to play a factor, as the Court
2   heard during the **Wilkinson** trial, that is an issue here
3   in all of these cases.  Mr. Swarm is of an age where the
4   -- all of the -- even the actuarial tools will tell us,
5   that the incidences of offense starts to drop off.
6        As a practical matter, given the level of scrutiny
7   that Mr. Swarm is under in the community, not just from
8   the probation department, but from the Sex Offender
9   Registry Act and the residency requirements and the
10  kinds of practical reality in small-town New York life,
11  um, he is going to -- if he's going to reoffend, it will
12  happen quite quickly.  But I think what you're going to
13  hear is that that's not an issue, that Mr. Swarm can
14  conform his conduct to meet not just the probation
15  requirement, but any concern that there is an ongoing
16  risk here.
17               THE COURT:  Okay.  Thank you.
18               MS. PIEMONTE-STACEY:  Your Honor, one
19  housekeeping matter.
20       All of these exhibits, 1 through 36, were
21  admitted.  The Government would just request, and I
22  think with respondent's assent, that Exhibit 27, the
23  presentence investigation, be under seal.
24               THE COURT:  Okay.  I will place it under seal
25  temporarily, but this is an open proceeding and the
```

1    decisions, um -- well, let me ask you this.  Why do you

2    want it under seal, does it mention, for example, the

3    names of third parties or victims?

4              MS. PIEMONTE-STACEY:  It mentions the names of

5    the victims and also just the statutory language that

6    says it's not to be disclosed.

7              THE COURT:  But it can be disclosed upon a

8    court order.

9              MS. PIEMONTE-STACEY:  That's right.

10             THE COURT:  All right.  I will place it under

11   seal because of solicitude for the victims who were

12   named, um, but to the extent there's questioning about

13   it, the questioning will be in public session.  And, um,

14   if there's information in there that's relevant to my

15   decision, that information will be public, although it

16   probably won't be necessary to refer to any victim by

17   name.  Okay.  So Exhibit 27 is under seal.

18        Are we ready to get Dr. Mills?

19             MR. WATKINS:  I think that we are, your Honor.

20             THE COURT:  All right.  Dr. Barry Mills,

21   please.

22             (Witness enters courtroom.)

23             THE COURT:  Dr. Mills, I've been told that

24   you're taking some medication that may make you

25   nauseous.  If you feel that coming on and are able to

```
 1   give us an alert, I'll take a recess and try to get you

 2   someplace.

 3              THE WITNESS:  Thank you.

 4              THE COURT:  All right.

 5              (DR. BARRY J. MILLS, sworn.)

 6              THE COURT:  Okay.  Have you agreed that

 7   Mr. Watkins would go first or have you discussed it?

 8              MS. PIEMONTE-STACEY:  Yes, your Honor.

 9              THE COURT:  Okay.  Go ahead.

10

11              * * * * * * * * * * * * * *

12              DR. BARRY MILLS

13              * * * * * * * * * * * * * *

14

15   DIRECT EXAMINATION BY MR. WATKINS:

16   Q.  Would you please state your name for the record.

17   A.  Barry Joseph Mills.

18   Q.  Dr. Mills, do you see a document before you there?

19   A.  Yes.

20   Q.  And do you recognize that?

21   A.  Yes, I believe it's my resume.  Yes.

22   Q.  And was that provided -- was that provided to the

23   court clerk today?

24   A.  Yes.

25              MR. WATKINS:  With the Court's permission, I
```

1  would enter that as exhibit --

2          THE COURT:  It's Exhibit 36.

3          MR. WATKINS:  36.

4          THE COURT:  Okay, it was previously admitted

5  with the others.  1 through 36 are in evidence.

6          MR. WATKINS:  So I take it, your Honor,

7  there's no need to formally move for admission of any of

8  the exhibits that are agreed upon?

9          THE COURT:  Correct.

10 Q.  Dr. Mills, where are you currently employed?

11 A.  I'm in private practice in Santa Barbara, California

12 and working part time for the University of California

13 at Santa Barbara.

14 Q.  And you're part time.  That's a private practice?

15 A.  Both are part time, yes.

16 Q.  And what kind of -- what is that practice engaged

17 in?

18 A.  General psychiatry.

19 Q.  And any particular specialty in psychiatry?

20 A.  No.

21 Q.  Your teaching responsibilities, what do you do at

22 Santa Barbara?

23 A.  Minimal.  Um, primarily I'm working at the UC Santa

24 Barbara in student health.  I do do some minimal

25 teaching and research involvement with the Department of

1    Psychology.

2    Q.   When did you move to California to begin your own

3    practice?

4    A.   One year ago.

5    Q.   And where were you before that?

6    A.   I was at Cambridge Health Alliance here in Boston

7    and Mass General Hospital.

8    Q.   Why did you move to Santa Barbara?

9    A.   Um, a variety of reasons, one of which was some

10   health problems.

11   Q.   Do you have an undergraduate degree?

12   A.   Yes.

13   Q.   Where is that from?

14   A.   Austin College in Sherman, Texas.

15   Q.   And what was your field of study?  What did you

16   major in?

17   A.   Philosophy.

18   Q.   After getting your undergraduate degree, where did

19   you go?

20   A.   Then I went to the University of Texas, Southwestern

21   Medical School, in Dallas, for an M.D. degree, and then

22   for psychiatry training at the University of Texas

23   Health Science Center at San Antonio.

24   Q.   And do you also -- so do you now have a medical

25   degree?

1   A.   Yes.

2   Q.   And do you also hold other advanced degrees?

3   A.   Yes.  I have a PhD in cultural studies, comparative

4   religions, and a master's degree in the same field.

5   Q.   And where did you receive those?

6   A.   From Pacifica Graduate Institute in Santa Barbara.

7   Q.   Since becoming a psychiatrist, did you ever work for

8   a jail or any prison systems?

9   A.   Yes.

10   Q.   And when did that begin?

11   A.   Um, primarily from the very beginning, that was my

12   first job out of college, and I consistently did

13   forensic psychiatry pretty much until a year ago.

14   Q.   When you say "forensic psychiatry," how does that

15   differ from clinical psychiatry?

16   A.   Technically it's any interface between medicine and

17   the law, so it can be civil issues, criminal issues, the

18   management and treatment of offenders.  For me it was a

19   collection of all of it.

20   Q.   Were you employed by -- at North Texas State

21   Hospital?

22   A.   Yes.

23   Q.   And can you describe that institution?

24   A.   It's a maximum security state hospital at Texas.

25   It's essentially the equivalent of Bridgewater in

```
 1    Texas.  It's where any person who's either in the prison
 2    system or the state hospital system that were deemed
 3    either too dangerous or had some pending criminal issue
 4    were sent there.  It was kind of a hybrid between a
 5    prison and a hospital and I was the chief psychiatrist
 6    for one of the programs there.
 7    Q.  And how long were you chief psychiatrist?
 8    A.  Oh, many years.  Five, probably.  Something like
 9    that.
10    Q.  And this was a secure facility?
11    A.  Oh, yes.
12    Q.  As part of your job, were you responsible for doing
13    evaluations?
14    A.  Yes.
15    Q.  Would you do evaluations for possible civil
16    commitment?
17    A.  Yes.
18    Q.  How many of those evaluations have you done while in
19    Texas?
20    A.  Hundreds, if not, you know, approaching a thousand.
21    It was pretty much our daily issue there.
22    Q.  Did you also evaluate for insanity cases, the
23    capacity to understand right and wrong?
24    A.  Yes.
25    Q.  How many of those cases did you do?
```

A.   Um, in my private practice, you know, less than a
hundred, and at the state hospital position, probably
about the same number.

Q.   And so you were required to testify in court in
Texas?

A.   Frequently.

Q.   Um, did you testify for the state of Texas on their
behalf?

A.   Yes, definitely.

Q.   And did you testify for defendants on their behalf?

A.   Yes.

Q.   Do you have some kind of percentage breakdown of how
often you would do each?

A.   In the beginning it was probably 60/40, state, and
probably in the latter years it became more towards the
defense.

Q.   And the individuals you were working with and doing
commitments for, um, were these people that committed
violent crimes or were they less serious kinds of cases?

A.   Usually quite violent.

Q.   And would that include sex offenses?

A.   Yes.

Q.   At the time that you worked in Texas, was there a --
well, does Texas have a civil commitment statute?

A.   For sex offenders or regular civil crime?

1    Q.  For sex offenders.

2    A.  They do.  It's very different, but, yes, they do.

3    Q.  Does it end up with inpatient commitment?

4    A.  No, Texas has kind of gone in the direction of

5    outpatient sex offender commitments.

6    Q.  Did you conduct any of those or did you do

7    evaluations for purposes of that, um, sex offenders?

8    A.  That was getting started up pretty much at the time

9    I was leaving.

10   Q.  Now, did you do an evaluation of Andy Swarm?

11   A.  Yes.

12   Q.  And have you brought a copy of that evaluation with

13   you today?

14   A.  I believe I have.

15   Q.  Do you have one with you or do you need me to give

16   you a copy?

17   A.  I can get it.  (Gets copy.)

18            MS. PIEMONTE-STACEY:  Excuse me, your Honor,

19   if I may?  I have an exhibit -- the Government has an

20   exhibit book that we've prepared.  If I have permission,

21   I'll place it on the witness stand.

22            THE COURT:  Sure, that would be helpful.

23            MS. PIEMONTE-STACEY:  Thank you, your Honor.

24            MR. WATKINS:  And, your Honor, if I may also

25   get the monitors, I think you have to hit "Defense 4."

1          THE COURT:  Here.

2          (Pause.)

3   Q.  I've put up on the screen what's been marked as

4   Exhibit 31.  Do you see that?

5   A.  Yes.

6   Q.  And is that indeed the report of the evaluation?

7   A.  It definitely looks like it, yes.

8          THE COURT:  Is that the April 28th, 2008?

9          THE WITNESS:  I believe so.

10  Q.  Now, I'm turning to the last page of that report,

11  which has been marked -- it looks like Exhibit 31A.  Is

12  that the update that you sent to the Court on December

13  14th, 2010?

14  A.  Yes.

15  Q.  When were you first contacted to do an evaluation?

16  A.  I'd have to go back to my records, but the spring of

17  2008, I think.

18  Q.  And what did you do when you undertook the

19  evaluation?

20  A.  Um, reviewed records, met Mr. Swarm, and conducted

21  an evaluation.

22  Q.  And when you say you reviewed the records, what

23  records do you recall that you reviewed?

24  A.  There was a whole host of them provided.  I think I

25  listed some of them, just in general.  But prison

1    records and previous probation records, things like

2    that.

3    Q.   And these were all records that were provided by the

4    Court to you?

5    A.   I believe so, yes.

6    Q.   In 2008, how many times did you meet with Mr. Swarm?

7    A.   I believe just once.

8    Q.   And did you perform some tests?

9    A.   Yes.

10   Q.   What kinds of tests did you perform?

11   A.   Well, the standard mental status examination has

12   some testing on it, things like memory, attention span,

13   but the main formal test that I gave him was the

14   executive interview.  It's a specific test for frontal

15   lobe executive dysfunction.

16   Q.   And how long did you meet with him at Devens?

17   A.   I don't remember.  It's on my original bill.  A

18   couple of hours is a normal assessment time.

19   Q.   And typically meeting with a -- someone you're

20   evaluating for commitment, what kinds of conversations

21   do you have with the person?

22   A.   Well, in general, um, you try to stay openended.  I

23   mean, first, you explain the purpose of the evaluation

24   because it's not for treatment.  They have to understand

25   that.  But then you go with a fairly openended

1    evaluation and see what they say in response to a lot of

2    questions and then you transition it more into a

3    structured interview, maybe asking them to explain what

4    they say in the context of something you read.  And then

5    finally you move to much more formal testing, where it's

6    very specific questions and answers about things, like

7    assessing their memory and things like that.

8    Q.  What was your observations of Mr. Swarm as far as

9    his responding to you, his ability to speak with you

10   about these issues?

11   A.  He did fairly well.

12   Q.  When you say "fairly well," was he -- what's the

13   word, "guarded" or was he "open"?

14   A.  Well, he was -- when I say "fairly well," he was

15   attentive, he was on track, he was able to understand

16   the questions.  There was -- there was a guardedness,

17   somewhat of an evasiveness about details.  I mean, it's

18   a very stressful situation for someone because of the

19   implications.  But some minimization, kind of spinning

20   things towards a positive direction, while

21   simultaneously taking responsibility for a number of

22   things.  So it was kind of a mixed bag.

23   Q.  Um, this guardedness and evasiveness and

24   minimization, is that unusual in your experience for

25   persons for whom you're considering civil commitment?

1    A.  No.

2    Q.  And did you -- did Mr. Swarm understand why it was

3    you were there as far as you could tell?

4    A.  Yes.

5    Q.  He understood that he was being considered for a

6    commitment?

7    A.  For a sex offender commitment, yes.

8    Q.  Now, when doing an evaluation, part of the

9    evaluation is actually observing the person while you're

10   asking the questions?

11   A.  Yes.

12   Q.  Also observing the person before and after, if

13   possible?

14   A.  Yes.

15   Q.  Did you have a chance to observe Mr. Swarm other

16   than while you were asking him questions?

17   A.  Yes.

18   Q.  And was this in the waiting room there at -- well,

19   the visiting room at Devens?

20   A.  Yes.

21   Q.  And did you see him even before you started speaking

22   with him?

23   A.  Yes, the prison had assigned us to a room where I

24   was located and then the inmate was in a -- kind of a

25   giant waiting area with a whole lot of other people.  He

1   was sitting there for a while.

2   Q.  Um, these interviews rooms, they're off of that

3   giant visiting room, right?

4   A.  Yes.

5   Q.  Is one of those rooms dedicated to children?

6   A.  Yeah, it looks like a playroom where people that are

7   visiting who have kids can allow their kids to, I guess,

8   play a lot of toys, and little chairs, and things like

9   that.

10  Q.  Now, did you make any significant observations of

11  Mr. Swarm while he was sitting there waiting to come in

12  to meet with you?

13  A.  I believe, as I recall, there were children just

14  kind of running around the area where he was, which took

15  me a little bit aback.  The room that we were using for

16  the interview was right next to the room for the

17  children to play in.  Um, I was a little taken aback

18  with that.

19  Q.  As far as Mr. Swarm's reaction to that environment,

20  did you notice anything of significance?

21  A.  No, he seemed very appropriate and, you know, not

22  doing anything that brings alarms.

23  Q.  For example, he was not fixated on children or

24  unexpected attention to that children's room?

25            MS. PIEMONTE-STACEY:  Objection.

1          THE COURT:   To the leading quality.

2     Sustained.

3     Q.   And how long was Mr. Swarm out in that big room

4     before you could see him?

5     A.   Approximately 10 minutes.

6     Q.   Did you see any indication of impatience or

7     fidgetiness -- being fidgety?

8     A.   No.

9     Q.   After reviewing the records and interviewing

10    Mr. Swarm, did you come to a conclusion about whether he

11    met the requirements of 18 U.S.C. 4248?

12    A.   Um, yes, I did come to a conclusion.

13    Q.   And what is that conclusion?

14    A.   I didn't think he met all the criteria.

15    Q.   In addition to the evaluation and the, um, interview

16    of him, did you also do a risk assessment?

17    A.   I don't know if I did an independent risk assessment

18    or I just reviewed the one that had already been done

19    and I agreed with it.  But I didn't have any

20    disagreement with the ones that had already been done.

21    Q.   I'll show you here, and I'll try to focus on it a

22    little better.

23              (Pause.)

24    Q.   You talk about the limitations of the actuarial

25    tools?

1    A.  Yes.

2              THE COURT:  What page is that, please?

3              MR. WATKINS:  It's got to be Page 26.

4    Q.  And you indicate some -- well, what are you saying

5    here about the actuarial risk assessments that you read

6    about?

7    A.  Well, the two most commonly used now, the RRASOR and

8    the Static 99, um, there's a lot of criticism about

9    them.  They certainly have helped in some ways, but

10   they've also, um, in many of our opinion, are a little

11   bit overstated in their value.  For example, on this

12   particular assessment, um, the defendant has a long

13   history of misbehavior that counts against him on some

14   of these instruments that's also been quite ameliorated

15   in recent years.  Age, being one of the significant

16   factors in these statistical analyses that isn't taken

17   into official consideration, and once people get older,

18   their risk tends to go down.  The other test was -- I

19   think he was knocked down for some points because he

20   hadn't been able to hold a job, which I thought was a

21   little bit paradoxical because he's been declared

22   disabled for Social Security for so many years that

23   technically he wasn't really supposed to have a job.

24   Q.  What did he score on the two tests that you used?

25   A.  I would have to look specifically for the ones.

1    (Pause.)  On the Static 99, he scored a 6, which is high

2    risk of reoffending.  And then on the RRASOR, he scored

3    a 2, which was actually a low risk of sexual reoffense.

4    Q.  But either way, um, what is your conception of how

5    much to be guided by those actuarials?

6    A.  I think they're helpful.  They're certainly more

7    helpful than just a pure clinical approach.  But it's

8    almost a worse mistake to then flip and rely completely

9    upon that.  So it's a guided-type of assessment.  The

10   fact that it's got a discrepancy between the numbers

11   here shows one of the problems with a purely actuarial

12   approach.  I mean, he does have some risk.  He is not

13   without risk for the future.  But I don't think that the

14   risk that they are describing, in many ways, is directly

15   applicable to the question that I was being asked.

16   Q.  So when you began thinking about whether Mr. Swarm

17   qualified under the statute, how did you go about it?

18   What did you consult in your thinking?

19   A.  Well, in forensic psychiatry we try to be really

20   careful as to what the actual law -- or the question,

21   the legal question that we're being asked, says, so

22   they're -- the statute has some unique wording that has

23   kind of complicated the assessment when people like

24   myself do them.  For example, you know, as opposed to,

25   um, you know, just saying the person "is at a certain

1  level of risk," it says "the person has difficulty

2  refraining from certain behavior."  The two things are

3  different.  A statistical risk is different than saying

4  an individual is going to not be able to refrain from a

5  behavior.  So you might be able to infer certain things

6  from it, but they're not equivalent.  So essentially I

7  went through each step and tried to answer each question

8  separately.

9  Q.  And in preparation for that did you actually try to

10  come up with a diagnosis of Mr. Swarm?

11  A.  Yes.

12  Q.  And how does one come up with a diagnosis as a

13  psychiatrist?

14  A.  Well, there's many different ways.  But the most

15  common way is -- (Coughs.)  The most common way is, um,

16  through a collection of the person's symptoms and

17  history, both symptoms that they report and symptoms

18  that are more objectively reported about them.  You

19  compare it to, um, statistical clusters of syndromes,

20  illnesses, diagnoses that have been established in the

21  literature, of varying degrees of scientific validity.

22  But there's a book called the Diagnostic and Statistic

23  Manual that has some definite advantages and

24  disadvantages.  It's -- in the United States, it's the

25  most commonly used diagnostic manual, that do certain

1    diagnoses meet certain criteria?  And in my opinion, he

2    met some of the criteria for some of these diagnoses.

3    Q.  Now, when you do the diagnoses using the DSM,

4    there's talk about axes, different axes?

5    A.  Yes.

6    Q.  Can you describe what those different axes are?

7    A.  Well, it is an unusual document and it's in flux.  I

8    mean, currently the APA is meaning to come out with a

9    whole new version of this that changes a number of these

10   things.  But in general the DSM-IV has five axes,

11   probably the most important are Axis 1 and 2.  Axis 1 is

12   reserved for certain types of illnesses and Axis 2 for

13   other types of illnesses that are qualitatively

14   distinct.  Axis 1 is normally what we consider major

15   mental illnesses or disorders.  Axis 2 is for things

16   like mental retardation or personality disorders.  Axis

17   3 is for physical health conditions like diabetes.  Axis

18   4 is a measure of -- no matter what else is going on

19   with other axes, Axis 4 is a measure of what stress

20   disorders they have going on in their life.  And then

21   Axis 5 is called a GAF, a Global Assessment of

22   Functioning, it's a number from 0 to 100, that tries to

23   kind of take the whole picture into consideration and

24   say, "Let's give a rough round number to how this person

25   is doing in light of these other four axis."

1   Q.   Um, let's do the easy one first, Axis 5, which is

2   Global Assessment of Functioning.

3   A.   Yeah.

4   Q.   How did you score Mr. Swarm?

5   A.   A 65.

6   Q.   And what is the scale on which that's based?

7   A.   Um, it's very detailed and at times it's almost

8   contradictory because it's trying to balance symptoms

9   and functioning, which can separate out independently at

10  times.  But essentially a GAF score of 65 is someone who

11  is having some mild impairment in their life, um, but

12  not to the point that they need to be in a hospital or

13  anything of that sort.

14  Q.   When we talk about the need to be in the hospital as

15  far as the Axis 5, Global Assessment of Functioning,

16  that would be somebody that simply can't take care of

17  the activities of daily living?

18  A.   Well, it could be a variety of things, but what we

19  teach is that a GAF score of 50 or below, the person

20  needs to be in the hospital unless there's something

21  else that, in rare circumstances, they can be monitored

22  24-7 at their home.  But in general, um, a score of 50

23  or below, we would tell a student, "Okay, this means

24  you're going to put the person in the hospital,

25  correct?"  Anything above a 50, you know, can be

1   anywhere from is right on the edge of needing to be in

2   the hospital to having no symptoms at all.

3   Q.   And this would take into account a variety of

4   factors, medical, social, as well as the mental health

5   issues, correct?

6   A.   Yes.

7   Q.   Um, going back to Axes 1 and 2, which you said are

8   the two more important.  You diagnosed -- well, did you

9   come to a diagnosis of Mr. Swarm on Axis 1 and 2?

10  A.   Yes.

11  Q.   And what were those diagnoses?

12  A.   Well, Axis 1, pedophilia, um, it has some

13  qualifiers, but the main diagnosis is "pedophilia,

14  sexually attractive to females, non-exclusive."  He also

15  has three diagnoses of substance abuse, polysubstance

16  dependence, cannabis dependence, and alcohol dependence,

17  all three of which are in remission probably due to

18  incarceration.  And then Axis 2, the personality

19  disorder NOS, which is an acronym for "not otherwise

20  specified," with antisocial narcissistic and borderline

21  features.

22  Q.   Now, I'm going to go to Axis 2 first, um, not

23  otherwise specified.  Can you talk a little bit about

24  antisocial personality disorder, is that what you've

25  diagnosed Mr. Swarm with?

1    A.  No, definitely not, he does not meet the criteria

2    for antisocial personality disorder, but he does have

3    some antisocial traits.  One of the dilemmas that we get

4    into in diagnosing on the DSM is -- one of the

5    weaknesses of it is it's a categorical diagnosis.  If

6    you have three out of the five symptoms, you meet the

7    criteria for the diagnosis, where if you have just, for

8    example, 2 out of 5, you don't meet it at all.  It's a

9    black and white, all or nothing, which is really

10   limiting because some person might have some significant

11   antisocial traits, but they don't meet the full criteria

12   for it.  A personality disorder not otherwise specified

13   is a way of saying that a person, they definitely have a

14   personality disorder, but it doesn't fit any of the

15   classic, specific personality disorders because they've

16   got kind of a smattering of different ones.

17   Q.  And is there a concern as far as the future of

18   somebody who is diagnosed with antisocial -- well, let

19   me back up.

20        Is there a difference in concern between somebody

21   who's diagnosed with antisocial personality disorder as

22   opposed to personality disorder not otherwise specified?

23   A.  Well, any of the not otherwise specified diagnoses

24   are -- I'm always a little bit, um, hesitant because

25   there's less research on it.  It's a "wastebag

1    diagnosis," which is to say that there's a lot of

2    research on the antisocial personality disorder or the

3    borderline personality disorder, but there's less

4    research on personality disorder NOS.  It's more of a

5    clinical tool for people to say, "There's something

6    going on here, but we haven't really been able to either

7    get enough information to be given the more specific

8    diagnoses or we have enough information and they really

9    don't meet the diagnoses that most of the research is

10   done on."

11        In terms of the prognosis, all the personality

12   disorders do not have a good prognosis, but there is

13   some general amelioration of symptoms that seems to

14   occur once people reach their 40s.  They call it the

15   "burnout."  That if a person with a personality disorder

16   can make it to about 45, it doesn't mean they're cured,

17   but their life seems to develop a new stability and they

18   get into less trouble.  We don't know why this is and

19   it's hotly debated because there's some evidence that,

20   in fact, this doesn't happen, and maybe they just get

21   better at being antisocial and don't get into as much

22   trouble.  But for the most part the evidence is that

23   something happens with aging and that it becomes less of

24   a problem.

25   Q.  When evaluating Mr. Swarm and looking at his records

1   and his present functioning, do you see consistency with

2   him in aging out?

3   A.  I see some lessening of symptoms, yes.

4           THE COURT:  I'm sorry.  His symptoms of

5   personality disorder?

6           THE WITNESS:  Yes, sir.

7           THE COURT:  And what specifically do you see

8   diminishing?

9           THE WITNESS:  Well, people with personality

10  disorders, particularly this collection, they call them

11  the "Cluster D" collection, antisocial, narcissistic and

12  borderline, they tend to live very loud, dramatic,

13  chaotic lives.  So there's always something going on in

14  their life that is an issue of concern where they're

15  suicidal one day, they're very depressed the next day,

16  and then they're not depressed.  Then the next day they

17  get into a fight with somebody.  It's just -- one of the

18  things that we use to describe somebody with personality

19  disorders is a "stable chaos."  From the outside it kind

20  of looks like their life is just in continuous chaos.

21  And, in fact, if you just look at it over time, they're

22  always kind of in chaos.

23       That's what seems to change once someone with a

24  personality disorder makes it to their 40s or 50s is

25  they actually start to develop some real, more healthy

```
 1    stability in their lives.  So, I mean, if I looked in
 2    the records or heard that Mr. Swarm was just constantly
 3    in fights in prison and was on suicide precautions
 4    frequently and then off them the next day, that would
 5    indicate a very active personality disorder that's still
 6    not ameliorated at all.  But that really hasn't
 7    happened.  The structure of prison is -- for him, he's
 8    actually doing fairly well.
 9    Q.  And while on that you did review the Bureau of
10    Prisons' report and including any potential disciplinary
11    reports?
12    A.  Yes.
13    Q.  And there were none, none of any significance?
14    A.  Correct.
15    Q.  Now, you did diagnose Mr. Swarm with pedophilia?
16    A.  Yes.
17    Q.  And what was that -- well, let me as you this.  Part
18    of your evaluation you spoke with Mr. Swarm?
19    A.  Yes.
20    Q.  And what did he tell you about whether he has
21    pedophilia or not?
22    A.  You know, I'm not sure I asked him specifically if
23    he thought he had the diagnosis, because he was fairly
24    forthcoming that he is sexually attracted to young girls
25    and has been for a long time.
```

1    Q.   And as you looked through the reports and you looked

2    through the, um -- did your own interview, is it true

3    that Mr. Swarm actually admitted offenses that were

4    known about other than his admissions?

5    A.   I believe so.

6    Q.   And is that unusual, in your experience, for

7    somebody who's diagnosed with pedophilia?

8    A.   Um, yes and no.  You know, if the evidence is

9    against them, they may go ahead and admit it.  On the

10   other hand, there was a forthcomingness on his part that

11   wasn't just a complete denial that I had met with other

12   pedophiles.

13   Q.   And the -- besides the conversations with Mr. Swarm,

14   what other basis was there for your diagnosis of

15   pedophilia?

16   A.   Um, the records have indicated also statements that

17   he has made at other times, at other assessments.

18   Q.   And pedophilia is recognized by the DSM-IV and the

19   literature as a -- as an abnormality or a mental

20   illness?  What's it recognized as?

21   A.   Well, there's huge debates on the semantics of

22   "disorder" or "syndrome" or "abnormalities."  Um, in

23   general I -- to me pedophilia is a mental disorder, um,

24   and it's accepted in the medical community.

25   Q.   And I think you've, um -- in your report you talked

1   about it being a mental disorder, as recognized in the

2   literature, but not a serious disorder.  Is that the

3   gravamen of your report?

4   A.  Yes, and I'm not sure I worded this exactly the way

5   I would like because, of course, "serious" could mean a

6   lot of different things.  If we're saying "serious" in

7   terms of implications to society, then obviously it's

8   quite a serious disorder.  The way I interpreted it was

9   more of, in terms of in the medical literature when we

10  say something is a "serious" disease or illness or

11  disorder or something is not, um, there's a lot of

12  literature and evidence that would question whether or

13  not pedophilia is a serious disorder in that sense.

14  Q.  And is that a -- when you talk about the literature,

15  can pedophilia ever be a serious disorder?

16  A.  Well, I suspect there are people that would

17  definitely say that.  I would disagree.  I did a -- I've

18  had literature searches for "serious mental disorder,"

19  looking at what is the debate on this, and I was

20  impressed that, in a variety of articles that I found,

21  no one of them diagnosed or used pedophilia in that

22  criteria.

23          MS. PIEMONTE-STACEY:  Your Honor, I move to

24  strike.  It's outside of the report, the literature

25  cited in the report, nor is that conclusion cited within

1   the report.

2           THE COURT:  Well, I think I'll reserve

3   judgment on that.  Thank you.  I mean, I will wait to

4   see what happens when you cross-examine because --

5           (Pause.)

6           THE COURT:  It could possibly come in under

7   Rule 803.18 if this is something that he's relying on in

8   his direct examination and in providing his opinion.  I

9   guess I'd have to look closely at the report and see if

10  there's some more equitable reason for excluding it.  At

11  a minimum this would go to the weight.  Let's see how it

12  gets developed.

13  Q.  What you talked about was the literature in the

14  community, the medical community about whether

15  pedophilia is serious or not.  How does that compare to

16  the "serious," as far as you understand it, the word

17  "serious" in the statute in 4248?

18  A.  I don't know.  I don't know what they intended.

19          THE COURT:  Well, here, I can help you on

20  this, because this is my job and I wrote to it on

21  ***Wilkinson***.

22      It's my conception, and it might change in the

23  course of this case, but this is a matter of legislative

24  intent and I think, in your report, you pointed out that

25  "abnormality" is not a -- a "mental abnormality" is not

1    a word used in the medical community, but it has been

2    used in statutes, including the first one I think the

3    Supreme Court found constitutional is a civil commitment

4    in *Kansas vs. Hendricks*.

5         My present understanding is that a "mental

6    abnormality" is essentially analogous or synonymous with

7    a "mental illness or disorder" as clinicians would use

8    those terms, and that the DSM-IV-TR generally says that

9    the "mental illnesses" it recognizes can have varying

10   degrees of severity.

11        So subject to what I am educated to understand in

12   this case, I understand that a "serious abnormality"

13   means a serious mental illness and a mental illness

14   could be serious for one of two reasons.  One, it's a

15   type of illness that is always severe in terms of

16   causing distress to the individual who has it or, for

17   the purposes of this case, always severe in causing an

18   inability to control conduct, or the second would be it

19   might or might not be severe in its impact on a person's

20   ability to control his conduct and -- well, generally,

21   and then what do the facts show in this case?  Does the

22   person have the mental illness to the degree that it is

23   properly said there's a serious volitional problem, a

24   serious inability to control engaging in illegal

25   conduct?

1      So hopefully -- well, let me ask you this.  Does

2  what I said generally make sense to you as a expert --

3  as a psychiatrist?

4          THE WITNESS:  Um, yes, it's complicated, but

5  the part -- one of the parts that jumped out at me was

6  the presence of the diagnosis automatically -- one of

7  the conditions is if the presence of the diagnosis

8  automatically infers a serious difficulty in

9  refraining?

10          THE COURT:  Yeah, let me clarify that.  I'm

11  saying conceivably it could.  Maybe, in your opinion,

12  there's no such diagnosis that would always cause a

13  serious inability to control impulses.  And, in fact, I

14  think in this case the parties agree, and it's my state

15  of mind, that pedophilia is not, in every person, um, a

16  serious mental illness or abnormality within the meaning

17  of the statute.  And it seems to be undisputed that

18  Mr. Swarm is properly diagnosed with pedophilia and the

19  issue for me is going to be to decide whether it is so

20  severe in it's impact on his ability to control his

21  behavior that I should find that it's serious within the

22  meaning of the statute, that it would cause him serious

23  difficulty in refraining from engaging in sexual

24  violence or child molestation.

25          THE WITNESS:  I would agree with that, yes.

1           THE COURT:  Okay.

2   Q.  So breaking that down, is that your view, that there

3   are different levels of severity of pedophilia once

4   diagnosed?

5   A.  Yes.

6   Q.  And would there, um -- again, are you able to put a

7   particular individual on a continuum of how severe their

8   pedophilia is?

9   A.  Well, um, he has a nonexclusive pedophilia, so he --

10  you know, there are pedophiles that are just

11  continuously obsessed with one particular sexual issue

12  always involving children.  So he would not have that.

13  On the other hand, is this a recurrent primary fantasy

14  for him throughout his life?  Yes.

15  Q.  And you did diagnose nonexclusive as opposed to

16  exclusive.  As far as the severity, generally speaking,

17  exclusivity is a more severe form of pedophilia?

18  A.  I think that would be one element of it, yes, but

19  much more depending on his individual behavior.  I mean,

20  if he was -- for example, I've had patients that are --

21  despite being locked up for years, are almost

22  continuously masturbating to the fantasies that they

23  have, that's pretty severe and serious.  Um, so there's

24  a spectrum here and he's somewhat in between.

25          THE COURT:  When you reach a convenient

1  breaking point, we'll take about a 15-minute morning

2  break.

3            MR. WATKINS:  This is fine, your Honor.

4            THE COURT:  All right.  We will take a break

5  and resume at 11:15.  The Court is in recess.

6            (Recess, 11:00 a.m.)

7            (Resumed, 11:20 a.m.)

8            THE COURT:  You may resume.

9            MR. WATKINS:  Thank you, your Honor.

10  Q.  Before we broke we were talking about the standard

11  for "serious" as used in the statute and, um, the Court

12  indicated that that might correlate with "severity."

13  Having heard that explanation, does that change your

14  opinion at all about whether Mr. Swarm suffers from a

15  serious mental illness?

16  A.  Well, if I'm understanding correctly, there's

17  nothing about pedophilia, in and of itself, that says

18  it's a severe illness, condition, but that it certainly

19  can be depending on the individual aspects of the case.

20  Q.  And are you prepared to give an opinion, based on

21  the severity of Mr. Swarm's pedophilia, whether it rises

22  to "serious"?

23            MS. PIEMONTE-STACEY:  Objection.

24            THE COURT:  All right.  Overruled.  I'm

25  sorry.  What's the objection?

1          MS. PIEMONTE-STACEY:  Your Honor, I thought he

2     was asking him to go outside the scope of his report

3     again.

4          THE COURT:  Well, I think this goes right to

5     the heart of the issue, overruled, and to what his

6     report covered in part.  Overruled.

7          (Pause.)

8     A.  (Reads.)  I don't know, I really don't know if they

9     do or not.  I mean, it's possible.  Um, just the way I

10    have thought about this case is that almost -- I think

11    it's possible that it could be a serious pedophilia.  It

12    is possible, yes.

13    Q.  And --

14          THE COURT:  Well, let's -- do you have an

15    opinion to a reasonable degree of medical certainty as

16    to whether Mr. Swarm's pedophilia is serious?

17          THE WITNESS:  In the context of the different

18    ways of looking at the word "serious," um, I would say,

19    "Yes, it is serious."

20    Q.  Um, moving on.  You also talked, in your report, at

21    some length, um -- and I'll paraphrase, that they're

22    trying to figure out what Congress was getting after

23    when they talked about "suffers from"?

24    A.  Yes.

25    Q.  Do you recall that?

1    A.  Yes.

2    Q.  Now, you testified in the *Wilkinson* matter and also

3    before Judge Tauro in *Graham*?

4    A.  Yes.

5    Q.  As a result of testifying and learning the statute,

6    has your thinking about "suffers from" changed at all?

7    A.  Well, yes and no.  I think if it's a more liberal

8    definition of "suffering from," meaning "has the

9    condition," then absolutely.

10            THE COURT:  Okay, here.  And, again, this is

11   my role to define the terms, although I'm interested in

12   what the medical community would say, if they're

13   familiar terms, but I, thus far, would interpret

14   "suffers from" to be meaning "has," not that he has

15   anguished from it, but that he has it.

16   A.  So then, in that sense, yes, he has it.

17   Q.  All right.  So with that I want to turn to the third

18   question you answered, which was whether he would have

19   serious difficulty refraining from further acts of child

20   molestation?  And you answered that question, "No,"

21   correct?

22   A.  Yes.

23   Q.  Turn to Page 23 of your report.  (Pause.)  Yes, 23

24   of your report.

25        You talk here about some of the reasons or your

```
 1    interpretation of the statute and how to go about

 2    determining whether somebody has serious difficulty in

 3    refraining.  Do you recall that?

 4    A.  Yes.  (Reads.)

 5              THE COURT:  It would be most helpful for me if

 6    you just asked him if that's his opinion today and if so

 7    what the bases are rather than him reading his report

 8    that was written a couple of years ago.

 9    Q.  Have you reviewed the report in preparation for

10    today's testimony?

11    A.  Yes.

12    Q.  And is that still your opinion that he does not meet

13    that aspect of 4248?

14    A.  That's correct.

15    Q.  And what is the basis for your conclusion?

16    A.  Well, it's essentially a -- to me a question of

17    volitional control and there's nothing inherently about

18    pedophilia or a personality disorder and particularly

19    about his particular presentation that shows an

20    inability to -- or a serious inability to control his

21    behavior.  In fact, I think he's probably in quite good

22    control.

23    Q.  And what gives you the basis for saying he's in

24    quite good control of his behavior?

25    A.  Well, a variety of things.  I mean, his general
```

1    behavior outside of just specific sexual behavior is

2    under good control.  Specifically the best way in the

3    medical world that we have for assessing volitional

4    control is through assessment of the executive cognitive

5    functions and his are quite intact.

6    Q.  In your report you went into the issue of desire and

7    control of desires.  Is that what you mean by

8    "volition"?

9    A.  Um, no, I think they're slightly different.  Um,

10    "desire" can mean an object of sexual attraction.  It

11    could be pedophilia.  It could be normal sexual

12    interaction.  So the mere qualitative difference of

13    "desire" does not infer anything about a quantitative

14    inability to control one's behavior.  So I think that's

15    important because it's a frequent lay understanding that

16    anyone that was a pedophile must just not be able to

17    control their behavior to do such a thing, and that's

18    not the case.

19    Q.  In Mr. Swam's case you wrote, in the report, that,

20    um, "his desire was not overwhelming."  What was the

21    basis for your conclusion?

22    A.  Well, for one thing he certainly is not a

23    hypersexual individual, he's not someone that the prison

24    is reporting him masturbating on a frequent basis.  Sex

25    does not seem to occupy most of his life.

1   Q.   May I interrupt you there?   When you were in North

2   Texas did you see individuals where that was true, that

3   sex occupied their life?

4   A.   Oh, absolutely.

5   Q.   And how would that be manifested in a prison

6   setting?

7   A.   Um, it can get quite bizarre, people that actually

8   had to be put in straight-jackets, they would masturbate

9   so much that they would start to harm their genitals.

10  Q.   And there's no indication of any of that kind of

11  thing in the records here for Mr. Swarm?

12  A.   No.

13  Q.   Admittedly he -- he admitted to masturbating,

14  correct?

15  A.   I believe so, yes.

16  Q.   You talk a little bit about the lack of disciplinary

17  reports.   As far as the volition, what is the connection

18  of a lack of disciplinary reports to a finding of

19  volition?

20  A.   Well, it's not an automatic inference, but it does

21  tend to show that within a certain set of guidelines and

22  rules, he understands them and is able to follow through

23  with them and chooses to do that.   He's not having

24  difficulty with getting into trouble for certain types

25  of things that he doesn't want to be doing.   I mean,

1    people with volitional control frequently get into

2    trouble for something that a minute, an hour a day later

3    they're incredibly angry with themselves because they

4    really didn't want to be doing that and they knew it but

5    they just could not control themselves at the time.  If

6    anything, Mr. Swarm has demonstrated, even when he was

7    in the free world, careful, meticulous, um, cautious

8    action in acting out his pedophilia.

9    Q.  Turning back to the exit interview.  That raises --

10    and let's say in layman's terms, whether there's

11    cognitive impairment?

12    A.  Well, yes and no.  The executive functions are

13    currently bridged between cognitive impairment and

14    behavior.  The frontal lobes of the brain are the parts

15    of the brain that say "No."  So, for example, it's --

16    this is one of the paradoxes of when children get

17    stimulants and it calms them down.  It doesn't make any

18    sense why a stimulant would calm someone down and make

19    them actually more in control of their behavior.  But it

20    does if you understand that stimulants primarily work on

21    the frontal lobes of the brain, they stimulate the

22    frontal lobes so that the very part of that brain that's

23    inhibitory, that tells the rest of the brain, "No," is

24    working, and there's -- and working well.  And there's

25    nothing in Mr. Swarm that says that his frontal

1    inhibitory system is defective.

2    Q.   And are the results from that exit interview

3    consistent with volitional control then?

4    A.   Yes.  Compared to a normal population, he's within

5    the normal range.

6    Q.   Um, now, clearly, your opinion about difficulty

7    refraining is not completely unqualified.  I think

8    you've already said there is a risk, right?

9    A.   But the two aren't exactly the same.  I mean, people

10   commit offenses not necessarily out of a lack of

11   volitional control, I mean, he can choose to be bad.

12   That's one of the problems with the RRASOR or the Static

13   99 is that it's also including people that choose to

14   reoffend as opposed to those who have some type of

15   inability to control their behavior.

16   Q.   Um, I'm going to turn to -- you mentioned substance

17   abuse diagnoses that you --

18              THE COURT:  I don't know if this is a good

19   point to -- and perhaps the government intends to do it,

20   but you haven't asked him about the criteria for a

21   diagnosis of pedophilia, and in view of the testimony he

22   just gave about the possible difference between desire

23   and acting on the desire, um, I'm curious about what the

24   criteria are.

25              MR. WATKINS:  Okay.

1  Q.  Are you familiar with the criteria for diagnosing
2  pedophilia?
3  A.  Yes, but I couldn't recite them from memory, though.
4  Q.  You can or cannot?
5  A.  Cannot.
6  Q.  I believe, um -- (Looks.)  I'm handing you a book.
7  Can you identify what that book is?
8  A.  Um, the Diagnostic and Statistical Manual IV, Text
9  Revisionist.  This is the current active one.
10 Q.  And is that the DSM that's currently relied upon in
11 the field?
12 A.  Yes.
13 Q.  Um, the DSM-V is due to come out, is that correct?
14 A.  It's in process right now, yes.
15         THE COURT:  What page are you looking at?
16         THE WITNESS:  572.
17 Q.  And on Page 572, what do you see there?
18 A.  It is the diagnostic criteria for pedophilia.
19 Q.  And perhaps you could go through the diagnostic
20 criteria and tell the Court how Mr. Swarm does or does
21 not meet those criteria.
22 A.  Sure.  There's three main criteria.  "Over a period
23 of at least six months, recurrent, intense sexually" --
24         THE COURT:  Excuse me.  Not too fast for the
25 Court Reporter.

1   A.  I'll repeat it.

2       Criteria A:  "Over a period of at least six

3   months, recurrent, intense sexually-arousing fantasies,

4   sexual urges or behaviors, involving sexual activity

5   with a prepubescent child or children, generally aged 13

6   years or younger."

7       And Part B:  "The person has acted on these sexual

8   urges or the sexual urges or fantasies caused marked

9   distress or interpersonal difficulty."

10      And Criteria C:  "The person is at least 16 years

11  old and at least five years older than the child or

12  children in Criteria A."

13  Q.  Now, with respect to Criteria C, um, looking at the

14  records, all of those factors are met, is that safe to

15  say?

16  A.  Yes.

17  Q.  Um, Criteria A talks over a six-month period of

18  time.  That can be anywhere in a person's lifetime or

19  does it need to be within that last six months?

20  A.  Anytime.

21  Q.  And Mr. Swarm has admitted to you, and in records,

22  that he's had those fantasies during periods of his

23  life?

24  A.  Yes.

25  Q.  And then as to Criteria B, how does Mr. Swarm fit

1    that?

2    A.  He has acted on these urges.

3    Q.  And, again, under the criteria, that could be

4    anytime in the lifetime presumably after the age of 16?

5    A.  Yes.

6              MR. WATKINS:  Did your Honor have any further

7    questions or should I --

8              THE COURT:  Not -- not at this point.  Thank

9    you.

10   Q.  The six-month period talked about "recurrent" and

11   "intense."  Is it your understanding or experience that

12   that could change over time?

13   A.  Yes.

14   Q.  So that while that might happen in one six-month

15   period of time, at a later portion of life that could be

16   less or completely eliminated?

17   A.  It's less common, but it does happen, yes.

18             THE COURT:  I'm sorry.  What's less common?

19             THE WITNESS:  That people actually become less

20   pedophilic at some later point in age.

21   Q.  And you diagnosed Mr. Swarm with a nonexclusive-type

22   of pedophilia.  Is that defined in the DSM, nonexclusive

23   versus exclusive?

24   A.  Yes, that's one of the qualifiers.  If it's

25   exclusive, they're only sexually attracted to children.

1   Nonexclusive is they're sexually attracted to children

2   and to adults as well.

3   Q.  So as far as recurring images and fantasies for a

4   nonexclusive pedophile, that could change to fantasies

5   of more grown women?

6   A.  Yes, in fact, that would be part of the treatment.

7   It's one of the factors.  It's a complex issue, but if

8   you're going to help someone move from pedophilia to

9   nonpedophilia, or at least not acting on that, if they

10  -- if they're the nonexclusive type, you've got a little

11  bit more to work with as opposed to trying to create

12  sexual attraction to something they never actually

13  have.

14  Q.  I want to move back to the serious difficulty in

15  refraining and also your diagnosis of substance abuse.

16      First, when you spoke with Mr. Swarm, um, he's not

17  drinking or drugging now while he's in jail, correct?

18  A.  That's correct.

19  Q.  And so when you saw that or made that diagnosis,

20  that was from the past records which indicated that

21  there had been a substance abuse problem?

22  A.  Yes.

23  Q.  And, of course, he was convicted of growing

24  marijuana in his home in 2000, correct?

25  A.  Yes.

1   Q.  Um, I think what you wrote is -- let's see if I can

2   get it up here.  (On screen.)  "Substance abuse is a

3   significant contaminating variable in the respondent's

4   risk assessment."

5          Certainly substance abuse can -- a diagnosis of

6   substance abuse can remit over a person's lifetime?

7   Somebody can become clean?

8   A.  Yes.

9   Q.  And someone that's clean, for a period of time, then

10  would not have this contaminating variable?

11  A.  Well, it kind of depends on the reasons they're not

12  clean.  Being locked up is certainly important, but, um,

13  it is slightly different.

14  Q.  For example, um, hypothetically, if a person was

15  released on supervised release and was on supervised

16  release for a period of 10 months after having been in

17  prison for, in part, growing marijuana, would that

18  indicate to you a remission of substance abuse?

19  A.  That would certainly move in that direction, yes.

20  Q.  And as far as volitional control -- well, first,

21  Mr. Swarm's abuse of marijuana and/or alcohol, was

22  that -- was that severe according to records?

23  A.  Yes.

24  Q.  Um, and that is something that can be a subject of

25  volitional control, to stop drinking and drugging?

1    A.   Particularly alcohol, yes.

2    Q.   Is that true also of marijuana?

3    A.   Not as much.

4    Q.   So to the extent one has volitional control and has

5    a serious substance abuse problem -- well, let's see.

6    One has a substance abuse problem and isn't able to stop

7    completely drinking and drugging for a period of time,

8    does that indicate the existence of volitional control?

9    A.   Um, I mean wanting to recover from substance abuse

10   is a very complex issue.  I mean, strangely, Step 1 of

11   the 12-step program is to admit that you don't have

12   control over things, but paradoxically the whole idea is

13   that you actually start to get some control over your

14   life but in a different kind of way.  So, you know,

15   someone stopping using may or may not be a volitional

16   decision, but it certainly -- the continued use, despite

17   serious consequences, will indicate a total lack of

18   volitional control, possibly, or just choosing to do

19   something they know they're going to get into a lot of

20   trouble for.

21   Q.   Um, I want to turn now to the issue, again, in the

22   context of serious difficulty in refraining, of age.

23   Um, you talked about, as far as the borderline

24   personality disorder, that individuals as they age tend

25   to exhibit the symptoms of that less so or can?

1  A.  Yes.

2  Q.  Um, is there a similar decline, as far as acting

3  out, on pedophilia?

4  A.  Um, there is evidence for that, yes.

5  Q.  Is it as much as it is in borderline personality?

6  A.  I don't know if I've ever seen a direct one-to-one

7  comparison.  Age is probably the single most important

8  factor and, um, if you had to reduce it to one issue in

9  terms of risk for pedophilia.  But I've never seen a

10  comparison between personality disorders and sexual

11  offenses.

12  Q.  Now, you learned that Mr. Swarm has diabetes?

13  A.  Yes.

14  Q.  He characterizes that as "brittle diabetes"?

15  A.  Yes.

16  Q.  Is that a medical term, "brittle diabetes"?

17  A.  Yes.

18  Q.  And what does that connote?

19  A.  It's a particularly unfortunate or bad form of

20  diabetes where your blood sugar is more rapidly and

21  unpredictably out of control.  Some people have diabetes

22  but their blood sugar is just high and it kind of stays

23  high.  Other people can have diabetes where the blood

24  sugar just goes up and down on a quite frequent basis.

25  Q.  Um, you've seen indications on the record where

1    Mr. Swarm has done things and indicated that that was a

2    result of his diabetes?

3    A.  Yes.

4    Q.  Where you've seen that, is that consistent with your

5    understanding of how brittle diabetes might impact

6    someone?

7    A.  It could be.

8              THE COURT:  Done what kinds of things?

9    Q.  For example, holding up a chair and threatening

10   somebody?

11   A.  Well, it's complex, it's any kind of behaviors that,

12   um, involve volitional control, actually.  I mean,

13   someone with a very high or very low blood sugar, one of

14   the very first things that will go is their

15   understanding of their environment and their ability to

16   interact with it.  I think it's complicated though by --

17   it also appears at times Mr. Swarm has used his diabetes

18   as an excuse to -- for certain behaviors in the past.

19   That whether he's done that or not, it certainly doesn't

20   detract from the fact that brittle diabetes can have a

21   significant impact on one's brain.

22             THE COURT:  Just so I understand this.  In

23   your opinion, can brittle diabetes injure volitional

24   control?

25             THE WITNESS:  Yes.  Absolutely.

1   Q.  And how long does that volitional -- does that

2   impairment of volitional control -- well, let's take two

3   steps.

4       Someone who is hyperglycemic, has high blood

5   sugar, how long would that inability to volitionally

6   control last?

7               MS. PIEMONTE-STACEY:  Objection.

8               THE COURT:  Well, I don't know if he said

9   there was an inability, but --

10              MS. PIEMONTE-STACEY:  Well, can he ask for

11  Mr. Swarm, your Honor, as opposed to -- well, there's a

12  likely difference with people.

13              THE COURT:  Well -- but that objection is

14  overruled.  Um, to the extent you're able to answer, you

15  may.

16  A.  You know, it does very much depend on the individual

17  case.  There's two levels to it.  There is the immediate

18  effect because high-enough blood sugar and a person can

19  become delirious, disoriented and go into a coma, and

20  vice-versa, almost the same thing with a low blood

21  sugar.  So that can be almost an immediate effect within

22  a 24, 48 hour period and can reverse itself almost as

23  quickly with appropriate treatment.  The second level is

24  the long-term effects.  Brittle diabetes is not healthy

25  for the brain.  It causes very tiny little strokes in

 1    the brain over long periods of time and even if you get
 2    your blood sugar under really good control, you can
 3    still have these kind of long-term issues associated
 4    with it.
 5    Q.  Um, I'll be direct.  When we're talking about
 6    volitional control, um, someone with brittle diabetes,
 7    to the extent they have high blood sugar or low blood
 8    sugar, is that the kind of volitional control where
 9    they're going to go out and molest a child?
10              MS. PIEMONTE-STACEY:  Objection.
11              THE COURT:  Overruled.  I might not let him
12    answer that if a jury was here.  But go ahead.
13    A.  Well, I think it depends.  Um, to me the biggest
14    issue is substance abuse.  Substance intoxication would
15    be the most immediate thing that could affect his risk
16    of reoffending.  But if his diabetes were to really get
17    out of control, that would be a significant issue, too.
18    The worst-case scenario for him is to leave, not have
19    appropriate medical supervision, as his blood sugar gets
20    really up or down, and to start drinking again.
21    Q.  And you saw that he's on disability and he has
22    medical insurance, correct?
23    A.  Correct.
24    Q.  And he's talked with you about his management of his
25    diabetes, that he takes insulin?

1    A.   Yes, he's very good about that.

2    Q.   Um, when you reviewed the Bureau of Prisons' records

3    for Mr. Swarm, did you see indications where he had

4    declined psychological treatment while in the Bureau of

5    Prisons?

6    A.   I would have to go back and review.  I don't -- that

7    doesn't jump out at me.  The first thing that jumps out

8    at me is that there wasn't a lot offered.

9    Q.   But to the extent anything was offered, you don't

10   recall particularly whether he took advantage of it or

11   not?

12   A.   No.

13   Q.   And there was no indication in the records that sex

14   offender treatment was offered to him?

15   A.   That's correct, which is -- well, I can elaborate on

16   that, but that's correct.

17   Q.   At the conclusion of your report you talked about

18   prognosis and management for Mr. Swarm.  You've written

19   that:  "You believe his prognosis is poor if he's either

20   committed to long-term psychiatric inpatient care or

21   released to the community with no follow-up or

22   treatment."

23             THE COURT:  What page is that, please?

24             MR. WATKINS:  I'm sorry.  That's the last page

25   of your original report, which would be Page 30.

1              (Pause.)

2    Q.   When you talk about his prognosis, is his prognosis

3    including the risk of reoffending?

4    A.   Yes.

5    Q.   Um, and it seems like you said either of those two

6    extremes would not help?

7    A.   Yeah, I don't believe long-term hospitalization

8    would be helpful.  In fact, he might get worse with

9    that.  And, of course, no treatment at all would be the

10   most worst-case scenario.  But a very intensive or

11   outpatient-monitored program, with sex offender

12   treatment, with substance-abuse monitoring, it really

13   gives him the best prognosis and that includes in terms

14   of minimizing the reoffending.

15   Q.   And what do you base that conclusion on, that that

16   would be the best course?

17   A.   Well, this is the standard of care for most sex

18   offender treatment is done as an outpatient.  It doesn't

19   mean there's not a risk of relapse or reoffending.  But

20   inpatient treatment doesn't offer a lot of advantages

21   other than just control of the environment.  Um, the

22   other thing is that with his personality disorder, the

23   long-term hospitalization of personality disorders

24   paradoxically seems to make them worse.  That very thing

25   that they tend to get better once they get into their

1   40s or 50s, um, doesn't seem to happen as much if

2   they're doing this in an institutionalized-type setting

3   where they can get quite regressed and dependent upon

4   that and then it's difficult to actually get them out of

5   the institution.

6   Q.  And you talked about --

7           THE COURT:  Could I just ask you one

8   question.

9       You say the prognosis is much better if he's

10  released to a "community-based mandatory program."  What

11  do you mean by "community-based mandatory program"?

12          THE WITNESS:  Well, there are -- they're not

13  common, but there are a number of sex offender treatment

14  programs that are kind of the gold standard where people

15  are mandated to go to these, to attend on a very

16  frequent basis, um, and that there are consequences if,

17  in fact, they don't attend.  So it's highly structured.

18  The "community-based" means it's very integrated in the

19  community.  You have a case manager that actually goes

20  out and checks in on him on a regular basis.  They don't

21  -- they're not naive, they, um, you know, understand

22  that they need to be looking for objective signs, if

23  things are not going right.  You know, these aren't

24  common programs.  But when these people do the best,

25  it's frequently in these types of programs.

1    Q.  And, um, you mentioned 12-step programs.  Like

2    12-step programs, are there times when people make

3    progress and times when they fall back?

4    A.  Yes.

5    Q.  You talk about your experience in Texas and your

6    knowledge that Texas does not do inpatient civil

7    commitment?

8    A.  Yes, for sex offenders.

9    Q.  For sex offenders.  When you talk about these

10   programs, is that based on your experience or your

11   knowledge of Texas or is it wider than that?

12   A.  It's wider than that.  I mean, this is one of the

13   arguments that's going on in Texas at the time when they

14   were trying to decide how to do this.  Because, for

15   example, it's incredibly expensive to set up these

16   inpatient programs and if the outcome is actually no

17   better with the structured inpatient versus outpatient,

18   that was one of the arguments that was used to say,

19   "Well, let's just set up an intensive outpatient

20   program."

21   Q.  And are you aware of studies at all in Texas about

22   the efficacy of outpatient, particularly, for

23   pedophilia?

24          MS. PIEMONTE-STACEY:  Objection.  Outside the

25   scope again, your Honor.

1              THE COURT:  Well, again, I might or might not

2    let a jury hear this, but I'm going to overrule it.  And

3    I'll see, if I consider it at all, what weight to give

4    it, once you examine on it.

5    A.  I'm not familiar if there is this in Texas for sex

6    offender programs.  I am familiar with it for more

7    general offenders that included some sex offenders and

8    some nonsex offenders.  I ran one of those programs.

9    Q.  Um, in your conclusion and prognosis here, you talk

10   not just about, um, treatment, but also intensive

11   supervision.  Would that be a part of reducing the risk

12   in your mind?

13   A.  Absolutely.

14   Q.  I'm going to show you now a document you haven't

15   seen.  Well, perhaps you've seen it.  It was in the

16   materials.  (Looks.)  This is Exhibit 25.

17   A.  (Turns.)

18   Q.  I'm going to try to -- (Adjusts screen.)  This

19   document is entitled "Special Conditions of

20   Supervision."  Mr. Swarm will be released -- if he were

21   to be released, he would be on these particular

22   conditions of supervision.

23        I want to go through them and ask you, as to each

24   one, if this is what you had in mind as far as intensive

25   cooperation?

1    THE COURT:  Let me just clarify.  Is this the

2  judgment on the revocation of supervised release?

3    MR. WATKINS:  Correct.  Exhibit 25.

4    THE COURT:  Okay.

5  Q.  Number 2 is what you talked about, "Participating in

6  a mental health program"?

7  A.  Yes.

8  Q.  "Which may include outpatient and/or inpatient

9  treatment."  At least on the surface is that consistent

10  with the kinds of programs you're talking about?

11  A.  Definitely.

12  Q.  Um, Number 4 says:  "You shall refrain from the use

13  of alcohol while in treatment and for the remainder of

14  the term of supervision following the completion of

15  treatment."  That's consistent with what you've told us

16  is necessary for Mr. Swarm?

17  A.  That and probably, I'm sure, it may be in here

18  somewhere else, but that he has to comply with any

19  request for testing to verify that.

20  Q.  And I'll jump down to Number 10.

21  A.  Oh, yes, I see it.

22  Q.  "He may reach out, participate in a program for

23  substance abuse, which shall include the testing for

24  drug and/or alcohol use and may include inpatient or

25  outpatient treatment"?

1   A.   Yes.

2   Q.   So that would be consistent with a program you think

3   would -- has the best chance of working for Mr. Swarm?

4   A.   Yes.

5   Q.   Number 5 is:  "You shall not have direct contact

6   with a person under age 18, unless it's supervised by a

7   person approved by the probation office"?

8   A.   Yes.

9   Q.   And then it goes on to talk about indirect contact

10  also being prohibited?

11  A.   Yeah, and just specifically for him, he should have

12  no access to a computer.

13  Q.   Number 6 talks about prohibited being in an area

14  where a person under the age of 18 are likely to

15  congregate such as school grounds, childcare centers, or

16  playgrounds.  Is that a reasonable condition?

17  A.   Yes.

18  Q.   And Number 8, again, restates I think what we saw in

19  Number 2:  "A mental health program which will include,

20  but not be limited to, participation in a treatment

21  program for sexual offenders"?

22  A.   Yes.

23  Q.   And then it goes on to talk about using -- including

24  examinations using polygraphs?

25  A.   That I wasn't familiar with.  I've never -- I'm

1  hesitant about those.  But I've seen those be used, yes.

2  Q.  And Number 9 talks about the computers, except that

3  perhaps employment seemingly is not an issue with

4  Mr. Swarm, who is completely disabled?

5  A.  Yes.

6  Q.  Um, it does not prohibit the use of a computer, but

7  allows unannounced examination of a computer, correct?

8  A.  That does, but to me, in the beginning, I don't

9  think he should have access at all to computers.

10  Q.  And then jumping down to Number 11.  "You shall

11  serve home detention for your term of supervised release

12  to include electronic monitoring or other location

13  verification system."  Are you familiar with persons

14  released on electronic monitoring?

15  A.  No, I have not had direct clinical experience with

16  that, but that did not seem unreasonable.

17  Q.  And are you familiar with programs they use for

18  global positioning satellites to determine the

19  whereabouts of an offender at any particular time?

20  A.  Yes.

21  Q.  Even though you're not personally aware about it, is

22  that a sensible condition?

23  A.  Yes.

24  Q.  And would that go to any length to reduce the risk

25  that Mr. Swarm presents?

1    A.  Yes.

2    Q.  So having read through those conditions, in light of

3    your conclusion, would release to a mental health

4    treatment program, and in the community with these

5    conditions, better serve the long-term prognosis?

6    A.  I believe so.

7              MR. WATKINS:  That's all I have, your Honor.

8              THE COURT:  Well, let me just put your last

9    question a little differently.

10        Mr. Swarm will be on supervised release for four

11   and a half years if he's released as a result of my

12   decision in this case.  If he's released on these

13   conditions and, among other things, is required to

14   participate in a sex offender treatment program with the

15   threat that he'll be locked up again if he doesn't

16   participate and successfully complete it, in your

17   opinion will he, during the period of let's say

18   treatment, um, have serious difficulty in refraining

19   from sexually violent conduct or child molestation?

20             THE WITNESS:  I would say "No" with an

21   asterisk that as long as he is refraining from substance

22   abuse and is closely monitored by a doctor for his

23   diabetes.

24             (Pause.)

25             THE COURT:  All right.  Then about how long do

1    the -- in your experience, do the community-based

2    mandatory sex-offender treatment programs that you've

3    referred to take?

4                THE WITNESS:  Years.

5                THE COURT:  Years.  So he might be in such a

6    program for the four and a half years of his supervised

7    release?

8                THE WITNESS:  Yes.

9                (Pause.)

10               THE WITNESS:  In fact, can I add one thing,

11   your Honor?

12               THE COURT:  Yes.

13               THE WITNESS:  That reminds me.  For his

14   particular case, as a special condition, I mean this

15   probably goes without saying, but having a close follow-

16   up with a medical doctor for his diabetes, I think,

17   almost should be a condition and it should not be enough

18   just for him to rely on saying that his diabetes is

19   under control.  He needs to be seeing someone on a

20   regular basis that is checking that and verifying that.

21               THE COURT:  All right.  And then assume

22   hypothetically he ends the four and a half years of

23   supervised release.  Actually, let me take a step back.

24          When you say that the treatment can take years, in

25   your opinion, do some people come to the point where

1    they no longer need to be in that program because

2    they're --

3              THE WITNESS:  Yes.  It's interesting, though,

4    that a lot of times if people really get into these

5    programs and do it the right way, they continue in it

6    voluntarily even after it's no longer mandated.  It's

7    almost thinking like AA, that this is a lifetime issue

8    that will lessen in its severity.  If he can complete

9    four and a half years of this type of program and not

10   get into trouble, he would be doing quite well.  He

11   probably would have the tools set to go on and be

12   successful the rest of his life.

13             THE COURT:  That's what I was getting at,

14   because you've expressed the opinion that, you know, if

15   he were released on these conditions and was compliant

16   with them, he wouldn't be dangerous during -- he

17   wouldn't have serious difficulty in refraining from

18   engaging in sexual violence or child molestation while

19   he was on supervised release.

20        So now let's say he's finished that four and a

21   half years.  Do you have an opinion as to whether, when

22   he was no longer on supervised release, um, he would

23   have serious difficulty from refraining, um, from

24   engaging in child molestation or other sexual violence?

25             THE WITNESS:  Well, of course, our ability to

 1    predict kind of decreases over -- the longer he goes

 2    out.  But if he's able to complete this program

 3    successfully, then his risk, after that point, would

 4    almost, by definition, be less.  And that his highest

 5    risk time is going to be probably within the first year

 6    of his release.

 7              THE COURT:  Why is that?

 8              THE WITNESS:  He's not used to living in the

 9    world.  He's been locked up.  There's going to be

10    challenges that present to him that he hasn't really had

11    to deal with, and that's what one of these intensive

12    programs would help him with and walk him through it.

13    By the end of four and a half years, the goal would be

14    that it's so internalized in him, by that point, that he

15    wouldn't really need somebody else monitoring him so

16    closely.

17              THE COURT:  All right.  Thank you very much.

18         You know what wasn't covered, and maybe it was

19    intentional or inadvertent, but do you want to ask about

20    his opinion of pharmacological treatment?

21              MR. WATKINS:  Um, I was going to rely on the

22    report.

23              MS. PIEMONTE-STACEY:  I'll ask, your Honor.

24              THE COURT:  All right.  Okay.  Very good.

25              MS. PIEMONTE-STACEY:  If I could just have a

1  minute, your Honor?

2            THE COURT:  Certainly.

3

4  CROSS-EXAMINATION BY MS. PIEMONTE-STACEY:

5  Q.  Good afternoon.

6  A.  Good afternoon.

7  Q.  You were asked about the number of times that you

8  examined Mr. Swarm in 2008.  Do you recall that?

9  A.  Yes.

10  Q.  Okay.  And I'd just like to refer you to Exhibit 31,

11  the very first page of your report.

12  A.  (Turns.)  Oh, I stand corrected.  I did see him

13  twice.

14  Q.  You saw him on April 7th, 2008 as well as April

15  26th, 2008?

16  A.  That's correct.

17  Q.  And was that approximately two hours each time you

18  saw him?

19  A.  I would have to look at my bill, but approximately

20  that's usually what I spend with them, yes.

21  Q.  Okay.  And then you saw him again on November 12th,

22  2010, is that right?

23  A.  Yes.

24  Q.  And as part of your examination, you asked Mr. Swarm

25  to voluntarily participate in the interview, is that

1    correct?

2    A.  Yes.

3    Q.  And, um, you went through a number of factors that

4    you might call "informed consent," is that right?

5    A.  Yes.

6    Q.  And if I refer you to Page 2 of your report, you

7    told him the purpose of the interview, right?

8    A.  Yes.

9    Q.  The lack of any doctor-patient relationship?

10   A.  Yes.

11   Q.  You told him of the potential consequences to him

12   from the evaluation?

13   A.  Yes.

14   Q.  You informed him that nothing he said would be

15   confidential, correct?

16   A.  Yes.

17   Q.  You told him you would be sending a report about

18   this case report?

19   A.  Yes.

20   Q.  And that you'd likely be called to testify as well,

21   correct?

22   A.  Yes.

23   Q.  You told him he had a right not to answer specific

24   questions or not to participate at all, correct?

25   A.  Correct.

1   Q.  And that any decision he made not to answer

2   questions or not participate wouldn't be viewed

3   negatively, is that right?

4   A.  Correct.

5   Q.  And you reminded him of these factors of informed

6   consent halfway through the interview, right?

7   A.  Correct.

8   Q.  And that's to be sure he retained them?

9   A.  Correct.

10  Q.  Now, um, during your interview with Mr. Swarm you

11  asked Mr. Swarm the purpose of the examination, correct?

12  A.  Correct.

13  Q.  And you testified earlier that he said, um, he knew

14  it was for certification under the Adam Walsh Act,

15  correct?

16  A.  That's what I remember, yes.

17  Q.  But he also told you, um, and I'll refer you to Page

18  3 of your report, on the top of Page 3, quote, "The

19  government is just trying to keep another group locked

20  up."  Do you recall that statement?

21  A.  Oh, yes.

22  Q.  And you also asked him to elaborate on that

23  statement, right?

24  A.  Yes.

25  Q.  And he told you that the federal government was

1   trying to, quote, "expand its power," unquote?

2   A.   Correct.

3   Q.   And that was by, quote, "indefinitely incarcerating

4   sex offenders after their sentences," is that right?

5   A.   Yes.

6   Q.   Mr. Swarm never mentioned, um, that the federal

7   government committed people for treatment, did he?

8   A.   Um, that's not what he said at that time, no.

9   Q.   Now, you also asked Mr. Swarm to give you his

10  personal history, right?

11  A.   Correct.

12  Q.   And as part of the personal history, one of the

13  things Mr. Swarm told you was that his father had

14  sexually molested female children in the neighborhood?

15  A.   Yes.

16  Q.   And he also said his father was convicted of a sex

17  crime, is that right?

18  A.   Yes.

19  Q.   And he also reported to you that his father had

20  abused his sister, is that right?

21  A.   I believe so, yes.

22  Q.   Okay.  Um, you asked Mr. Swarm about his goals for

23  the future, right?

24  A.   That's normally what I do, but I'm not seeing it.

25  But, yes.

1   Q.   Okay.  All right.  I'll refer you to Page 4.

2   A.   (Reads.)  Oh, yes.

3   Q.   The second paragraph.  "When asked about his plans

4   and goals for the future, Mr. Swarm indicated he'd like

5   to rekindle his relationship with Penny."  Is that

6   right?

7   A.   Correct.

8   Q.   And Penny is the 13-year-old girl that he was

9   involved with years ago?

10  A.   Correct.

11  Q.   And he also wanted to move to Germany, is that

12  right?

13  A.   Yes.

14  Q.   And the reason he told you he wanted to move to

15  Germany is because "They have less laws and it's a more

16  free country than the United States.  That he could

17  never really be free here now."  Did I read that

18  correctly?

19  A.   That's what he said.

20  Q.   I'm sorry?

21  A.   That's what he said, yes.

22  Q.   You also asked him about his sexual history?

23  A.   Yes.

24  Q.   And he reported to you that his only romantic

25  relationship was with 13-year-old Penny, is that

1  correct?

2  A.  Correct.

3  Q.  And during the course of Mr. Swarm's relationship

4  with Penny, um, she was between the ages of 13 and 16,

5  is that right?

6  A.  I believe so, yes.

7  Q.  And if I refer you to the bottom, it's actually

8  highlighted on the screen, the bottom of your report,

9  "Penny was much younger in the relationship, aging from

10  13 to 16"?

11  A.  Yes.

12  Q.  Do you agree that was her age?

13  A.  Yes.

14  Q.  You also asked Mr. Swarm about his previous

15  convictions, correct?

16  A.  I believe so, yes.

17  Q.  And he told you, um, he was first convicted of a sex

18  crime involving a step niece in 1994, is that right?

19  A.  I'm not seeing it, but that sounds correct, yes.

20  Q.  If I could refer you to Page 5 of your report.

21  A.  (Reads.)

22  Q.  And while I have Page 5 on the screen, I'm not

23  seeing it either.  So give me just one moment, please.

24  A.  The bottom of the second paragraph:  "The respondent

25  indicates he was first convicted of a sex crime for

1    events involving a step-niece named Bobbie."

2    Q.  Okay.

3            THE COURT:  I think you're going to have to

4    read that more loudly and slowly so it can be reflected

5    accurately on the record.

6    A.  On Page 5:  "The respondent indicates that he was

7    first convicted of a sex crime for events involving his

8    step-niece named Bobbie."

9    Q.  And just while we're talking, be careful, if you

10   might, for the record, not to use any last names of any

11   of these minor children, if you know them.

12   A.  Certainly.

13   Q.  And in discussing the, um, sex crime involving his

14   step-niece he also emphasized to you that he was

15   partially not responsible, did he not?

16   A.  Yes.

17   Q.  He said -- and I'm highlighting it on the screen.

18   He emphasized he was partially not responsible because

19   he repeatedly told his step-niece not to spend the night

20   at his home, is that right?

21   A.  Yes.

22   Q.  And this was the step-niece that his family had

23   asked him to babysit, right?

24   A.  I believe so.

25   Q.  And she was between the ages of 9 and 11 years old

1    at the time?

2    A.   That sounds correct.

3    Q.   And he admitted to you that he masturbated while he

4    watched his niece?

5    A.   (Reads.)   I just want to make sure because I

6    remember there was some disagreement about this issue.

7    Could you cite exactly where that is?

8    Q.   Absolutely.   In terms of the "9 to 11 years old"

9    with Dr. Mills, I'm referring to Page 7 of your report,

10   um, the second paragraph.   The second paragraph, um,

11   that begins "In 1994," about midway through.   "The

12   respondent frequently babysat the victim between the

13   ages of 9 and 11."

14   A.   Okay.   But it's -- at the next-to-last paragraph

15   when it says that he admitted to regularly masturbating

16   while watching his niece, that's actually coming from

17   the Bates Stamp 261, that's not what he necessarily told

18   me.

19   Q.   Okay.   But in reviewing the records, and I could

20   find Bates Stamp 261, but in reviewing the records you

21   saw an admission by Mr. Swarm that he regularly

22   masturbated while watching his niece?

23   A.   Yes.

24   Q.   Now, he was also convicted of receipt and possession

25   of child pornography, is that correct?

1    A.   Yes.

2    Q.   And he was released from prison in September of

3    2005, is that right?

4    A.   That sounds correct, yes.

5    Q.   And then he violated the conditions of his release

6    by being in the presence of minors, is that right?

7    A.   Yes.

8    Q.   And he wasn't just in the presence of minors, he

9    actually had physical contact with minors, is that

10   right?

11   A.   (Pause.)  I'm not seeing that.

12   Q.   Okay.  I would refer you to -- well, you reviewed a

13   number of records that were produced to you, correct?

14   A.   Yes.

15   Q.   I'd like to -- in the binder that's on the witness

16   stand in front of you, refer you to Exhibit D.

17   A.   (Looks.)

18            THE COURT:  Which is Exhibit D, because it's

19   not in evidence?

20            MS. PIEMONTE-STACEY:  I'm sorry, your Honor.

21   Exhibit D is the petition to the United States District

22   Court for the Northern District of New York for the

23   warrant or summons for the offender under supervision.

24            MR. WATKINS:  I'm going to object, your

25   Honor.  I think we started out asking if he admitted to

1  those things, now we're putting in allegations that

2  actually were never admitted to, so.

3            MS. PIEMONTE-STACEY:  I'm asking -- the

4  purpose of why I'm asking is Mr. -- the question was

5  about to be if he reviewed his records and saw these

6  admissions and do they factor into his opinion?

7            THE COURT:  Well, I don't know that they're in

8  as admissions.  That's my point.  This is a petition.

9  It could be admitted -- it's like the SORA document.  It

10  can be admitted from the fact that it's filed with the

11  court.  The statements in the petition are hearsay.  You

12  would need to bring the person who prepared the

13  petition, perhaps it's the probation officer, um, to say

14  "I spoke to Mr. Swarm and this is what he said to me."

15            MS. PIEMONTE-STACEY:  And it is the probation

16  officer, so may I offer the evidence and subject it to

17  being stricken if the evidence doesn't come out through

18  Probation Officer Pierce?

19            THE COURT:  Okay.

20            MR. WATKINS:  Your Honor, may I have just a

21  minute to make sure?

22            THE COURT:  Yes, this is Exhibit D.

23            MR. WATKINS:  Yes, I have it in front of me.

24  I just didn't understand what the government was --

25  well, here we go.

1          (Reads.)

2          THE COURT:  Do you want to show us what the

3     pertinent part is?

4          MS. PIEMONTE-STACEY:  It's all right if I do?

5          THE COURT:  Sure.

6          MS. PIEMONTE-STACEY:  Your Honor, I have it

7     highlighted and let me just see here.

8          (Pause.)

9          THE COURT:  Okay, the witness doesn't have it

10    now.  Um, the -- and this is so Mr. -- he still has it?

11         MS. PIEMONTE-STACEY:  Yes.

12         (Pause.)

13         THE COURT:  Now, Mr. -- no, I was hoping --

14    then Mr. Watkins and I can see it.  But it doesn't

15    matter.

16         MS. PIEMONTE-STACEY:  Sorry.

17         MR. WATKINS:  Okay, your Honor, I'll withdraw

18    my objection.  If she wants to --

19         THE COURT:  All right.  Go ahead.

20    Q.  So, um, Mr. Swarm admitted to you that he had

21    masturbated while watching his niece, is that correct?

22         MS. PIEMONTE-STACEY:  I'm sorry.  I backed up

23    the question that --

24         THE COURT:  No, he said that that wasn't said

25    to him, that he saw it in a document with a particular

1   Bates stamp.

2           MS. PIEMONTE-STACEY:  Oh, okay.  I apologize,

3   your Honor.

4           THE COURT:  Let me put it this way.  That's my

5   memory of what he said.

6       Is that correct?

7           THE WITNESS:  Yes.

8           MS. PIEMONTE-STACEY:  Your Honor, I shouldn't

9   have asked that question.

10  Q.  So in your report you indicated that Mr. Swarm was

11  released from prison in September of 2005 and violated

12  the conditions of his release by being in the presence

13  of minors, is that right?

14  A.  And in possession of a "Hustler" magazine.

15  Q.  Okay.  And one of the conditions of his release was

16  that he not be left alone with children, correct?

17  A.  Correct.

18  Q.  And you had records during your review of this case

19  to see that it wasn't just that he was left alone with

20  children, but he actually had some physical contact with

21  children, is that right?

22  A.  I don't remember seeing that.

23  Q.  So, um, I now would refer you to Bates Stamp 447,

24  and that's Exhibit D.

25          THE COURT:  You want to establish whether he

```
 1    read this?
 2              MS. PIEMONTE-STACEY:  That was my next
 3    question.
 4    Q.  Did you review this document?
 5    A.  You know, I reviewed a lot of documents and this
 6    sure looked familiar, but I don't specifically remember
 7    this one.
 8    Q.  Okay.
 9              MS. PIEMONTE-STACEY:  I'll move on, your
10    Honor.
11              THE COURT:  Okay.
12    Q.  Now, Mr. Swarm told you, during your interview, that
13    he would groom children by letting them know they could
14    talk to him confidentially, is that right?
15    A.  Yes.
16    Q.  And one of the ways he would attempt to groom the
17    children for potential sex was by impressing them with
18    his physique, correct?
19    A.  Correct.
20    Q.  And he informed you about seven to nine other past
21    sexual incidents with children over his lifetime,
22    correct?
23    A.  Correct.
24    Q.  And he told you that Penny was the only one that
25    involved nudity or intimate physical contact?
```

1  A.  That sounds right, correct.

2  Q.  And the other incidents involved feeling the breasts

3  of prepubescent children in the neighborhood, is that

4  right?

5  A.  Like with their clothes on and things like that,

6  yes.

7  Q.  And there were two or three incidents of Mr. Swarm

8  patting the children on their buttocks, is that right?

9  A.  Correct.

10  Q.  Now, Mr. Swarm has never taken complete

11  responsibility for his actions involving his step-niece,

12  has he?

13           MR. WATKINS:  I'm going to object, your Honor.

14           THE COURT:  I sustain this to the form of the

15  question.

16  Q.  All right.  In his interview with you, Mr. Swarm did

17  not take complete responsibility for his actions

18  involving his step-niece, did he?

19  A.  I'm not sure what "complete responsibility" means.

20  Q.  Did he blame his step-niece for what happened in

21  part?

22  A.  Yes.

23  Q.  And your record review led you to believe that he

24  has a persistent history of avoiding responsibility for

25  his actions, isn't that right?

1  A.  Yes.

2  Q.  And he's blamed blood sugar fluctuations for his

3  actions as you've previously testified, right?

4  A.  Yes.

5  Q.  And he's placed responsibility for molestations on

6  his victims, correct?

7  A.  To some degree, yes.

8  Q.  And he's claimed that children were the real

9  aggressors to him, right?

10  A.  He has in the past, yes.

11  Q.  And he said, at one point, he was under the control

12  of his victim.  Do you recall that statement?

13  A.  I want to make sure it's -- are we talking about

14  something that he had said in the past or to me?

15  Q.  Well, let me refer you to Page 8 of your report.

16  A.  (Looks.)

17  Q.  The paragraph that begins "More importantly."  I'm

18  sorry.

19  A.  Yes, I see it.  Yes.  Yes.  It was a combination of

20  those statements he's made in the past, that I reviewed,

21  and statements that he made to me.

22  Q.  And, um, Mr. Swarm has also argued that he's less

23  culpable for his offenses because he warned the victims

24  and encouraged them to avoid him, right?

25  A.  Yes.

1    Q.   And you can conclude, to a reasonable degree of

2    certainty, that Mr. Swarm has engaged or attempted to

3    engage in sexually violent conduct or child molestation

4    in that past, is that right?

5    A.   Yes.

6    Q.   And that's due to Mr. Swarm's admitted past history

7    of child molestation as well as child pornography

8    possession, correct?

9    A.   Correct.

10   Q.   Now, Mr. Swarm's primary sexual fantasies have

11   always involved prepubescent girls, is that right?

12   A.   I believe so.

13   Q.   And he told you that he wasn't only attracted to

14   female minors, but he was attracted to those who have

15   been previously molested?

16   A.   Yes.

17   Q.   And he told you he became addicted to child

18   pornography, didn't he?

19   A.   I just want to make sure that he said that to me.

20   Do you know where it is?

21   Q.   I believe it's Page 5 of your report, towards the

22   bottom.

23   A.   (Reads.)  Yeah, that was from something he had said

24   in the records, Bates Stamp 95.  He did not say that to

25   me.

1    Q.   Okay.  So you said, at least on the records, that he

2    had --

3    A.   Any time there's a Bates stamp at the end of it,

4    that's what he said in the records, not necessarily what

5    he said to me.

6    Q.   Okay.  Um, his interests in child pornography

7    involved children down to the age of 9, is that right?

8    A.   Um, that's in the records, correct.

9    Q.   Okay.  And actually they involved children down to

10   the age of 6, didn't they?

11   A.   I've not seen that in my report.

12   Q.   Okay.  I'm going to ask you to turn to Exhibit 37 of

13   the exhibits that have been admitted into evidence.

14                 THE COURT:  37?

15                 MS. PIEMONTE-STACEY:  I'm sorry.  It's the

16   presentence investigation report.

17                 THE COURT:  27, I think you told me.

18                 MS. PIEMONTE-STACEY:  Oh, 27.  Right, your

19   Honor.

20   Q.   Now, do you have 27?

21   A.   Yes.

22   Q.   Do you recall reviewing this presentence

23   investigation report?

24   A.   This looks very familiar, but I don't remember --

25   no, no, no, this actually looks quite familiar.

1   Q.  I'm going to show you the page -- it's Page 4 of

2   this report, Bates Page, um, 37.

3   A.  Yup.

4   Q.  And it talks about the first -- the PSR, it talks

5   about the first child pornography -- it describes the

6   first video that was ordered, correct?

7   A.  Yes.

8   Q.  And, um, the video was described as involving a

9   child at the age of 6, wasn't it?

10  A.  That's correct.

11  Q.  And as a whole, of the three videos that Mr. Swarm

12  ordered, the ages of the children were 6, 8, and 9,

13  weren't they?

14  A.  Yes.

15  Q.  And those videos were children involved in hardcore

16  sexual activity, correct?

17  A.  It certainly sounds like it.

18  Q.  And you also know that Mr. Swarm had an extensive

19  collection of child porn that included prepubescent

20  children, correct?

21  A.  Yes.

22  Q.  And between the interview and the records review,

23  that's how you came to your Axis 1 diagnosis of

24  pedophilia sexually attracted to females, not exclusive,

25  correct?

1   A.   Correct.

2   Q.   And you also diagnosed Mr. Swarm with personality

3   disorder NOS, correct?

4   A.   Correct.

5   Q.   And, I'm sorry, you have my DSM.  So could you just

6   -- for the Court could you go through the elements of a

7   personality disorder NOS?

8             THE COURT:  And let us know what page.  And

9   then for tomorrow, I'd appreciate it if counsel would

10  make copies of the pages that are being referred to and

11  we'll make them exhibits.

12            MS. PIEMONTE-STACEY:  Yes, your Honor.

13            THE COURT:  What page?

14  A.   (Looks.)  Well, the first description of it is on

15  Page 685 of the DSM.  It says "Personality" -- do you

16  want me to read it?

17  Q.   If you could.

18  A.   It says:  "Personality disorder not otherwise

19  specified is a category provided for two situations, the

20  individual's personality pattern meets the general

21  criteria for a personality disorder and traits of

22  several different personality disorders are present, but

23  the criteria for any specific personality disorder are

24  not met; or, Number 2, the individual's personality

25  pattern meets the criteria for a personality disorder,

1   but the individual's considered to have a personality

2   disorder that's not included in the classification."

3        So these are things like passive aggressive

4   personality disorder, if there is a formal diagnosis of

5   it.

6   Q.  And is there any other section that you referred to

7   in making the diagnosis of personality disorder NOS?

8   A.  I don't think I referred to any of the DSM when I

9   made the diagnosis.  It's -- in the DSM there's a

10  description of these things.  I don't think there's

11  anything more detailed about personality disorder.  I'll

12  check it here.  (Turns.)  On Page 729, there is

13  basically a restatement of that with a little more

14  elaboration.  But that's pretty much it.

15  Q.  And what are the characteristics of people with

16  personality disorder NOS?

17  A.  Well, it depends on which of the other personality

18  disorders' traits that they have, because there's like

19  nine different personality disorders.  So it could be a,

20  you know, huge statistical combination of whichever

21  ones.  But he essentially had a combination of

22  antisocial, narcissistic and borderline, they call them

23  the Cluster B personality disorders.

24  Q.  And what are -- some of the Cluster B personality

25  disorders, are they, um -- are there characteristics

1  associated with them?

2  A.  The common theme amongst them is kind of being loud,

3  chaotic and in trouble.

4  Q.  Are they deceitful?

5  A.  Um, not -- the antisocial is, specifically, but not

6  necessarily on some of the other ones.

7  Q.  What about where Mr. Swarm has borderline antisocial

8  personality, would you attribute that trait to --

9  A.  They can be quite manipulative.  Cluster Bs,

10  manipulation can be part of the common theme.

11  Q.  And, um, they also don't like to conform with social

12  norms, is that right?

13  A.  Um, not necessarily the case.  Some narcissistic

14  personality disorders actually do quite good in

15  conforming, but the antisocial traits tend to lead

16  people to conform less.

17  Q.  And, um, a lack of remorse exists in people with

18  antisocial personality disorder, correct?

19  A.  Correct.

20  Q.  But again Mr. Swarm's diagnosed with personality

21  disorder NOS with these antisocial personality disorder

22  traits, is that right?

23  A.  Yes.  Technically he doesn't meet the criteria for

24  antisocial personality disorder because he didn't -- to

25  meet actual criteria you have to have essentially a

1  history of juvenile delinquency and he did not have

2  that.

3  Q.  Now, the personality disorder is recognized though

4  as a clinical syndrome, correct?

5  A.  Yes.

6  Q.  And it's Axis 2, I believe you testified, an Axis 2

7  diagnosis?

8  A.  Yes.

9  Q.  And other mental conditions like pedophilia are on

10  Axis 1, correct?

11  A.  Correct.

12  Q.  And those are serious -- the Axis 1 diagnoses are

13  serious mental illnesses?

14  A.  Not necessarily.

15  Q.  Well, I would just refer to Page 18 of your report.

16  A.  (Turns.)

17  Q.  Looking at the third full paragraph down.

18  A.  (Looks.)

19  Q.  Um, you talk about how the DSM-IV distinguishes

20  personality disorders on Axis 2 for mental conditions on

21  Axis 1, correct?

22  A.  Correct.

23  Q.  And then you end -- so Axis 1 is pedophilia,

24  correct?

25  A.  Correct.

1  Q.  And Axis 2 is this personality disorder NOS,

2  correct?

3  A.  Correct.

4  Q.  And you conclude that paragraph by saying:  "It's

5  consistently recognized that these personality disorders

6  are substantively different than the serious mental

7  illnesses," correct?

8  A.  Correct.

9  Q.  And the serious mental illnesses are Axis 1?

10  A.  Well, that's where I would disagree.  It's just the

11  mere -- the mere presence on Axis 1 doesn't mean they're

12  serious, however the inverse is true, serious mental

13  illnesses do go on Axis 1.  But there's other Axis 1

14  diagnoses like adjustment disorder or mathematics

15  disorder, they go on Axis 1, but that wouldn't

16  necessarily or automatically mean they're a serious

17  mental illness.

18  Q.  And you testified today that, um, pedophilia is a

19  major mental illness disorder, correct?

20  A.  It is.  It's qualitatively different, but, um,

21  certainly in certain circumstances it can be.  It's

22  quite serious in its implications, yes.

23  Q.  And pedophilia, as a condition, is one that's

24  unlikely to change over time, is that right?

25  A.  That's true.

1  Q.  It's a lifetime condition?

2  A.  For the most part, yes.

3  Q.  Now, in terms of, um, difficulty controlling.  You

4  testified that brittle diabetes can impact --

5          THE COURT:  Before you go on from personality

6  disorder not otherwise specified, did you, by any

7  chance, read my decision in the **Wilkinson** case?  It was

8  sometime ago.

9          THE WITNESS:  I think I did, but it's been

10  some time.

11          THE COURT:  All right.  In **Wilkinson**, I think

12  you testified, but in any event I found that antisocial

13  personality disorder generally, but Mr. Wilkinson's

14  particularly, um, was not volitional in character in the

15  sense that, um -- that because of that diagnosis he was

16  impaired in making good choices, that it just described

17  a person who historically had made illegal choices.

18  That's what I found with regard to antisocial

19  personality disorder.

20      Personality disorder not otherwise specified, does

21  that -- is that, in your opinion, a volitional

22  impairment or is it comparable to what I found

23  antisocial personality disorder to be?

24          THE WITNESS:  It's comparable.  In fact, I

25  think it's almost synonymous, but it's just that

1    antisocial is kind of a way of describing people who get

2    into trouble with the law, whereas borderline

3    personality disorder tends to describe people who get

4    into trouble with relationships, and narcissistic

5    personality disorder kind of is people that are in

6    trouble with their sense of their entitlement and their

7    way of relating to other people in a kind of an

8    undeserving grandiose way of life.  But, yes, it's

9    purely a description as opposed to an illness or any

10    type of etiology.

11        In general it's why the personality disorders are

12    separated off.  It's not that they can't be serious in

13    terms of their implications on life, but they -- when

14    they started the DSM process they knew that the

15    personality disorders were different.  We couldn't

16    include those on the same level as a major mental

17    illness because, for one thing, it's kind of like saying

18    someone's not responsible for their behavior because

19    they haven't been responsible for their behavior.

20             THE COURT:  Okay.

21             MS. PIEMONTE-STACEY:  Thank you.

22    Q.  Um, when you saw Mr. Swarm the first time, in 2008,

23    he told you that he masturbated to images of

24    prepubescent children, correct?

25    A.  I just want to make sure it's something he told me

1  as opposed to what I got from the records.  Do you know

2  where that specifically came from?

3  Q.  (Looks.)  Um, Page 5.

4  A.  Yeah, in the third to last paragraph, it says:

5  "There was contradictory information.  The records

6  describe him as having -- masturbating about having sex

7  with minors, but also describe him as having that with

8  sexual fantasies with adults.  To me he reported that

9  his current sexual fantasies primarily involved

10  imagination of sex with adult actresses."

11  Q.  Okay.  And so there's contradictory information in

12  the record based on his own self-report, correct?

13  A.  Yes, and it may have changed.

14  Q.  And it may have changed either way?

15  A.  Yes.

16  Q.  But regardless of whether it's changing, pedophilia

17  remains a life-long condition, correct?

18  A.  Well, for the most part it's like alcoholism, you

19  may be completely clean and sober for 50 years, but you

20  never say you're not an alcoholic.

21  Q.  And it's unlikely to change over time, isn't that

22  true?

23  A.  It is a high recidivist behavior, yes.

24  Q.  In fact, when you're offering an explanation in your

25  report about pedophilia, you say, quote:  "Pedophilia is

1  a lifetime condition and the aberrant quality of sexual

2  desire is unlikely to change over time."  Is that right?

3  A.  Yes.

4  Q.  Now, you, um -- I'm sorry.  We were talking about

5  brittle diabetes and volitional control, and you had

6  testified that brittle diabetes would affect volitional

7  control, is that right?

8  A.  It can.

9  Q.  And it can negatively impact volitional control,

10  correct?

11  A.  Yes.

12  Q.  And, um, when you talk about volitional control,

13  another thing that can affect volitional control are

14  antiandrogens, correct?

15  A.  Yes.

16  Q.  And antiandrogens are pharmacological treatment?

17  A.  Well -- I'm sorry.  May I qualify something?

18  Q.  Absolutely.

19  A.  There's nothing about antiandrogens in themselves

20  that would affect volitional control.

21  Q.  How do antiandrogens affect volitional control?

22  A.  Well, in this case it would be indirectly, because

23  one of the side effects of these antiandrogen

24  medications is they tend to make diabetes a little

25  worse.

1   Q.   And so you opined in your most recent report, to a

2   reasonable degree of professional certainty, that

3   because of this diabetes Mr. Swarm would not be a

4   candidate for pharmacological treatment, is that right?

5   A.   No, I don't think he's not a candidate.  I think

6   that if he started on this at the beginning, it would be

7   good to do it in a controlled environment, because if

8   he's going to have a real exacerbation of his diabetes

9   with the initiation of treatment, it's probably going to

10  happen in the initiation phase of the treatment.

11            THE COURT:  Can I take a step back.  I'm

12  sorry.  But this --

13       Antiandrogens are part of a pharmacological

14  treatment for pedophilia?

15            MS. PIEMONTE-STACEY:  Yes, your Honor.

16            THE COURT:  Could you explain that to me, what

17  are antiandrogens and what they do?

18            THE WITNESS:  Sure.  Antiandrogens are some

19  medications that for -- through different mechanisms,

20  essentially lower the amount of testosterone in the

21  body, and for people who have very high sexuality, um,

22  you can give them these medications and the testosterone

23  level will drop to a point that their -- fairly

24  predictably their sexual behavior will decrease.  So

25  it's one of the more common treatments, medication-wise

 1    for pedophiles, that you give them like a monthly shot

 2    and their testosterone level drops so low that they just

 3    don't even have sex with anybody.  I mean, they're just

 4    not -- they may be interested in sex, but it doesn't

 5    happen.

 6          Now, the problem is that almost all of these

 7    medications that are used to do this can make diabetes

 8    worse.  So he's kind of in a special class.  There's

 9    nothing about antiandrogen medications themselves that

10    will affect his volitional control.  In fact, it might

11    help him in the sense of being less sexually

12    interested.  But paradoxically it might make his

13    diabetes worse and that would not be good for him,

14    because that would have much more a direct effect on his

15    immediate volitional control.

16          If I was going to be treating Mr. Swarm, I would

17    be very reticent to just give him a shot of one of these

18    medications and send him home and say, "I'll see you in

19    two weeks," because that two weeks could be a time where

20    he's already -- his brittle diabetes gets even more

21    brittle.

22                THE COURT:  So -- and this is very helpful to

23    me.

24          So these testosterone-lowering antiandrogens would

25    not only be bad for his health generally in the ways

1    that diabetes is bad for one's health, but it would put

2    him at a higher risk of acting on his pedophilia

3    impulses because the extreme blood sugar issues that you

4    described before could occur?

5              THE WITNESS:  Yes.

6              THE COURT:  Okay.  But if his diabetes was

7    closely -- his blood sugar was closely monitored when he

8    was on them, this would lower the testosterone, not

9    diminish his volitional control, because his diabetes

10   was out of control, is that what I should understand?

11             THE WITNESS:  Yeah, the ideal situation here

12   would be possibly before he would be released from

13   prison, if he were to get put on one of these

14   antiandrogen medications and then they could adjust his

15   insulin to accommodate for whatever changes are to

16   happen.  Because, for example, if he goes on a shot of

17   Depo-Provera and suddenly his sugar starts going up

18   more, well, then they could adjust his insulin to

19   compensate for it and he could leave and get his monthly

20   Depo-Provera shot and not have any problems with it.

21   But to do that as an outpatient would be an extra level

22   of risk.

23             THE COURT:  As far as I know from the record,

24   you say the testosterone level gets lowered to the point

25   where somebody may still have -- well, this is getting

1  cleared up.

2      If you take these antiandrogens, does it diminish

3  your desire to have sex with prepubescent children or

4  just your sort of energy or ability to do it?

5          THE WITNESS:  Well, this is debated a lot, but

6  for the most part the people still have the fantasies.

7  No medication is going to take away the fantasies.  But

8  their general interest in sex goes down and their

9  ability to have sex.  For a male, just the ability to

10  get an erection becomes a lot more difficult.

11          THE COURT:  And in this case there's no

12  evidence in the record, if you put aside Penny for this

13  purpose, that Mr. Swarm has had any intimate

14  relationship with a prepubescent child.  I think he was,

15  you know, revoked for touching clothed young children.

16  Would the antiandrogens reduce the risk that he would

17  touch clothed children or unclothed children again?

18          THE WITNESS:  It would decrease his overall

19  sexual interest.  So if he touches a child and it is of

20  sexual motivation, that this is somehow arousing to him,

21  yes, that -- it would decrease.

22          THE COURT:  Okay.  Thank you.

23  Q.  And Mr. Swarm's touching of a child, he wasn't

24  revoked -- he touched the child's breasts, correct?

25  A.  I believe so.

1    Q.  And the buttocks, correct?

2    A.  Correct.

3    Q.  And, again, over the clothing?

4            MR. WATKINS:  I'm going to object here.  I'm

5    not sure if that's what the testimony is.

6            THE COURT:  Okay.  But that's basically my

7    understanding and the lawyers can point me to whatever

8    the evidence in the record is.

9    Q.  And so I think I mistakenly said to you that your

10   supplemental report said he was not a candidate for

11   pharmacological treatment, but you actually said he

12   wasn't an ideal candidate for pharmacological treatment,

13   is that right?

14   A.  That's correct.

15   Q.  And have you explained all the reasons why you think

16   he's not an ideal candidate for pharmacological

17   treatment?

18   A.  I think that's the main points.

19   Q.  Have you had the opportunity to review the Bureau of

20   Prisons', um, the institution's supplement on

21   pharmacological treatment?

22   A.  Yes.

23   Q.  And, um, after reviewing the institution's

24   supplement, do you understand that it's something that

25   may be offered within the Bureau of Prisons',

1   pharmacological treatment?

2   A.  That's my understanding, yes.

3   Q.  As part of the sex offender treatment program?

4   A.  Yes.

5   Q.  Um, you --

6           THE COURT:  I'm sorry to interrupt.

7       But if one were to go on these antiandrogens like

8   Depo-Provera, which somebody should spell for the

9   stenographer, um, how long does it ordinarily take to

10  have an effect?

11          THE WITNESS:  A couple of weeks.

12          THE COURT:  So if Mr. Swarm were to start them

13  next week, for example, one would expect that in a

14  couple of weeks there would be an effect and in the same

15  period his blood sugar could be monitored?

16          THE WITNESS:  Yes.  The full effect may take a

17  little longer, but fairly quickly patients will say,

18  "Wow, I can't get an erection now."  So it doesn't take

19  months to have a full effect.

20          THE COURT:  Okay.  We're going to have to stop

21  in about five minutes, so why don't you get yourself to

22  a convenient place.

23          MS. PIEMONTE-STACEY:  I will, your Honor.

24  Thank you.

25  Q.  To have an effect, the antiandrogen or

1  pharmacological treatment, it does require compliance,

2  correct?

3  A.  Absolutely.

4          MS. PIEMONTE-STACEY:  Your Honor, I'm at a

5  natural breaking point now.

6          THE COURT:  Well, let me ask a question.

7      What's compliance?

8          THE WITNESS:  Well, some of the antiandrogen

9  medications are oral pills and some are shots.  The oral

10  pill versions actually are probably less toxic to the

11  body and better tolerated, but then you don't know if

12  the person is actually taking the pill, you have to

13  either trust them or have them monitored when they're

14  actually swallowing the pill each day.  The advantage of

15  the shot version is that they come in and you know

16  whether or not they got the shot or not.

17          THE COURT:  All right.  Thank you.  Dr. Mills,

18  I'm going to excuse you now.  You should come back --

19  you have to come back at 9:00 tomorrow morning.  We'll

20  complete your testimony, I expect, tomorrow morning.

21  Thank you.

22          THE WITNESS:  Thank you.

23          (Witness leaves.)

24          THE COURT:  Do you have a -- I'm not trying to

25  rush you, you've been very helpful, but do you have a

1    sense of about how much longer you're likely to be with

2    Dr. Mills?

3              MS. PIEMONTE-STACEY:  I was about two-thirds

4    through, your Honor.

5              THE COURT:  All right.  And the witnesses

6    after Dr. Mills, remind me again, please, are?

7              MS. CONNOLLY:  Michael Pierce, the probation

8    officer, and then, um, if we have time, we'll see if

9    Dr. Ferraro can come in tomorrow, and maybe Ms. Walsh if

10   we can coordinate the logistics on that video.  I'm not

11   sure --

12             THE COURT:  Well, let's see.  Pierce should be

13   here -- and I think I directed you, didn't I --

14             MS. CONNOLLY:  Yes, you did.

15             THE COURT:  -- to give him the conditions of

16   supervised release -- well, he's got the conditions of

17   supervised release, the doctors' reports and --

18             MS. CONNOLLY:  Yes.  -- and ask him whether

19   those treatments would be available to --

20             THE COURT:  Well, right, including these

21   antiandrogen treatments.  I'm going to be interested in

22   that.  That's one.

23             MS. CONNOLLY:  Okay.

24             THE COURT:  Walsh is the person who treated

25   him previously?

1          MS. CONNOLLY:  Correct.  Well, in conjunction

2    with the supervised release.  She was reporting back to

3    probation during that period of his supervised release.

4          THE COURT:  And does the SORA relate to her

5    testimony or that's independent?

6          MS. CONNOLLY:  It's Pierce.  That gets

7    reported back to Pierce.

8          THE COURT:  No, but the document that's

9    disputed, the --

10          MS. CONNOLLY:  Um --

11          THE COURT:  Let me have the document, please.

12          MS. CONNOLLY:  It doesn't really come in under

13    either one.  We're offering it for judicial notice

14    because there are -- I believe it's Government Exhibit

15    Number --

16          THE COURT:  All right, so it doesn't -- that's

17    all I need to know for now.

18          MS. CONNOLLY:  Okay.

19          THE COURT:  My present understanding is that

20    it doesn't come in, although we may address this

21    tomorrow.

22          MS. CONNOLLY:  Okay.  And then with respect to

23    Ms. Walsh, the concern we have is in trying to

24    coordinate the video conference, we're not sure -- there

25    are a couple of layers of coordination there.  So if we

 1    can move it from Wednesday to Tuesday, we could look at

 2    that.  We're just not sure if --

 3                THE COURT:  Why, is it planned for Wednesday?

 4                MS. CONNOLLY:  Yes.  I'm sorry, Thursday.

 5    Thursday, the 13th.

 6                THE COURT:  Well, here, why don't you do the

 7    following.  We'll finish Dr. Mills.  We'll deal with

 8    Mr. Pierce.  Um, and you want to ask Dr. Ferraro about

 9    the admissions, right?  So --

10                MS. CONNOLLY:  Yes, your Honor.

11                THE COURT:  So bring Dr. Ferraro tomorrow, um,

12    and I'll delve into this more deeply, but if all you

13    want to get is Mr. Swarm's statements to her, um, those,

14    I expect, will be admissions under 801(d), um, and as I

15    understand it, you're not trying to get her opinion as

16    to whether he's sexually dangerous, is that correct?

17                MS. PIEMONTE-STACEY:  That's correct, your

18    Honor, because she actually didn't decide whether he was

19    or wasn't, she was making a risk assessment.

20                THE COURT:  Yes.

21                MS. PIEMONTE-STACEY:  The part of this I think

22    that would go on her testimony is the fact that she

23    diagnosed him with pedophilia as part of the risk

24    assessment.

25                THE COURT:  Well, I don't know that I would

1  let any of that in.  There's no dispute that he's got

2  pedophilia.

3            MS. PIEMONTE-STACEY:  Right.

4            THE COURT:  Okay.  So basically I view her as

5  a fact witness, so what did she hear?  What did she

6  observe?  So if you have Pierce and Ferraro and Mills, I

7  think that will be plenty for tomorrow and if we end

8  early, that's okay.

9       All right.  So then you'll keep Walsh for

10 Thursday.

11           MR. WATKINS:  Your Honor, as far as the

12 disputed exhibits, there was an Exhibit F, which is the

13 Penny affidavit.  As you heard, um, Ms. Stacey kind of

14 touched on it with Mr. Mills.  The Court has it and it

15 is what it is.

16           THE COURT:  Well, I haven't look at it and we

17 need to stop, but it's an affidavit.  As far as I know,

18 the Rules of Evidence apply in this proceeding and

19 unless she were to testify and be subject to cross-

20 examination, the affidavit is hearsay.

21           MR. WATKINS:  That is true, the -- as far as

22 putting it into evidence.  But I suggested to the

23 government -- and honestly I don't know what the best

24 way to do this is, um, showing it to the experts.  The

25 experts have reviewed all kinds of hearsay evidence.  In

```
 1    fact, that's really what they do with the records with
 2    you.
 3         What keeps coming up is this cognitive distortion
 4    that Mr. Swarm has when he talks about his relationship
 5    with Penny being consensual or willing.  It is, um -- I
 6    think I need to correct the article of fact.  I'm not
 7    sure it makes any difference as far as --
 8              THE COURT:  Well, I'll think about it.
 9    I'll -- I'll think about this issue for tomorrow.  My
10    clerks will remind me.  But I've -- and I'll say this,
11    so you'll remind me, but I don't think I'll forget,
12    because I'm going to issue an order to Dr. Saleh.  I
13    have to read the Bureau of Prisons' protocol.  I haven't
14    done that.  And so --
15         As I understand it, though, these antiandrogens
16    are something different than chemical castration?
17              MR. WATKINS:  I think it's shorthand for it.
18              THE COURT:  Oh, it is to say that -- if this
19    is what's called "chemical castration," so it's not a
20    permanent alteration, you have to keep taking the shots
21    or taking pills, correct?
22              MR. WATKINS:  As I understand it, that's true.
23              THE COURT:  All right.
24              MS. PIEMONTE-STACEY:  That's true, your Honor.
25              THE COURT:  All right.  The Court is in recess
```

1    until 9:00 tomorrow morning.

2              (Adjourned, 1:00 p.m.)

3

4              C E R T I F I C A T E

5

6         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

7    do hereby certify that the foregoing record is a true

8    and accurate transcription of my stenographic notes,

9    before Chief Judge Mark L. Wolf, on Monday, January 10,

10   2011, to the best of my skill and ability.

11

12

13   /s/ Richard H. Romanow 03-15-11
     _____

14   RICHARD H. ROMANOW  Date

15

16

17

18

19

20

21

22

23

24

25