1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3
                                    Civil No. 07-cv-12062-MLW
4

5

6   UNITED STATES OF AMERICA,
                    Petitioner
7
    vs.
8

9   ANDREW M. SWARM,
                    Respondent
10

11

12                        * * * * * * * * *

13
                        For Hearing Before:
14                     Chief Judge Mark L. Wolf

15

16      18:4248(a) Commitment of Sexually Dangerous Person

17

18                     United States District Court
                       District of Massachusetts (Boston.)
19                     One Courthouse Way
                       Boston, Massachusetts 02210
20                     Tuesday, January 11, 2011

21
                          * * * * * * * *
22
                    REPORTER: RICHARD H. ROMANOW, RPR
23                      Official Court Reporter
                      United States District Court
24      One Courthouse Way, Room 5200, Boston, MA 02210
                        bulldog@richromanow.com
25

```
 1                A P P E A R A N C E S

 2

 3   EVE A. PIEMONTE-STACEY, ESQ.
     ROSEMARY CONNOLLY, ESQ.
 4      United States Attorney's Office
        One Courthouse Way, Suite 9200
 5      Boston, Massachusetts 02210
        (617) 748-3265
 6      Email: eve.stacey@usdoj.gov
        For the Petitioner
 7

 8   TIMOTHY G. WATKINS, ESQ.
     IAN GOLD, ESQ.
 9      Federal Defender's Office
        51 Sleeper Street, 5th Floor
10      Boston, Massachusetts 02210
        (617) 223-8061
11      Email: Timothy_watkins@fd.org
                Ian_gold@fd.org
12      For the Respondent

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 1:07-cv-12062-MLW   Document 174   Filed 03/16/11   Page 3 of 169

3

```
 1                      I N D E X

 2

 3     WITNESS                DIRECT  CROSS  REDIRECT  RECROSS

 4

 5     DR. BARRY J. MILLS  (Continued.)

 6          By Mr. Watkins:                    27

 7          By Ms. Stacey:            12

 8

 9     MICHAEL J. PIERCE

10          By Ms. Connolly:    48                159

11          By Mr. Watkins:            136

12

13                      E X H I B I T S

14

15

16     EXHIBIT 37......................................    8

17     EXHIBIT 38......................................   11

18     EXHIBIT 39......................................   11

19     EXHIBIT 40......................................  121

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              (Begins, 9:00 a.m.)
 3              THE CLERK:  Civil Action 07-12062, the United
 4   States versus Andrew Swarm.  The Court is in session.
 5   You may be seated.
 6              THE COURT:  All right.  Would counsel please
 7   identify themselves for the record.
 8              MS. CONNOLLY:  Rosemary Connolly for the
 9   United States of America.
10              MS. PIEMONTE-STACEY:  Good morning, your
11   Honor.  Eve Piemonte-Stacey for the United States.
12              MR. WATKINS:  Good morning, your Honor.  Tim
13   Watkins and Ian Gold, Federal Defender's Office, on
14   behalf of Andrew Swarm.
15              THE COURT:  Mr. Swarm is present.  Okay,
16   Dennis.
17              THE CLERK:  Yes.  The plaintiff has 8 hours,
18   47 minutes remaining.  The respondent has 7 hours, 30
19   minutes remaining.
20              THE COURT:  As you know, the weather forecast
21   for tomorrow is ominous.  I expect, unless it improves
22   by midday, the Court is going to be put on a skeleton
23   day and not everybody will be here, although I will.
24   But given the number of people who have to get here,
25   including Mr. Swarm, it may be most reasonable to plan
```

1    not to sit tomorrow.

2         Mr. O'Leary communicated with Dr. Saleh.  He's

3    available on Thursday, although he says he has to be in

4    Worcester at 1:30.  I'm not sure why.  But if you think

5    that if we started with him at 9:00 on Thursday, um,

6    we'd complete him by about 12:30, then it may make sense

7    not to sit tomorrow and to make that decision before the

8    end of court today.

9         What are your thoughts on that?

10             MS. CONNOLLY:  Yes, your Honor, that sounds

11   like a very reasonable plan.  The only question we have

12   on Thursday is, was that one of the days the Court was

13   going to sit for a full day, on Thursday?

14             THE COURT:  No.

15             MS. CONNOLLY:  No.  Okay.  So then we would

16   reschedule Ms. Walsh?

17             THE COURT:  Yes.

18             MS. CONNOLLY:  Then she would have to --

19   because Friday --

20             THE COURT:  Yeah, we're not sitting on Friday,

21   so you would have to do that on Tuesday.

22             MS. CONNOLLY:  We would have to bump her into

23   Tuesday of next week.  Okay.  Thank you, your Honor.

24             MS. PIEMONTE-STACEY:  Your Honor, I also want

25   to inform the Court that I did have contact with

```
 1    Dr. Mills this morning, simply on the travel
 2    arrangements, and we're looking to book him a flight out
 3    this evening instead of tomorrow morning.  But I wanted
 4    to just report back on that.
 5               THE COURT:  Okay.  I expect we'll finish
 6    Dr. Mills today.
 7               MR. WATKINS:  Your Honor, in anticipation of
 8    the snowstorm, I actually spoke with Mr. Swarm this
 9    morning.  Um, informal discussions indicate that most
10    everybody here is fairly local.  The difficulty might be
11    getting Mr. Swarm up from Wyatt tomorrow rather than
12    getting experts.  To the extent that it's feasible, I
13    talked with Mr. Swarm about waiving his appearance in
14    court for this specific witness if indeed, um, everybody
15    else was able to go forward tomorrow.  Like the Court I
16    expect I'll be working whether it's a snow day or not.
17               THE COURT:  Do you think that Dr. Saleh could
18    be finished -- started and finished on Thursday
19    morning?
20               MR. WATKINS:  Um, really it's the government's
21    witness and Mr. Gold is cross-examining him, so I --
22               MS. CONNOLLY:  Well, yes, your Honor, I think
23    we could do that.  For example, we could offer his
24    report as part of the direct and his CV.  Obviously
25    they're both in as exhibits.  So we could move from
```

 1  there.  So I think we could probably --

 2          THE COURT:  He could also come back next

 3  Tuesday.  Mr. Gold?

 4          MR. GOLD:  I was simply going to say I

 5  anticipate about two hours of cross.  It might be very

 6  tight.  If we had the option to essentially extend it

 7  into another day --

 8          THE COURT:  If he wants to leave at 12:30 on

 9  Thursday, I'm going to order him to come back on

10  Tuesday.

11      Um, I think the following.  We're not going to sit

12  in this case tomorrow.  I have an urgent matter that was

13  filed yesterday afternoon that I can pay some attention

14  to tomorrow morning.  But I am concerned about

15  everybody's safety, and not just getting here, but

16  getting here at the same time.  Who knows what the

17  conditions will be.

18      Dennis, you can tell Dr. Saleh that we're not

19  going to sit tomorrow.  We'll start his testimony at

20  9:00 on Thursday morning, um, but if it's not complete,

21  he's going to have to come back next Tuesday.  Ask him

22  about his availability on Tuesday.  And that we're going

23  to try to complete it, although that might be

24  facilitated if he wasn't asking me to let him go before

25  1:00.  But we're going to get his testimony one way or

1    the other, just not tomorrow.  Okay?

2         I have to keep reminding myself that this isn't a

3    criminal case, so I don't think Mr. Swarm even has a

4    constitutional right to be here, but I think it is

5    important that he be here, not just to assist counsel,

6    but he's going to testify eventually and one of the

7    questions -- well, I assume they'll be questions that

8    derive from the testimony of the examiners.

9              MS. PIEMONTE-STACEY:  And, your Honor, just --

10   Section 4248, I believe, provides the right to confront

11   and cross-examine witnesses as well.  It indicates that.

12             THE COURT:  Okay.  Thank you for reminding me.

13             MS. PIEMONTE-STACEY:  You're welcome.

14             THE COURT:  That reinforces my view.

15        Um, we have Dr. Saleh's updated CV.  We'll make it

16   the next numbered exhibit.  What number is that?

17             THE CLERK:  It's 37.

18             (Exhibit 37, marked.)

19             THE COURT:  All right.  So when we've

20   completed Dr. Mills, who's going to be the witness after

21   that?

22             MS. CONNOLLY:  Mr. Pierce.

23             THE COURT:  And then?

24             MS. CONNOLLY:  Um, Dr. Ferraro.

25             THE COURT:  I've looked quickly at the Bureau

 1    of Prisons' guidelines on pharmacological treatment.  Is
 2    she going to be in a position to testify about those
 3    guidelines, if any testimony is appropriate?
 4              MS. PIEMONTE-STACEY:  Your Honor, that would
 5    be Dr. Hernandez, um, who would be the best person to
 6    testify about those, not her.
 7              THE COURT:  Okay.  And should those guidelines
 8    be regarded -- does anybody want to offer them in
 9    evidence?
10              MR. WATKINS:  I had proposed to offer them in
11    evidence.  The government is opposed to it.
12              MS. PIEMONTE-STACEY:  Well, your Honor, the
13    objection was simply that it was inconsistent with our
14    position in the pretrial briefing -- in the trial
15    briefing, in that we are saying that the treatment
16    wasn't relevant and so --
17              THE COURT:  I wouldn't necessarily -- at the
18    moment -- and I still have to get more deeply into it.
19    I got a filing in the Chuck Turner case yesterday
20    afternoon.  It's diverted me from some of the time I
21    intended to invest in this.  I'm not suggesting that I
22    would consider it for that purpose.  But they're going
23    to be called to the attention of Dr. Mills, I think, and
24    others.  There's some discussion about pharmacological
25    treatment in his testimony yesterday about it being

1  desirable that he start on antiandrogens while he's

2  detained.  Um, if the jury was here, they might not go

3  into evidence, but they might be read into the record.

4      You know, without prejudice to the government's

5  argument that they're irrelevant to whether this is

6  civil or criminal, is there an objection to making it

7  part of the record?

8          MS. PIEMONTE-STACEY:  No, there isn't.  And

9  similarly, um, where Dr. Hernandez is kind of sitting

10  there on hold in North Carolina and I asked him to be

11  available next week if I --

12          THE COURT:  Well, you're just going to have to

13  wait.  I'll look at that.  But I hope by the end of

14  Thursday, we'll be able to give him guidance.

15          MS. PIEMONTE-STACEY:  Right.  And if the Court

16  wants to hear testimony or if the respondents want to

17  offer him as a witness, then we'll --

18          THE COURT:  I'm sorry.  I couldn't hear you.

19          MS. PIEMONTE-STACEY:  I'm sorry.  If the Court

20  is interested in hearing testimony on those -- on that

21  policy, he is the best person.

22          THE COURT:  All right.  The -- does somebody

23  have a clean copy of the CV of the next number.  What is

24  that?  We made that 37?

25          THE CLERK:  37, your Honor.

1                    THE COURT:  All right.

2                    MS. CONNOLLY:  Your Honor, I think yesterday

3     we made Exhibit 38 the next numbered exhibit, the pages

4     from the DSM, that were referenced by Dr. Mills.  I have

5     copies for the Court.

6                    THE COURT:  All right.  So that would be 38?

7                    THE CLERK:  Correct.

8                    (Passes up.)

9                    (Exhibit 38, marked.)

10                   THE COURT:  And then "The Bureau of Prisons'

11    Pharmacological Treatment of Inmates with Paraphilias,"

12    October of 2005, will be admitted as Exhibit 39.

13                   (Exhibit 39, marked.)

14                   THE COURT:  Okay.  Are we ready to have

15    Dr. Mills resume the stand?

16                   MS. PIEMONTE-STACEY:  Yes, your Honor.

17                   MR. WATKINS:  Your Honor, just to make it

18    clear for the record, I had proffered pharmacological

19    guidelines as Exhibit G.  So Exhibit G is now 39?

20                   THE COURT:  Yes.

21                   MR. WATKINS:  Okay.

22                   THE COURT:  All right.  Dr. Mills, please take

23    the witness stand again.

24                   (Takes stand.)

25                   THE COURT:  Do you understand that you remain

1   under oath?

2           THE WITNESS:  Yes.

3

4   CROSS-EXAMINATION BY MS. PIEMONTE-STACEY:  (Continued.)

5   Q.  Dr. Mills, Mr. Swarm scored a 2, or a low risk to

6   reoffend, on the RRASOR actuarial instrument, is that

7   right?

8   A.  Yes.

9   Q.  And, um, Mr. Swarm scored a 6, or high risk to

10  reoffend, on the Static 99.  Do you recall that?

11  A.  I think so, yes.

12  Q.  Now, did you -- you didn't score Mr. Swarm on the

13  Static 99R, which has replaced the Static 99, did you?

14  A.  That's correct.

15  Q.  And are you aware that the Static 99R better

16  accounts for age, as you testified about yesterday?

17  A.  I understood that's one of the arguments for it.

18  Q.  Okay.  And yesterday you testified that age is an

19  important factor in terms of recidivism, is that right?

20  A.  Yes.

21  Q.  And are you aware of research that suggests child

22  molesters offend well into their fifties?

23  A.  Yes, there is evidence of that.

24  Q.  And, um, are you also aware of the research that

25  says that much of the decline in sexual reoffending for

1    child molesters could be attributed to the fact that

2    molesters learn a new and better way to avoid detection,

3    do you remember that research?

4    A.   That's one of the arguments out there, yes.

5    Q.   Okay.  Now, in your interview with Mr. Swarm or on

6    your record review, did you learn that Mr. Swarm claims

7    to be, quote, "terrified of physical contact with adult

8    women"?

9    A.   Yes.

10   Q.   And in terms of volitional control, you used the

11   executive cognitive function medical assessment to

12   assess Mr. Swarm's ability to refrain from specific

13   behavior, correct?

14   A.   That was one of the main ways of assessing it, yes.

15   Q.   Okay.  And it's also called "EXIT"?

16   A.   The executive interview, yes.

17   Q.   And the executive interview hasn't been validated

18   for use with sex offenders, has it?

19   A.   Well, it's validated for the general population,

20   which may include sex offenders, but specifically for

21   sex offenders, it's not.

22   Q.   Okay.  And I think you testified yesterday, while

23   you were in court, that Mr. Swarm's detailed,

24   methodical, careful, controlled execution of the

25   grooming of victims in this molestation wasn't

1    consistent with serious difficulty refraining, is that

2    right?

3    A.   Correct.

4    Q.   Yet Mr. Swarm still molested children, right?

5    A.   Yes.

6    Q.   And violated the terms of his supervised release,

7    right?

8    A.   Yes.

9    Q.   And violating the terms of supervised release would

10   indicate an inability to control your conduct, right?

11   A.   Not necessarily.

12   Q.   Okay.  Mr. Swarm also expressed a desire to be

13   castrated?

14   A.   Um, I believe in the past, he has, yes.

15   Q.   Okay.  And you also testified that volitional

16   control is evidenced by the fact that Mr. Swarm has

17   refrained from getting into trouble in prison, is that

18   right?

19   A.   Yes.

20   Q.   And prison is a very restrictive environment, isn't

21   it?

22   A.   Yes.

23   Q.   And the stricter the controls Mr. Swarm has been

24   under, the more compliant he's been, isn't that right?

25   A.   Well, in general.  Yes.

1    Q.  And certainly the way he behaves in prison is not

2    indicative of how he'll act in the community when he's

3    free, is that right?

4    A.  Not directly, one to one, yes.

5    Q.  In fact, you testified yesterday that the first year

6    of his release would be the most difficult for him

7    because he doesn't know how to act with all those

8    choices, right?

9    A.  Correct.

10   Q.  And you testified that Mr. Swarm -- oh, I'm sorry,

11   your report indicates that Mr. Swarm could get worse if

12   he were committed indefinitely, is that right?

13   A.  Yes.

14   Q.  But that doesn't take into account that he hasn't

15   gotten worse during the time he's been in prison, has

16   he?

17   A.  That's correct, prison being different than a long-

18   term hospitalization.  But, yes, institutionalization

19   can have different effects on people.

20   Q.  But institutionalization is different for commitment

21   for treatment purposes, isn't it?

22   A.  Yes.

23   Q.  Now, you also agree that if Mr. Swarm became

24   intoxicated, whether by alcohol or drugs, it could

25   impair his executive control or his volition, correct?

1  A.  Definitely.

2  Q.  And Mr. Swarm has a past history of substance abuse?

3  A.  Yes.

4  Q.  And he's had an extensive problem with alcohol,

5  right?

6  A.  Yes.

7  Q.  And he, Mr. Swarm, describes the effect alcohol had

8  on him as making him, quote, "nonthinking" and "mean,"

9  isn't that right?

10  A.  Correct.

11  Q.  Mr. Swarm, though, told you he's never had a problem

12  with using alcohol, right?

13  A.  Um, that sounds familiar, but I'm not sure that was

14  a direct quote to me or if it was reported in the

15  record.  But he didn't minimize in general the

16  seriousness of his alcohol issue.

17  Q.  I'm sorry.  He did or did not minimize it?

18  A.  He did not minimize it.

19  Q.  Okay.  And studies, um -- in your report you cite

20  studies that suggest that substance abuse is a more

21  reliable factor than others in predicting future

22  dangerousness, right?

23  A.  Um, in a general sense, yes.

24  Q.  Now, in terms of his family support, Mr. Swarm has

25  described his mother as "a cooperative, loving caretaker

1   who gave up her life for her children," is that right?

2   A.   Yes.

3   Q.   And he described his father as a "poor provider," a

4   "strangely disruptive influence," right?

5   A.   Yes.

6   Q.   And yet his father, at least when you met him, was

7   the only regular contact he's had, right?

8   A.   That is correct.

9   Q.   And this is the father that he says molested

10  neighborhood children as well as his own sister, right?

11  A.   That's correct.

12  Q.   And so as a forensic psychiatrist you'd find that

13  highly risk-relevant behavior to be with him, wouldn't

14  you?

15          MR. WATKINS:  Your Honor, I'm going to object

16  to this line of questioning.  There is a specific reason

17  why Mr. Swarm was forced to live with his father.  To

18  suggest that it was some kind of change or some kind of

19  decision that increased his risk, I think is very

20  misleading, particularly coming through this witness.

21          MS. PIEMONTE-STACEY:  Well, your Honor, one of

22  the conditions that they claim he could be released on

23  is home confinement, and the only place he has to go, at

24  least to our knowledge, is with his father.  And so I

25  think it's quite relevant as to what the conditions of

1   home confinement might be.

2          MR. WATKINS:  We're not proffering his

3   father's home.

4          MS. PIEMONTE-STACEY:  That's the only evidence

5   I see, your Honor.  I've been told it's not near a

6   school, where he wouldn't be allowed to be, and his

7   testimony has indicated that he plans to live with his

8   father.

9          MR. WATKINS:  We are not proffering his

10  father's home as a release point.

11         THE COURT:  Well, I'm not going to sustain the

12  objection, but if his father's home is not being

13  suggested as a place for home detention, um, the

14  evidence is not going to carry any weight with me.  But

15  you can answer.

16         MS. PIEMONTE-STACEY:  I think Dr. Mills isn't

17  feeling well, your Honor.

18         (Pause.)

19         THE WITNESS:  I'm okay.

20         THE COURT:  And I meant to say, because of

21  your medication or any other reason you want a break,

22  just let me know and we'll take a recess.

23         (Pause.)

24         THE COURT:  Why don't you put the question

25  again.

1    Q.   Would it be risk-relevant to you that Mr. Swarm's,

2    um -- I'm sorry.  -- that Mr. Swarm's regular contact is

3    with his father, um, who has been known to sexually

4    molest children as well as his own daughter?

5    A.   Yes and no.  I mean, I think it's not the ideal

6    situation for him to be living in.  On the other hand,

7    it's been a long time.  So -- I didn't specifically

8    assess that situation.  But, just in general, it doesn't

9    sound very good.

10   Q.   Now, Mr. Swarm has minimized responsibility for his

11   past acts, as you testified yesterday, right?

12   A.   Yes and no.  He accepts a lot of them, but then also

13   minimizes them, yeah.

14   Q.   And he also tells you that one of his positive

15   characteristics is that he takes responsibility for his

16   behavior, right?

17   A.   Yes.

18   Q.   And, um, minimization is a risk factor for

19   recidivism, isn't it?

20   A.   Um, it can be a factor, yes.

21   Q.   And one of the ways that Mr. Swarm has minimized his

22   responsibility is he blamed the "60 Minutes" TV show for

23   teaching him how to find child pornography, right?

24   A.   Yes.

25   Q.   And, um, he said he was less culpable for his

1    attraction to a neighborhood girl because he drew a

2    graphic picture for the girl to take home so her parents

3    would realize the situation and get her away from him,

4    right?

5    A.   Yes.

6    Q.   And to another child he told the child to turn him

7    in and gave her a letter, too, right?

8    A.   Yes.

9    Q.   Now, when he indicated that -- when he ordered the

10   child pornography videos from the law enforcement

11   website, he chose that website because he knew it was

12   law enforcement, but didn't know what to do to get

13   help.  Do you recall that?

14   A.   That's what he said, yes.

15   Q.   Although in the past he presented himself to sex

16   offender treatment program for castration, right?

17   A.   That's what he said, yes.

18   Q.   And he also blames previous treatment provider,

19   Cortland Mental Health, for not giving him the necessary

20   treatment, right?

21   A.   That's right.

22   Q.   Now, in 1995, um, Mr. Swarm attended sex offender

23   treatment until July of 1995.  Do you recall that?

24   A.   That sounds about right.

25   Q.   And then he withdraw from treatment two months after

1   his probation ended, correct?

2   A.   That was a point that was always confusing to me of

3   how much he withdrew versus was actually told to leave,

4   because there seemed to be contradictory statements on

5   it.   But the bottom line is that he left, yes.

6   Q.   Um, and if I could refer you to Exhibit 27 and ask

7   you to look at Paragraph 71.

8   A.   (Looks.)

9   Q.   Exhibit 27 is the presentence investigation report.

10  Do you recall reviewing this?

11  A.   Yes.   It says:   "He withdrew from treatment two

12  months after his probation term ended."

13  Q.   Okay.   And that was his first treatment program,

14  correct?

15  A.   I believe so.

16  Q.   And Mr. Swarm told you, um, that -- or Mr. Swarm has

17  described his sex offender treatment as, quote, "bogus,"

18  is that right?

19  A.   One of them, correct.

20  Q.   And, um, he's also told you that he was compliant

21  with sex offender treatment and didn't miss any

22  appointments, is that right?

23  A.   Yes.

24  Q.   But one condition of sex offender treatment was that

25  he would be completely honest during all treatment

1  sessions and assume full responsibility for his offenses

2  and behavior.  Do you recall that?

3  A.  Yes.

4  Q.  And his contract with the sex offender treatment

5  program mandated that he follow program rules and any

6  case-specific rules that were required of him.  Do you

7  recall that?

8  A.  Yes.

9  Q.  And one of the rules was that Mr. Swarm not commit

10  any reoffenses, correct?

11  A.  Correct.

12  Q.  And that he would avoid situations that might set up

13  reoffenses, correct?

14  A.  Correct.

15  Q.  And he was expected to report a reoffense or a

16  potential reoffense to group immediately, right?

17  A.  Yes.

18  Q.  And he also agreed he'd request approval before

19  having any contact with children or staying overnight

20  with children, right?

21  A.  Correct.

22  Q.  And he agreed to be supervised with one of those

23  children, right?

24  A.  Correct.

25  Q.  But he violated all of those rules, didn't he?

```
 1    A.   I believe so.
 2    Q.   Now, your review of the records indicate that
 3    Mr. Swarm did not benefit from sex offender treatment,
 4    is that right?
 5    A.   That particular treatment at that time, yes.
 6    Q.   Um, and he offended again after completing two sex
 7    offender treatment programs, right?
 8    A.   I don't know if he completed both of them, but he
 9    was in two of them, yes.
10    Q.   Now, yesterday, you testified that it would be a
11    recommendation that to administer a chemical castration
12    or pharmacological treatment outside the confines of the
13    Bureau of Prisons would increase the level of risk,
14    right?
15    A.   I want to make sure I'm saying this correctly.   I
16    think that doing this as an outpatient where he's not
17    closely medically supervised would increase the risk,
18    yes.
19    Q.   And you're aware that the Bureau of Prisons offers a
20    pharmacological treatment program, correct?
21    A.   Yes.
22    Q.   And I think you testified yesterday that there was
23    no real benefit to committing him for sex offender
24    treatment, is that right?
25    A.   I don't think I would stay there would not be any
```

1    benefit from it.  I think there are pros and cons to all

2    of these, but there are some pretty big cons to that as

3    well.

4    Q.  And one of the pros is that, at least at the Butner

5    sex offender treatment program, the inmates are living

6    in the same area where their treatment providers are,

7    correct?

8    A.  Yes.

9    Q.  And they have access to their providers nearly 24-7,

10   right?

11   A.  It's a much more intensive medicalized environment.

12   Q.  Now, you testified yesterday -- you were shown a

13   list of release conditions and you testified that all

14   those conditions would give Mr. Swarm the best chance of

15   success, didn't you?

16   A.  Yes.

17   Q.  And you are aware that those were the conditions he

18   was under when he was revoked?

19              THE COURT:  I'm not sure that's right.

20              MS. PIEMONTE-STACEY:  Okay, I'll withdraw the

21   question.

22              THE COURT:  Well, I mean, it might be.  But I

23   think there are two sets of conditions.

24              MS. PIEMONTE-STACEY:  All right.  I'll

25   withdraw the question.

```
 1              THE COURT:  Well, I might be wrong.  I'm not
 2    sure he was shown both sets of conditions that I have.
 3    I think there were more detailed conditions of
 4    supervised release that were imposed in connection with
 5    the revocation than were imposed in the original
 6    judgment.
 7              MS. PIEMONTE-STACEY:  Okay.
 8    Q.  Now --
 9              THE COURT:  Well, let's see.  They're attached
10    to somebody's trial brief, the defendant's trial brief
11    maybe, or Mr. Swarm's trial brief?
12              MS. PIEMONTE-STACEY:  That's correct.  I think
13    the Court understands the point that he was under
14    conditions and revoked.
15              THE COURT:  Okay.
16              MS. PIEMONTE-STACEY:  I'm just going to move
17    on from here.
18              THE COURT:  Okay.
19    Q.  Now, the records you reviewed, Dr. Mills, they
20    indicated that Mr. Swarm had difficulty with
21    motivational consistency and treatment while in the
22    Bureau of Prisons, is that right?
23    A.  While in those treatment programs or in the Bureau
24    of Prisons?
25    Q.  Both.
```

1    A.   I would need to review that.  I'm not specifically

2    remembering that.

3    Q.   Sure.  I ask you to please refer to Page 9 of your

4    report.

5    A.   Which -- um, what number is my report?  I don't have

6    that right here.

7    Q.   Um, Exhibit 31.

8    A.   Page 9?

9    Q.   Yes.

10   A.   (Looks.)  Yes, it says that:  "In the past he has

11   been described as making progress, but difficulty with

12   motivation and consistency."

13   Q.   And, in fact, he was terminated from therapy in 2002

14   due to poor compliance, is that right?

15   A.   Yes.

16   Q.   And you would agree that poor compliance with

17   treatment is a risk factor for recidivism, correct?

18   A.   Yes, with a caveat that there needs to be treatment

19   recommended because that was one of the confusing

20   factors is that some of the recommendations were that he

21   needed no treatment.  So he can't be compliant with a

22   treatment that's not recommended.

23   Q.   Right.  But if he's terminated for poor compliance,

24   um, termination from therapy for poor compliance is a

25   risk factor for recidivism, right?

1   A.   It very well can be, yeah.

2   Q.   And certainly compliance with therapy and drugs,

3   that's necessary to succeed with pharmacological

4   treatment, correct?

5   A.   Yes.

6           MS. PIEMONTE-STACEY:   May I have a moment,

7   your Honor?

8           (Pause.)

9   Q.   And, Dr. Mills, you did testify yesterday that

10  Mr. Swarm has some risk for future sexually dangerous

11  behavior, correct?

12  A.   Oh, definitely.

13          MS. PIEMONTE-STACEY:   I have nothing further,

14  your Honor.

15

16  REDIRECT EXAMINATION BY MR. WATKINS:

17  Q.   Dr. Mills, you worked in a prison system before as a

18  psychiatrist, is that correct?

19  A.   Correct.

20  Q.   So you have familiarity with, um, the prison milieu?

21  A.   Yes.

22  Q.   Is there generally a -- can there be availability to

23  alcohol while in prison?

24  A.   Unfortunately, yes.

25  Q.   Is there availability of drugs?

1   A.  Yes.

2   Q.  Can sexual crimes occur while in a prison setting?

3   A.  Yes.

4   Q.  Can violent crimes occur in a prison setting?

5   A.  Quite regularly.

6   Q.  Did any of those -- do you see any indication of any

7   of that in Mr. Swarm's Bureau of Prisons' records?

8   A.  No.

9   Q.  Um, Ms. Stacey asked about treatment and

10  noncompliance in treatment.  You're not specifically

11  familiar with Fort Dix's -- the Bureau of Prisons'

12  facility in Fort Dix?

13  A.  Is that the one in Butner?

14  Q.  No, Fort Dix is a separate Bureau of Prisons'

15  facility.  It does not have a medical treatment

16  facility.

17          MS. PIEMONTE-STACEY:  Objection to the

18  question, the assumptions that are put in.

19          MR. WATKINS:  I was trying to clarify.

20  Q.  It is not a federal medical facility?

21          THE COURT:  You can ask him if he knows.

22          MR. WATKINS:  Right.

23  Q.  Do you know whether it's a federal medical facility

24  or not?

25  A.  I'm not familiar with it.

1    Q.  If I told you that it was not a federal medical

2    facility, does that make a difference in how you would

3    conceptualize Fort Dix as a prison facility?

4    A.  Not particularly.  I mean, there's still -- in

5    prison settings, the ones I'm familiar with, there's

6    still probably more medical and nursing coverage than

7    one would have in the street.  But definitely if it's

8    not a medical center, that would lessen the availability

9    of services.

10   Q.  Um, as far as the availability of psychological

11   services, um, in a prison facility that's largely

12   voluntary, unless somebody is committed, is that

13   correct?

14   A.  I don't understand?

15   Q.  Um, in the absence of actual civil commitment within

16   a prison facility, psychological treatment is voluntary?

17   A.  Oh, I see what you're saying, yes.

18   Q.  So someone comes in and volunteers, "I'm having a

19   problem.  I need some help"?

20   A.  Absolutely.

21   Q.  And, by the same token, later on they could say,

22   "I'm okay now.  I don't need any more help."  Is that

23   correct?

24   A.  Correct.

25   Q.  Um, one could do that formally or one could just

1  stop going to appointments when they don't need help

2  anymore?

3  A.  Correct.

4  Q.  And, in fact, it can be difficult to get

5  psychological appointments sometimes.  Prisons are large

6  facilities and they're understaffed, right?

7  A.  Very much.

8  Q.  And in the records did you see any indication that

9  Mr. Swarm was offered sex-offender-specific

10  psychological counseling?

11  A.  I don't believe I've seen that.

12  Q.  So when he was not in compliance for missing

13  appointments at the federal Bureau of Prisons, does that

14  have any impact on your risk analysis?

15  A.  Um, not particularly.

16          MR. WATKINS:  I have nothing further, your

17  Honor.

18          THE COURT:  Is there any recross?

19          MS. PIEMONTE-STACEY:  No, your Honor.

20          THE COURT:  Well, let me see if I have a

21  couple of questions.  Counsel should not be timid about

22  objecting.

23          (Pause.)

24          THE COURT:  And you might object that this is

25  outside the scope of the previous expert's opinions

1   expressed, but I'll tell you that this is something

2   going back 25 years that interests me.  Going back 25

3   years to my first federal criminal trial as a judge.

4            Did you see information in the records where

5   Mr. Swarm reported that his father abuses children?

6                THE WITNESS:  Yes.

7                THE COURT:  Or abused children previously?

8                THE WITNESS:  Yes.

9                THE COURT:  Including young girls, I think?

10                THE WITNESS:  Correct.

11                THE COURT:  In -- in your opinion is there any

12   correlation between having a parent who has abused

13   children and the likelihood that a person himself will

14   abuse children?

15                THE WITNESS:  Um, pedophilia does seem to be

16   transmitted generational, and not so much genetically,

17   but a child that is prematurely sexualized in an

18   inappropriate or even an aggressive manner to a parental

19   figure is much more likely to do that themselves.  So,

20   yes.  Now, at the same time, Mr. Swarm does not recall

21   ever being sexually abused by his father.  He says that

22   he has significant periods of his childhood for which he

23   has no memory.  Um, that's not an uncommon thing for

24   people to say that had been abused, that they

25   essentially have disassociated it and blanked it out and

1    don't recall it.  But, yes, having a parent that has

2    done that particularly to the person makes them more

3    risk to do it themselves.

4            THE COURT:  And you just, I think, addressed

5    what was going to be my next question.  In your opinion,

6    to the extent there's an increased likelihood that the

7    child of an abuser would be an abuser himself, is that

8    sort of genetic or just as a result of experience, in

9    your opinion?

10           THE WITNESS:  Probably more the latter.  It's

11   essentially that the victim becomes the perpetrator.

12           THE COURT:  And does the information that

13   exists and that you just referred to about Mr. Swarm's

14   history, Mr. Swarm's father's history as an abuser,

15   affect the prediction of whether he's -- Mr. Swarm is

16   likely to commit sexually violent crimes or child

17   molestation in the future?

18           MR. WATKINS:  Your Honor, I'm going to timidly

19   object at that point.  I'm not sure that there is, um,

20   particular scientific support for a risk prediction.

21           THE COURT:  Yeah, that's -- all right.  I

22   mean, I've got this far, and I may not credit or rely on

23   any of this.  But, you know, the ultimate -- you know,

24   the ultimate question is predicting future dangerousness

25   and I've just been told something, and I can leave it

 1    right there without objection, that somebody is more

 2    likely to be an abuser if his father abused him or was

 3    an abuser, so.

 4              MR. WATKINS:  I think the answer was

 5    experientially and perhaps anecdotally.

 6              THE COURT:  That's fine.  All right.  I

 7    sustain the objection.  And I don't want you to be timid

 8    about it.  Um -- and -- let me just -- part of the

 9    reason I ask is the interest -- it's rooted in this

10    case, but goes beyond this case, but is we always --

11    well, maybe the civil lawyers don't, but you read the

12    presentence report and so many times when somebody has a

13    history of abuse, whether it's a minor conviction or

14    not, you see that they were abused.

15        Then could somebody give Dr. Mills "The Bureau of

16    Prisons' Pharmacological Treatment of Inmates with

17    Paraphilias."  What exhibit did we make that, 39?

18              MS. CONNOLLY:  I think in that book, your

19    Honor, it's Exhibit G at the very end.

20              THE COURT:  Oh, okay.  What number is this?

21    Do you have that?

22              THE WITNESS:  I have no G.

23              MS. PIEMONTE-STACEY:  Let me provide him with

24    my copy, your Honor.

25              THE WITNESS:  Mine ends at P.

```
 1                    (Hands to witness.)
 2               THE COURT:  Do you have that?
 3               THE WITNESS:  Yes, sir.
 4               THE COURT:  Would you go to Page 2, please.
 5     Mr. Watkins, you'll want to listen to this.
 6               MR. WATKINS:  Oh, I'm sorry, your Honor.
 7               THE COURT:  Do you need a break?
 8               MR. WATKINS:  No, your Honor.
 9               THE COURT:  Okay.  Go to Page 2, the second
10     full paragraph.  It says:  "Paraphilias range in
11     severity from a condition in which the individual
12     experiences deviant sexual fantasies and urges but does
13     not engage in any victim contact, to individuals who act
14     on their urges and fantasies with children or
15     nonconsenting adults, to individuals with significant
16     sadistic or homicidal sexual fantasies, urges and/or
17     behavior."  Do you see that?
18               THE WITNESS:  Yes.
19               THE COURT:  Do you agree with that statement?
20               THE WITNESS:  (Pause.)  Yes.
21               THE COURT:  And where on that continuum, in
22     your opinion, does Mr. Swarm fall?
23               THE WITNESS:  Um, I mean, it's difficult to
24     say because there's different components to it.  It's
25     somewhere in the middle.  I mean, he's -- he's --
```

1    certainly this is not a mild situation.  He has acted on
2    it repeatedly despite prohibitions.  On the other hand,
3    he's certainly -- he's on some level cognizant of the
4    wrongfulness of the action, has apparently taken steps
5    to not do it, he's not particularly sadistic or
6    homicidal.  Even his rationalizations and minimizations
7    can be seen two ways.  Um, one, it can be kind of a
8    sociopathic way of not accepting responsibility.  On the
9    other hand, it is an indication of awareness of what
10   he's doing is wrong.  I mean, there are pedophiles I've
11   met that are quite convinced that what they're doing is
12   not wrong at all.  So he's definitely not at that end of
13   the spectrum.
14          THE COURT:  The next sentence says:  "These
15   groups can further be divided and subdivided based on
16   ages and genders of the victims, the relative number of
17   victims, the relationship between the offender and the
18   victims, the presence of multiple paraphilias, more
19   often the rule than the exception, the level of harm to
20   victims, et cetera."  Do you agree with that statement?
21          THE WITNESS:  Certainly.  I mean, there are
22   many different ways to try to grasp and make sense out
23   of the paraphilias and the pedophilias, in particular,
24   but all these are different variables, some of them
25   militating towards better prognosis and some of them

1    militating against that.  For example, snatching
2    stranger children off the street and then trying to kill
3    them after that act is probably one of the most extreme,
4    um, versions of this.  And then you can kind of step
5    backwards on many levels back to probably people that
6    have fantasies that they're incredibly bothered by, but
7    have never acted on them.
8              THE COURT:  And what do you understand
9    Mr. Swarm has actually done that constitutes either
10   sexual violence or child molestation?  What are the
11   acts, as you recall them, that have been the foundation
12   or part of the foundation for your opinion?
13             THE WITNESS:  Well, the single most important
14   thing is his admission that he is sexually attracted to
15   very young women.  I mean, if he had not done anything,
16   he could still meet the criteria for pedophilia because
17   that's his preferential sexual fantasy.  It's not only
18   what he's actually acted on in terms of having sex with
19   a minor, you know, quote, unquote, "consensual sex,"
20   supposedly, as soon as possible in a relationship, and
21   then inappropriate physical touching, and then on some
22   level --
23             THE COURT:  But the inappropriate -- this is
24   -- I thought this paragraph gave me a valuable framework
25   consistent with the statute that it could be a serious

1    mental illness, pedophilia, but then what I was thinking
2    was I probably or should probably or properly take into
3    account the nature of his actions evidently based on
4    that paraphilia and, as you said, he didn't rape some
5    child who's a stranger and then kill her.  That would be
6    one extreme.  I'm trying to sort of marshal what the
7    evidence indicates he did do.
8         He had a relationship with a person we've been
9    calling -- the minor, a young woman.  He, as I recall,
10   masturbated looking at his step-niece while she was
11   sleeping.  He touched the breasts and buttocks of
12   clothed neighborhood children.  At the moment I'm
13   actually not clear on whether -- and then he had some --
14   well, some sat on his lap.  Have I left out something?
15            THE WITNESS:  Well, the pornography, in many
16   ways is -- some would argue is actually even more of a
17   serious thing.
18            THE COURT:  Well, let me stop just short of --
19   there's a legal reason I'm stopping just short of that.
20   Um, but actually that helps me.
21        So were those, as you recall, the actions that he
22   took as a result of or relating to his pedophilia, the
23   ones I just described?
24            THE WITNESS:  Yes.
25            THE COURT:  And then with regard to -- I

1    discussed this with the lawyers before you testified.

2    The government doesn't argue that Mr. Swarm, um, can

3    properly be detained or should be detained based on the

4    risk that, in the future, he'll look at child

5    pornography.  This case is about whether there's clear

6    and convincing evidence that, as a result of his

7    pedophilia, he'll have a substantial difficulty in

8    refraining from doing something physical with a child.

9         Does the fact that he hasn't in the past -- he

10   hasn't in the past raped a child -- he's touched them,

11   but he hasn't raped them, have any meaning with regard

12   to predicting what he's likely to do in the future?

13            THE WITNESS:  Well, yes and no.  Um, a lot of

14   the times one of the most helpful things to do, say, if

15   I was in long-term treatment with Mr. Swarm, would be

16   really getting at his core fantasies.  There's probably

17   a couple of very core sexual fantasies that is what

18   preferentially gives him arousal, and we don't really

19   know enough about that.  In fact, he may not be

20   completely aware of that.  That's one of the things that

21   really good sex offender therapy can be helpful for.  It

22   does seem to have elements of, for example, him being

23   attracted to girls that have already been molested.

24   It's elements like that that if we could identify more

25   and more about what that is, we could say more

 1    definitively if it puts him at that risk.

 2         But in general, the information that we have right

 3    now, if I had to infer what his fantasies are, um,

 4    they're not particularly violent or sadistic fantasies,

 5    they're kind of actions of opportunity that he can have

 6    a plausible denial excuse that it wasn't totally his

 7    fault here.  There's a lot of steps that a good sex

 8    offender treatment program and a good case manager and

 9    monitoring could really keep him on a short leash about

10    these things.

11         So, in general, of all the pedophiles I've met,

12    you know, he's somewhere in the middle in terms of risk.

13              THE COURT:  And you testified to this already,

14    but in your opinion if Mr. Swarm is released on a

15    supervised release program that prohibits him from being

16    in the vicinity of prepubescent children without

17    supervision, that prohibits him from using a computer,

18    and that requires that he stay home whenever probation

19    orders him to stay home, that he participate in a

20    sex-offender-treatment program, um, possibly including

21    pharmacological treatment, do you believe in those

22    circumstances he would have a substantial difficulty in

23    refraining from engaging in sexually violent conduct or

24    child molestation?

25              THE WITNESS:  No.

1          THE COURT:  Why not?

2          THE WITNESS:  Um, well, the substantial

3    difficulty in refraining, um, of course, opens up a lot

4    of things we've already talked about, but he currently

5    doesn't have any volitional impairment.  If he got into

6    the wrong situation, of course, that may change.  But

7    he -- I'm not sure I'm answering your question right.

8          This is really the best shot he has.  Um, if we

9    lock him up, unless we lock him up for the rest of his

10   life and can be assured that he could be locked up for

11   the rest of his life, um, that the second best option

12   for preventing him from doing anything like this again

13   is the kind of plan that's been outlined.  It's not a

14   guarantee, but with all those elements together, it

15   would be the best for him to maintain his current status

16   of not having a substantial inability to refrain.  He

17   doesn't have it now and hopefully, with the right level

18   of intensive supervision, that would likely stay that

19   way.

20          THE COURT:  Well, as a psychiatrist you're

21   perhaps focused on the patient.  I think the law

22   generally directs me, at this point, to focus on the

23   risk to potential victims.  And so let me -- I

24   understand that you think a release on the conditions of

25   supervised release would be the best for Mr. Swarm and

1    would give him his best shot at not committing these

2    crimes again if he's in the community.  You've

3    expressed, a number of times, the opinion that if he

4    were released, all conditions of supervised release in

5    that period -- and maybe I don't even have to ask you

6    this again, you've testified to this, and I'll go back

7    and find it.

8              MR. WATKINS:  May I just interject here, your

9    Honor?  We've used the phrase "substantial difficulty in

10   refraining," the legal standard is "serious difficulty

11   in refraining."  We seem to be using them

12   interchangeably.  I just wanted to make that clear.

13             THE COURT:  All right.  I'd have to go back to

14   what I wrote, "seriously."  Actually, hold on a second.

15             (Pause.)

16             THE COURT:  Okay.  Do my questions suggest any

17   further questions to counsel?  No?

18             MR. WATKINS:  No, your Honor.

19             THE COURT:  All right.  Dr. Mills, thank you

20   very much.  You're excused.

21             MS. PIEMONTE-STACEY:  I'm sorry, your Honor.

22   I have one.

23             THE COURT:  Sure.

24             MS. PIEMONTE-STACEY:  I'm looking for it.

25        As part of your review of the records you reviewed

1    the presentence investigation report?

2              THE WITNESS:  I believe so.

3              MS. PIEMONTE-STACEY:  And I don't want you to

4    testify -- sorry, your Honor.  That screen was just

5    lying off -- I'm sorry.

6              (Fixes computer screen.)

7              MS. PIEMONTE-STACEY:  Now, without testifying

8    to the substance of the victim's statements made in the

9    presentence report, did you have any cause to believe

10   that Mr. Swarm did more than just masturbate to his

11   niece while she was sleeping?

12             MR. WATKINS:  I'm going to object there, your

13   Honor.

14             THE COURT:  No, I was having trouble

15   remembering this.  Is there something you want to point

16   me to?

17             MS. PIEMONTE-STACEY:  I'm looking for that,

18   your Honor.  I mean, in the PSR, which is admitted into

19   evidence, there are statements by the step-niece and I'm

20   looking for the exact page and paragraph.  Um, I stayed

21   away from that due to the hearsay quality of it, but she

22   recounts on Page 12 of --

23             THE COURT:  Well, it may not necessarily be

24   hearsay because --

25             MS. PIEMONTE-STACEY:  Right, and so --

```
 1              THE COURT:  Page 12?
 2              MS. PIEMONTE-STACEY:  Page 12, Paragraph 62,
 3    for the attempted sexual abuse, second degree, and
 4    attempted endangering the welfare of a child.
 5              THE COURT:  (Turns.)  All right.
 6              MS. PIEMONTE-STACEY:  The second paragraph
 7    under Paragraph 62 in Dr. Mills' Exhibit 27.
 8              THE COURT:  (Turns.)
 9              MR. WATKINS:  I would like an opportunity to
10    make the record before we ask any questions.
11              (Pause.)
12              THE WITNESS:  Which paragraph again?  I'm
13    sorry.
14              MS. PIEMONTE-STACEY:  The second paragraph.
15              THE WITNESS:  On page?
16              MS. PIEMONTE-STACEY:  It's Bates stamped on
17    the bottom right-hand corner says SW-00045.
18              THE WITNESS:  (Turns.)
19              MS. PIEMONTE-STACEY:  It begins in 1996, but
20    don't answer anything while the objection is pending.
21              THE COURT:  All right.  Well, what's the
22    question going to be?
23              MS. PIEMONTE-STACEY:  Did it suggest to him
24    that Mr. Swarm had done more than just masturbate while
25    looking at his niece?
```

```
1            MR. WATKINS:  What we have is the government
2     posing a question which assumes a particular fact.  If
3     indeed what they're going to do is prove up that fact at
4     trial, I'm happy to have that particular individual come
5     in here.  As the Court has read, these are statements
6     from years later after whatever happened happened down
7     there.  It would be categorically denied by Mr. Swarm,
8     while he admits and has admitted what the allegations
9     that were made in 1994.  We would adamantly deny the
10    ones in 1998.  It's already been my understanding that
11    that's what we're talking about.
12         What the government is trying to suggest is that
13    these things are true and ask what the risk is.
14            THE COURT:  I think the way to do this is,
15    what I was trying to do, but perhaps inartfully, is to
16    ask him if -- because he has no personal knowledge
17    whether they're true or not.  You can ask him, you know,
18    if -- did he have this in mind when he gave me the
19    opinion he gave me, or if he assumes this is true, does
20    it affect his opinion?
21            MR. WATKINS:  The question is what used to
22    make up the answer at that point.  If he gives an
23    answer, "Did you consider this?"  That would assume that
24    that could be taken into account --
25            THE COURT:  No, because I'm going to behave
```

1    the way I instruct juries.  I tell juries that if an

2    expert's given an opinion based on an assumed fact that

3    hasn't been proven to be true, the jury is required to

4    disregard the opinion to the extent it relies on the

5    unproven fact.  So that's my state of mind.

6              MR. WATKINS:  Again, I would object.  I think

7    we're wasting our time, but I think it's unduly

8    confusing.  But if the Court certainly understands my

9    objection --

10             THE COURT:  Well, I think I opened the door to

11   it, before there was any objection.  Don't be timid.

12        But you can ask one of the questions that I just

13   posed, or something similar.

14             MS. PIEMONTE-STACEY:  Did you consider the

15   information in rendering -- in responding to the Court's

16   inquiry?

17             THE WITNESS:  Yes.

18             MS. PIEMONTE-STACEY:  And does that change

19   your opinion?

20             THE WITNESS:  Um, no, and if I can elaborate?

21   The -- in pedophiles one of the fundamental rules is

22   that you always assume there are more offenses than we

23   know about.  That it's -- that's a common, if not the

24   rule, that there's -- that it's very rare for a

25   pedophile, even in full-fledged successful treatment, to

1  acknowledge everything they've ever done.  So I don't

2  know if this is true or not, but even if it was true, it

3  doesn't change my opinion.

4          MS. PIEMONTE-STACEY:  And you also had the

5  opportunity, Dr. Mills, to look at exhibit -- what's

6  been marked as Exhibit 29 into evidence in this case,

7  the criminal docket for the attempting to endanger the

8  welfare of a child?

9          THE WITNESS:  (Turns.)  It looks familiar, but

10  it has been a while.

11          MS. PIEMONTE-STACEY:  If I could ask you to

12  look at the voluntary statements signed by Mr. Swarm.

13          THE WITNESS:  (Looks.)

14          MS. PIEMONTE-STACEY:  Have you reached that

15  document?

16          THE WITNESS:  Yes.

17          MS. PIEMONTE-STACEY:  Mr. Swarm admitted to

18  putting his hand on his niece's leg, correct?

19          THE WITNESS:  Yes.

20          MS. PIEMONTE-STACEY:  And Mr. Swarm admitted

21  to brushing his niece's hair out of her face, so he

22  could see her eyes?

23          THE WITNESS:  Yes.

24          MS. PIEMONTE-STACEY:  Mr. Swarm admits telling

25  his niece that he wanted to kiss her?

```
 1                 THE WITNESS:  (Reads.)  Yes.
 2                 MS. PIEMONTE-STACEY:  And at the time his
 3      niece was 11 years old?
 4                 THE WITNESS:  (Reads.)  I'm not seeing that.
 5                 MS. PIEMONTE-STACEY:  If I could refer you to
 6      the last paragraph.
 7                 THE WITNESS:  Oh, yes, there it is.  Yes.
 8                 MS. PIEMONTE-STACEY:  I have nothing further
 9      at this time, your Honor.
10                 THE COURT:  Okay.  Two things.  One, the
11      niece's full name, including her last name is in this
12      document.  You should provide a redacted copy for the
13      public record.
14                 MS. PIEMONTE-STACEY:  Yes, your Honor.
15                 THE COURT:  And, Dr. Mills, thank you very
16      much.  You're excused.
17                 THE WITNESS:  Thank you for accommodating my
18      illness.
19                 THE COURT:  I'm glad we made it this far and I
20      hope you get out the door.
21                 MS. PIEMONTE-STACEY:  Your Honor, may I have a
22      quick moment just to introduce Dr. Mills to Ms. Soris,
23      who's just outside the door.
24                 THE COURT:  Yeah, who is the next witness?
25                 MS. CONNOLLY:  I have to step outside again.
```

```
 1              THE COURT:  Okay, we'll take about a five-
 2      minute break for the logistics.  The Court is in
 3      recess.
 4              (Short recess, 10:15 a.m.)
 5              (Resumed, 10:20 a.m.)
 6              THE COURT:  The government may call the next
 7      witness.
 8              MS. CONNOLLY:  Thank you, your Honor.
 9      Mr. Pierce.
10              (Mr. Pierce enters.)
11              (MICHAEL JOSEPH PIERCE, sworn.)
12
13              ********************
14              MICHAEL JOSEPH PIERCE
15              ********************
16
17      DIRECT EXAMINATION BY MS. CONNOLLY:
18      Q.  Good morning, Mr. Pierce.  Will you state your full
19      name?
20      A.  Michael Joseph Pierce.
21      Q.  And please tell us the name of your employer?
22      A.  I'm employed by the United States Probation
23      Department.
24      Q.  How long have you worked for the United States
25      Probation Department?
```

A.   In April it will be 13 years.

Q.   And can you tell us your duties and responsibilities working for the probation office?

A.   I'm a probation officer.  I supervise most release supervisees.  I'm a pretrial officer.  I do pretrial reports and supervise pretrial supervision.  I'm also the evidence technician in our office.  I'm certified in voice stress analysis as an examiner.  I'm also monitoring the electronic monitoring in our office.

Q.   Can you explain to us what the electronic monitoring is that you supervise?

A.   The electronic monitoring is the ankle bracelet that monitors through a company called BI the comings and goings of a person, um, electronic monitoring and they also have a GPS unit that I track where they go and where they're scheduled.

Q.   And your office is in Binghamton, New York, is that right?

A.   Yes, but it's a satellite office.  Our main office is in Syracuse.

Q.   And what's the geographic area your office covers?

A.   We cover five counties within the 32 district -- within our district of New York.

Q.   And is your title a "probation officer"?

A.   Yes.

1  Q.  And how many probation officers are there in that

2  office?

3  A.  In my office?

4  Q.  Yes, sir.

5  A.  There are two supervising officers and one

6  supervisor.

7  Q.  What's your current caseload?

8  A.  Um, it ranges anywhere between 65 and 75.

9  Q.  And of the caseloads you currently have, how many of

10  the people you're supervising are sex offenders?

11  A.  Um, right now I believe it's six people for sexual

12  offenses.

13  Q.  And of those sex offenders how many are charged with

14  pedophilia?

15  A.  I have two out of those six that are diagnosed with

16  pedophilia.

17  Q.  And in general, sir, if you could tell us, in terms

18  of the time commitment to supervise sex offenders and

19  those with pedophilia, how does that compare with people

20  that you're supervising who have been charged and

21  convicted with other crimes?

22  A.  Um, sex offenders require a lot more time in terms

23  of supervision.  Um, you have to see them on a more

24  frequent basis in terms of office visits, contacts, home

25  visits.  Um, they have much stricter conditions that we

1    have to adhere to.

2    Q.   And why is that?

3    A.   They're considered a more dangerous population.

4    Q.   Dangerous to whom?

5    A.   The community.

6    Q.   When you were telling us about the electronic

7    monitoring, um, is the monitoring that your office does

8    a passive-type of monitoring?

9    A.   What we do is passive.

10   Q.   And can you explain for us what that is?

11   A.   A passive GPS is they carry the GPS with them, at

12   the end of the day they dock it and that information

13   gets downloaded.  I cannot look at it in real-time.

14   Q.   So you would know, at the end of the day when they

15   dock the bracelet and you download the information, you

16   would know at the end of the day what geographic areas

17   someone had been in previous in the day?

18   A.   Yes, I can map their route and see if they adhered

19   to their schedule or not.

20   Q.   You also mentioned that you're a certified voice

21   stress examiner.  Could you just tell us briefly what

22   that is?

23   A.   Um, about two years ago in conjunction with -- we

24   have a polygraph in our district, um, we were looking

25   for a more easily accessible technology and voice stress

```
 1    analysis presented that.  It's a program developed by
 2    the National Institute of Truth Verification, it comes
 3    on a laptop, and you have a microphone and the person
 4    speaks into a microphone and this program is measuring
 5    the stress level on the vocal chords.
 6    Q.  Was that something that was in place when you were
 7    supervising Mr. Swarm?
 8    A.  No, it wasn't.
 9    Q.  Can you tell us a little bit about your relevant
10    educational work experience that prepared you to be a
11    probation officer?
12    A.  Prior to coming to the U.S. Probation Department, I
13    was a county probation officer for approximately eight
14    years.  Um, I have my bachelor's in applied social
15    sciences with an emphasis in criminal justice and
16    psychology.  I have my master's in psychology with an
17    emphasis in criminal behavior.
18    Q.  Have you taken any courses or seminars as part of
19    your job to help you in the supervision of sex
20    offenders?
21    A.  I've taken several seminars and I've been to
22    symposiums offered by the U.S. government.
23    Q.  Do you recall, um, whether you had gone to any of
24    those symposiums or programs prior to your supervision
25    of Mr. Swarm?
```

1   A.   I had.

2   Q.   I'd like to draw your attention now to your

3   supervision of Mr. Swarm.  When was it that you began

4   working with him?

5   A.   Um, Mr. Swarm was released, I think, from a federal

6   halfway house and our Syracuse office initially

7   contacted him in September of '05, and it was determined

8   that he was going to live in our area of the district,

9   and so I was assigned the case and I think I met with

10  Mr. Swarm in the beginning of, um, October of '05.

11  Q.   And where was Mr. Swarm living in your district?

12  A.   He was going to live with his father in Marathon,

13  New York.

14  Q.   Approximately how long were you Mr. Swarm's

15  probation officer while he was on supervised released?

16  A.   About a year.

17  Q.   And about how long -- um, well, strike that.

18       Approximately when did your supervised release

19  supervision of Mr. Swarm end?

20  A.   October 31st of 2006.

21  Q.   And why did it end?

22  A.   Um, I filed a violation with the court based on his

23  violation of conditions.

24  Q.   And do you recall what specific condition or

25  conditions he violated?

1    A.   Um, my violation consisted of three violations.   One

2    was not being truthful on his monthly sheets and with

3    his officer.   Um, he was -- the second violation had to

4    do with, um, violating treatment protocols and being

5    discharged from treatment.   And the third violation was

6    violating the condition of being alone with minor

7    children.

8    Q.   We'll come back to that in a minute.   Um, I'd like

9    to talk a little bit about the terms and conditions of

10   his supervised release as he came to you in October of

11   2005.   Do you know what he was -- what he had been

12   convicted of, what he had been -- what the underlying

13   federal charge was, if you recall?

14   A.   I don't recall the exact conviction.

15   Q.   Is there something that would refresh your memory?

16   A.   The judgment.

17   Q.   Would you take a look at, um, Exhibit Number 22 in

18   the book before you, please.

19   A.   (Looks.)

20   Q.   If you would just look at that for a moment to

21   yourself.   Have you had an opportunity to look at that?

22   Does that refresh your recollection?

23   A.   Yes, ma'am.

24   Q.   And what was the underlying federal charge of which

25   he was convicted?

```
1   A.  He was convicted of receipt of child pornography,
2   possession of child pornography, and the manufacture of
3   marijuana.
4   Q.  And as part of that judgment were certain conditions
5   put on Mr. Swarm for his release?
6   A.  Yes.
7   Q.  And I would like to turn your attention to Exhibit
8   23 in that book, please.
9   A.  (Turns.)
10  Q.  Can you tell us what Exhibit 23, Pages 3 and 4 are?
11  A.  (Turns.)  Page 3 is a standard "Condition of
12  Supervision Sheet."  Everybody that's on supervision has
13  these conditions assigned to them.
14  Q.  I'm sorry.  Did you say everyone on supervised
15  release has those conditions?
16  A.  Yes, ma'am.
17  Q.  And on page -- the next page, Page 4, would you tell
18  us what those are?
19  A.  Those are special conditions assigned to Andrew
20  Swarm.
21  Q.  And are these consistent with the types of
22  conditions that would be imposed on other sex offenders
23  that you supervised?
24  A.  Um, at the time of his sentencing, yes.
25  Q.  I'd like to go over with you the special conditions
```

1    that Mr. Swarm has.  If you could, um, read the first

2    special condition and tell us what that meant in terms

3    of a condition of Mr. Swarm's release?

4            MR. WATKINS:  Your Honor, just by way of

5    clarification, there were amended conditions imposed.  I

6    think perhaps the government's going to go into that at

7    some point, but we're going to --

8            THE COURT:  No, I think I see where this is

9    going.  But do you want to respond to that?

10            MS. CONNOLLY:  Well, your Honor, I was just

11    going to have him talk about the special conditions and

12    then we'd move into the revised conditions.

13            MR. WATKINS:  I thought I heard Ms. Connolly

14    say that these are the conditions he's supervised

15    under.  Maybe the present tense was what threw me there

16    because I think there were amended conditions and --

17            THE COURT:  I think these are the conditions

18    that were violated, correct?

19            MR. WATKINS:  Well, no.  Perhaps partly.  But

20    the point is there's an amended set of conditions.

21            THE COURT:  I know that.  I pointed it out

22    previously.  But the objection is overruled.  Go ahead.

23            MS. CONNOLLY:  Thank you.

24    Q.  The first special condition, um, Mr. Pierce?

25    A.  "The defendant shall not possess or use a computer

1    at any location including his residence or employment.

2    The defendant is also prohibited from having any device

3    which communicates data by a modem, a dedicated

4    connection, or a wireless access with the Internet.  The

5    defendant is further prohibited from having access to

6    any on-line computer service at any location without

7    prior approval of a probation officer.  If the defendant

8    is found to be in possession of a computer or other such

9    device, it will be considered contraband and subject to

10   seizure."

11   Q.   Is this a term of release that you discussed with

12   Mr. Swarm when you met with him?

13   A.   Yes, ma'am.

14   Q.   Can you please read Number 2.

15   A.   Number 2 says:  "The defendant shall register with

16   the state sex offender registry agency in any state

17   where he resides, is employed, he carries on a location,

18   or is a student, as directed by the probation officer."

19   Q.   And did you explain that condition to Mr. Swarm?

20   A.   Yes.

21   Q.   And what was it that he was expected to do to comply

22   with Number 2?

23   A.   He had to fill out a form and send that form to the

24   registry.

25   Q.   In the state of New York?

1    A.   In the state of New York who would then make a

2    determination of what level of risk he is to the

3    community based on that form.

4    Q.   Thank you.  And please tell us about Condition

5    Number 3, what is Condition Number 3?

6    A.   "The defendant shall submit to a mental health

7    evaluation and complete treatment specifically related

8    to sex offender treatment as directed by the probation

9    officer.  The defendant shall contribute to the cost of

10   services rendered and co-pay in an amount to be

11   determined by the probation officer based on ability to

12   pay or the availability of third-party payments."

13   Q.   Did you explain this condition to Mr. Swarm?

14   A.   I did.

15   Q.   Do you know whether he understood it or not or did

16   he indicate to you whether he understood it?

17   A.   He did.

18   Q.   What was Condition Number 4?

19   A.   "The defendant shall not have any direct or indirect

20   contact with a person under the age of 18 unless it is

21   supervised by a person approved by the probation

22   officer."

23   Q.   Did you explain that term to Mr. Swarm?

24   A.   Yes.

25   Q.   Did he indicate to you that he understood that term?

A.  He did.

Q.  Please tell us about Term Number 5?

A.  "The defendant shall submit to alcohol and drug testing as directed by the probation officer."

Q.  Did you explain that term to Mr. Swarm?

A.  Yes.

Q.  Did he understand it?

A.  Yes.

Q.  Please tell us about Condition Number 6?

A.  "The defendant shall submit to a substance-abuse evaluation and complete treatment as directed by the probation officer.  The defendant shall contribute to the cost of services rendered and co-pay in an amount to be determined by the probation officer based on the ability to pay or the availability of third-party payments."

Q.  Can you tell us what the difference between Term Number 6 is and Term Number 5?

A.  Number 5 is basically telling him that he has to submit to alcohol and drug testing in a program that we offer.

Q.  And how does that drug testing and alcohol testing work in your office?

A.  Um, the day I met with Mr. Swarm on the first appointment, I enrolled him in our program.  Our program

1   is a calling program.  Um, he's assigned a PIN number

2   and given a number that he's to call in every night

3   seven days a week.  When he dials into the program and

4   punches in his PIN number, the computer program will

5   tell him whether he has to report that day or not.

6   Q.   During what time period each day is Mr. Swarm

7   supposed to call in?

8   A.   He has from 6:00 p.m. until 8:00 a.m. to make that

9   call.

10   Q.   So it actually goes on the next day, in other words?

11   A.   Until 8:00 in the morning.

12   Q.   And that's seven days a week, 365 days a year?

13   A.   Yes.

14   Q.   And was that term to be imposed for the duration of

15   his supervised release?

16   A.   The computer program, on average, runs between a

17   year and a year and a half.  If he calls in, shows up,

18   or tests consistently negative, he should complete that

19   part of the program in about a year or a year and a

20   half.

21   Q.   At some point in your supervision of Mr. Swarm were

22   the terms of his release modified at your request?

23   A.   They were.

24   Q.   Would you turn your attention now to Exhibit Number

25   24, please.

1    A.   (Turns.)

2    Q.   And please tell us what this document is?

3    A.   This is a modifying request to the court to modify

4    conditions of supervision.

5    Q.   Did you prepare this document?

6    A.   I did.

7    Q.   And why did you seek to modify the conditions of

8    Mr. Swarm's supervision?

9    A.   At the time of Mr. Swarm's sentencing, which I

10   believe was in 2001, um, standard conditions -- I'm

11   sorry, special conditions for sex offenders had evolved

12   from 2001 until he came on supervision in 2005, so I

13   modified the conditions to match the current sex

14   offender conditions that we were practicing in our

15   district.

16   Q.   And what were those modified conditions that you

17   sought to have imposed on Mr. Swarm?

18   A.   What I chose to modify was Special Condition Number

19   1, which refers to the computer.  Um, the new condition

20   involves the monitoring of the computer.  We had the

21   capability or technology to either scan computers now

22   or, um, through a cost to the defendant, um, of

23   monitoring it as he's on the computer.

24   Q.   It was a different way for you to actually monitor

25   computer use as opposed to changing the fact that they

1  weren't supposed to use the computer for elicit

2  purposes?

3  A.   Yes.

4  Q.   Were there any other modifications to the special

5  conditions for Mr. Swarm's supervised release?

6  A.   I also modified the Special Condition Number 3.  Um,

7  basically we elaborated on the condition with using

8  polygraphs at that time to help monitor his treatment.

9  Q.   And Condition Number 3 had to do with his, um --

10  A.   -- mental health.

11  Q.   -- attendance and completion of the sex offender

12  treatment?

13  A.   Yes.

14  Q.   Any other modifications to the special conditions?

15  A.   I also monitored his condition -- Special Condition

16  Number 4, which has to do with any contact with a person

17  under the age of 18.  Um, Number 4 had been enhanced

18  over time to include third-party contacts.  Um, so not

19  only could the defendant not contact any child directly,

20  but through the Internet, through chat rooms, through

21  the phone, through somebody else.  So that condition was

22  modified for that reason.

23  Q.   I'm putting up on the screen the modification to

24  Special Condition Number 4.  I'm putting a red box

25  around it.  Do you see that?

1    A.   I do.

2    Q.   And how did that change specifically, the original

3    special condition of release for Mr. Swarm?  What was

4    added?

5    A.   Once again, what was added was that he was not to

6    have direct contact with a person under the age of 18,

7    was not to use any devices or people indirectly to

8    contact children under the age of 18.

9    Q.   Unless the person was -- unless he was supervised by

10   somebody approved by you?

11   A.   Correct.

12   Q.   Did you explain this term to Mr. Swarm?

13   A.   I did.

14   Q.   Do you know whether or not he understood that term?

15   A.   He said he did and he signed the waiver.

16   Q.   And, um, were these modified conditions approved by

17   the Court, if you know?

18   A.   They were.

19   Q.   And were those terms, in Exhibit 23 with the

20   modifications in 24, the conditions of Mr. Swarm's

21   supervised release?

22   A.   They were, and also the two other conditions that I

23   added.

24   Q.   And those were what?

25   A.   That he's not to be in an area where children under

1    the age of 18 congregate, such as school grounds,

2    schools, um, without permission of the probation

3    officer, and I also added that he has to contribute to

4    the cost of the evaluation, testing, treatment or other

5    monetary services unless he has a third-party ability to

6    pay.

7    Q.   Is that the Special Condition Number 4?

8    A.   Special Condition Number 4 refers to not having a

9    third party or having contact with a minor.

10   Q.   Right.  And then Special Condition 17 is not to be

11   near school grounds or child care centers, that type of

12   thing?

13   A.   Yes.

14   Q.   And then contributing to the cost of treatment to

15   the extent that he could?

16   A.   Yes.

17   Q.   Did Mr. Swarm agree to these modifications?

18   A.   He did.

19   Q.   So let me go back then.  In terms of the conditions

20   for Mr. Swarm's supervised release, were the terms of

21   his release the conditions we talked about in Exhibit

22   23, the standard conditions plus the special, and then

23   the modified conditions in conjunction with those

24   special conditions in Exhibit 23?  Were those the terms

25   of his supervised release?

A.  Yes.

Q.  Thank you.  And in your experience as a probation

officer supervising sex offenders, are these the kinds

of standard and special conditions that you use to

supervision, um, sex offenders when they're on release?

A.  Yes.

Q.  In your experience as a probation officer have you

ever supervised any special protocols for pedophiles as

opposed to just sex offenders in general?

A.  No.

Q.  In your work since you were with Mr. Swarm in 2005,

2006, are there any new conditions that have been

imposed on sex offenders when they're subject to

supervised release?

A.  The only added condition now, um, is the -- it's

under the mental health condition and it involves not

just the polygraph, but the CVSA is now included as a

tool to monitor their truthfulness.

            MR. WATKINS:  Sorry.  I'm having trouble

hearing you.

            THE COURT:  Yeah, could you speak into the

microphone.  You used an acronym.

            MR. WATKINS:  Right.

            THE COURT:  What was that?

            THE WITNESS:  The CVSA, the Certified Voice

1    Stress Analysis.

2    Q.  And that's a condition that they've been using since

3    2006 in monitoring sex offenders on supervised release?

4    A.  Yes.

5    Q.  What about pharmacological treatment, um, do you

6    supervise any sex offenders on release that are subject

7    to any kind of pharmacological treatment as part of

8    their supervised release?

9    A.  No.

10   Q.  Would you have the ability to supervise someone on

11   release who is undergoing pharmacological treatment as

12   part of their terms of supervised release?

13   A.  At this time, no.

14   Q.  And why is that?

15   A.  Um, right now we don't have the protocol regarding

16   that.

17   Q.  For outpatient treatment?

18   A.  Yes.

19   Q.  Are you aware of any sex offenders that you are

20   supervising who have voluntarily submitted to have

21   pharmacological treatment?

22   A.  Yes.

23   Q.  And can you tell us what you know about that?

24   A.  Um, the treatment agency has recommended that they

25   take antidepressants or antianxieties to -- well, two of

1    my people that I supervise, to help them, um, diminish

2    their sexual fantasies and thoughts.

3    Q.  What's the name of the treatment center you're

4    referring to?

5    A.  Um, Family and Children's Society.

6    Q.  And just to be clear, the fact that they're

7    participating in this treatment is not part of the terms

8    of their supervised release, is that right?

9    A.  That's correct.

10   Q.  So you do not monitor or supervise that particular

11   feature of whatever voluntary treatment they're having?

12   A.  Not at this time, no.

13   Q.  And you may have said this and I may have missed it,

14   but how many people that you're currently supervising

15   are taking these kind of antianxiety or antidepressants?

16   A.  Two.

17   Q.  Two.  And what are the charges for which those two

18   individuals were convicted and are now out on release?

19   A.  Um, one is traveling in interstate commerce to have

20   sex with a minor and the other one is possession of

21   child pornography.

22   Q.  All right.  The, um -- one of the terms of release

23   that we talked about earlier was that Mr. Swarm was

24   supposed to complete sex offender treatment.  Do you

25   recall that?

1  A.  Yes.

2  Q.  And what if anything did you do to get Mr. Swarm

3  enrolled in sex offender treatment?

4  A.  I referred him to the Family and Children's Society

5  for a sex offender treatment evaluation.

6  Q.  How many programs are there in the area that you

7  cover in -- from the Binghamton office that offer sex

8  offender treatment?

9  A.  Um, the nearest and only one that we have is the

10  Family and Children's Society.

11  Q.  And do they have a special program just for

12  pedophiles or is it just for all sex offenders?

13  A.  It's for all sex offenders.

14  Q.  And would you tell us, to the best of your

15  knowledge, what kind of a program is it that the Family

16  and Children's Society offers for sex offender

17  treatment?

18  A.  Um, they do a group setting work and in the -- work

19  within the guidelines in terms of how to deal with sex

20  offenders and how to help them control their thoughts

21  and urges to act.

22  Q.  What kind of guidelines did you mean?

23  A.  The ATSA.

24  Q.  Can you tell us what that acronym stands for?

25  A.  Not offhand, no.

1           THE COURT:  What is the acronym?

2           THE WITNESS:  ATSA.  A-T-S-A.  They're a

3    national guideline in terms of dealing with sex

4    offenders.

5    Q.  Is this what's sometimes referred to as "cognitive

6    therapy"?

7    A.  Yes.

8    Q.  This is done on an outpatient basis, is it?

9    A.  It is.

10   Q.  Do they have an inpatient placement as well?

11   A.  No.

12   Q.  Are you aware of any inpatient treatment for sex

13   offenders in the district that you cover?

14   A.  No.

15   Q.  Did you have any concerns about Mr. Swarm being

16   enrolled in sex offender treatment?

17   A.  Um, I had concerns, yes.

18   Q.  What were those concerns?

19   A.  That he wouldn't be accepted in the treatment

20   because he's a high risk.

21   Q.  Did you have a conversation or two with Family and

22   Children's Society about that?

23   A.  I had ongoing conversations with them.  I got them

24   to agree to do the evaluation.  And, um, over, I believe

25   it was a six or eight, um, appointments, the evaluation,

1    they agreed to accept him on a probationary period.

2    Q.  What was your understanding of the assessment that

3    the Family and Children's Society was performing on

4    Mr. Swarm?

5                MR. WATKINS:  I'm going to object at this

6    point.  I think we're going to have somebody from Family

7    and Children's Society.  So to the extent he's now going

8    to start reporting hearsay, I don't think it's

9    appropriate here.

10                MS. CONNOLLY:  I think as the probation

11   officer supervising his term of release, he needed to

12   know what it was that they were looking at to make sure

13   that he could be part of that treatment.

14                THE COURT:  Well, I think then you're not

15   offering this for the truth of what they did, you're

16   offering it -- well, for what purpose?

17                MS. CONNOLLY:  How it informed Mr. Pierce so

18   that he could appropriately supervise Mr. Swarm.  He

19   needed to know that Mr. Swarm was in and on his way to

20   completing sex offender treatment to supervising a term

21   of his release.  Mr. Pierce is not giving the treatment

22   himself, he's relying on an outside vendor who's

23   reporting back to him, so he can make sure that this

24   term of supervised release is being met.

25                THE COURT:  And what's the relevance?

1          MS. CONNOLLY:  Because ultimately one of the
2    terms of the violation for his supervised release is
3    that he gets suspended from treatment and this is based
4    on information that he has to get from the treatment
5    provider to see if Mr. Swarm is complying with that
6    term.
7          MR. WATKINS:  I don't have any, um, opposition
8    to what was just laid out.  I just thought we were
9    starting to get into specific conversations and to the
10   extent that those are necessary, I mean, I think all of
11   that is coming out.  But I would like to --
12         THE COURT:  Well, why don't you put the next
13   question and see if there's an objection.
14   Q.  Mr. Pierce, I believe you told us that you had
15   several conversations with Family and Children's service
16   and ultimately they agreed to take Mr. Swarm on a
17   probationary period, is that right?
18   A.  That's true.
19   Q.  Do you know how long a probationary period it was
20   that they were taking him for?
21   A.  They were going to do it for, I believe, three
22   months.
23   Q.  And did you explain to Mr. Swarm that his, um,
24   acceptance into the program is probationary?
25   A.  Yes.

1    Q.  And how did you explain that to him, what did you

2    say?

3    A.  I explained to him that they had concerns about him

4    and he needed to give it his best effort to cooperate

5    with their rules and that this would help him along.

6    Q.  I'd like to turn your attention now to Exhibit 34 in

7    the book before you.

8    A.  (Turns.)

9    Q.  Do you have that in front of you?

10   A.  I do.

11   Q.  Could you tell us what Exhibit 34 is?

12   A.  This is my chronological record through PACTS.

13   PACTS stands for "Probation Automated Collection

14   Tracking System."

15   Q.  I noticed on the first page, page and a half, there

16   are some redactions.  Um, those aren't in your notes,

17   are they?

18   A.  No.

19           THE COURT:  Hold on just a second.  34?

20           MS. CONNOLLY:  Yes, your Honor.

21           THE COURT:  (Looks.)  All right.  Go ahead.

22   Q.  What's the purpose of keeping chronological notes,

23   Mr. Pierce?

24   A.  It's to keep a record of what we're doing with the

25   clients and what actions we're taking.

```
1    Q.  Um, just to help us if we're going to go through

2    some of these entries, could you help us with some of

3    the acronyms that we see here.  Occasionally we see a

4    reference to, um, capital U, capital A.  What does that

5    mean?

6    A.  That stands for a urinalysis test that was

7    conducted.

8    Q.  Is that a day he would call in?

9    A.  Yes.

10   Q.  And in that urinalysis test, what are you testing --

11        MR. WATKINS:  I'm going to object.  Well, all

12   right, I'll clear it up on cross.

13        THE COURT:  Go ahead.

14        MR. WATKINS:  I'll withdraw it.

15        THE COURT:  Go ahead.

16   Q.  For that urinalysis test, what are you testing for

17   specifically with respect to Mr. Swarm?

18   A.  Um, Mr. Swarm, we did a breathalyzer for alcohol, we

19   also did a -- I believe at that time a four-panel

20   instant test, which tested for amphetamines, cocaine,

21   marijuana and opiates.

22   Q.  And can you help us, um, with the breathalyzer, how

23   recent would the alcohol have to be in order to show up

24   on the breathalyzer?  If you know.

25   A.  The body basically processes, um, a bottle of beer,
```

1    a glass of wine, or a shot, about every hour.  So if he

2    were to test positive, he would have had to have

3    consumed alcohol an hour before showing up for the test.

4    Q.  And was the urinalysis also tested for alcohol or

5    just for the four panels of drugs that you described?

6    A.  It was tested for alcohol.

7    Q.  And was the urinalysis more sensitive to alcohol

8    than the breathalyzer?  If you know.

9    A.  Oh, I'm sorry.  The instant test is not testing for

10   alcohol, just the breathalyzer.

11   Q.  All right.  And when he was calling in each night,

12   was that for both urinalysis and the breathalyzer?

13   A.  Yes, it's for all of it.

14   Q.  Thank you.  Um, another reference we see sometimes,

15   for example, on Page 3 of 25 here at the top, there's

16   the initials capital C, capital S.  What does that stand

17   for?

18   A.  That stands for "Closing Summary."

19   Q.  And is that something you prepared?

20   A.  Yes.

21   Q.  And why did you have a closing summary?

22   A.  Um, to have a record if we have to go back and look

23   at what transpired.

24   Q.  With Mr. Swarm?

25   A.  Correct.

1  Q.  Um, on the next page, Page 425, there are a series

2  of entries that say "condition" and whatever that

3  condition is, is "removed."  Do you know why all these

4  conditions of the supervised release were removed from

5  here in your chronological report?

6  A.  Well, these are removed by a specialist and

7  basically I think they are being removed because of the

8  result of a revocation hearing, a violation.

9  Q.  So because he had been revoked from his supervised

10 release, were you closing his file?

11 A.  Yes.

12 Q.  Thank you.  Occasionally throughout the

13 chronological notes we see the initials "WMR".  What are

14 those?

15 A.  "WMR" refers to monthly reports that they have to

16 submit.  Um, it contains information on where they're

17 living, if they're working, um, what vehicles they're

18 driving, um, and it asked questions if they had any

19 association with law enforcement or with anybody on

20 probation or parole.  Basically pertinent information

21 that I would need to know.

22      For people that have sex offense convictions we

23 also have a separate sheet that's -- a sex offender on

24 this sheet that's connected to that is asked questions

25 about were you in contact with children and -- well, you

1    know.

2    Q.   Are these sheet forms that the offender fills out

3    and returns to you?

4    A.   Yes.

5    Q.   And how often are those WMRs due to you?

6    A.   They hand those in once a month.

7    Q.   And is it a retrospect report, I'd imagine?

8    A.   Yes, they're always filling it out for the month

9    that just occurred.

10   Q.   So on January 1 you would be submitting it --

11   A.   Filling it out for December.

12   Q.   Thank you.  Um, how often were you meeting with

13   Mr. Swarm during the one year you supervised him?

14   A.   I would say an average of at least once a week

15   between the urinalysis testing and meeting with

16   Mr. Swarm.

17   Q.   And what was your goal or objective in terms of what

18   you wanted to accomplish in your supervision with

19   Mr. Swarm?

20   A.   My goal was to, um, get him to trust me, to trust

21   the process, um, for treatment, um, to start

22   implementing what he's learning in treatment and how to

23   stabilize his life where he wouldn't reoffend.

24   Q.   And what were the ways in which you tried to

25   establish that trust relationship with Mr. Swarm?

1    A.   Um, by explaining things to him about what's coming,

2    what's to expect, um, encouraging him to participate,

3    um, in the process.

4    Q.   When you say to tell him what's coming, what

5    specifically are you referring to?

6    A.   What treatment would be like when he was getting

7    ready to go to treatment.  He was a very distrustful

8    person, so he didn't like groups, he didn't like being

9    around large amounts of people.  So I, you know, tried

10   to explain to him that this is what the process is and

11   what to expect so it would kind of alleviate some of his

12   fears.

13   Q.   Um, do you think you were successful in creating

14   that kind of trust with Mr. Swarm in general over the

15   course of your supervised release with him?

16   A.   I think we were building it to some degree.

17   Q.   Um, what was the working relationship between you

18   and Family and Children's Services, and what I mean by

19   that is was there any kind of, um, confidential wall

20   between the services they were providing and yourself?

21   A.   They -- Mr. Swarm signed a release that allowed

22   communication between myself and that agency, um, in

23   terms of progress, in terms of attendance concerns.

24   Q.   In the one year that you worked with Mr. Swarm, did

25   you, um, come to any conclusions about, um, the

1   decisions that Mr. Swarm made, the choices about where

2   he placed himself during the period of your supervised

3   release?

4   A.   The conclusion I came to is that Mr. Swarm kept

5   placing himself in the proximity of children under the

6   age of 18 on many occasions.

7   Q.   I'd like to turn your attention back to Exhibit 34

8   and specifically to Page 17 of 25.

9   A.   (Turns.)

10   Q.   I'd like to turn your attention to the entry on

11   November 21.  Do you see that?

12   A.   I do.

13   Q.   Um, did Mr. Swarm tell you that he had been in the

14   presence of children under the age of 18?

15   A.   Um, he told me that he was in the presence of

16   children under the age of 18.

17   Q.   And what was it that he told you?

18   A.   That he's basically hanging out with friends and

19   those friends have children that are under the age of

20   18.

21   Q.   Did he tell you whether or not the other adults were

22   present when he was around children?

23   A.   He indicated to me that they usually were.

24   Q.   And as a result of this disclosure did you have any

25   concerns about whether he was in violation of any of the

1    terms of his supervised release?

2    A.   Yes, I had concerns about him being in violation.

3    Q.   And what was it that you said to him?

4    A.   I warned him that he is in violation and that he

5    needs to not do that.

6    Q.   Why didn't you turn him in right then?

7    A.   Um, when you're supervising people you're trying to

8    give them every benefit of the doubt.  Um, you're trying

9    to determine if it's, um -- if it's an intentional

10   mistake or an unintentional mistake, and you're still

11   trying to assess that.  And you're also understanding

12   that when you're working with somebody, they're on a

13   learning curve, they had a behavior that was

14   unacceptable before and you're trying to change it.  So

15   you're trying to give them every benefit of the doubt in

16   terms of that.

17   Q.   And in terms of establishing this trust relationship

18   with Mr. Swarm, did you think it was a positive sign

19   that he made this disclosure to you?

20   A.   I did.

21   Q.   And was that something that you wanted to continue

22   to encourage?

23   A.   Absolutely.

24   Q.   Now, that was November 21st.  I'd like to turn your

25   attention now to Page 16 of 25 and turn your attention

1    to, um, the entry for November 26th.  Actually, I'm

2    sorry, that's still on the same page.  The 26th of

3    November, that's still on Page 17 of 25.  (Puts on

4    screen.)  Do you see the entry for 11-26?

5    A.  I do.

6    Q.  And what does that indicate?

7    A.  It indicates to me that Mr. Swarm failed to call

8    into the urinalysis program the previous evening.

9    Q.  Um, do you happen to know -- so that's sometime

10   between November 26th at 6:00 p.m. and November 27th at

11   8:00 a.m. that Mr. Swarm failed to call in, is that

12   right?

13   A.  Um, it's from November 25th from 6:00 p.m. to

14   November 26th at 8:00 a.m.

15   Q.  Oh, okay.  So it would have been from -- it would

16   have been from -- I see, from the 25th through the

17   morning of the 26th.

18          MS. CONNOLLY:  I would like the Court to take

19   judicial notice that November 26th is the day after

20   Thanksgiving in 2005.

21          THE COURT:  If there's no dispute, I'll assume

22   that's correct.

23          MR. WATKINS:  There's no dispute.

24   Q.  And when Mr. Swarm failed to call in on that day,

25   um, what did you do?  What was your practice?

```
 1    A.  Usually I would contact the person and ask them why
 2    they didn't call in, and as soon as possible, either
 3    that day or the day after.  Sometimes the person calls
 4    in and says "I forgot to call in" or report in.
 5    Q.  Now, I'd like to turn your attention now to, um --
 6    by the way, did Mr. Swarm give you any reason why he
 7    might have forgotten to call in, if you recall?
 8              THE COURT:  I don't think he testified that
 9    Mr. Swarm said he didn't.
10              MS. CONNOLLY:  Oh, I'm sorry.
11    Q.  Do you recall what it was Mr. Swarm told you about
12    why he didn't call in?
13    A.  On that specific occasion?
14    Q.  Yes.
15    A.  No.
16    Q.  I would like to turn your attention to Page 16 of
17    25, the entry for November 25th.
18    A.  (Turns.)
19    Q.  Is there an entry there that says "flag"?
20    A.  Once again Mr. Swarm failed to call into the
21    urinalysis program.
22    Q.  And the 25th was Christmas day, is that correct?
23    A.  Christmas day, yes.
24    Q.  Do you recall calling Mr. Swarm after that?
25    A.  Um --
```

1    Q.   Would something refresh your memory?

2    A.   Yes.

3    Q.   What would refresh your memory?

4    A.   To just look at the chrono for December 25th.

5    (Looks.)   I didn't speak to Mr. Swarm until the 29th.

6    Q.   And when you spoke with Mr. Swarm, what did he say

7    and what did you say?

8    A.   Um, he reported where he spent Christmas and what he

9    was doing on Christmas and New Year's.   He reported

10   basically his medical condition, his diabetes was in

11   flux.

12   Q.   When were you able to get a test from him after the

13   25th, was that also on the 29th?

14   A.   Yes.

15   Q.   And what if anything did Mr. Swarm tell you about

16   having any contact with children?

17   A.   I believe he said that he had no contact with

18   children that day.

19   Q.   Now, um, one of the things you said to build a trust

20   relationship with Mr. Swarm was that you would try to

21   tell him about things that were coming up.   Was one of

22   the things coming up a polygraph exam?

23   A.   Yes.

24   Q.   And do you know when that first polygraph was to be

25   administered?

1    A.   I believe the first polygraph was on January 16th.

2    Q.   And was this a polygraph you yourself were

3    administering to Mr. Swarm?

4    A.   No.

5    Q.   Who administered the polygraph?

6    A.   Um, the person's name is George Brown and he's the

7    contracted polygraph person at that time for our

8    district.

9    Q.   So it was an independent person who would perform

10   these polygraphs?

11   A.   Yes.

12   Q.   And how was it that you would prepare Mr. Swarm to

13   tell him that the polygraph was coming, what is it that

14   you said to him?

15   A.   Well, let him know what day it was coming on and we

16   would talk about what possible questions would be asked

17   and if there was anything that he would need to share

18   now and get it out before it came time to take the test,

19   and to talk about it in group, also.

20   Q.   Now, did you know what the subject matter for the

21   first polygraph was to be?

22   A.   The first polygraph is usually called the sexual

23   history polygraph where he would go through the

24   defendant's entire sexual history and ask all different

25   categories of sexual questions.

1    Q.  And you also said, I think, that you would encourage

2    him to disclose anything to you in advance of the

3    polygraph, is that right?

4    A.  Yes.

5    Q.  And what was the purpose of having those disclosures

6    made before the polygraph?

7    A.  Well, one, so he could pass the test.  If he

8    discloses he's got a better chance of passing the

9    polygraph and not be deceptive on that.  Um, plus it

10   helps him, once again, the more he gets out, his chances

11   increase of doing well in treatment and being safe in

12   the community.

13   Q.  Now, are you present when the polygraph is being

14   performed?

15   A.  No.

16   Q.  And, um --

17              THE COURT:  Ms. Connolly, when you reach a

18   convenient breaking point, we'll take the morning

19   break.  It doesn't have to be this minute, but it can be

20   if you want.

21              MS. PIEMONTE-STACEY:  This minute is fine,

22   your Honor.  Thank you.

23              THE COURT:  All right.  We'll take a 15 minute

24   break and we'll resume at 11:20 or 11:30.

25              (Short recess, 11:00 a.m.)

1          (Resumed, 11:30 a.m.)

2          THE COURT:  You may resume.

3          MS. CONNOLLY:  Thank you, your Honor.

4    Q.  Mr. Pierce, the first polygraph we were talking

5    about before the break, um, that was to be administered

6    when?

7    A.  I believe it was January 16th of 2006.

8    Q.  And was it, in fact, administered on that day, if

9    you know?

10   A.  It was.

11   Q.  And then after that polygraph did you have occasion

12   to speak with Mr. Swarm?

13   A.  I did.

14   Q.  And I'd like to turn your attention now to Page 15

15   of 25, the entry for the, um, 16th of 2006.  Do you see

16   that on the screen?

17   A.  I do.

18   Q.  On the page in front of you?

19   A.  Yes.

20   Q.  And can you tell us, um, what it was you discussed

21   with Mr. Swarm after the polygraph?

22   A.  After the polygraph I discussed with Mr. Swarm,

23   following up on what he had talked with the polygrapher

24   about, which was admitting to the six minor victims and

25   failing or showing deception on the test.

1    Q.  And do you recall what if anything Mr. Swarm said to

2    you at that time?

3              THE COURT:  Excuse me.  I don't understand

4    your testimony.  Did he admit to you that he was in the

5    vicinity of six minor victims or did he admit to the

6    polygraph examiner?

7              THE WITNESS:  Initially he admitted to the

8    polygrapher and then I met with the polygrapher and

9    Mr. Swarm after the test to learn the results of the

10   test and what was found out from the polygrapher, and

11   then after that I took Mr. Swarm back to my office and

12   we had a further discussion about that.

13   Q.  So in that further discussion with Mr. Swarm, did he

14   admit to you about the six minor victims?

15             MR. WATKINS:  Your Honor, may I object or

16   interject here?  Because of the Court's comment, can we

17   make it clear that what the polygrapher and then

18   Mr. Pierce were talking about were past conduct.  It's

19   not contemporaneous conduct.  This is an initial

20   polygraph exam.

21             THE COURT:  Oh, okay, this was past conduct?

22             MS. CONNOLLY:  Correct, just his sexual

23   history.

24             MR. WATKINS:  This was a sexual history

25   polygraph.  It was not contemporary.  It was not asking

```
1    contemporaneous questions.

2              MS. CONNOLLY:  That's right, your Honor.

3              THE COURT:  Then I don't understand.

4              THE WITNESS:  They're all the victims that he

5    had perpetrated before he came on supervision, your

6    Honor.

7              MS. CONNOLLY:  The purpose of this initial

8    polygraph was to get a baseline history of Mr. Swarm's

9    sexual --

10             THE COURT:  Well, why don't we do this in a

11   nonleading manner.  What question was he asked by you or

12   the polygraph examiner and what did he say?

13             THE WITNESS:  The polygrapher goes through a

14   history with him of --

15             THE COURT:  No, let's do what he said to you.

16   He went and he took the polygraph?

17             THE WITNESS:  Yes.

18             THE COURT:  And what did he tell you about --

19   so what did he say to you?

20             MR. WATKINS:  Your Honor, I'm going to object

21   and perhaps we can address this objection and talk

22   briefly before the Court continues on?

23             THE COURT:  Okay.  Go ahead.

24             MR. WATKINS:  As I understand the potential

25   testimony and in practice how the polygraph works is
```

1       that it's the threat of the polygraph which elicits

2       admissions, that is its purpose.  When someone fails the

3       polygraph, quote, unquote, "fails" the polygraph, there

4       is subsequent questioning of the person to see if they

5       can gain even further admissions.

6              Polygraph tests and results are not admissible in

7       a criminal proceeding or really any other criminal

8       proceeding.  Indeed, a person retains his Fifth

9       Amendment rights to the questions asked during the

10      polygraph exam.

11             In preparation to trial I made it clear and I will

12      make it clear here that I will object to the

13      introduction of the results of the polygraph exam here.

14      Certainly I think it makes sense and it's appropriate

15      for Mr. Pierce to talk about his admissions made

16      afterwards and his --

17                 THE COURT:  That's actually what I was trying

18      to get.

19                 MR. WATKINS:  All right.

20                 THE COURT:  And what I've heard is a little

21      different than what I understood from the openings, but

22      maybe I misunderstood it.  But that's what I want to

23      know, because I think that is admissible, what Mr. Swarm

24      said to you.

25                 MR. WATKINS:  To Mr. Pierce.

1           THE COURT:  Yes.

2           MR. WATKINS:  That's correct, your Honor.

3           MS. CONNOLLY:  That's what I would like to get

4    from the witness, your Honor.

5    Q.  What was it that Mr. Swarm said to you after the

6    first polygraph?

7    A.  Mr. Swarm admitted that he had six victims that he

8    had touched, brushed on the outside of their clothes,

9    had skin-to-skin contact, oral and vaginal sex with one

10   of the victims on multiple occasions.  Um --

11           THE COURT:  And did he say when?  In other

12   words, whether he was on supervised release or prior

13   to --

14           THE WITNESS:  This was prior to supervision.

15           (Pause.)

16           THE COURT:  Go ahead.

17           MS. CONNOLLY:  Thank you.

18   Q.  What if anything did you, um, say to Mr. Swarm after

19   he made these admissions to you?

20           THE WITNESS:  Even though he failed and showed

21   deception on the test, it was a good sign that he had

22   revealed these victims because it shows that he's being

23   honest about his past and that he's applying what he's

24   learning in group and getting that stuff out.  So I

25   congratulated him and said this is good, that this is a

1    good sign.

2    Q.  Actually in January of 2006, he wasn't yet accepted

3    into the sex offender group therapy, had he been?

4    A.  Um, I -- he may have been in the evaluation process

5    of it.  I'm not sure whether he was in group yet.  But

6    still I would still tell him that he did a good job at

7    this because I think revealing intimate stuff that he's

8    kept secret for so long is a good step in the direction

9    of getting treatment.

10   Q.  And then further in your visit with him in February

11   of 2006 he made further disclosures to you about the

12   nature of his relationship with some of those previous

13   victims, is that correct?

14   A.  Yes.

15   Q.  And can you tell us, as best you can recall, what

16   the information was that Mr. Swarm revealed to you about

17   those prior victims at that time in February of 2006?

18   A.  He talked about how his this one victim, Penny, how

19   much she meant to him and his feelings about that.  He

20   also disclosed about a niece that he had possibly

21   offended against.

22   Q.  When you say "possibly offended against," did he

23   specifically tell you, um, whether he had contact with

24   that niece or not?

25   A.  Um, Mr. Swarm would always make it the victim's

1    being the pursuer, not him, and I don't think he

2    admitted to me that he had -- he had thoughts about it,

3    I think is what he talked about, but that he didn't act

4    on it.

5    Q.   Um, the chronological notes that you take, um, and

6    that are in Exhibits 3 and 4, are they taken as a result

7    of your communications with Mr. Swarm?

8    A.   As I'm meeting with him, I'm taking notes down by

9    writing them down, but when I take my notes, I enter

10   them in the chrono and then I destroy my notes after

11   that.

12   Q.   I would like to turn your attention to the entry of

13   Page 15 of 25, the entry for February 1st, 2006.   In

14   that entry, um, at that time did you put in your chrono

15   that Mr. Swarm admitted to touching his step-niece

16   Bobbie?

17   A.   Yes.

18   Q.   Is that something different than what you just said

19   in terms of Mr. Swarm externalizing and saying that

20   others were touching him and being the aggressor?

21   A.   Yes.

22   Q.   And did you see that as a positive sign?

23   A.   Yes.

24   Q.   And then, um, were there occasions in January and

25   February where Mr. Swarm failed to call in for his daily

1  urinalysis?

2  A.  Yes.

3  Q.  Um, in February of -- I'm sorry.  Strike that.

4       At what point did Family and Children's Services

5  agree to accept Mr. Swarm on a probationary period, if

6  you recall?

7  A.  I believe it was in March, maybe, that they agreed

8  to start him on a probationary period.

9  Q.  In 2006?

10  A.  Yes.

11  Q.  And did they tell you why it was only on a

12  probationary period that they accepted Mr. Swarm?

13  A.  They were concerned about, um --

14           MR. WATKINS:  Again, I'm going to object, your

15  Honor.

16           THE COURT:  Sustained.  It's hearsay.  Well,

17  let's see.  Why?

18           MR. WATKINS:  Because it's hearsay.

19           THE COURT:  Well, no, I'm trying to -- I'm

20  pausing to see --

21           MR. WATKINS:  Your Honor, I'll withdraw that

22  particular objection.

23           MS. CONNOLLY:  Well, I'll try to rephrase the

24  question.

25           THE COURT:  It might have come in under 8033

1    anyway as an existing state of mind, depending on what

2    it related to.  But go ahead.

3    Q.  If Family and Children's Services had not agreed to

4    accept Mr. Swarm, what sex offender treatment would have

5    been available for him in your district?

6    A.  He would have to travel more than an hour away to

7    treatment in Ithaca or Syracuse.

8    Q.  And he had originally transferred from Syracuse to

9    Binghamton, is that correct, because he was living with

10   his dad?

11   A.  Well, he was living between Syracuse and Binghamton

12   in the past and had, in the past, attended Cortland

13   Mental Health, I believe, when he was on supervision.

14   Q.  Um, in March of 2006, in one of your visits with

15   Mr. Swarm, did he tell you he had been anywhere that

16   caused you some concern?

17   A.  Um --

18   Q.  If there's something that -- is there something that

19   would refresh your memory?

20   A.  May I refer to my chrono entries in March of 2006?

21   Q.  Yes.  I'll direct your attention to the March 16th

22   entry on Page 13 of 25.

23   A.  (Turns.)  Yes, on March 15th, he came to my office

24   for an appointment and, um, admitted to me that he had

25   gone to a Disney movie.

1          THE COURT:  I'm sorry.  I can't hear you.

2    A.  He came to my office on March 15th and reported to

3    me that he had been to a Disney movie, the movie

4    "8-Below," where children would commonly congregate.

5    Q.  And why did that cause you concern, Mr. Pierce?

6    A.  For just what I just said, that Disney movies

7    attract -- they're meant for children and they attract

8    children.

9    Q.  And what if anything did you say to Mr. Swarm at

10   that time?

11   A.  I told him that he's not to do that, not to go to

12   places where children congregate.  And I believe his

13   response was that he loves animals and that's why he

14   went to see that movie.

15   Q.  Was that a -- was his attendance at a movie theater,

16   at the Walt Disney movie, a violation of one of the

17   special terms of his supervised release?

18   A.  It could be, yes.

19   Q.  And did you violate him at that time?

20   A.  No.

21   Q.  You were willing to give him another chance?

22   A.  Yes.  It's a thinking error.

23   Q.  Um, occasionally would Mr. Swarm call you to talk

24   with you on the phone?

25   A.  Yes.

1   Q.   And in April of 2006, did you have an occasion to

2   get a phone call from Mr. Swarm about an upcoming drug

3   test?

4   A.   He left me a voice mail that was concerned about if

5   he had eaten poppy seeds would that show up on a test.

6            THE COURT:   If he had eaten what?

7            THE WITNESS:   Poppy seeds.

8   Q.   And what if anything did that message indicate to

9   you as his probation officer?

10   A.   It could have a couple of significant reasons.  One,

11   people get very concerned or paranoid about things that

12   are in their system when they're being tested or

13   sometimes they're, um, testing the waters to see if

14   they've done something and what would be revealed if

15   they ingested something.

16   Q.   And based on your experience supervising Mr. Swarm

17   up to this point, up until April of 2006, um, what if

18   anything did that message indicate to you about -- well,

19   indicate to you?

20   A.   Mr. Swarm had always tested negative on his tests,

21   so I wasn't that concerned about that.

22   Q.   Um, in April of 2006, if you know, was he up to date

23   with turning in his WMRs, his monthly reports?

24   A.   No.

25   Q.   Do you know how many months behind he was?

1    A.   He usually ran between a month and two months behind

2    on his monthly sheets.

3    Q.   And as part of your supervision did you go to the

4    home where Mr. Swarm was living?

5    A.   I did.

6    Q.   And you did an inspection there?

7    A.   I did.

8    Q.   And one of the terms of his release, he was supposed

9    to -- one of the standard terms was that he was supposed

10   to work or have an excuse why he wasn't working?

11   A.   Correct.

12   Q.   And which was it in Mr. Swarm's case?

13   A.   He could not work.  He had a medical reason.

14   Q.   So based on your supervision and going out to the

15   home, what did you learn about how Mr. Swarm spent his

16   days while on release?  What did he do?

17   A.   He basically would either go and visit friends that

18   usually had children or hang out at his house.

19   Q.   And, um, at some point, um, starting in April of

20   2006, did Mr. Swarm have a conversation with you about,

21   um, attending an upcoming festival, if you recall?

22   A.   Yes, he wanted to attend the Marathon Maple

23   Festival.

24   Q.   And what if anything did you say to Mr. Swarm about

25   that?

1    A.   I discouraged him from doing that and told him he

2    really needed to bring that up in group and hear from

3    the group members what they would say about that, which

4    I was reasonably sure they would say, "Don't go because

5    that's a place where children congregate."

6    Q.   And I was going to ask you -- my next question is

7    why didn't you want him there?

8    A.   Parades, festivals, that's places where children

9    usually gather.

10   Q.   And would it have been a violation of his special

11   conditions of supervised release had he attended the

12   Maple Festival without --

13   A.   It would be, yes.

14   Q.   Um, when was the next polygraph?

15           THE COURT:   I don't know if I can live with

16   this suspense.  Did he go to the Maple Festival?

17           THE WITNESS:   He did go.  He reported to me

18   that he didn't stay long because of the crowds.  He

19   didn't anticipate how crowded it was, so he returned

20   home.

21           THE COURT:   Go ahead.

22   A.   The next polygraph was in, I believe, in May of

23   2006.

24           MS. CONNOLLY:   If I could just have one

25   moment, your Honor?

1           (Pause.)

2     Q.   In prepping Mr. Swarm for the polygraph, what if

3     anything did you say to him?

4     A.   I just probably told him the day when it was going

5     to be and, once again, he needs to be as open as he can

6     be about anything that he's not revealed yet.

7     Q.   And did Mr. Swarm reveal anything to you?

8     A.   Not prior to the test, no.

9     Q.   I'd just like to make one correction.  Previously

10    you said that he did go to the Maple Fest.  Um, could

11    you look at your notes, Page 12 of 25, the entry for

12    April 19th and read that to yourself for a moment.

13    A.   (Reads.)

14    Q.   Didn't Mr. Swarm tell you he didn't go to the Maple

15    Festival.

16    A.   He didn't.  I'm sorry.  Yes.

17              THE COURT:  I'm sorry.  Where is it?

18              MS. CONNOLLY:  I'm sorry.  Page 12 of 25, the

19    entry for April 19th, 2007.

20              THE COURT:  So he didn't go?

21              MS. CONNOLLY:  He didn't go.  He talked about

22    going, but did not go.

23    Q.   By May, with the next polygraph coming, did you have

24    any concerns about the choices Mr. Swarm is making in

25    terms of where he's placing himself?

1   A.  Yes.

2   Q.  And what are those concerns you have?

3   A.  That he's associating with friends that are children

4   that are under the age of 18.

5   Q.  And at the time of the May polygraph -- well, strike

6   that.

7       What is the subject matter for the May polygraph?

8   A.  The May polygraph is called a "maintenance

9   polygraph" and it's basically -- part of it is to follow

10   up on the sexual history.  Um, when people come on

11   supervision for sexual offenses and we start treatment,

12   there's a learning curve there.  Um, so we expect that

13   there would be more information coming out after the

14   second polygraph.

15   Q.  And you were not in the room for the second

16   polygraph, were you?

17   A.  No.

18   Q.  Did you have occasion to speak to Mr. Swarm

19   immediately after that polygraph?

20   A.  I did.

21   Q.  And what if anything did Mr. Swarm say to you after

22   that second polygraph?

23   A.  He admitted to three more minor-aged victims.

24   Q.  And these are past victims?

25   A.  Past victims.

1  Q.  And what if anything did you say to Mr. Swarm at

2  that time?

3  A.  Um, I think it's good that he's revealing

4  information.  I talked to him about that.  We talked

5  about him being more comfortable in the process, of

6  being more open and honest about his past.  Um, and it

7  was an ongoing process.

8  Q.  Was this also something, to your understanding, he

9  was supposed to be working on in group as well?

10  A.  Yes.

11  Q.  In May of 2006, um, did there come a time when

12  Mr. Swarm asked permission to attend --

13          THE COURT:  I'm sorry.  To do what?

14          MS. CONNOLLY:  I'm sorry.

15  Q.  -- to attend a gathering in May of 2006, if you

16  recall?

17  A.  I'm -- I'll have to refer to my notes.

18  Q.  I'll turn your attention to Exhibit 34, page, um, 11

19  of 25, to the entry on May 24th, 2006.

20  A.  (Turns.)

21  Q.  Do you see that entry?

22  A.  Yes.

23  Q.  Does that refresh your recollection?

24  A.  Yes.  He asked to go to a concert at Ozzfest.

25  Q.  I was going to ask you, what is Ozzfest?

1   A.  I believe it's a concert put on by Ozzie Osborne

2   with other groups in attendance.

3   Q.  And, um, what did you say about that, in response to

4   Mr. Swarm's inquiry?

5   A.  Um, that that probably would be something I would

6   allow him to do.

7           THE COURT:  Did he also ask if he could attend

8   a church class on the Holy Spirit in Dryden for three

9   days?

10          THE WITNESS:  He did.

11          THE COURT:  That's the poet or is Dryden a

12  place?

13          THE WITNESS:  Dryden is a place, Dryden, New

14  York.

15          THE COURT:  Oh, okay.  Thank you.

16  Q.  Do you know whether he attended these events?

17  A.  I don't believe he attended the Ozzfest.  I couldn't

18  tell you -- I can't remember if he attended the

19  religious classes or not.

20  Q.  Um, that night, May 25th, do you know whether or not

21  Mr. Swarm made his call in for his urinalysis?

22  A.  Um, he did not.

23  Q.  And what did you do in response to that?

24  A.  Um, on May 26th I received a voice mail from the

25  offender, um, that he admits calling in the night

1  before.
2  Q.  And do you know how long it was before he had his
3  next test done?
4  A.  Um, not without referring to my chrono notes.  Um,
5  the next test was on June 15th, 2006.
6  Q.  I'd like to turn your attention to your entry of
7  June 6th, 2006, which is on Page 1125 as well.
8          THE COURT:  Actually, can I clarify
9  something?
10          MS. CONNOLLY:  Yes, your Honor.
11          THE COURT:  What about 6-3-06, was there a
12  drug test on that day?  It's the third entry down.
13          MS. CONNOLLY:  Yes, your Honor, I see that
14  here.  (Circles on screen.)
15          THE WITNESS:  Sometimes these are the results
16  of lab results of previous tests coming in.  But, yes,
17  possibly that could have been a test date.
18          THE COURT:  So --
19          THE WITNESS:  But I don't believe so.  I think
20  -- if it doesn't say "UA," then I believe that's a past
21  result.
22          THE COURT:  Okay.  Thank you.
23  Q.  So the point there is that basically there's some
24  period of time between drug testing, based on
25  Mr. Swarm's failure to call in, is that right?

1    A.   Yes.

2    Q.   On June, um, 6th, 2006, you had a meeting with

3    Mr. Swarm.  What is it he revealed to you at that

4    meeting, if you recall?

5    A.   On June 6th, there was a drug test and I had met

6    with Mr. Swarm and he didn't hand in his monthly

7    report.  Um, he reports he did go to a church seminar

8    and completed it.  He reports that he is learning from

9    group in how to set boundaries.  He also reported,

10   though, that his niece tried to crawl into his lap and

11   that he has to resist that urge to let her.  And he was

12   reminded by me not to be around children without

13   permission.  I also requested a letter from his sister,

14   the mother of the child, to state to me that she was

15   aware that he has this conviction and this condition.

16   Q.   Did you ever get that letter?

17   A.   I believe I did.

18   Q.   At this point, um, based on what you're hearing from

19   Family and Children's Services, did you believe he was

20   making progress in group in June of '06?

21   A.   Yes.

22   Q.   Um, at some point do you learn what his sex offender

23   status classification is by the State of New York?

24   A.   Yes.

25   Q.   And what is it you learned?

1   A.   That he is a Level 3.

2   Q.   And what if anything does that mean to you?

3   A.   There are three levels in New York state, Level 1

4   being the least dangerous and Level 3 being the most

5   dangerous.

6   Q.   Is that information that Mr. Swarm told you?

7   A.   I believe so, yes.  I also received a -- probably a

8   copy from the New York State Registry.

9   Q.   Could you, um -- I'm going to show you the first

10   page of a document and ask you if this is a document

11   that you recall seeing in the mail, the first page of a

12   document you recall seeing in the mail, and it's been

13   marked Government Exhibit E?

14              MR. WATKINS:  This is objected to and it

15   continues to be objected to.

16              MS. CONNOLLY:  E.  Yeah, it's proposed Exhibit

17   E.

18   A.   Um --

19              MS. CONNOLLY:  It's the "Order for a

20   Determination."

21              THE COURT:  And where is it in the materials,

22   please?

23              MS. CONNOLLY:  It's in the binder in the back.

24              (Pause.)

25              THE COURT:  All right.  This is the SORA

```
 1  determination?
 2            MS. CONNOLLY:  Yes.
 3  Q.  I just want to know if this is the document that you
 4  recall receiving in the mail?
 5  A.  Yes.
 6  Q.  That's the document that told you he was a Level 3
 7  sex offender?
 8            THE COURT:  Ms. Connolly, I can't hear you.
 9            MS. CONNOLLY:  Oh, I'm sorry.
10  Q.  Is this the document that told you that Mr. Swarm
11  was considered a Level 3 sex offender by the State of
12  New York?
13  A.  Yes.
14  Q.  Thank you.  Do you recall come June, July of 2006,
15  were there occasions when Mr. Swarm failed to call in
16  for his daily urinalysis?
17  A.  Yes.
18  Q.  Um, and in August were there times when he failed to
19  call in, as you recall?
20  A.  Yes.
21  Q.  At some point in August, um, is there a disclosure
22  that Mr. Swarm makes to you?
23  A.  (Silence.)
24  Q.  I turn your attention now to the entry of August
25  2nd, 2006, Page 9 of 25.
```

1   A.  (Turns.)

2           THE COURT:  Well, let's see.  This Exhibit

3   number is --

4           MS. CONNOLLY:  Exhibit 34.

5   A.  (Turns.)

6           THE COURT:  Okay.

7   A.  So he reports that he -- his step-mom allowed the

8   grandchildren to stay over at his house.  He didn't know

9   that it was happening and left the house to go to a

10  friend's house for an overnight.

11  Q.  Would it be a violation of any of the terms of his

12  release to be in the home with a child who is spending

13  the night at the home?

14  A.  Yes.

15  Q.  And what did you say to him after he made this

16  disclosure?

17  A.  He has to use good judgment.  If he's excusing

18  himself, which is probably a good idea, going someplace

19  where there's -- a child in the home would not be a good

20  idea.  He needs someplace safe where there are no

21  children.

22  Q.  So the fact that he's making this disclosure to you,

23  um, did you consider this to be a positive sign?

24  A.  I viewed it as progress, yes.

25  Q.  Do you know how many times in August Mr. Swarm

1   failed to call in for his urinalysis?

2   A.  Not offhand, no.

3   Q.  If I turn your attention to the entry starting for

4   Page 9 of 25, entries for 8-20, 8-22 and 8-31, which

5   goes into Page 8.

6   A.  (Turns.)  I see five times that he failed to call in

7   in August to the urinalysis program.

8   Q.  And each time he failed to call in, what would you

9   do?

10  A.  Um, I either called him in on that day or he called

11  me to say he forgot.

12  Q.  Did he ever give you a reason of why he forgot?

13  A.  I'm sure he did, you know.

14  Q.  Come October, was there another polygraph being

15  planned?

16  A.  There was.

17  Q.  And when was the October polygraph planned for?

18  A.  Um, I want to say the 15th of October.

19  Q.  And what if anything were you doing to get Mr. Swarm

20  ready for the October polygraph?

21  A.  Um, the same thing I had done for the previous ones,

22  to go over information, um, and he was processing,

23  apparently, things in group.  I had told him that there

24  was a polygraph coming up on a certain day.  He

25  apparently told group.

1    Q.   And up to this point what was your impression of how

2    Mr. Swarm was progressing?

3    A.   Um, I think on the surface of it it looked like he

4    was doing well.  Um, he had instances where he

5    kept being in the company or around minor children, but

6    he was showing that he was reporting certain things.

7    Um, at this point, a year later, he should start

8    implementing the tools he learned in treatment and not

9    be making these blatant mistakes.  So more focus of

10   applying -- of not being around children needs to be

11   implemented quickly.

12   Q.   Um, at some point in October, early October, does

13   Mr. Swarm -- do you receive a call from Family and

14   Children's Society about a disclosure Mr. Swarm made in

15   group?

16   A.   Yes.

17   Q.   And what was it that you were informed of?

18   A.   Um, Sarah Walsh, the therapist of Mr. Swarm's

19   treatment group, called me and left -- basically told me

20   that he had revealed that he had found an adult

21   pornographic DVD in a stream and had revealed that in

22   group and did he tell me about that?

23   Q.   In a stream?

24   A.   Um, across from his house it's kind of a boggy area

25   with streams and it's near the river.

1  Q.  Had Mr. Swarm disclosed this to you?

2  A.  No, not until that day.

3  Q.  And, um, I was going to ask you, when did Mr. Swarm

4  make this disclosure to you?

5  A.  Um, he came in the same day that Sarah Walsh had

6  called me and basically came into my office and tossed

7  -- tossed this DVD on my desk and said, "I'm supposed to

8  tell you about this.  I found this."  And then

9  subsequent to talking about it, he admitted that he had

10  had it for a little over two weeks and had viewed it and

11  masturbated to it.

12  Q.  And, um, was the viewing and possessing, both, of

13  adult pornography a violation of any of his treatment

14  terms, to your knowledge?

15  A.  It's a violation of his treatment terms, but not his

16  supervised release terms.  He has a condition of his

17  treatment that he's not to view any pornography.

18  Q.  And what did you say to him when he gave you the

19  DVD?

20  A.  "Is there anything else you need to tell me that

21  you're keeping secret?"

22  Q.  And what did Mr. Swarm say to you?

23  A.  I -- I don't recall if he told me then or after the

24  polygraph of more instances of being around children.

25  Q.  Um, is there something that would refresh your

1   recollection?

2   A.   Yes.

3   Q.   Would you like to take a look at Exhibit 34, I turn

4   your attention to the entry for October 4th, 2006 on

5   Page 7 of 25.

6   A.   (Turns.)  He said he found the DVD three weeks ago

7   and watched it over the weekend while his parents were

8   not there.  He had been masturbating to it several times

9   over the weekend.  And then he brought that to the

10   group's attention the previous week.  They told him to

11   destroy it and bring it to his officer.  So basically a

12   week went by and he hadn't done that.

13   Q.   Um, subsequent to the October 4th meeting you had

14   with Mr. Swarm, what was your next meeting before the

15   October polygraph?

16   A.   Um, it was scheduled for November 1st.

17   Q.   Do you have an occasion to see him again or talk to

18   him again in October before the polygraph?

19   A.   Yes.

20   Q.   And when was that?

21   A.   When he came in on October 13th for the polygraph.

22   Q.   And you spoke with him before then?  If you know.

23   If you recall.

24   A.   Um, I believe I spoke to him after the polygraph.

25   Q.   Do you recall whether or not, before the polygraph,

1    he had disclosed to you about being in the company of,

2    um, two minor children?

3    A.   (Silence.)

4    Q.   I turn your attention to the entry on Page 7 of 25,

5    the entry for October 12th.

6    A.   (Reads.)  No, he did not.

7    Q.   Is that a disclosure he made to Family and Children?

8    A.   Yes.

9    Q.   Did Family and Children make that disclosure to you?

10   A.   Um, Sarah Walsh had spoken to me about his

11   disclosure.

12   Q.   If you look at the 10-12 entry, um, I'm reading

13   here:  "Entry and chrono at 11:35, Pierce, Michael.

14   Defendant called the State to report being at a friend's

15   house."  Do you see that entry?  October 12th, 2006.

16   A.   Yes.

17   Q.   Um, was that a call that Mr. Swarm made to you?

18   A.   Yes.

19   Q.   And what was it that Mr. Swarm said to you?

20   A.   He called to report that he had been at a friend's

21   house where a three-year old resides.  He had been left

22   alone with a three-year old while the friend went inside

23   for a while.  Um, and the three-year old had kicked a

24   ball over to him and he had kicked it back.

25   Q.   So that was a disclosure that Mr. Swarm did make to

1   you before the polygraph, is that right?

2   A.   That's right.  Yes.

3   Q.   And subsequently was there another communication you

4   had with Family and Children's Services, with Ms. Walsh,

5   about that same topic?

6   A.   The same day, yes.

7   Q.   And what if anything did it mean to you that you had

8   received the DVD and then this disclosure in advance of

9   the polygraph?

10  A.   That he's gearing up to practice deception.  Even

11  though he's being forthcoming, it's like he's waiting --

12  he needs to have a polygraph come, to hold his feet to

13  the fire, before he starts revealing things.  It's a

14  concern.  It's not like he's coming forward voluntarily.

15  Q.   And how long has he been on supervised release at

16  this point?

17  A.   Almost a year.

18  Q.   And then there was a polygraph in October of 2006,

19  October 13th, is that right?

20  A.   That's correct.

21  Q.   And, um, you were not in the room for that

22  polygraph, were you?

23  A.   No.

24  Q.   After the polygraph did you speak with Mr. Swarm?

25  A.   I did.

1    Q.   And what if anything did Mr. Swarm say to you after

2    that polygraph on the 13th of October, 2006?

3    A.   The concerns were, for the polygraph, that he was

4    alone with minor children.  He had spent the night at a

5    house where a minor child was.  Um, that he wasn't being

6    truthful on his monthly reports and with his officers.

7    So the conversation went around those questions.

8         He admitted basically, over time, while I was

9    meeting with him that he had been with a female and they

10   were going swimming and they went to a house to get a

11   towel and when he went to the house there were two

12   six-year-old children at the house, um, and when he

13   turned to leave, one of the six-year olds hugged him

14   around the knees.

15        Um, he also revealed that he's hanging out with

16   his friend, TC, um, who has a minor child, and he's

17   going there on a regular basis, um, and that he was left

18   alone with this three-year old child.

19        He also admitted that he was at his sister's house

20   and his sister's child jumped from the bed onto his lap

21   while he was in a rocking chair.

22        Um, he also talked about going to a wedding where

23   he ran into, um -- I believe there were 8 or 9 year old

24   females walking back from the wedding, which was

25   apparently out in the country, quite a ways from the

1  cars, um, and being with them on the way back.

2  　　　He also talked about going to Hicker's Park, which

3  is a park in Oswego, New York, and he was attending a

4  100 kegger party there, which is a beer party.

5  Q.  Um, any other disclosures did he make to you at that

6  time?

7  A.  (Silence.)

8  Q.  Well, let me ask it a different way.  Um, looking at

9  your entry on Page 6 of 25, carrying over to 7 of 25,

10  does that chronological entry capture what you have just

11  told us about the disclosures Mr. Swarm made to you at

12  that time?

13  A.  I believe it does.

14  Q.  And once you had this information, um, what if

15  anything did you do?

16  A.  I got Mr. Swarm to give me some of the addresses of

17  these people so that I could contact them to try to get

18  some more information.  I was greatly alarmed, at this

19  point, about his admission about being around children

20  and totally disregarding, you know, what he was supposed

21  to be doing.  And I filed a violation with the court and

22  asked for a warrant.

23  Q.  Um, some of the offenses that Mr. Swarm had admitted

24  to in this October time period, do you know if those

25  were offenses that were -- strike that.  If those were

1   incidents that had happened earlier in the year?

2   A.  Yes, he claimed they occurred in June or July of

3   2006.

4   Q.  And was that at or about the time when you and

5   Family -- the Family and Children's Society thought he

6   was making good progress?

7   A.  Yes.

8   Q.  Um, when you made contact with some of these people,

9   um, did you keep a note of that in your chronology?

10  A.  I did.

11  Q.  And can you point, in your chronology, where the

12  entries are about your conversations with the contacts

13  you made after that disclosure?

14  A.  I had contacted, um, Brandy, who is the daughter of

15  one of Mr. Swarm's friends.  She, I believe is 17 and I

16  spoke to her.  She had told me that he had not been left

17  alone around her children at any time that she was aware

18  of.

19  Q.  Who was in the house when he was present at that

20  home?

21  A.  These children.

22  Q.  With the children?

23  A.  Yes, the minor children.

24  Q.  But you said that he wasn't left alone with the

25  children.  So who was the adult who was in the home with

1    him when he was there?

2    A.   Um, according to Brandy, she was the one in charge

3    when her mother wasn't there.

4    Q.   The 17-year old?

5    A.   Yes.

6    Q.   And would it be a violation of the terms of his

7    supervised release to be in the unsupervised presence of

8    a 17-year old?

9    A.   Yes.

10   Q.   And who else did you make contact with?

11          THE COURT:   Well, let me ask you a question,

12   because now we're at the heart of this, but it's 12:10

13   and I assumed we would have been finished with

14   Mr. Pierce much earlier and I have two other matters

15   scheduled for this afternoon.   We're going to stop at

16   1:00.   We're not going to sit tomorrow.   He may be

17   snowed in here.   It's just an observation.   Go ahead.

18          MS. CONNOLLY:   Well, I don't -- I certainly

19   don't want this witness to be snowed in.   I'm getting to

20   the end here, though.

21          THE COURT:   Okay.   Go ahead.

22          MS. CONNOLLY:   Thank you, your Honor.

23   Q.   So when you make the contact with the second person,

24   what if anything do you learn?

25   A.   That he's been hanging out with TC, TC's aware of

1    his conviction, but he's never left alone with her

2    daughter.

3    Q.  And how old is the --

4    A.  Three years old.

5    Q.  All right.  And I believe you said earlier, in

6    response to a question, that as a result you sought a

7    warrant?

8    A.  Yes.

9    Q.  And I would like to show you a document and ask you

10   if this is the document that you prepared?  Well, it's

11   Government Proposed Exhibit D.

12             THE COURT:  D?

13             MS. CONNOLLY:  "D" as in "dog."

14   A.  (Looks.)  Yes.

15   Q.  Putting before you the first page of that document.

16             MR. WATKINS:  And, your Honor, just for the

17   record, this is objected to as far as coming in as

18   evidence.  I'm not sure what the relevance is at this

19   point certainly.  He can talk about steps that he took,

20   but why this particular 12(c) petition comes in, it's

21   unclear to me.

22             MS. CONNOLLY:  Well --

23             THE COURT:  Well, he's objecting to you

24   questioning about it, I think.

25             MS. CONNOLLY:  Well, you're objecting to the

1    document itself, right?

2            MR. WATKINS:  Well, the document and I guess

3    we'll go question by question.  I'm not quite sure where

4    we're going on this.

5            MS. CONNOLLY:  May I, your Honor?

6            THE COURT:  Go ahead.

7    Q.  Is this a document you prepared?

8    A.  It is.

9    Q.  And what was the purpose for preparing this

10   document?

11   A.  This is a petition for a violation of a warrant from

12   the court.

13   Q.  And why were you making this 12(c) petition on

14   behalf of Mr. Swarm?

15   A.  Because he was in violation of at least three

16   conditions.

17   Q.  And what conditions were those?

18   A.  That he wasn't being truthful on this monthly report

19   with this officer, that he was, at that point, um,

20   terminated from supervision or from treatment, and, um,

21   that he had direct contact and was in the presence of

22   minor children.

23   Q.  And was this document submitted to the Court?

24   A.  It was.

25   Q.  And did the Court take action on it, if you know?

```
 1    A.   They did.
 2    Q.   And was there a revocation hearing that you
 3    attended?
 4    A.   October 31st, 2006 in Syracuse, New York.
 5    Q.   And what happened as a result of that revocation?
 6    A.   Mr. Swarm waived his right to a hearing, admitted, I
 7    believe, Violation Number 3, and was sentenced to 4
 8    months incarceration and 4 1/2 years of supervised
 9    release to follow.
10              THE COURT:  So let's see.  He admitted
11    Violation Number 3?
12              THE WITNESS:  Yes, sir.
13    Q.   And that's Number 3 in Exhibit D, is that correct?
14    A.   Yes.
15    Q.   And could you tell us what Violation Number 3 in
16    Exhibit D is?
17    A.   That he's not to have any direct contact with a
18    person under the age of 18 unless he's with a person
19    approved by the probation department.
20              MS. CONNOLLY:  Your Honor, we'd move for the
21    admission of the exhibit -- Government proposed Exhibit
22    D.
23              THE COURT:  Well, it's a document, I believe,
24    that could come in merely for the fact that it was filed
25    with the court, but not for the truth of the information
```

 1  that's in there.  These are allegations and, in fact,

 2  not all of them were admitted.

 3              MS. CONNOLLY:  Correct.  We could redact it

 4  and only have Violation 3.

 5              THE COURT:  Well, I don't think he even

 6  admitted -- did he admit everything in 3?

 7              MS. CONNOLLY:  Yes, your Honor.  Exhibit

 8  Number, um -- um, Exhibit 25 in the books.

 9              THE COURT:  But I thought the testimony, a

10  moment ago, was that he admitted that -- well, let me

11  see.

12      Wasn't it your testimony that in court he admitted

13  all of the charges or all of the facts in alleged

14  Violation Number 3?

15              THE WITNESS:  Yes, sir.

16              MR. WATKINS:  Your Honor, if I may be heard?

17  We actually have the transcript of that.

18              THE COURT:  I was just about to ask about

19  that.

20              MR. WATKINS:  We do have the transcript.  It's

21  been submitted as Exhibit H.  I believe it's Exhibit H

22  at the -- and what I think the --

23              THE COURT:  Do you object to H going in?

24              MR. WATKINS:  I don't.  I think the government

25  did.

```
1              MS. CONNOLLY:  We didn't see why the
2    transcript was necessary, but we have the judgment of
3    the Court where he admits to --
4              THE COURT:  Yeah, the transcript -- the
5    transcript would be better evidence of what he admitted
6    and what he didn't.  Is there any discrepancy between
7    the transcript and the judgment?
8              MS. CONNOLLY:  No, your Honor.
9              THE COURT:  Well, H can go in.
10             MR. WATKINS:  Your Honor, I think the
11   confusion arises perhaps from Ms. Connolly's and
12   Ms. Stacey's lack of experience with supervised
13   revocation proceedings, whereas the Court knows that a
14   lot of allegations could come in, but not all of them
15   get admitted to.  Clearly Mr. Swarm did admit to having
16   contact going to TC's house, for example, where there
17   was a three-year old, where it had not been approved,
18   and that clearly was a violation that was clearly
19   admitted.  I'm not sure that the transcript, as I recall
20   it, even is that specific, as often happens here.
21             THE COURT:  What's the next number?
22             MS. CONNOLLY:  Well, I'm --
23             THE COURT:  I'm asking the Clerk.  I'll admit
24   Exhibit H, the transcript, as Exhibit 40.
25             (Exhibit 40, marked.)
```

1          THE COURT:  You're going to have to lay a

2    further foundation with regard to section -- alleged

3    Violation 3, or maybe it's in this transcript.  Well,

4    I'll read the transcript.  I'll compare it to the

5    petition.

6        But basically this is a charge and except to the

7    extent that Mr. Swarm admitted it or the charge is

8    otherwise proven, he's testifying, I can rely on his

9    testimony, um, and it's not coming in for the truth.  So

10   since I think you want it in for the truth, at the

11   moment I'm not admitting Exhibit D.

12          MS. CONNOLLY:  No, your Honor, actually I

13   won't admit Exhibit D for the truth, but I think it does

14   -- it should be admitted as to what it was because if

15   you read both the transcript and the judgment, it will

16   only make sense, I think, if you look at the summons and

17   the --

18          THE COURT:  I will do that, I'll read the

19   transcript, I'll read the judgment, I'll read the

20   petition, and you can ask me again on Thursday.

21          MS. CONNOLLY:  Thank you, your Honor.

22   Q.  As a result of the hearing on the 31st of October of

23   2006, what happened with respect to Mr. Swarm's

24   supervised release?

25   A.  It was terminated.

1   Q.  Now, based on your experience the year that you

2   supervised Mr. Swarm, was he consistently compliant with

3   calling in for his urinalysis events?

4   A.  No.

5   Q.  Now, when he did call in, eventually he did pass, is

6   that correct?

7   A.  Yes.

8   Q.  But some period of time would elapse?

9   A.  Yes.

10  Q.  Was Mr. Swarm consistently compliant with submitting

11  his monthly reports?

12  A.  No.

13  Q.  Um, was Mr. Swarm, in your opinion, truthful with

14  you?

15  A.  No.

16  Q.  Was Mr. Swarm compliant with the conditions of his

17  supervised release that we went over in Exhibits 23 and

18  24?

19  A.  No.

20          MS. CONNOLLY:  Thank you.

21          THE COURT:  Now, who's going to ask -- did the

22  government tell you that there are certain things that I

23  was interested in that I wanted you to be prepared to

24  address today?

25          THE WITNESS:  Yes, sir.

1          MS. CONNOLLY:  I believe I asked earlier about

2     the pharmacological treatment, your Honor.

3          THE COURT:  Okay.  Did you read the reports of

4     Dr. Mills and Dr. Saleh?

5          THE WITNESS:  I did, sir.

6          THE COURT:  All right.  I'll ask him, if

7     necessary, although it may be next Tuesday by the time

8     we get to it, um, about all of Dr. Saleh's

9     recommendations and whether -- for example, whether they

10    can be implemented in his office.

11         MS. CONNOLLY:  I think all of them actually

12    are things that are being implemented or were with

13    Mr. Swarm, except for GPS, except for the

14    pharmacological, and I believe I did inquire of this

15    witness --

16         THE COURT:  You asked if anybody was on it,

17    you didn't ask whether he could be -- well, here, do you

18    want me to ask him now?  I know what I'm interested in.

19    I'm the finder of fact.

20         MS. CONNOLLY:  Go ahead.  Thank you, your

21    Honor.

22         THE COURT:  Would somebody give him

23    Dr. Saleh's report, please.

24         THE WITNESS:  I have it, sir.

25         THE COURT:  You've got it?

1              THE WITNESS:  Yes.

2              THE COURT:  Well, I need it.

3         All right.  Do you have the report dated January

4    8th, 2011?  It's the updated report.  That one page.

5              THE WITNESS:  Yes, sir.

6              THE COURT:  Would you go to Page 9, please.

7              THE WITNESS:  (Turns.)

8              THE COURT:  Do you see, in that first full

9    paragraph, there's a discussion of pedophilia?

10             THE WITNESS:  Yes.

11             THE COURT:  And Dr. Saleh says:  "I recommend

12   treatment with either medroxyprogesterone acetate or

13   leuprolide acetate.  These medications are given by

14   injection, are reduced or even stopped within a very

15   short period of time, usually within a few weeks for

16   paraphilic symptoms."

17        Is there -- if Mr. Swarm is released and he's

18   required to participate in a sex offender treatment

19   program, is there a program you could put him in that

20   would administer these pharmacological products to him?

21             THE WITNESS:  I'm not aware of a program that

22   has the capability to do this.  We also don't have the

23   protocol from the Administrative Office in Washington on

24   how we would monitor this.  I could have a doctor sign a

25   release so that, you know, the doctor could demonstrate

```
 1    that he gave the injection.
 2              THE COURT:  You say you're not aware of it.
 3    Have you asked the Family and Children's organization or
 4    anybody else?
 5              THE WITNESS:  Um, I've had discussions with
 6    Sarah Walsh about medications that would reduce the
 7    fantasies and, like I discussed earlier, we have two
 8    people that are doing it.
 9              THE COURT:  They're taking antidepressants,
10    though?
11              THE WITNESS:  Correct.
12              THE COURT:  But the point is, have you asked
13    Sarah Walsh or anybody else whether they could and would
14    do this?
15              THE WITNESS:  No, sir.
16              THE COURT:  All right.  And if I order you to
17    do that before next week, and maybe if you appear again
18    on television, um, you could do that?
19              THE WITNESS:  I could.
20              THE COURT:  Because what I'm interested in,
21    and it's not a game, um, is -- and that one of the
22    experts has said -- well, he has recommended this
23    treatment program, and he hasn't testified yet, he's
24    going to testify on Thursday, but he hasn't opined on --
25    I have to set the conditions of supervised release, so
```

1    -- and I'll put this in a written order, too, to help

2    you.  But I do want to know whether this is treatment

3    that could be provided feasibly -- could be provided to

4    Mr. Swarm if he were released on conditions of

5    supervised release?

6           Now, I don't know how my friend, Judge Skullen,

7    would read it, but he's -- his current conditions of

8    supervised release, which actually I don't think you've

9    been shown his current conditions of supervised release

10   either, requires, among other things, that he

11   participate in a sex offender treatment program,

12   correct?

13                THE WITNESS:  Correct.

14                THE COURT:  And if the sex offender treatment

15   program essentially prescribed this for him, um, it

16   would already be covered by his conditions of supervised

17   release, I guess, wouldn't it?

18                THE WITNESS:  It would.

19                THE COURT:  However, if Mr. Swarm came to you

20   now or next week and said, "I want to propose and agree

21   to a change in my conditions of supervised release to

22   provide for this pharmacological treatment during the

23   four and a half years I'm on supervised release, as part

24   of my treatment program," do you know, as you sit here

25   today, whether you would recommend that change in

1    conditions to Judge Skullen?

2              THE WITNESS:  I could propose it to the judge,

3    yes.

4              THE COURT:  But do you know whether you would

5    or --

6              THE WITNESS:  I would.  I would do anything

7    that would reduce the risk to the community.

8              THE COURT:  Okay.  And would you expect that

9    Judge Skullen would follow your recommendation?

10              THE WITNESS:  Yes.

11              THE COURT:  All right.  Then if you go down to

12    the second full paragraph where it says:  "Sex offender-

13    specific counseling is recommended.  Mr. Swarm should be

14    encouraged to talk freely and openly about his sexual

15    fantasies," et cetera.  Is that something that you

16    understand it is part of the sex offender treatment

17    program that Family and Children's would provide if they

18    took him back?

19              THE WITNESS:  Yes, sir.

20              THE COURT:  Do you have any information on

21    whether they would take him back?

22              THE WITNESS:  Um, the last I spoke to Sarah

23    was back when this violation had happened and he was

24    being sentenced and they were willing to take him back

25    at that time and continue with the treatments.  We were

```
 1   going to address the -- being out of bounds, the GPS,
 2   and implement GPS for him.
 3               THE COURT:  I'm sorry.  Would you say that
 4   again?
 5               THE WITNESS:  We had discussed, at the time of
 6   the sentencing, when he comes back on supervised
 7   release, that there would be a condition to include
 8   electronic monitoring and GPS coverage.
 9               THE COURT:  Real-time GPS or the kind you
10   described earlier?
11               THE WITNESS:  We can do real-time, but it's
12   expensive and it's at the cost to the defendant.
13               THE COURT:  All right.  It says here that
14   Mr. Swarm would also benefit from individual
15   psychotherapy.  Would that be a feasible condition of
16   supervised release?
17               THE WITNESS:  That's something I'd have to ask
18   Family and Children's.  They do one-on-one appointments
19   once every three months or so, but they don't do it on a
20   regular basis.
21               THE COURT:  And the next one talks about
22   substance abuse treatment, that "he participate in
23   specialized treatment, including group treatment and
24   involvement in AA and NA."  Is that something that you
25   could and would cause to occur if he was released?
```

1              THE WITNESS:  Yes, I can do that, the only

2      thing is -- when I read the report and that was

3      suggested, the only thing that came to my mind is that

4      mental health treatment doesn't like to compete with

5      substance abuse treatment.  They might argue the

6      chicken-and-the-egg theory, you know, which one should

7      be done first?  But we can certainly look into it and

8      see if we can make it happen at the same time.

9              THE COURT:  Well, here's essentially -- here's

10     the legal question I have to wrestle with.  Up to this

11     point Mr. Swarm has a qualifying conviction, he has a

12     diagnosis of pedophilia, but pedophilia -- which is a

13     serious mental illness, but there are different degrees

14     of severity, and the last witness I had -- and I don't

15     know what the next expert will tell me, but he said, you

16     know, that he's sort of in the middle.  He hasn't raped

17     a stranger or anything, but he continues to violate,

18     like, the conditions of his supervised release in the

19     ways that you've described.  And I have to decide

20     whether he's going to have serious difficulty in

21     refraining from engaging in sexually violent conduct or

22     child molestation, and I have to focus in on what's

23     child molestation -- and if released.  So the parties

24     agree that the conditions of supervised release are

25     relevant to that analysis.  And if Dr. Saleh was

1   assuming that there would be no restriction on his

2   ability to, um, be with children, but that restriction

3   exists in the conditions of supervised release, and, in

4   fact, you would have the power under the present

5   conditions of supervised release to require home

6   detention, does that mean you authorize him to go out?

7           THE WITNESS:  Correct.

8           THE COURT:  So I'm going to be asking -- I

9   ordered that the doctor read the conditions and be

10  prepared to testify about them.

11      What I think I'm going to order you to do is

12  basically show these recommendations to the provider,

13  Sarah Walsh, or Family and Children's, and see to what

14  extent they could or would -- well, could and would, um,

15  provide them, particularly the pharmacological

16  treatment, if he was ordered released, because I look at

17  this somewhat like a bail decision.  You know, what are

18  the feasible conditions of release and then once I

19  figure out what those are, I'll see -- I'll have to make

20  a decision as to what the risk is if he is released on

21  those conditions.  I'm not going to find or assume that

22  he's going to be subject to some impossible conditions

23  of release.  That's my current state of mind.

24      And maybe I should ask you this, and it's not a

25  rhetorical question.  If he were released and he were

1    placed under your supervision again, would you be

2    willing to supervise him?

3                 THE WITNESS:  If the Court orders me to do so,

4    I will.

5                 THE COURT:  Well, let me ask you this.  Do you

6    feel you could supervise him in a professional way?

7                 THE WITNESS:  Yes.  I can supervise -- we're

8    better equipped today to deal with people like this.  My

9    feeling is that he should go through something like

10   Butner to prove that he deserves that shot.  We would do

11   that for somebody that had an addiction problem and had

12   been through treatment for substance abuse, he needs to

13   show that he's willing to address this and then come out

14   and we can certainly abide by the conditions that you

15   set.

16                THE COURT:  Yeah, but the legal question for

17   me is not what would be best, but if -- you know, if he

18   hasn't been treated in prison, um, but he is going to

19   get some treatment as a condition of supervised release,

20   is the standard for commitment met or not met?  But, you

21   know, if I could define the questions as well as try to

22   give the answers, I think I'd agree with you.  Um,

23   anyway.

24                MS. PIEMONTE-STACEY:  Your Honor, may I be

25   heard on, um, the proposed -- the order that you

1    proposed?  Sarah Walsh, the treatment provider that

2    you're ordering him to speak to, is the witness that was

3    going to testify by video conference.  So I would be

4    happy to --

5              THE COURT:  It's good to be reminded of that.

6              MS. PIEMONTE-STACEY:  So I be happy to provide

7    all of this information to her in advance.

8              THE COURT:  I'm sorry.  I'm not thinking

9    clearly.

10             MS. PIEMONTE-STACEY:  Whatever the Court

11   wants.

12             THE COURT:  No, I think -- is there objection

13   to that, Mr. Watkins?

14             MR. WATKINS:  No, your Honor.

15             THE COURT:  All right.  Why don't you do

16   that.  But, in fact, we're going to get as far as we can

17   with you now, and I'm going to send you home ahead of

18   the snowstorm, and -- do you have video conferencing

19   capacity in your office?

20             THE WITNESS:  We do.

21             THE COURT:  If I need to hear from you

22   further, and I might, um, we'll put you on the

23   television.

24             THE WITNESS:  Okay.

25             THE COURT:  But I may have another -- well,

```
1    let me ask you this.
2          You talked about how Mr. Swarm, for example, was
3    not fully forthcoming immediately.  First he told you
4    about six victims?
5                THE WITNESS:  Yes.
6                THE COURT:  And then I think in advance of
7    another polygraph he told you about three more victims?
8                THE WITNESS:  Yes.
9                THE COURT:  Is it common or uncommon in your
10   experience for people under your supervision not to be
11   fully forthcoming immediately?
12               THE WITNESS:  It's common.  Like I said, he's
13   on a learning curve.  Um --
14               THE COURT:  And I'm not trying to put words in
15   your mouth, but I'm trying to see if I accurately
16   understand the essence of your testimony.  But for about
17   a year it looked like Mr. Swarm was trying.  There were
18   times he would tell you when he was in the vicinity of
19   minors, for example, correct?
20               THE WITNESS:  Correct.
21               THE COURT:  And he'd ask you if he could go to
22   the Maple Festival?
23               THE WITNESS:  Correct.  My concern is that
24   he's dangling a carrot for that to distract me from what
25   he was really doing is the question.  Is he truly making
```

1    an effort to tell me or is there another agenda?  And

2    when a year goes by and you're not implementing the

3    stuff, that's where the concern starts coming in.

4                    THE COURT:  And --

5                    THE WITNESS:  And he doesn't reveal this stuff

6    until the test comes and he has his feet held to the

7    fire.  So it's not like he's coming to me and being open

8    about it.

9                    THE COURT:  And he violated his conditions by

10   essentially being in the vicinity of minors, correct?

11                   THE WITNESS:  Correct.

12                   THE COURT:  Did you in any way receive or

13   develop information that he had touched any minors or

14   did anything more substantial even than that?

15                   THE WITNESS:  No.

16                   THE COURT:  Except the hugging of the niece.

17                   THE WITNESS:  Correct.

18                   THE COURT:  And maybe the baby-sitting and

19   somebody trying to sit in his lap?

20                   THE WITNESS:  No.

21                   THE COURT:  Okay.  That's -- well, okay.

22        Mr. Watkins, why don't you go ahead.

23                   MR. WATKINS:  Yes, and perhaps we can start

24   out from that last point.

25

1  CROSS-EXAMINATION BY MR. WATKINS:

2  Q.  You followed up the October disclosures with

3  questioning individuals to try to ascertain -- well, the

4  individual known as TC, you talked with him and asked

5  him about whether there was contact with the child?

6  A.  Yes.

7  Q.  And, again, there was a three-year-old child, which

8  seems to be far below Mr. Swarm's particular interest,

9  is that correct?

10  A.  Yes.

11  Q.  Um, you also talked with Brandy.  Does Brandy have a

12  familial relationship to Mr. Swarm?

13  A.  Not that I'm aware of.

14  Q.  You don't know whether she's his niece?

15  A.  I don't.

16  Q.  And Mr. Swarm's mother lives at 20 -- lives in

17  Homer, New York, correct?

18  A.  Yes, sir.

19  Q.  And as well as a sister and brother and a brother-

20  in-law, right?

21  A.  I don't know.

22  Q.  Um, and when Mr. Swarm explained to you about the

23  child jumping up into his lap, he also explained that

24  there were other people present, there were adults in

25  the same room, correct?

1    A.  Yes.

2    Q.  And again you did what you could to verify this and

3    that's true?

4    A.  Yes.

5    Q.  That's "Yes"?

6    A.  Yes.

7    Q.  Um, I want to turn to the revocation hearing

8    itself.

9         In the Northern District of New York is there a

10   practice of meeting informally with the judge before you

11   go in for a supervised release revocation hearing?

12   A.  Yes.

13   Q.  I don't want to know anything about the

14   conversations with the judge, but in that, did you

15   submit proposed conditions of further supervised

16   release?

17   A.  Yes.

18   Q.  And, um, I show you -- and were those ultimately the

19   conditions that were imposed?

20   A.  I believe so.

21   Q.  Perhaps I can put it up on the screen?

22            THE COURT:  What number is it?

23            MR. WATKINS:  It's Exhibit 25, Page 4.

24            (On screen.)

25            MR. WATKINS:  Well, perhaps -- do you have

1    Exhibit 25 in that binder?  It's actually coming up on

2    your screen here in a minute.  With any luck.

3                (On screen.)

4    Q.  Does this look familiar to you as the conditions

5    that you recommended to Judge Skullen?

6    A.  Yes.

7    Q.  And again, without getting into specific

8    conversations you had with the judge, um, the ultimate

9    outcome was four months, which was within the three- to

10   nine-month range, correct?

11   A.  That's correct.

12   Q.  Judge Skullen could have given him up to, I think,

13   three years, correct, for this particular charge?

14   A.  Without a departure, yes.

15   Q.  Yeah, but statutorily he could have gone all the way

16   up there and for somebody who was an incredible risk,

17   that might have been appropriate, somebody who had been

18   charged with a new crime, for example?

19   A.  Correct.

20   Q.  But Judge Skullen imposed four months, correct?

21   A.  Yes.

22   Q.  And, um, during the hearing, um, Mr. Swarm's then

23   attorney specifically mentioned that Family and

24   Children's Services was going to take him back once he

25   finished up the term of jail, is that correct?

1    A.   Yes.

2    Q.   And you were at the hearing, right?

3    A.   Yes.

4    Q.   And that was something you certainly didn't disagree

5    with, that's true, that's what was going to happen?

6    A.   After he finished serving his time, yes, he would

7    hopefully return back to Family and Children's.

8    Q.   In fact, Family and Children's Services is a

9    contract vendor for you, right?

10    A.   Yes.

11    Q.   And you kept the contract for Mr. Swarm open during

12    the period that he was serving the time, is that right?

13    A.   Um, I would try to do that.

14    Q.   Um, you closed it after you heard that he had been

15    considered for civil commitment proceedings, does that

16    sound correct?

17    A.   Yes.

18    Q.   But at least as of the time, on October 31st, 2006,

19    um, the additional conditions in addition to the

20    sanction he was receiving and an additional four years

21    and six months of release was something you were

22    prepared to work with?

23    A.   Yes.

24    Q.   I'm going to go to the other end of the timeline

25    here.

1        In preparing for release from the Bureau of

2    Prisons, is it your understanding that an inmate needs

3    to have a release plan?

4    A.   Generally, yes.

5    Q.   And that release plan goes to the probation

6    department to help in supervision afterwards?

7    A.   Yes.

8    Q.   The release plan would include an address, right,

9    the Bureau of Prisons requires a specific address?

10   A.   Yes.

11   Q.   In this case Mr. Swarm did not make his mother his

12   address that he was going to be returned to.  Do you

13   know why that is?

14   A.   I do not.

15   Q.   Are you aware of --

16   A.   I believe his mother lived across from a playground.

17   Q.   Right, and under New York law is that permissible

18   for him to live next to a high school?

19   A.   No.

20   Q.   So Mr. Swarm needed to find somebody else who would

21   take him on?

22   A.   Yes.

23   Q.   And that resulted in him living at Marathon?

24   A.   Yes.

25   Q.   And you've been to that house in Marathon, correct?

1    A.  Yes.

2    Q.  It's in a very -- well, it's rural, right?

3    A.  It is.

4    Q.  A long way from any main towns, right?

5    A.  Yes.

6    Q.  Indeed there aren't really houses too awfully close,

7    it's on a road, right?

8    A.  True.

9    Q.  And that's where Mr. Swarm was living at the time

10   during the period of supervised release?

11   A.  Yes.

12   Q.  And, um, at least at the beginning he didn't have a

13   license, he had to go back and get a driver's license?

14   A.  True.

15   Q.  So he had to depend on other people to drive him

16   around?

17   A.  Yes.

18   Q.  And, um, you mentioned that you wanted to modify the

19   conditions of release because of developments in

20   supervision, right?

21   A.  Correct.

22   Q.  And this is an odd topic, true, that supervision of

23   sex offenders is a constantly evolving issue with the

24   probation department?

25   A.  Yes.

1   Q.   In line with that there used to be a portion of the

2   probation supervision monograph that dealt with, um, the

3   supervision of sex offenders?

4   A.   Yes.

5   Q.   Um, that's been withdrawn and the probation

6   department indeed is trying to develop new protocols?

7   A.   Yes.

8   Q.   And right now there's no monograph, but hopefully

9   there is going to be new information for probation

10  officers to successfully deal with and monitor and

11  successfully help sex offenders?

12  A.   Yes.

13  Q.   You're not involved specifically with that, but

14  there's a working group, right, that's involved with

15  that?

16  A.   Correct.  We have a point of contact person in our

17  office that's keeping in contact with the working group.

18  Q.   Um, when you asked to modify the conditions of

19  supervised release, Mr. Swarm could have opposed that

20  and argued in front of the judge about it?

21  A.   He could have.

22  Q.   And he waived his right to do that?

23  A.   He did.

24  Q.   He went ahead and agreed to them, the conditions

25  that you wanted?

1  A.  Yes.

2  Q.  I want to talk about the urinalysis issues.

3       I think colloquially here we refer to a "color-

4  code system."  Does that make sense to you?

5  A.  I've heard about it.

6  Q.  So these telephone calls, they are telephone calls

7  in to determine whether that person needs to come in the

8  next day to give a urinalysis, right?

9  A.  Correct.

10  Q.  So Mr. Swarm would miss a telephone call, but that

11  doesn't mean he missed the urinalysis, it just means he

12  missed whether he was supposed to come in or not, right?

13  A.  Yes.

14  Q.  And if a closer view of the -- of your chronology

15  notes -- well, let me back up.

16       These notifications to you are automatic, right,

17  they're electronic, you'd get something saying he's

18  missed a phone call?

19  A.  I receive an e-mail saying he's missed a call from

20  the night before.

21  Q.  And sometimes it might be the same day he's already

22  scheduled to come into your office for another purpose?

23  A.  Correct.

24  Q.  Or you may have even scheduled an office visit the

25  same time you were thinking of doing the urinalysis,

1  right?

2  A.  Right.

3  Q.  So even though he missed that call, it's really of

4  no importance because he's coming in anyway -- he knows

5  he's coming in anyway, right?

6  A.  It's expected for people to miss once in a while.

7  When it gets to be a habit, that's a concern.

8  Q.  And indeed for many people it's quite a habit,

9  right, people go days and weeks sometimes without

10  calling in, right?

11  A.  Well, something would be done if that happens.

12  Q.  Because if they went several days they would likely

13  also miss the urinalysis itself and that is a violation

14  -- well, having four of them is a violation of

15  supervised release, is that right?

16  A.  Correct.

17  Q.  And just to be clear, Mr. Swarm didn't have four,

18  right?

19  A.  Four?

20  Q.  Positive urine tests?

21  A.  He never tested positive.

22  Q.  He never tested positive the entire time that he was

23  on supervised release with you, right?

24  A.  Correct.

25  Q.  And you're aware that one of the counts that he pled

1    guilty to was growing marijuana plants for his use at

2    his house, right?

3    A.   Yes.

4    Q.   And one probation officer might have had a healthy

5    skepticism that he's going to be able to test negative

6    all through his period of supervised release with that

7    kind of background, right?

8    A.   I'm sorry.  What was the question?

9    Q.   It was very tortured.

10        It would be, um -- it would be appropriate to have

11   heavy drug testing at the beginning of supervised

12   release, right?

13   A.   Generally in the program we have your number comes

14   up a lot, um, just to establish the baseline.

15   Q.   And because he kept testing negative, um, you

16   stepped him down on the color code or whatever you call

17   it, the number of times his number comes up?

18   A.   The computer alerts you if he's completed that

19   section and moves him down.

20   Q.   And did he get to the point where he had moved down?

21   A.   Um, I believe he completed one of the three phases.

22   Q.   Um, when he was first -- you didn't supervise him in

23   the very, very earliest days, is that accurate?

24   A.   Um, Syracuse initially received the release plan and

25   then officers in Syracuse dealt with it through when he

```
 1    was at the federal halfway house.
 2    Q.  And initially a probation officer, Genevieve Dubois,
 3    am I pronouncing it correct?
 4    A.  Dubois.
 5    Q.  Dubois.  She supervised him for just a week or two,
 6    right?
 7    A.  Correct.
 8    Q.  She's in Syracuse, right?
 9    A.  Yes.
10    Q.  In fact, on one occasion when Mr. Swarm missed the
11    telephone call for the drug analysis, the next day she
12    met with him in the office and ordered him to go up that
13    day to Syracuse?
14    A.  Yes.
15    Q.  Um, that's no easy matter from Marathon, is that
16    correct, about an hour away?
17    A.  30, 40 minutes or so, yeah.
18    Q.  And Mr. Swarm did that, he went and did the
19    urinalysis that same day?
20    A.  He did.
21    Q.  In fact, he explained to Ms. Debois that he was
22    scheduled for a Medicaid appointment that same day and
23    he didn't want to go up there and she said he had to?
24    A.  Yes.
25    Q.  And indeed he went up there and apparently missed
```

```
 1   the Medicaid appointment, right?
 2   A.  I believe so.
 3   Q.  But he did come in that day and test a negative for
 4   marijuana as he did on all occasions, correct?
 5   A.  Correct.
 6   Q.  And he, um -- when you talk about the monthly
 7   supervision reports, he ultimately did turn in all of
 8   the reports, is that right?
 9   A.  Yes.
10   Q.  And it's fair to say that monthly supervision
11   reports is a constant difficulty in supervising people,
12   people are not good about turning those in, is that fair
13   to say?
14   A.  Yes.
15   Q.  And so Mr. Swarm, even though sometimes a month or a
16   month and a half wait, he still turned all of them in,
17   right?
18   A.  Yes.
19   Q.  And indeed, on one of his supervision reports, he
20   noted in that report that he was meeting with somebody
21   who had a criminal record, Charles Hoff, right?
22   A.  Yes.
23   Q.  Um, and -- well, it can often be the case that
24   people don't report in specifically contacts with people
25   who are felons, right?
```

1    A.   It can the case, yes.

2    Q.   Because the only way you're going to know is if you

3    actually run that person's record, right, so that people

4    think they can get away with it, right?

5    A.   Yes.

6    Q.   Don't ask, don't tell, right?

7    A.   Yes.

8    Q.   But Mr. Swarm, on the other hand, told you about --

9    or told Ms. Dubois anyway about Mr. Hoff, right?

10   A.   Yes.

11   Q.   Once he was evaluated and accepted into the program

12   at Family and Children's Services, he went to all of

13   the, um, group sessions?

14   A.   Yes.

15   Q.   And he told you, I think you testified, that that

16   was very difficult for him, he wanted one on one rather

17   than group, correct?

18   A.   Correct.

19   Q.   He found it very difficult to talk about these

20   sensitive issues in group?

21   A.   Yes.

22   Q.   But nevertheless he went?

23   A.   He did.

24   Q.   And oftentimes in your meetings with him he would

25   say, "It's helping me," "I'm enjoying it," at one point

1    he said, right?

2    A.  Yes.

3    Q.  You talked about that Mr. Swarm came to you, I think

4    in November of 2005, and I'm looking at Exhibit 34, at

5    Page 17 of 25.  Let's see if I can put it up here.  (On

6    screen.)

7         Anyway, the issue was whether he was associating

8    with, um, a particular -- um, it might be associating

9    with children or associating with somebody who didn't

10   know that he had these offenses?

11   A.  Yes.

12   Q.  And you asked him to get a letter from that person?

13   A.  Yes.

14   Q.  And he actually did get a letter from that person

15   concerning that, is that true?

16   A.  Yes.

17   Q.  And he got letters from -- and later on you also

18   talked about, um, his sister who lived at his mother's

19   house, that you also wanted a letter from her concerning

20   whether he should be around the children or not, and he

21   supplied those letters from both of those people?

22   A.  Yes.

23   Q.  And both of them said, "Yes, I know about his

24   conviction," and, "Yes, it's okay for him to be in the

25   house with my children," right?

A.  Yes.

Q.  And again that was consistent with your

investigation after the failed polygraph where people

said, "Yes, I know about his conviction" and "Yes, it's

okay to be here," right?

A.  Yes.

Q.  And the problem was that Mr. Swarm had not disclosed

to you, had not disclosed to his group, about these, um,

incidental contacts, correct?

          MS. CONNOLLY:  Objection, your Honor, to the

characterization.

          MR. WATKINS:  Well, let me ask that again.

Q.  Did you ask about specific incidents that Mr. Swarm

had told you about when you went back to interview those

people?

A.  (Silence.)

Q.  Let's take TC first.  When you went back to TC, did

you tell her that Mr. Swarm had disclosed to you that he

had been alone for a brief period with his

granddaughter?

A.  Yes.

Q.  And did he, um -- did he suggest that it must have

been longer than a short period, I mean, did he describe

when Mr. Swarm was there?

A.  Describe what?

1    Q.  The circumstances of how Mr. Swarm might have been

2    at his house or had been in charge of a three-year old.

3    A.  TC just basically said that he hangs out at his

4    house and he's not left alone usually with his

5    granddaughter.

6    Q.  So that's consistent with what Mr. Swarm said, which

7    is that Mr. -- that TC went out for a cigarette for a

8    few minutes and left him there with the three-year old,

9    right?

10    A.  That's consistent with what he said.  It only takes

11    a second, though, for somebody to touch somebody.

12    Q.  And again this was the three-year old and Mr. Swarm

13    has never admitted some kind of inclination for that age

14    group, is that correct?

15    A.  As far as I know.

16    Q.  Similarly when you investigated the incident where

17    the child jumped up onto his lap, you found out that

18    that was in the presence of adults and that they had

19    seen that?

20    A.  That's what he reported, yes.

21    Q.  When you investigated did you find anything

22    inconsistent with what he reported?

23    A.  No.

24    Q.  You talked about the polygraph and that Mr. Swarm

25    only coming -- or generally coming forward when the

1  polygraph was imminent.

2      Is it safe to say that's one reason we use the

3  polygraph in probation is to force the issue?

4  A.  Yes.

5  Q.  And that is always available for as long as

6  somebody's on supervision that can go do a polygraph or

7  now this stress test, right?

8  A.  Yes.

9  Q.  And the stress test is the same thing, it's you ask

10  him a question, "Have you been with -- unaccompanied

11  with a minor?" and if it comes up negative, right away

12  you know there's a red flag, right?

13  A.  Correct.

14  Q.  And it is -- it didn't happen in Mr. Swarm's case,

15  but it is possible that an offender can say, "The

16  machine is wrong.  I didn't" -- "I wasn't with this

17  unaccompanied minor," correct?

18  A.  Correct.

19  Q.  It would raise a red flag, but that would put you in

20  a difficult position, right, because you can't use that

21  as a basis for the violation, right?

22  A.  Correct.

23  Q.  It is only when the offender admits, that's what you

24  use for the violation, right, or if you get some other

25  kind of independent information?

1    A.   Correct.

2    Q.   And the polygraph is also to -- and I think you

3    already said this, but is to, um, oddly enough, to try

4    to establish some trust, trying to say, "You can tell me

5    the truth about these things and we'll keep on moving,"

6    is that fair to say?

7    A.   Initially, yes.

8    Q.   When he, um, gave you the pornography DVD, he also

9    expressed some emotion about having taken it and viewed

10   it?

11   A.   He said he was ashamed.

12           THE COURT:  Did that seem sincere to you?

13           THE WITNESS:  Um, no.  By the time of the

14   third polygraph, your Honor, I was starting to seriously

15   question.

16   Q.   But there's no question this was adult pornography,

17   not a violation of his supervised release conditions,

18   correct?

19   A.   Correct.

20   Q.   But the program -- that's the motto of the program,

21   "No pornography at all," right?

22   A.   Right.

23   Q.   You talk about your concerns about the associations

24   Mr. Swarm was making that he seemed to be with

25   children.  Mr. Swarm, when he came to you on

1  supervision, was 42 years old?

2  A.  I guess so.

3  Q.  And he has family and friends that you know of in

4  the greater Homer area, right?

5  A.  Yes.

6  Q.  And they are, do you know generally, of his age, his

7  family and friends, his siblings?

8  A.  Do I know their age?

9  Q.  Yes.  Well, I suppose not.  But they're all of his

10  age, at least his siblings, right, or around his age?

11  A.  I guess so.

12  Q.  And they have children, is that right?

13  A.  They do.

14  Q.  And, um, it is a fact of the matter that when we get

15  into our 40s our cohort starts to have children, right?

16  A.  Yes.

17  Q.  So if we're with our friends and our family we may

18  necessarily be with our friends and family's children,

19  too, right?

20  A.  Theoretically, yes.

21  Q.  Which is why it is at least difficult, if not

22  impossible, to prohibit any contact with an 18-year old,

23  what we try to limit it to is unsupervised contact or

24  people who know what the game is here or what the issue

25  is here, right?

```
 1   A.  Say the question again?
 2   Q.  The release condition is "No contact with minors
 3   unless in the company of an approved parent or an
 4   approved adult," right?
 5   A.  Correct.
 6            MS. CONNOLLY:  Objection.  I don't think
 7   that's the term of --
 8            THE COURT:  Well, I've got the essence of it
 9   and we've got about two more minutes on the regular
10   schedule.
11      Do you have an idea about how much more you have?
12            MR. WATKINS:  If I could have three minutes I
13   think I could be done.
14            THE COURT:  Okay.
15   Q.  You talked about the medication, the chemical
16   treatment of pedophilia and that you have no protocol by
17   which to do it?
18   A.  Correct.
19   Q.  Are you aware of any other federal districts where
20   probation departments do employ that as part of their
21   release?
22   A.  I'm not aware of it.
23   Q.  Your point person, is he or she on the working
24   group?
25   A.  No.
```

1  Q.  But she would be aware of whether there's

2  consideration of that or whether other districts are

3  doing that, right?

4  A.  She could probably find out.

5  Q.  Um, you talked about, um, medication and cost.

6  You're aware that Mr. Swarm is disabled so he has a

7  steady stream of income?

8  A.  Yes.

9  Q.  As far as active GPS versus passive GPS, you say

10  there's a cost to the offender.  Is there a sliding

11  scale involved with that?

12  A.  Um, it's based on their ability to pay.

13  Q.  So Mr. Swarm could be put on active GPS while he's

14  in the community and someone would figure out how much

15  he owes to make that so?

16  A.  Yes.

17  Q.  Um, just to go back while he was on supervised

18  release.  One of the conditions was your ability to scan

19  his computer?

20  A.  Yes.

21  Q.  And you did that on at least one unannounced

22  instance?

23  A.  Yes.

24  Q.  Did you find anything untoward on his computer?

25  A.  No.

1   Q.   There are other programs developed now that can

2   actually log computer use?

3   A.   Yes.

4   Q.   Does your district use those programs?

5   A.   Yes, we actually have a lot of remote monitoring

6   matters.

7   Q.   So something could be on Mr. Swarm's computer, for

8   example, where it would report to you at all times what

9   he was looking at, if he would be allowed on the

10  Internet at all?

11  A.   Yes.

12  Q.   Um, the judge asked you this, but I want to follow

13  up.   Individual one-on-one counseling is not the model

14  that Family and Children's Services uses?

15  A.   Generally, no.

16  Q.   But that could be available that you could find a

17  psychotherapist in the greater Binghamton area who deals

18  with issues of pedophilia?

19  A.   Possibly.

20  Q.   And again where Mr. Swarm has -- is disabled and has

21  Medicaid, perhaps there's a provider that would be able

22  to do that based on his insurance?

23  A.   Yes.

24          MR. WATKINS:   That's all I have, your Honor.

25          (Pause.)

```
 1                    MR. WATKINS:  Oh, your Honor --
 2                    THE COURT:  Just one second.  (Pause.)  Yes.
 3                    MR. WATKINS:  Mr. Swarm is getting a little
 4       woozy.  I have some candy here.  Ordinarily the marshals
 5       would not allow me to do that.
 6                    THE COURT:  Is there any objection to
 7       Mr. Watkins giving Mr. Swarm --
 8                    THE MARSHAL:  It's a standard objection, but
 9       you can overrule it.
10                    THE COURT:  Okay, you object, and I'm going to
11       let him give him the candy.  There's also things called
12       Glucogin, I think it's called.
13                    MR. WATKINS:  He's telling me he just does not
14       have one with him right now.
15                    THE COURT:  The Glucogin?
16                    MR. WATKINS:  Yes, your Honor.
17                    THE COURT:  All right.  It may be the marshals
18       who are transporting him could ask him or remind him to
19       bring what he's supposed to take.
20                    MR. WATKINS:  They have it downstairs, he
21       tells me, it's just the nature of his condition.
22                    THE COURT:  We're only going to be here a few
23       more minutes.
24                    MS. CONNOLLY:  Your Honor, just one follow-
25       up?
```

1        THE COURT:  Sure.

2

3   REDIRECT EXAMINATION BY MS. CONNOLLY:

4   Q.  Was there any indication on the third polygraph that

5   there was deception on the question whether he had

6   touched any of the minors that were disclosed?

7        THE COURT:  I think this is what Mr. -- I

8   think this is what was objected to, the polygraph -- you

9   want -- you're trying to get in the results of the

10  polygraph, not what he said after the polygraph.

11       Do you object to that?

12       MR. WATKINS:  I do, your Honor.

13       MS. CONNOLLY:  Well, your Honor, what I was

14  trying to get at is I think there was a question whether

15  there was any evidence of touching.

16       THE COURT:  Yeah, the polygraph is not

17  admissible evidence under the Federal Rules of Evidence,

18  as far as I know.  It's not admissible.  So if you're

19  asking did he have any evidence?

20  Q.  Was there ever any disclosure made to you about

21  whether there was touching of any of the minors that

22  were disclosed?

23       THE COURT:  You mean any disclosure made to

24  him by Mr. Swarm?

25       MS. CONNOLLY:  Correct.  I'm sorry, your

```
 1   Honor.  Yes, your Honor.
 2   Q.  If you recall.
 3   A.  Just the hugging around the knees by the six-year
 4   old, I believe.
 5   Q.  And then just one final thing.  The -- I think you
 6   mentioned this earlier, but I think you were not clear.
 7       The alcohol testing, is that done by the
 8   urinalysis?
 9   A.  The day he comes in for urinalysis, he blows into an
10   Alco Sensor.
11   Q.  So there are two parts to that daily test?
12   A.  Yes.
13           THE COURT:  And did he ever test positive for
14   the use of alcohol?
15           THE WITNESS:  No.
16           THE COURT:  But he would have to have had a
17   drink within the hour to test positive?
18           THE WITNESS:  Yes.
19           MS. CONNOLLY:  That's all, your Honor.  Thank
20   you very much.
21           THE COURT:  I actually have a couple.
22           (Pause.)
23           THE COURT:  You read Dr. Saleh's proposed
24   treatment plan?
25           THE WITNESS:  Yes.
```

1              THE COURT:  So there's certain things that he

2       would recommend if Mr. Swarm was released.

3          Is there anything else, on reflection, in addition

4       to the existing conditions of supervised release and

5       perhaps what Dr. Saleh recommends, that you would

6       recommend if Mr. Swarm is released soon?

7              THE WITNESS:  Um, nothing more than what the

8       doctor recommended.  I had a question whether his

9       diabetes medicine would interfere with these injections.

10             THE COURT:  Well -- and, in fact, I heard some

11      testimony on that that it might, um, and that it would

12      have to be -- that his blood sugar would have to be

13      carefully monitored and that it would be better to start

14      on an inpatient basis with the pharmacological treatment

15      so that could be done.

16         But anyway if something comes to mind before next

17      Tuesday, I may ask you this question again.  That's one.

18         Two, let's say Mr. Swarm was released on

19      conditions, the existing conditions and perhaps

20      additional conditions that he agrees to in the course of

21      this proceeding and are imposed before he's released,

22      and let's say he violates some of those conditions, you

23      find that he's been in the vicinity of minors without

24      supervision or that -- well, what would you do in those

25      circumstances?

```
 1            THE WITNESS:  What we've been doing in the
 2     last year, your Honor, is I've become the case agent,
 3     I've been investigating -- if I find out information
 4     that he's been violating his conditions, um, I would
 5     work with the FBI in developing a new case.  So he's
 6     looking at a new -- if he gets convicted, a 10-year
 7     mandatory minimum on the sex offense plus a violation,
 8     and that's how we're kind of addressing those issues.
 9            THE COURT:  So let's see if I understand
10     this.  Let's say he gets released and you have reason to
11     suspect, perhaps based on what he says, that he's
12     touched a minor, um, and in that sense molested a child,
13     or something that -- well, actually I don't want to put
14     words into your mouth.  Explain to me, please, what you
15     just said.
16            THE WITNESS:  If he violates his conditions by
17     touching a minor child, um, I would seek new charges
18     against him for that offense on top of a violation being
19     filed.
20            THE COURT:  And would you quickly seek to have
21     him revoked?
22            THE WITNESS:  I would quickly have him taken
23     into custody, yes.
24            THE COURT:  So basically -- and what if you
25     found out that he was in the vicinity of a child under
```

1  18, either alone or without somebody whom you had

2  approved, what would you do?

3           THE WITNESS:  I would try to find out if it

4  was an intentional or unintentional act.  First of all,

5  if it was intentional, I definitely would file a

6  violation given Mr. Swarm's history and what he's gone

7  through already.

8           (Pause.)

9           THE COURT:  All right.  Does anybody -- again,

10  I want your advice on this.  Does anybody have an

11  objection to Mr. Pierce being present when Ms. Walsh

12  testifies next week?

13           MS. CONNOLLY:  You mean in the room when she's

14  being questioned?

15           THE COURT:  Well, in the room or -- I guess

16  I'd like him to be available after she testifies.  She's

17  going to testify by video.

18       You have a video capacity in your office, is that

19  correct?

20           THE WITNESS:  We do.

21           THE COURT:  You know, ideally she would come

22  to his office, testify there, and either he could hear

23  her testimony, because you might want to ask questions

24  about it or I might, or if there were further questions

25  for Mr. Pierce, they could be put after her testimony.

```
 1   What are your thoughts?
 2              MS. CONNOLLY:  We have no objections.
 3              MS. PIEMONTE-STACEY:  May I, your Honor?  I
 4   may just want to -- I arranged the video, so I
 5   apologize, but --
 6              THE COURT:  Go ahead.
 7              MS. PIEMONTE-STACEY:  The only issue is that
 8   we just have to get that reset up with the Court in
 9   time.  Right now she was going to the U.S. Attorney's
10   Office in Binghamton and she was testifying by video
11   there.  So we just need to coordinate.  And then the
12   sequestration order, with no objection --
13              THE COURT:  Right, well, that's why I'm
14   asking.
15         Mr. Watkins, what are your thoughts on this?
16              MR. WATKINS:  I have no objection as long as
17   the sequestration order is in effect until that time,
18   with the exception of the specific thing that we talked
19   about before.
20              THE COURT:  Well, actually, I don't need
21   Mr. Pierce to ask her to review the conditions, I'll
22   rely on the U.S. Attorney's Office to do it.  Okay?
23              MS. PIEMONTE-STACEY:  Yes, your Honor.
24              THE COURT:  That keeps the sequestration order
25   in place then.
```

```
 1              MS. PIEMONTE-STACEY:  Okay.

 2              THE COURT:  Um, your office is in Binghamton,

 3     too?

 4              THE WITNESS:  The U.S. Attorney's Office is on

 5     the third floor of the building.

 6              THE COURT:  Right, that's what I -- a small

 7     town, but not that small, and loved by those who live

 8     there.

 9              MS. PIEMONTE-STACEY:  Yeah, I just wasn't sure

10     how much time --

11              THE COURT:  Right, the ideal would be -- and

12     should he be present when she testifies or not?

13              MS. CONNOLLY:  We would have no objection,

14     your Honor.

15              MR. WATKINS:  Nor would I.

16              THE COURT:  Because, you know, fundamentally,

17     you know, if I'm persuaded that it's appropriate to let

18     Mr. Swarm out, it's going to be relied -- in reliance on

19     the quality of the treatment and the promise of the

20     treatment, probably.  I mean, the conditions of

21     supervised release are going to be meaningful and then I

22     think everybody would want to minimize the consequences

23     if it turns out the prediction is not prophetic, so.

24          All right.  As far as you know are you able to be

25     available next Tuesday morning?
```

1          THE WITNESS:  I can make myself available,

2     your Honor.

3          THE COURT:  All right.  And if necessary tell

4     my friend, Judge Skullen, that I said "Thank you" and,

5     in any event, when you see him, say hello to him for me.

6          THE WITNESS:  Good.  What time on Tuesday?

7          THE COURT:  I suspect it will be sometime --

8     we can't tell until I finish the testimony on Thursday,

9     but it will either be 9:00 or when we finish Dr. Saleh.

10    All right?  All right.  You're excused.  Thank you very

11    much.

12         Is there anything -- well, let's see.  We're going

13    to take tomorrow off and we'll have Dr. Saleh on

14    Thursday and then we're going to have Ms. Walsh.  And

15    are there any more government witnesses or is that it?

16         MS. PIEMONTE-STACEY:  Dr. Ferraro, she was

17    outside today.  So, um, perhaps I should instruct her to

18    come later on Tuesday?

19         THE COURT:  We'll see where we are on

20    Thursday.  We're not going to get to her -- well, do you

21    think you might get to her on Thursday?

22         MS. PIEMONTE-STACEY:  Um, I suspect Dr. Saleh

23    will take the whole day.

24         THE COURT:  I think he will, too.  And today

25    was the day you were worrying about not having enough

1    witnesses, and it's 1:15.

2            MS. PIEMONTE-STACEY:  Your Honor, just because

3    it's a civil case and we have this hundred mile issue,

4    um, and I don't know if the Court thinks it's

5    appropriate, but I have absolutely no idea as I stand

6    here right now if I can get Ms. Walsh to agree to be

7    available next Tuesday.  Um, is it possible to have some

8    type of order issued, um, that -- because I think it's

9    -- you know, I understand what I'm asking the Court and

10   I'm just trying to resolve what I anticipate is going to

11   be a problem, um, that because of the motion we filed

12   earlier, she's dealing with a medical issue at work, her

13   old practice, and --

14           THE COURT:  Actually I didn't -- I don't have

15   a vivid memory of the motion.  I just --

16           MS. PIEMONTE-STACEY:  Yeah.

17           THE COURT:  I mean, here's the -- when is she

18   supposed to testify, Thursday?

19           MS. PIEMONTE-STACEY:  Thursday at 9:00.

20           THE COURT:  And she's arranged that?

21           MS. PIEMONTE-STACEY:  She has.

22           THE COURT:  Well, two things.  One, tell her

23   that because of the snow storm we're not going to sit

24   tomorrow, that there's a doctor who we expected was

25   going to testify -- who is going to testify on Thursday

1    instead of tomorrow, so it's pushed back, could she

2    please be available on Tuesday?  If she says "Yes," you

3    don't need an order.  If she says "No," you can ask me

4    for an order, but you'll have to tell me what my

5    authority to issue it is.

6              MS. PIEMONTE-STACEY:  Yeah, I understand, your

7    Honor.  I was trying to come up with some kind of

8    creative solution for some of the push-back I've been

9    getting myself in terms of the testimony.

10             THE COURT:  Well, the other thing I would say

11   is, if for some reason Tuesday is particularly bad, or

12   Tuesday morning, or it might be Tuesday afternoon, I

13   mean it's possible -- if 9:00 is better for her than

14   11:00, then, you know, maybe we could do that.

15             THE CLERK:  We have a plea on for Tuesday

16   afternoon.

17             THE COURT:  It's possible that we could do her

18   Tuesday afternoon.  But I'm really determined to finish

19   the evidence in this case no later than next Wednesday.

20   You may get an answer next week.

21             MS. PIEMONTE-STACEY:  I will tell her that,

22   your Honor.  Thank you, your Honor.

23             THE COURT:  All right.  The Court is in

24   recess.

25             (Adjourned, 1:15 p.m.)

```
 1                    C E R T I F I C A T E

 2

 3

 4

 5          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

 6    do hereby certify that the foregoing record is a true

 7    and accurate transcription of my stenographic notes,

 8    before Chief Judge Mark L. Wolf, on Tuesday, January 11,

 9    2011, to the best of my skill and ability.

10

11

12

13    /s/ Richard H. Romanow 03-15-11
      _____
14    RICHARD H. ROMANOW  Date

15

16

17

18

19

20

21

22

23

24

25
```