1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3                                Civil No. 07-cv-12062-MLW

4

5

6    UNITED STATES OF AMERICA,
                     Petitioner
7
     vs.
8

9    ANDREW M. SWARM,
                     Respondent
10

11

12                     * * * * * * * *

13
                     For Hearing Before:
14               Chief Judge Mark L. Wolf

15

16      18:4248(a) Commitment of Sexually Dangerous Person

17

18                     United States District Court
                       District of Massachusetts (Boston.)
19                     One Courthouse Way
                       Boston, Massachusetts 02210
20                     Wednesday, January 19, 2011

21                     * * * * * * *

22
                  REPORTER: RICHARD H. ROMANOW, RPR
23                     Official Court Reporter
                    United States District Court
24      One Courthouse Way, Room 5200, Boston, MA 02210
                     bulldog@richromanow.com
25

```
1                    A P P E A R A N C E S

2

3   EVE A. PIEMONTE-STACEY, ESQ.
    ROSEMARY CONNOLLY, ESQ.
4       United States Attorney's Office
        One Courthouse Way, Suite 9200
5       Boston, Massachusetts 02210
        (617) 748-3265
6       Email: eve.stacey@usdoj.gov
        For the Petitioner
7

8   TIMOTHY G. WATKINS, ESQ.
    IAN GOLD, ESQ.
9       Federal Defender's Office
        51 Sleeper Street, 5th Floor
10      Boston, Massachusetts 02210
        (617) 223-8061
11      Email: Timothy_watkins@fd.org
              Ian_gold@fd.org
12      For the Respondent

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        I N D E X

2

3    WITNESS                 DIRECT  CROSS  REDIRECT  RECROSS

4

5    ANDREW SWARM

6         By Mr. Watkins:      8                162

7         By Ms. Stacey:            114

8

9    DR. ANDRES HERNANDEZ

10        By Ms. Stacey       171

11        By Mr. Watkins:            185

12

13   CLOSING ARGUMENT BY MS. CONNOLLY................ 218

14   CLOSING ARGUMENT BY MR. WATKINS................. 250

15

16

17                     E X H I B I T S

18

19

20        EXHIBIT 43.................................... 170

21        EXHIBIT 44.................................... 170

22        EXHIBIT 45.................................... 171

23

24

25
```

1                    P R O C E E D I N G S

2              (Begins, 9:00 a.m.)

3              THE CLERK:  Civil Action 07-10762, the United

4    States versus Andrew Swarm.  The Court is in session.

5    You may now be seated.

6              THE COURT:  Good morning.  Would counsel

7    please identify themselves for the record.

8              MS. CONNOLLY:  Good morning, your Honor.

9    Rosemary Connolly for the United States of America.

10             MS. PIEMONTE-STACEY:  Good morning, your

11   Honor.  Eve Piemonte-Stacey for the United States.

12             MR. WATKINS:  Good morning, your Honor.  Tim

13   Watkins and Ian Gold on behalf of the respondent, Andrew

14   Swarm.

15             THE COURT:  Mr. Swarm is present.

16        Where we left off yesterday -- well, let me ask

17   this.

18        How much time does each side have remaining,

19   please?

20             THE CLERK:  The plaintiff has 1 hour and 32

21   minutes.  The defendant has 3 hours and 46 minutes.

22             THE COURT:  Well, who are you calling the

23   plaintiff and who are you calling the defendant?

24             THE CLERK:  The United States has 1 hour and

25   32 minutes.

```
1              THE COURT:  Okay.  And Mr. Swarm has how much
2    time?
3              THE CLERK:  Mr. Swarm has 3 hours and 46
4    minutes, your Honor.
5              THE COURT:  Okay.  Thank you.
6         Where we left off yesterday, the United States had
7    renewed its request to have Dr. Amy Phenix testify.
8          Is she available to testify this morning if I were
9    to permit it?
10             MS. PIEMONTE-STACEY:  Your Honor, because of
11   logistical and impractical concerns, the government will
12   withdraw its motion at this time.
13             THE COURT:  Okay.  Then -- and I did read her
14   report as well as what I wrote in February.  It is
15   withdrawn, but I'll note that because I didn't allow
16   her -- well, because I found in February of 2008 that I
17   had discretion, that the statute contemplated examiners,
18   not dueling experts, that for the reasons I described in
19   a persuasive Supreme Judicial Court decision about the
20   counterpart statute in Massachusetts, that I didn't
21   allow her to meet with Mr. Swarm.  And I've read her
22   report.  And she recognizes that there are inherent
23   limitations because she didn't speak to Mr. Swarm.  And
24   I was intending to rule that the minimal, marginal
25   probative value, if any, would be outweighed by the
```

 1     risks of unfair prejudice and undue delay.

 2          The statute contemplates these cases will be

 3     resolved quickly, but because the statute is new, its

 4     constitutionality hasn't been tested.  Everybody agreed

 5     to wait until now for the trial.  But if Dr. Phenix were

 6     to testify, I would have felt compelled to grant the

 7     continuance, and I don't know when we would have gotten

 8     back to this.

 9          But that's withdrawn, so that issue is moot.  The

10     only other question is, is Dr. Hernandez here?  Is he

11     going to testify in person?

12               MS. PIEMONTE-STACEY:  Yes, actually, your

13     Honor, he's here.  He's waiting outside.

14          I just was wondering if the Court would break from

15     its protocol and allow him to sit in during the

16     testimony of Mr. Swarm.  I don't think it would

17     influence his opinion, but it would put things in

18     context for him.

19               THE COURT:  Um, what's Mr. Swarm's view on

20     that?

21               MR. WATKINS:  I don't have a position one way

22     or the other on that, your Honor.  I don't expect him to

23     testify as an expert or anything, so I think that's

24     fine.

25               THE COURT:  Okay, let's bring him in.

```
1              MS. PIEMONTE-STACEY:  Thank you, your Honor.

2              THE COURT:  And thank you for making that

3     suggestion because the primary purpose of all of this is

4     to resolve the case concerning Mr. Swarm.  But I hope it

5     will have the incidental benefit of -- and it's still

6     relatively early as part of the Adam Walsh regime, but

7     of educating everybody who's going to be regularly

8     involved as to the best way to discharge their duties.

9          Okay.  All right.  So the next witness is Andrew

10    Swarm.  He's at the witness stand already.  He should

11    stand and be sworn.

12              (ANDREW SWARM, sworn.)

13              MR. WATKINS:  Your Honor, before we start

14    Mr. Swarm, can I raise one additional logistical

15    matter?

16         Mr. Gold has a hearing scheduled at 9:45 on a case

17    that simply cannot be, um -- because of client issues,

18    can't be continued until later today.  He may sneak out,

19    with the Court's permission, in the middle of

20    Mr. Swarm's --

21              THE COURT:  That's fine.  That's fine.

22              MR. WATKINS:  Thank you.

23              THE COURT:  All right.  You may proceed.

24

25              * * * * * * * * * * * *
```

```
 1              ANDREW SWARM

 2              * * * * * * * * * * * *

 3

 4    DIRECT EXAMINATION BY MR. WATKINS:

 5    Q.  Good morning.

 6    A.  Good morning.

 7    Q.  Would you state your name for the record and spell

 8    your last name.

 9    A.  Andrew Martin Swarm.  S-W-A-R-M.

10    Q.  Mr. Swarm, how old are you?

11    A.  47.

12    Q.  And where were you born?

13    A.  Chicago, Illinois.

14    Q.  During your youth did your family stay in Chicago or

15    did you move?

16    A.  We moved a lot around.

17    Q.  What places did you move to and from?

18    A.  Um, back and forth between Chicago and Pennsylvania,

19    Erie County, Pennsylvania, and then finally up to New

20    York.

21    Q.  When you say your family, was that -- who's in your

22    family?  Your mother and father, what are their names?

23    A.  Um, my mother is Margaret Swarm and my father is

24    Robert Swarm.

25    Q.  Were the two of them together all through your
```

1    upbringing?

2    A.   No.

3    Q.   What was their marital status while you were growing

4    up?

5    A.   They kept getting back together and divorced on and

6    off throughout.

7    Q.   Were there times during your -- when you were being

8    raised where it was just your mother and your father

9    wasn't present?

10   A.   Um, most of the time.

11   Q.   Do you have brothers and sisters?

12   A.   Yes.

13   Q.   How many?

14   A.   Um, three brothers, one sister, and a half sister.

15   Q.   And those brothers, those are all full brothers --

16   A.   Yes.

17   Q.   -- in other words, the sons of your mother and

18   father?

19   A.   Yes, sir.

20   Q.   You say you have a half sister.  How did that come

21   about?

22   A.   That's the -- my father was having an affair with

23   the woman across the street and my half sister is the

24   result.

25   Q.   And was there a time when she came to live with you

1   along with your father and mother?

2   A.   At one point my Dad moved both families into the

3   same house together.

4   Q.   When you talk about both families, that would be

5   your father and his then girlfriend and wife?

6   A.   Yes, and her kids.

7   Q.   When did you move to the New York area?  How old

8   were you?

9   A.   Um, 16.  15, 16.

10  Q.   And where in New York did you move?

11  A.   Homer.

12  Q.   And since you were 15 or 16 years old, have you

13  considered Homer your hometown?

14  A.   Yes.

15  Q.   Were you raised with any kind of, um -- in any kind

16  of religion?

17  A.   Yes, sir.

18  Q.   And how were you raised?

19  A.   I was raised Catholic.

20  Q.   And what did that entail for you?

21  A.   Um, going to church on Sunday, um, attending

22  catechism, um, prayer.

23  Q.   And how would you describe your family, very

24  religious, moderately, or less than that?

25  A.   My mother was very religious, um, us kids were, you

1  know, typical kids and we were just moderate, doing it

2  for our mom for the most part.

3  Q.  And has religion continued to be a part of your

4  life?

5  A.  Yes, sir.

6  Q.  Up to the present day?

7  A.  Yes, sir.

8  Q.  I want to talk a little more about your relationship

9  with your father.  You said he did not live with you

10  very much during the period of time that you were

11  growing up?

12  A.  Yes, sir.

13  Q.  Can you describe your relationship with him while

14  you were growing up?

15  A.  Um, estranged.  I blamed him for a lot of stuff that

16  happened.

17  Q.  When you say you blamed him for stuff that happened,

18  what stuff?

19  A.  Um, just being brought back and forth, the family

20  being brought back together and then broke back up,

21  being brought together and then broke back up, moving

22  around until we got settled.

23  Q.  Did there come a time when you became aware that

24  there were allegations against your father concerning

25  sexual abuse?

1    A.   Yes, sir.

2    Q.   How old were you?

3    A.   Um, 17, 18, somewhere in there.

4    Q.   And what did you understand the allegations to be?

5    A.   Um, that he had molested my sister, my half sister

6    -- my step sister, and some girl that I don't even know

7    who it was.

8    Q.   Um, and as a result of that -- do you know what

9    happened with that as the outcome of those allegations?

10   A.   Um, he ended up with probation.

11   Q.   Was there a time when he was away from the family?

12   A.   He went to Benjamin Rush, a mental institution at

13   that same time.

14   Q.   And again how old were you when this happened?

15   A.   17, 18, somewhere in there.

16   Q.   Did you, as a family, discuss these allegations or

17   what had happened in regard to that?

18   A.   No.

19   Q.   How was it handled by the family?

20   A.   Um, I really couldn't say how it was handled because

21   we didn't really --

22   Q.   Did you talk about it at all?

23   A.   Barely.  We knew what happened and that was it.  No

24   one to this day really talks about it.

25   Q.   Um, you moved to Homer.  Again, how old were you?

1  A.  15, 16 years old.

2  Q.  At that point you were in high school?

3  A.  Yes, sir.

4  Q.  And where did you go to high school?

5  A.  Homer.

6  Q.  What year did you begin at Homer High School?

7  A.  Um, the end of '89.

8  Q.  And what year in school were you?

9  A.  A freshman.

10  Q.  So you moved into Homer in the middle of the school

11  year and began anew at a new school?

12  A.  Yes.

13  Q.  And had you moved from Pennsylvania?

14  A.  Yes.

15  Q.  And did you make friends in high school?

16  A.  Yes, I did.

17  Q.  And while you were in high school did you have

18  relationships, have girlfriends?

19  A.  One.

20  Q.  And what was her name?

21  A.  Penny.

22  Q.  Did you -- before Penny, did you also date other

23  girls?

24  A.  Yes.

25  Q.  How many other girls did you date?

1    A.   Two.

2    Q.   And did those relationships go beyond dating?

3    A.   No.

4    Q.   And why not?

5    A.   I didn't know how to bring it from just holding

6    hands to anything more.

7    Q.   And these were girls in your grades or younger

8    girls, these prior relationships?

9    A.   They were younger but one of them was like two years

10   younger than me and the other was three.

11   Q.   You mentioned Penny.  How old were you when you

12   first met Penny?

13   A.   Um, I first met her?  I was probably 17, maybe 18.

14   Q.   And what were the circumstances, how did you end up

15   meeting Penny?

16   A.   Um, she was my sister's friend.

17   Q.   And what did that mean?  Did she spend time at your

18   home or did you go with your sister to other places?

19   A.   Um, she used to come over and visit my sister.

20   Q.   Was she your sister's only friend or were there

21   generally more than one friend --

22   A.   My sister had lots of friends.

23   Q.   Was your home with your mother and your siblings a

24   fairly social place where a lot of people come over?

25   A.   Yes.

1    Q.  Did your relationship with Penny become romantic

2    right away?

3    A.  No.

4    Q.  How long did you know her before it -- before you

5    started having romantic feelings for her?

6    A.  I can't really say because I don't really remember

7    much, if any, before that.

8    Q.  And how did it begin to be romantic?

9    A.  I was, um, stoned, smoking marijuana.  I had been

10   smoking marijuana for like two or three months at this

11   point.  And I left the room where my brother and our

12   friends were smoking pot because I was really, really

13   stoned.  I went and layed down on the couch to try to

14   not be so high and while I was layed down on the couch,

15   um, Penny came in and started talking to me, kissing me,

16   and from there it just progressed.

17   Q.  Prior to that time on the couch had you thought of

18   the two of you as being romantically, um -- well, had

19   you thought of her in a romantic way?

20   A.  No.

21   Q.  Describe Penny physically, if you will, particularly

22   was she developed at that point?

23   A.  Yes, she was --

24              THE COURT:  Should we ask him how old she was

25   at that point?

1  Q.  And how old was she at that time?

2  A.  She was 13.

3  Q.  And can you describe her development?

4  A.  Um, she was the most developed of all my sister's

5  friends.  She was very proud of the fact that she had

6  the biggest breasts in her class.  Um, she was on birth

7  control, so she was completely developed.

8  Q.  That first night on the couch, did that result in

9  intercourse?

10  A.  No.

11  Q.  What happened that night?

12  A.  Um, petting, kissing, talking, then she cuddled up

13  with me and that's where it ended.

14  Q.  And did it proceed from there, what happened next as

15  far as your relationship with her?

16  A.  Um, she came back over the next day and started

17  hanging out with me the next day instead of coming over

18  to see my sister and that progressed on to where we

19  started a sexual relationship.

20  Q.  Did it start that very next day or a couple of days

21  later or when?

22  A.  That very next day.

23  Q.  That day, were you stoned the next day also?

24  A.  I might have been some part of the day, but I don't

25  think I was in the evening when Penny was over.

1    Q.   Um, once you had sex that one day did you -- well,

2    that wasn't the end of your relationship, right?

3    A.   No.

4    Q.   How long did the relationship continue after that?

5    A.   We were together for about three years.

6    Q.   And during this three-year period, you were living

7    at home with your mother and sisters and brothers?

8    A.   Yes.

9    Q.   Now, at the time that you began having a sexual

10   relationship with her, you were 19 years old?

11   A.   Yes, sir.

12   Q.   There is a substantial difference in your ages, a 19

13   year old and a 13 year old?

14   A.   Yes, sir.

15   Q.   Did you recognize that there was that age

16   difference?

17   A.   Yes, I did.

18   Q.   And what did you -- what were your feelings about

19   that, about having a sexual relationship with a 13-year

20   old?

21   A.   I -- actually I wasn't even thinking about how old

22   she was.

23   Q.   And why was that?

24   A.   Um, I had never been romantic with any female at the

25   time and was just all caught up with it.

1    Q.   Was there an emotional attachment or is this just

2    strictly for sex?

3    A.   Um, I don't think I can have a sexual relationship

4    without having an emotional attachment.  I fell in love

5    with her that first night.

6    Q.   Um, for the next three years did you hold yourself

7    out as boyfriend and girlfriend?

8    A.   I don't understand "hold out"?

9    Q.   Um, did you consider yourselves boyfriend and

10   girlfriend?

11   A.   Yes.

12   Q.   She was close friends with your sister?

13   A.   Yes, sir.

14   Q.   How old was your sister at the time?

15   A.   Same age, 13.

16   Q.   And was there any sort of disapproval by your sister

17   about you going out with Penny?

18   A.   No.

19   Q.   Okay.  Do you believe your sister was aware of the

20   depth of your relationship?

21   A.   Yes.

22   Q.   What makes you think that she was aware?

23   A.   Um, the day after we were together I was walking

24   with them over to Penny's mother's house.

25   Q.   When you say "them," who was them?

1    A.   My sister and Penny.

2    Q.   Uh-huh.

3    A.   And Penny was telling Susan about our relationship.

4    That's how I found out Penny was on birth control, it

5    was because my sister asked her, "Aren't you afraid of

6    getting pregnant?"  And Penny said, "Oh, no, I'm on

7    birth control," so.

8    Q.   Over the years did you socialize with Penny along

9    with other people?

10   A.   Yes, sir.

11   Q.   And these were friends your age, friends her age?

12   What kind of groups of people did you socialize with?

13   A.   Um, both.  I would go over to her friends' houses,

14   she'd come over to my house, where my friends hung out.

15   Q.   Um, would you hold hands while the two of you were

16   together?

17   A.   Yes, sir.

18   Q.   Um, other public displays of affection?

19   A.   Yes.

20   Q.   Like what?

21   A.   Hugging, kissing.

22   Q.   Was there a time when she moved into your home?

23   A.   Yes, sir.

24   Q.   And why was it that she moved into your home?

25   A.   I think it was because she didn't -- her mother's

1    significant other was abusive.

2    Q.  About how long did she live with you in your home?

3    A.  Right around a year.

4    Q.  And in your home, at that time that she moved in,

5    who else was living there at that time?

6    A.  It was me, my brother Pat, my brother Tim, my sister

7    Sue, and my mom.

8    Q.  Um, you've, in recent years, learned about grooming

9    behaviors and, um -- well, about grooming behaviors?

10   A.  Yes, sir.

11   Q.  In regard to your relationship with Penny, do you --

12   can you identify any grooming behaviors that you engaged

13   in to get her to have a relationship with you?

14   A.  No, sir.

15   Q.  Was it unexpected to you that she came in wanting to

16   have sex with you?

17   A.  Very.

18   Q.  But not unwanted by any means?

19   A.  No.

20   Q.  The relationship ended at some point?

21   A.  Yes, sir.

22   Q.  How old were you when it ended?

23   A.  Um, probably 22.

24   Q.  And how old was she?

25   A.  15 or 16.

1   Q.   And how did it end up breaking up?

2   A.   Um, she came over the house and told me she was

3   breaking up with me.

4   Q.   And was she living at that house at that time?

5   A.   No, she was living in Cortland.

6   Q.   Um, why did she move to cortland, if you know?

7   A.   I think her mother broke up with the -- she wasn't

8   with her significant other anymore and had sold her

9   house in Homer and bought a smaller house in Cortland.

10   Q.   And so, um, she came over one day and broke up with

11   you?

12   A.   Yes.

13   Q.   And was that indeed the end of the relationship?

14   A.   Yes.

15   Q.   Was that what you wanted?

16   A.   No.

17   Q.   What did you want as far as the relationship?

18   A.   I had wanted to marry her.

19   Q.   Had you asked her to marry you?

20   A.   Yes.

21   Q.   Once?  More than once?

22   A.   Once, but I had indicated it that I had wanted it

23   before that.  But I only actually asked her once.

24   Q.   Um, what -- and was the break final?  When she came

25   over to the house did you have any other sexual

1   relations after that?

2   A.   With her, once.

3   Q.   But did there come a point where the relationship

4   was clearly over?

5   A.   Yes.

6   Q.   And what was your emotional condition once it became

7   clear that the relationship was over?

8   A.   Um, I was distraught, suicidal.

9   Q.   And why was that?

10  A.   Um, I couldn't handle the emotional pain.

11  Q.   What kinds of things did you do as far as the

12  suicidal, distraught, how did that manifest itself?

13  A.   Um, I drank liquor that was, you know, a hundred

14  proof or better, a liter or more every night.  I used to

15  take my insulin and fill a whole 100 ccs units of

16  regular insulin and shoot up insulin at night and go to

17  sleep, because I didn't want my mom to know that I was

18  trying to kill myself.

19  Q.   And were you indeed trying to kill yourself during

20  those years?

21  A.   Yes, I was.

22  Q.   And, again, why or what -- why were you trying to

23  kill yourself?

24  A.   Again, because I couldn't deal with the emotion, the

25  pain of the break-up.

1    Q.   Were there periods of time while you were on --

2    well, how long did that stage where you were suicidal

3    and despondent over Penny last?

4    A.   Um, two or three years.

5    Q.   During this period of time were you also getting

6    into legal trouble, criminal trouble?

7    A.   Yes, I was.

8    Q.   And what kinds of trouble were you getting into?

9    A.   Um, drunk and disorderlies.  Criminal trespass.

10   Stuff like that.

11   Q.   Um, was there an occasion where you assaulted a

12   police officer or were alleged to have been?

13   A.   Yes, that's what ended it all.

14   Q.   When you say it ended it, did it end your

15   despondency or did it end your period of criminal

16   activity?

17   A.   Um, it ended my drinking.

18   Q.   And how did that work?  How did you stop drinking?

19   A.   Um, when I woke up in the county jail and really

20   didn't know what happened the night before, and I knew

21   that I was in real trouble, I just decided, you know,

22   that if drinking was getting me into that kind of

23   trouble, that I didn't want to do it.

24   Q.   Um, how old were you then when you came to that

25   realization?

1    A.   Um -- 23.

2    Q.   And since that age have you ever had difficulties,

3    um, blackout drinking, excessive drinking?

4    A.   No.

5    Q.   And have you ever had difficulties controlling your

6    drinking since that time?

7    A.   No.

8    Q.   You were placed on probation for that offense?

9    A.   Yes, sir.

10   Q.   How long was that probation for?

11   A.   Five years.

12   Q.   Were there any conditions of that probation?

13   A.   Yes, sir.

14   Q.   And what were the conditions?

15   A.   Um, there's standard conditions plus no drinking and

16   to attend AA.  I think I had to attend AA.  I'm not

17   really sure.

18   Q.   And were you able to completely stop drinking during

19   that period of time?

20   A.   Yes, sir.

21   Q.   After that probationary period, have there been

22   times when you had drinks socially?

23   A.   Yes, sir.

24   Q.   And has that ever, in your mind, become a problem

25   since that time?

1   A.  No, sir.

2   Q.  How old were you when you got over the relationship

3   with Penny?

4   A.  Um, I was probably closer to 30 when I actually

5   fully got over it.

6   Q.  During the period of time in your 20s did you have

7   other relationships with women?

8   A.  There were, you know, there were women that I liked,

9   that I was interested in, I just never asked anyone out.

10   Q.  Was there -- did you have any other sexual partners

11   other than Penny?

12   A.  Yes, sir.

13   Q.  And describe that relationship?

14   A.  It was a one-night stand with another one of the

15   girls that used to come over the house with my sister.

16   Q.  And was that person also a friend of Penny's?

17   A.  Yes, sir.

18   Q.  And it was a one-night stand and you describe

19   yourself as falling in love with all girls that you have

20   sexual contact with.  Did you fall in love with her?

21   A.  Um, she wouldn't let it go any further.

22          THE COURT:  Could we get a time and date.

23          MR. WATKINS:  Sure.

24   Q.  When was this one-night stand in relationship with

25   your break-up with Penny?

1    A.  Um, 1989 or 1990.

2    Q.  And was that, um -- well, how old were you at that

3    time?

4    A.  Um, 26.

5    Q.  And --

6              THE COURT:  And how old was the girl?

7    Q.  How old was Penny's friend at that point?

8    A.  20.

9    Q.  And what were the circumstances of that one-night

10   stand?

11   A.  Um --

12             MS. PIEMONTE-STACEY:  Objection.

13             THE COURT:  Objection?

14             MS. PIEMONTE-STACEY:  The relevance.  The

15   circumstances of what, I assume, is a 20-year old.

16             MR. WATKINS:  I'm trying not to lead so much.

17   Q.  Can you explain why it was only a one-night stand?

18   A.  Um, because she wouldn't let it become anything

19   more.  I tried, but she wouldn't let it.

20   Q.  Did she communicate a particular reason that she

21   wanted to sleep with you?

22             MS. PIEMONTE-STACEY:  Objection.  Hearsay.

23             THE COURT:  Um, I don't think it would be

24   hearsay.  If it was her existing state of mind, it would

25   be admissible under Rule 8033.  Well, hold on a second.

```
 1   (Pause.)  The objection is overruled.  Well, this one
 2   just answer "yes" or "no."
 3         Did she say why she wanted to sleep with you?
 4              THE WITNESS:  Yes.
 5              THE COURT:  The objection is overruled.
 6   Q.  And then did you try to -- did you want to continue
 7   on the relationship?
 8   A.  Yes, I did.
 9   Q.  And did she explain to you why she would not want
10   to?
11   A.  She didn't really explain it, but the way that I
12   knew her I knew that -- I knew why.
13   Q.  And what did you know?
14   A.  Um, she had been dating someone else for quite a
15   long time, seriously, and their relationship -- when
16   they broke up, he was very controlling of her
17   afterwards, and she didn't want that again.
18   Q.  So that was it, that relationship ended after that
19   one night?
20   A.  Yes.
21   Q.  And since that time have you had any intercourse
22   with anyone?
23   A.  No.
24   Q.  Have you ever had a sexual encounter with a man?
25   A.  Never.
```

1  Q.  Now, after you graduated high school and you're in

2  your 20s, were you working?

3  A.  Yes.

4  Q.  Where did you work?

5  A.  I worked at Friendly's first, for five years, and

6  then I worked at Marietta Packaging for three years.

7  Q.  And what is Marietta Packaging, what do they do

8  there?

9  A.  Um, they package soap packagings, um, anything you

10  get as samplers in the mail and stuff like that, the

11  little foil packets and stuff, um, they make that stuff.

12  Q.  Are they a large employer around the Homer, New York

13  area?

14  A.  Yes.

15  Q.  Um, that job ended after about three years?

16  A.  Yes, sir.

17  Q.  Did you go on to anything else?

18  A.  I went on to disability afterwards.

19  Q.  And describe the circumstances of why you had to go

20  on disability?

21  A.  I couldn't get insurance and I kept getting fired

22  from job after job due to missing too much time due to

23  my sugars fluctuating.

24  Q.  And let's stop and talk about that a minute.  If

25  your sugar fluctuates, why does that have an impact on

1   whether you can show up for work or show up for

2   appointments?

3   A.   If it's really high, I'm hurting all over and I'm

4   really slow and groggy as I move.  And when it's low,

5   I'm at times unconscious.  And a lot of times I would go

6   hypoglycemia or low while at work and I would always be

7   doing the "I can get caught up first," and by the time I

8   was getting to telling one of my supervisors that my

9   sugar is low, I'm being rushed down somewhere to give me

10  an emergency treatment of, you know -- although it's

11  only food, you know, a soda or whatever, but still I

12  would get to where I was almost doing convulsions.

13  Q.   Using that example of Marietta, is that some kind of

14  assembly line job where you talk about getting caught

15  up?

16  A.   Yes.

17  Q.   So it sounds like you'd let your blood sugar get too

18  low to the point where you can't function any further?

19  A.   Right.

20  Q.   And that is when you would perhaps have to be taken

21  somewhere?

22  A.   Yes, sir.

23  Q.   Did you end up in the hospital, at any point, from

24  one of your jobs?

25  A.   Um, numerous times.

1  Q.  You talked about hypoglycemic or low blood sugar.

2  What happens if the blood sugar goes too high?

3  A.  Um, if it gets high, well, at first I just get

4  really sore all over, but, you know, I don't notice it

5  until -- it actually starts before that, slowing down,

6  and it's it's really hard to move, you've got to really

7  concentrate to move, but I don't notice it until it

8  starts to hurt, and after a while it will get so painful

9  that it even hurts to breathe, if it gets that high.

10  Q.  I think you mentioned convulsions.  How do

11  convulsions happen?

12  A.  They're generally low blood sugars.  If I let it get

13  down low enough to where I pass out, I go into

14  convulsions.

15  Q.  As you're aware, in the records it's been described

16  that sometimes you do strange things while you're

17  hyperglycemic or at least you have described it that

18  way.  Can you explain -- for example, how you might be

19  holding up a chair or threatening somebody with a chair?

20  A.  Um, I will not be thinking clearly of what's going

21  on around me.  Usually I don't get aggressive.  Usually

22  I get really silly.

23  Q.  And when you say "really silly," can you describe

24  what --

25                THE COURT:  Are you talking about hyper or

1    hypo?

2    Q.   Hyperglycemic, this is?

3    A.   Hypo.

4    Q.   Hypoglycemic.

5              THE COURT:   And hypo is too low?

6              THE WITNESS:   Right.

7    Q.   Is it?

8    A.   Right.

9    Q.   What do you mean by getting silly?

10   A.   I start talking about, you know -- well, okay, once

11   I was thinking everything looked like -- everything was

12   growing around me and I was shrinking, and I'm trying to

13   describe this to people and I sound really funny like

14   I'm, you know, trying to crack jokes and usually people

15   think that I'm just being funny, at first, and then

16   they'll realize, as the things I'll say get more and

17   more weird and far out, that I'm hypoglycemic.  My

18   friends always called it "tripping."  "Andy's tripping

19   again."  And what they mean is my sugar is low.

20   Q.   And taking your friends or co-workers, what would

21   they do when they realized that that was happening?

22   A.   Um, try to get me to go down and get help because

23   usually I was like "No, I don't want to get help, I want

24   to catch up first," and they would finally get me to

25   realize what was going on.

1   Q.  Um, in contrast to that high blood sugar, does that

2   make you lose thought process when your blood sugar gets

3   very high?

4   A.  No.

5   Q.  Is that more a physical condition that you feel?

6   A.  It's more physical.  I'm tired and there's pain.

7   Q.  So after the job in Marietta and you went on

8   disability, have you been on disability since?

9   A.  Yes, sir.

10  Q.  While you were working were you also going to

11  school?

12  A.  No.

13  Q.  Did you ever attend community college?

14  A.  Yes, I did.

15  Q.  And was that after you stopped working?

16  A.  No, it was before I stopped working.

17  Q.  Well, first did you get your high school diploma

18  from Homer High?

19  A.  Yes, I did.

20  Q.  And did you go right to college after that?

21  A.  Yes, I did.

22  Q.  Where did you attend college?

23  A.  Sullivan County Community College for one semester

24  and then a second semester at TC3.

25  Q.  What's TC3?

1    A.   Thompkins Cortland Community College.

2    Q.   And were those right in a row, those two attempts at

3    college?

4    A.   Yes, sir.

5    Q.   And what courses did you take?

6    A.   That's a long time ago.  Um, originally I was trying

7    -- at Sullivan County I was trying for a photography

8    major, I had a course in that, or a major in that, and

9    then I went to Cortland because I was having a real hard

10   time trying to control my sugar and everything while I

11   was away on my own.  So when I moved back to Cortland,

12   back to Cortland, I had to go to TC3, they didn't have

13   the photography, they had an art program, so I was

14   taking an associate of arts, I think that's what it's

15   called.

16   Q.   And if I have the time line correctly, this is also

17   perhaps the time that you were breaking up with Penny or

18   Penny had broken up with you?

19   A.   No, I was still with Penny at this time.

20   Q.   And were you also partying during that time?

21   A.   Yes, sir.

22   Q.   And describe those circumstances.  What did partying

23   mean to you back in your early 20s?

24   A.   Well, while I was going to college I was mostly

25   smoking pot and drinking.

1   Q.   And how did you do at college?

2   A.   I didn't do well because I missed a lot of time.

3   When I was there, I did really well while I was there.

4   But due to absenteeism, they always grade on that, so I

5   didn't do -- so I flunked out.

6   Q.   Now, as a diabetic you're aware that alcohol itself

7   has quite a bit of sugar in it, right?

8   A.   Yes, sir.

9   Q.   In your late teens and 20s did you recognize that

10  that was dangerous behavior?

11  A.   No, at first I wasn't planning on dranking at all

12  because of my diabetes, but then I tried it and I just

13  figured, "Well, I'll take more insulin," which, after my

14  arrest in '86, I found out was the exactly the opposite

15  thing that I was supposed to do.   Alcohol isn't

16  digested, it's absorbed through your stomach lining, so

17  the sugar doesn't break down and you can't use it.   So

18  when I was taking extra insulin, I'm not getting the

19  sugar because it's absorbed and my sugar is going to be

20  dropping out, which would cause me to black out.

21  Q.   Now, particularly after the breakup with Penny, did

22  you suffer from depression?

23  A.   Yes, sir.

24  Q.   Do you feel like you suffer from depression to this

25  day?

1    A.   No.

2    Q.   Um, how long did you suffer from depression?

3    A.   I would say I was depressed probably clean up to --

4    probably on and off up until the early '90s.   Then

5    again, after again -- after what happened with my step-

6    niece, again I was getting depressed a lot then, too,

7    because I couldn't live with the -- you know, I had to

8    live with it, but I didn't like what I had done to her.

9    Q.   At least during your 20s how did you manage your

10   depression or did you manage your depression?

11   A.   In my 20s I didn't really try.   I would be telling

12   people I want to be sedated and I would just drink and

13   smoke pot and do anything to close my emotions off.

14   Q.   So were you taking any kind of medication for

15   depression?

16   A.   No.

17   Q.   Did you see a doctor for that depression?

18   A.   Only once and I was so distraught at the time that I

19   was seeing him that if he told me to make another

20   appointment, I didn't hear him, and I just walked out,

21   in fact, and never saw him again.

22   Q.   And we talked about you, um -- your problems with

23   alcohol and stopping alcohol.   But you continued to

24   smoke pot in your 20s, right?

25   A.   Yes, on and off.

1    Q.   And this was even during your period of probation?

2    A.   All but the last year.

3    Q.   Um, what happened in the last year that made you

4    stop smoking pot?

5    A.   Well, I had been caught smoking pot the year before

6    and went to rehab and even after I went to rehab I was

7    still smoking, but -- I was passing the urine test now,

8    but my drug counselor, she knew to ask me, not just ask

9    me -- you know, she asked me, "Are you still smoking

10   pot?"  And she didn't let me evade the question and say,

11   "Well, what did my urine test say?"  And my urine test

12   came back clean.  And she said, "Yeah, but are you still

13   smoking pot?"  She knew I wouldn't lie to her if she

14   insists I actually answer the question and I told her I

15   was.  So at that point I stopped smoking and offered to

16   pay for the testing and everything myself, if I had to.

17   Q.   And did you indeed stop smoking pot entirely for the

18   rest of your probation there?

19   A.   Yes, I did.

20   Q.   Um, I want to move now into your early 30s.  You

21   were still living with your mother at home?

22   A.   Yes, I was.

23   Q.   And do other members of your family also live in

24   that home?

25   A.   Yes, sir.

```
1    Q.   Who was living there when you were in your 30s?
2    A.   Um, my brother was there the whole time, so I know
3    he was.  My sister was, on and off, with her husband,
4    her then husband and her oldest two kids.
5    Q.   And do they, so far as you know, do they continue to
6    live at that house?
7    A.   Um, they're back there, yes.  A different husband,
8    though.
9    Q.   Um, so it sounds to me as though your family stays
10   pretty close to then?
11   A.   Yes.
12   Q.   Why didn't you ever consider moving away from 20 --
13   from your home in Homer?
14   A.   Um, I had moved away for a while, but when my mom
15   would say that she can't pay the bills without other
16   help, I would move back.  The same thing with my
17   brother, too.  We couldn't let her lose her place.
18   Q.   You talked about moving away from home.  Were they
19   long periods of time or short periods of time?
20   A.   Short periods of time.
21   Q.   And was this on your own that you were living?
22   A.   Um, I lived with two other gentlemen.
23   Q.   During that period of time were you concerned about
24   living alone and living on your own?
25   A.   I was concerned about it because my hypoglycemia at
```

1    night, you know, if there's no one there to hear me hit

2    the floor, then, you know, I didn't know what to do.

3    But I had -- well, so I moved in with friends.

4    Q.  But you ultimately did end up back at your mother's

5    house?

6    A.  Yes, sir.

7    Q.  I'm going to talk about Bobbie now.  And you know

8    who I'm talking about with Bobbie.  This is your step-

9    niece?

10   A.  Yes, sir.

11   Q.  Okay.  When did you first become aware of Bobbie?

12   A.  Well, I met Bobbie soon after her mother started

13   back, um, back into Homer.  She was working at

14   Friendly's with me and my brother.

15   Q.  Did she eventually marry your brother?

16   A.  Yes, sir.

17   Q.  When she first started working with you at

18   Friendly's were the two of them married?

19   A.  No.

20   Q.  How old was Bobbie when you first met Bobbie's

21   mother?

22          THE COURT:  I'm sorry.  I think there's some

23   confusion in the last questions.  Maybe in the answer.

24       Is Bobbie your step-niece?

25          THE WITNESS:  Bobbie is my step-niece.

1          THE COURT:  So your sister is her mother?

2          THE WITNESS:  No, my sister in law.

3          THE COURT:  Your sister-in-law.  Okay.  And

4    who's working with you at Friendly's?

5          THE WITNESS:  My brother.

6          THE COURT:  I see.  Go ahead.

7    Q.  And your brother began dating Bobbie's mother?

8    A.  Yes, sir.

9    Q.  I think we can use her first name.  Her first name

10   is Tina, right?

11   A.  Yes.

12   Q.  And indeed she took your brother's last name, she

13   was Tina Swarm?

14   A.  Yes, sir.

15   Q.  Is she still Tina Swarm?

16   A.  Yes, sir.

17   Q.  And Bobbie is her daughter but not a blood relation

18   to you?

19   A.  That's right.

20   Q.  She had that daughter before she met and then

21   married your brother?

22   A.  Yes, sir.

23   Q.  How old was Bobbie then when you first became aware

24   of Tina Swarm and the fact that she had a daughter?

25   A.  I think Tina came back into -- back into Cortland

1    and started working in 1985, which made Bobbie 3 years

2    old.

3    Q.   And do you remember when Tina and Dennis got

4    married?  Dennis is your brother?

5    A.   Dennis is my brother-in-law.  Pat is my brother.

6    Q.   Patrick Swarm.  When did Patrick and Tina become

7    married?

8    A.   Um, probably right around 1989, 1988.

9    Q.   And how old were you at that time?

10   A.   Um, 25, 26.

11   Q.   And Bobbie is still quite young?

12   A.   Yes.

13   Q.   Did they live with your mother in Homer once they

14   got married?

15   A.   Part of the time, yes.

16   Q.   Was there a time when they moved out?

17   A.   Yes, sir.

18   Q.   And where were they working?

19   A.   They were working -- well, first they both worked at

20   Marietta -- at Friendly's, but by the time they got

21   married they were both working at Marietta Packaging.

22   Q.   And what shifts were they working there at Marietta

23   for the most part?

24   A.   The third shift.

25   Q.   And what did that mean as far as Bobbie, someone to

```
1    take care of Bobbie?
2    A.   It meant that they needed someone to look after
3    Bobbie at night when they were working.
4    Q.   And when that started who was doing that for them?
5    A.   Originally my mother.
6    Q.   And how long did that last for?
7    A.   Um, I couldn't say how long.  They -- my mom would
8    go to Cortland, when they lived in Cortland, she'd
9    babysit when Bobbie was really young.  At around Age 6
10   Bobbie was in Cortland.  But, um, you know, that lasted
11   quite a long time, but around 1991 or '92, they started
12   having me babysit.
13   Q.   And was that going over to Cortland or having Bobbie
14   come over to your house?
15   A.   Um, Bobbie and Danielle, Kevin, my niece and nephew
16   by my brother, and Tina, all came over.
17   Q.   So just to make it clear, once Patrick and Tina were
18   married they had two children of their own?
19   A.   Yes, sir.
20   Q.   And they were younger than Bobbie?
21   A.   Yes, sir.
22   Q.   And all of them would come over, during the third
23   shift, to sleep at your house while the parents were out
24   working?
25   A.   Yes, sir.
```

```
 1   Q.  And in the house at this time, again, what adults

 2   were living there?

 3   A.  Um, me, um, you know, part of the time my sister and

 4   my brother were also there, and my mother.  My mother

 5   was always there, but my sister and brother moved out at

 6   one point.

 7   Q.  How did it come to you to be the babysitter?

 8   A.  I think my mom had a nighttime job at that point.

 9   Q.  And was that something you wanted to do, to babysit?

10   A.  No.

11   Q.  Why not?

12   A.  I was right around 30 years old and I didn't want to

13   be home at night.

14   Q.  So why did you do it?

15   A.  Um, they said they didn't have anyone else to do it.

16   Q.  Did you start that babysitting of Bobbie and

17   Danielle and Kevin to -- for some kind of sexual

18   gratification?

19   A.  No.

20   Q.  Um, but while you were babysitting, did you develop

21   an emotional connection with Bobbie?

22   A.  Yes, I did.

23   Q.  Did you develop an emotional --

24               THE COURT:  Could you ask what her age was at

25   this time?
```

```
 1    Q.  About how old was she when you started realizing you

 2    had feelings for her?

 3    A.  About 9 1/2.

 4    Q.  And what kinds of feelings?  Can you describe those

 5    feelings?

 6    A.  I thought I was falling in love with her and I

 7    wanted to marry her, but I knew that this was impossible

 8    because she's my step-niece and it couldn't happen

 9    because, you know, she's family.

10    Q.  And she's 9 1/2 years old at that point, right?

11    A.  Right.

12    Q.  Not developed at all, is that fair to say?

13    A.  No, she was starting to develop breasts and, you

14    know, I wasn't actually thinking of having a

15    relationship with her at that time.  It was -- I was

16    thinking, "Well, if she gets to be 17, 18, years old,

17    then I could marry her, but I also knew that this wasn't

18    real."

19    Q.  And certainly looking back on it now, do you

20    recognize how bizarre that is?

21    A.  Yes, I do.

22    Q.  Did you act on it?  Once you started these emotional

23    feelings, did they also come with sexual feelings?

24    A.  Yes, sir.

25    Q.  And was that right away or did it evolve over time?
```

1    A.   It evolved over time.

2    Q.   Was that worrisome to you when you started

3    developing these kinds of feelings?

4    A.   Yes, it was.

5    Q.   And why was it worrisome to you?

6    A.   Because of what happened to my sister, I would say,

7    is the most part.

8              THE COURT:   When you say because of what

9    happened to your sister, what do you mean?

10             THE WITNESS:   Um, when my dad molested my

11   sister it -- I really -- I really ended up hating my

12   father at that point and it hurt her, so -- and I was

13   always, always protective of my sister.

14   Q.   Um, did you also develop emotional bonds with Kevin

15   and Danielle?

16   A.   Yes, sir.

17   Q.   Um, they were your blood relatives, right?

18   A.   A different type of emotional bond, but I loved them

19   as a niece and a nephew.   I'd do anything for them.   But

20   I would never think of anything sexual with them.

21   Q.   Um, but Bobbie was different, right?

22   A.   Yes.

23   Q.   Had you had this kind of feeling for anybody since

24   Penny?

25   A.   Um, one girl, Stephanie.

1  Q.  And this was also a younger girl, right?

2  A.  Yes.

3  Q.  How old was she?

4  A.  11.

5  Q.  And how did you know Stephanie?

6  A.  Um, I would -- I went up to a friend of mine's house

7  who lived on a lake and I was fishing out back of his

8  house and her and another one of the neighbor girls came

9  over and introduced themselves.  Stephanie came over and

10  ended up sitting on my lap and telling me all about her

11  family and that her mother let her have sex if she

12  wanted and all of that stuff.

13  Q.  And did you feel some kind of sexual attraction for

14  Stephanie?

15  A.  Yes, but I wouldn't act on it.

16  Q.  And why not?

17  A.  Um, well, two reasons.  Partially, because as I

18  said, I don't know how to -- I didn't know how to go

19  from holding hands to being intimate, to initiate.  And

20  secondly because I didn't know her that well at first,

21  although I almost -- well, all at once fell in love with

22  her right away.  But -- and again I was afraid of the

23  pain that if I did go on to the next part, the feelings

24  are going to get more intense and then if it breaks up

25  again, you know, am I going to end up killing myself?

1    Q.  Um, so did anything further happen with Stephanie?

2    A.  No.

3    Q.  Were you around her subsequently after that?

4    A.  Yes.

5    Q.  And were you able to control yourself and not

6    continue on in that?

7    A.  Yes, sir.

8    Q.  Now -- again moving to now you recognize grooming

9    patterns and the like.  In regard to Bobbie and

10   Stephanie, were there grooming kinds of activities,

11   however slight, that you engaged in?

12   A.  I can see them now that I know what they are with

13   both of them.

14   Q.  With Stephanie what kinds of grooming behaviors did

15   you engage in that were inappropriate?

16   A.  Um, I let her see that I noticed her.  I -- when she

17   would talk to me I would talk to her as if she was an

18   adult, you know, which makes her feel older and makes me

19   look -- feel younger, so it feels like we're closer in

20   age.  And that's about as far as I went with Stephanie.

21   I did the same things with Bobbie.  I noticed she had a

22   crush on me, so I encouraged her to have that crush on

23   me, more so with Bobbie than with Stephanie.

24   Q.  So you were 31, 32 years old around this period of

25   time?

1    A.  Um, no, not quite yet 30 yet.  Um, it was '91.  So,

2    um, in '91, I'm 29.

3    Q.  Now, um, is it your perception that you appear

4    younger to girls, younger girls?

5    A.  It's my perception that I tend to appear younger to

6    most people.  Any time I go to a fair and they have the

7    age-guessing thing, I'll always win that.

8    Q.  How tall are you, for example?

9    A.  5'4" and a half.

10   Q.  So you're a little bit on the --

11   A.  I'm short.

12   Q.  It's easy for me to say, but a little bit on the

13   shorter side?

14   A.  I'm short.

15   Q.  Um, and particularly with younger girls, did they,

16   as far as you perceive, see you as more of a peer?

17   A.  Yeah, they saw me as being more like someone who's

18   in his late teens, you know.

19   Q.  And did you -- um, with the girls, do anything to

20   disabuse them of that notion or try to change that

21   perception?

22   A.  No, I wouldn't.

23   Q.  Going back now to Bobbie.  Was there a time when you

24   began acting on your sexual feelings toward her?

25   A.  Yes, about the time she was 11.

1    Q.   And what forms did that take?

2    A.   Um, me masturbating, let her see that I was excited.

3    Q.   And when you say "let her see that you were

4    excited"?

5    A.   That I would have an erection.

6    Q.   Was there an occasion when you showed her your

7    erection?

8    A.   Yes, sir.

9    Q.   Well, at that time what was your intent in doing

10   that?

11   A.   I think that was just more of the grooming process.

12   I really hadn't gotten far enough into group to fully

13   explore that, but that's what I perceived what I did.

14   Q.   Um, and at least at the time did you perceive that

15   she didn't shy away from any of this?

16   A.   Yes, sir.

17   Q.   And what did that do as far as your sexual

18   attraction to her?

19   A.   It just made it more intense.

20   Q.   Would you masturbate while she was sleeping?

21   A.   Yes, sir.

22   Q.   Did you masturbate on her?

23   A.   No.

24   Q.   Did you rub your penis against her clothing?

25   A.   One time.

```
1    Q.   And describe that?
2    A.   Um, while she was sleeping, she was sleeping in her
3    underwear and a T-shirt, I think, at that time and -- a
4    short T-shirt, and she didn't have any leggings on or
5    anything and was laying in the middle of the living room
6    and I went in and I started out just looking at her and
7    touching myself and then I decided to rub myself against
8    the crotch of her underpants while I touched myself.
9    Q.   And did she wake up?
10   A.   No.
11   Q.   Did you come to climax during that time?
12   A.   No.
13   Q.   Did you continue to masturbate that night?
14   A.   Um, not any more there because I got really scared.
15   Q.   And what were you scared of?
16   A.   Um, I was scared of taking it any further and of
17   actually having intercourse with her.
18   Q.   And why did that scare you?
19   A.   Um, because I didn't think she really wanted it.
20   You know, she was asleep, first of all.  And second,
21   she's my niece and our step-niece and I was afraid of
22   where I was going.
23   Q.   Um, were you conflicted, in your mind at all, when
24   these things were going on?
25   A.   Yes, I was.
```

1  Q.  Why did you do them?  Why did you continue to do

2  them?

3  A.  Um, I was thinking -- or maybe I was under some

4  cognitive distortion, it's one or the other, but I was

5  thinking that she actually wanted me to.

6  Q.  But now looking back do you see that as absurd?

7  A.  Yes, I do.

8  Q.  Duration this period of time were you thinking of --

9  well, you were thinking of sexual gratification, but did

10 you also still have an emotional bond to her?

11 A.  Yes, sir, I wanted to marry her.

12 Q.  Did you -- after that -- well, let me ask.  Did you

13 ever penetrate Bobbie?

14 A.  No.

15 Q.  Vaginally?

16 A.  No.

17 Q.  Orally?

18 A.  No.

19 Q.  In any other way?

20 A.  In no way.

21 Q.  And as far as sexual activity and touching, was

22 there any instance where it was more serious than that

23 one you just described?

24 A.  No, sir.

25 Q.  After that particular incident did you continue to

```
 1   babysit for Bobbie?
 2   A.  Um, not as much.
 3   Q.  And why was that that you weren't babysitting for
 4   her as much?
 5   A.  Well, I constantly asked them to find someone else
 6   and I think at that point they had found someone else.
 7   Q.  And when you asked, when you say "them," to find
 8   somebody else, are you talking about Patrick and Tina?
 9   A.  Yes, sir.
10   Q.  And, um, what would you tell them about why you
11   wanted somebody else to babysit?
12   A.  Um, I would just indicate that I didn't want to do
13   it, that I wanted to go out and run around the town.
14   Q.  And that was true, wasn't it?
15   A.  Yes, it was.
16   Q.  But there was another reason?
17   A.  Yes.
18   Q.  And what was the other reason you're trying to --
19   A.  Because I was afraid of hurting Bobbie.
20   Q.  Were they able to find somebody right away?
21   A.  No.
22   Q.  Were there -- even when they found somebody else,
23   were there still occasions where she would come over and
24   spend the night?
25   A.  Yes.
```

1    Q.  And explain how that would happen?

2    A.  Um, I gathered that the other babysitter wasn't

3    available and they had them -- all three of them had

4    come over and it was just the three of them at this

5    point.  My sister had moved out and so my other nieces

6    weren't over at this time.  And I remember maybe sitting

7    and -- I think it was on a weekend, and they had told me

8    that I was going to be babysitting again for a full

9    month.

10   Q.  And what was your thought when you found out that

11   they wanted you to babysit for a whole month?

12   A.  I was scared.

13   Q.  And what were you scared about?

14   A.  I was scared that I would try and pick up things

15   with Bobbie the way they had been when they stopped

16   coming over.

17   Q.  Now, you testified before that one of the things

18   that worried you was what your father had done to your

19   sister and the consequences of that.  With that in the

20   back of your mind and knowing that you had these

21   feelings, why didn't you take some other steps to stop

22   yourself?

23   A.  I had no idea what I could do.

24   Q.  You could have just not been there that night to

25   babysit?

1    A.   Um, they had asked me because they didn't have

2    anyone else.   You know, it was like -- I was like

3    conflicted, so.

4    Q.   Did you ever consider telling anybody, at that

5    stage, that you were having these feelings?

6    A.   Um, I had no idea how to do that.

7    Q.   Did you ever consider it at all?

8    A.   Consider it?   Yes.   But I was just -- it's just such

9    a scary subject.

10   Q.   Was there a time when you looked through the

11   telephone book?

12   A.   Um, yes, but they didn't have anything that really,

13   you know, was for the offender.   I could find stuff if I

14   was the child that was being abused, but nothing -- no

15   number to call, if you're the offender, to call and say,

16   "Hey, I'm got this problem.   How can I deal with this?"

17   I couldn't find nothing in the phonebook on that.

18   Q.   Um, there was a night where you gave, um, Bobbie a

19   note, right?

20   A.   Yes, sir.

21   Q.   And what was your purpose in giving her that note?

22   A.   Um, it was the night I was just talking about and it

23   was -- because I was so afraid of her coming over for a

24   full month at night, so I gave her that note so she

25   would turn me in and then I could get the help so as I

1   didn't do nothing.  And I was so afraid that I would do

2   something to hurt Bobbie that -- you know, I begged her,

3   I literally begged her to turn me in.

4   Q.  Now, why not just turn yourself in?  Why not go to

5   her parents, at that point, you say, "I have this

6   problem"?

7   A.  Because I'd back out, I was afraid that I'd back

8   out, and I didn't want to give myself the chance to do

9   that.

10  Q.  Um, if Bobbie hadn't given that note to her parents,

11  what would you have done?

12  A.  Um, I have no idea.

13  Q.  Do you think things would have gone further?

14  A.  I doubt it, but I don't -- I don't -- I don't think

15  that I would have ended up being here today.

16              THE COURT:  Let me ask you this, because there

17  hasn't been any testimony from Mr. Swarm.  What did the

18  note say?

19              THE WITNESS:  The note said, and I'm

20  paraphrasing it, because I don't remember the whole

21  thing, although I know that they've got a copy of it

22  somewhere.  That I loved her in a wrong way.  That it

23  wasn't her fault, but I couldn't have her around at

24  night anymore.  And that I needed help and I think I

25  wrote that I needed help the night that I wanted her to

1    turn me in.

2    Q.   Um, and did that note go to her parents?

3    A.   No.

4    Q.   What happened?

5    A.   Instead she told her parents.

6    Q.   And, um, once her parents found out, was there a

7    sense of relief for you?

8    A.   Um, yes and no.  You know, it was very high anxiety

9    at that point, but there was a relief that I knew Bobbie

10   wasn't going to be around where I could hurt her again.

11   Q.   Now, her mother, your sister-in-law, came over to

12   confront you at the house, right?

13   A.   Yes, sir.

14   Q.   And you told her, you know, "The police can't arrest

15   me.  I didn't do anything."

16   A.   That's right.

17   Q.   But indeed you had, at that point, right?

18   A.   Yes, sir.

19   Q.   Why didn't you admit to her the full extent of what

20   had happened?

21   A.   It's such a scary subject that, you know, I -- I --

22   it took me until I found Family and Children to actually

23   come up and start talking about what really happened and

24   when.  I have to develop a big-time trust in order to

25   talk about sex at all.

```
 1   Q.  Well, let me ask you, I mean, you're here in a

 2   public courtroom now talking about these things.  Are

 3   you having difficulty doing that today?

 4   A.  I'm nervous.  It helps that I know that it's already

 5   all out there, so I know that everyone already knows

 6   this.  If I didn't think anyone knew it, I'd probably

 7   studder and stammer and, you know -- I have no idea if I

 8   could even speak.

 9   Q.  Now, you did go down to the Homer Police Department

10   in connection with the investigation of what happened

11   between you and Bobbie?

12   A.  Yes, I did.

13   Q.  And you gave them a statement?

14   A.  Yes, I did.

15   Q.  Did you call a lawyer or anything or just go down on

16   your own?

17   A.  I went down on my own.

18   Q.  And you told them about your feelings for Bobbie,

19   right?

20   A.  Yes, sir.

21   Q.  And that you needed help?

22   A.  Yes, I did.

23   Q.  And how old were you when you started with these

24   sexual feelings for Bobbie?

25   A.  Right around 30.
```

1    Q.  And I'm just going to digress for a minute and go to

2    Exhibit 41 on the third page here where Ms. Walsh

3    wrote:  "My nightmare since I was 29 years old."  Do you

4    know what the context of that is when you told her that

5    in Family and Children's Services was?

6    A.  I referred to my pedophilia as "my nightmare."

7    Q.  And that's when your pedophilia began, was when you

8    were 29 years old?

9    A.  That's when I became aware of it.

10   Q.  And specifically with this incident of Bobbie?

11   A.  Yes, sir.

12   Q.  And has it indeed been a nightmare for you?

13   A.  Yes, it has, sir.

14   Q.  Over the years what are some of the ways you dealt

15   with the nightmare?  Have you used drugs?

16   A.  Yes, sir.

17   Q.  What's your drug of choice?

18   A.  Marijuana.

19   Q.  And, um, after this period of time with Bobbie in

20   your 30s, did you smoke a lot of pot?

21   A.  Yes, I did.

22   Q.  And what was your thinking there?

23   A.  Well, I'm sure it wasn't a conscious thought, but

24   marijuana deadens your emotions, so it helps me to not

25   think about what I've done and what I still thought of

1    that I didn't like about myself.

2    Q.  Um, in regards to the encounter with Bobbie, do

3    you -- during your 30s did you understand what you had

4    done was wrong?

5    A.  Yes, I did.

6    Q.  And did you have shame about it?

7    A.  Yes, I did.

8    Q.  And describe that?  I mean, what was your shame

9    about what had happened?

10   A.  Um, the way I had fooled myself into believing that

11   it was okay.  Mostly it was the fact that I hurt Bobbie,

12   you know.

13   Q.  Do you -- you continued to have -- to fantasize

14   about marrying her even after that incident occurred?

15   A.  Yes, I did.

16   Q.  And in some sense you still fantasize about that,

17   what would it have been like?

18   A.  Right, about what it would have been like.

19   Q.  Do you see any reality to that at all at this stage

20   of your life?

21   A.  No, not anymore.  I won't let myself fantasize about

22   that anymore.

23   Q.  But it sounds like there was a point where you

24   didn't want to fantasize, but you couldn't help

25   yourself, right?

1  A.  Right.

2  Q.  Are things different now?

3  A.  Yes.  Well, I've started using some of the

4  techniques that I have learned in group and I'm trying

5  to reevaluate -- reorder my fantasies so that I don't

6  think of improper relationships.

7  Q.  You did plead guilty to the -- um, what happened

8  with Bobbie, but guilty to attempted sexual abuse and

9  attempted child endangerment?

10  A.  Yes, I did.

11  Q.  And you were placed on probation at that point?

12  A.  Yes, I was.

13  Q.  Part of that was getting counseling, getting the

14  help that you requested?

15  A.  Yes, sir.

16  Q.  And what was the nature of that counseling?

17  A.  Um, a very large group.

18  Q.  And where did it take place?  Where did it occur?

19  A.  Cortland County.

20  Q.  And was that nearby Homer?

21  A.  Yes, sir.

22  Q.  How often would that -- well, you said a large

23  group.  How many men?  All men?

24  A.  Yeah, all men.

25  Q.  How many men in the group?

```
 1   A.   Around 20 with two counselors.
 2   Q.   And on once a week, twice a week, how often would
 3   you go?
 4   A.   Um, once a week.
 5   Q.   And what kind of counseling, um, did they provide,
 6   what was the nature of the group there?
 7   A.   Um, they taught a little bit on grooming habits, but
 8   not a whole lot.  They did do a little bit also on the
 9   victims, showing -- well, only once, actually, in the
10   year and so many months I was there, they showed one
11   video on victim impact.  Mostly they talked to us and a
12   lot of times they would, um, use word turning where
13   they'd say, "Well, if you use this word, it would mean
14   this.  Did you mean this or this?"  And they didn't do
15   that a lot to me because I was very careful how I
16   phrased things, but there were several guys in the group
17   that weren't as literate and they would do that to
18   them.  Once they started doing that to the guys around
19   me and I'm figuring, "These guys can't defend
20   themselves," then I would start doing the same thing to
21   the two counselors.
22   Q.   Um, how long did you go to that counseling there in
23   Cortland County?
24   A.   Um, a year and a month, a year and two months.  I'm
25   not really sure.
```

1    Q.   Were there any aspects of it that you found helpful

2    in your pedophilia, in your nightmare?

3    A.   Not really.

4    Q.   Were you able to gain any insights?

5    A.   No, they didn't deal enough into the grooming habits

6    for me to really pick up anything, you know.

7    Q.   You talk about victim impact as being something they

8    didn't do.  Is that important to you?  Do you want to

9    learn about victim impact?

10   A.   Oh, very much.

11   Q.   And why is that?

12   A.   Um, because part of what I did was I would fool

13   myself into thinking it wasn't hurting the children and

14   I'm extremely protective of children.  So although I

15   credit that I'm scared of it, I know that's the most

16   important part for me to see, is how it actually hurt

17   the children.  Because, you know, as I said, I'm

18   extremely protective of children.  I can't handle seeing

19   them cry.  And when I see what it's done to them, I know

20   that that's going to have a big impact on me.  We hadn't

21   quite got that far at Family and Children yet either,

22   but I know that they were going to have me do that.

23   Q.   Did you feel any sense of connection to the

24   counseling group that you went to at Cortland County?

25   A.   Um, I made a few friends but, again, it wasn't -- it

```
 1    just wasn't the same.  They didn't -- they didn't really
 2    get us to open up.  They didn't get me hardly to open up
 3    at all.
 4    Q.  Was there any aspect of individual treatment at
 5    Cortland County?
 6    A.  No.
 7    Q.  So the minute you walked in it was into a group
 8    setting?
 9    A.  Yes, sir.
10    Q.  You completed your probationary period successfully?
11    A.  Yes, I did.
12    Q.  And then a month later you stopped going to Cortland
13    County Mental Health?
14    A.  Yes, sir.
15    Q.  Why did you stop going?
16    A.  I thought I was being more disruptive than helpful.
17    Q.  And when you say "disruptive," how did you perceive
18    yourself to be disrupted?
19    A.  I was constantly defending the guys around me.
20    Q.  But it's safe to say that you still struggled with
21    the fact that you had pedophilia?
22    A.  Yes, sir.
23    Q.  And you recognized that all through your 30s?
24    A.  Yes, I did.
25    Q.  You recognize that today, right?
```

1    A.   Yes, I do.

2    Q.   And you went back to Cortland County in January of

3    1997?

4    A.   Yes, sir.

5    Q.   And why did you decide to go back to Cortland County

6    even though you had a bad experience there?

7    A.   The fantasies were way high again and I was just

8    trying to get help again.

9    Q.   When you say the fantasies were way high, was --

10   A.   I was fantasizing and masturbating a lot.

11   Q.   And this was to children, at this point, right?

12   A.   Yes.

13   Q.   Was that treatment there -- was there more one-on-

14   one treatment?

15   A.   Um, this was one on one, um, me and a female

16   counselor.  At the time I was trying to find out if I

17   could get a -- like the judge said the other day,

18   chemical castration is what I knew it as and I was

19   asking about chemical castration.

20   Q.   And was that your specific intent in going back in

21   1997 to see if there was a medical treatment for it?

22   A.   Yes, because I had tried to castrate myself several

23   times and it hurts.

24   Q.   Describe what you mean by trying to castrate

25   yourself?

1   A.  Well, in the old days they used to tie a rubber band

2   or a rope around a horse's testicles and they would ride

3   off.  That's what I tried to do using rubber bands

4   around my testicles.  But by the time they -- you know,

5   after a day, here or there, they were swollen and it

6   hurts so much.  It's --

7   Q.  Why did you resort to such a thing?

8   A.  Um, I wanted to end the nightmare.  I wanted it to

9   end.

10  Q.  When you went to Cortland County to find medication

11  there, what was the outcome of that?

12  A.  Um, they had me try, and I don't remember the name

13  of the drug, but one of the antianxiety antidepression

14  -- antidepressive drugs that has the side effect of

15  making it so that you can't get an erection.

16  Q.  But did it -- did it, in fact, work for you?

17  A.  No, it didn't.

18  Q.  Could you still get an erection?

19  A.  Yes, I could.

20  Q.  And what was the effect of the medication, if any?

21  A.  It made me tired and then it just made me, you know

22  -- it made it so as it took longer to climax, which just

23  made it so that the fantasies were longer and more

24  intense, and it was working backwards, so I told him I

25  didn't want to be on it no more.  And then they told me

1    about, um -- even they called it "chemical castration,"

2    but they told me I had to ask my doctor and I had a new

3    doctor at the time and I had no idea how to talk to --

4    how to breach that subject to a new doctor, and I had a

5    female doctor at the same time.  So I just gave up.

6    Q.  So you did not follow through at that point to get

7    to chemical castration?

8    A.  No.

9    Q.  And did you eventually stop one-on-one treatment at

10   Cortland County Mental Health?

11   A.  Yeah, right around the same time when they, you

12   know, couldn't -- they couldn't prescribe it themselves

13   and told me that I had to ask my family doctor to do

14   it.

15   Q.  You're also suffering from depression at that point?

16   A.  Yes.

17   Q.  Were they doing anything helpful on your depression?

18   A.  Um, no, not really.  Um, you know, we would talk but

19   mostly we would talk about my fantasies and trying to

20   figure out ways for me to stop.

21   Q.  During that period of time when you were suffering

22   from depression and pedophilia, did you see the two

23   things as separate or are they together?

24   A.  Um, I didn't see it.  I'm sure I actually knew that

25   it was because of it, but, you know, I didn't admit it

1    to myself at that point what it was, that I was

2    depressed because I couldn't stop the nightmares, as I

3    called them, "the nightmare," and that was probably the

4    big cause of it.  I know it is now, but --

5    Q.  Um, in your 30s you turned to collecting first adult

6    pornography?

7    A.  Yes, sir.

8    Q.  When did you start collecting adult pornography?

9    A.  Oh, I have actually always collected adult

10   pornography.  I've had adult pornography since I was 18

11   years old.

12   Q.  And did you start also getting child pornography?

13   A.  Um, sometime in 1998 I started to get child

14   pornography.

15   Q.  This was after you stopped the -- stopped going to

16   Cortland County Mental Health after you couldn't get the

17   chemical castration or around the same time?

18   A.  Around the same time.

19   Q.  And child pornography, why collect child

20   pornography?

21   A.  At first I was thinking that I could have that same

22   release through the pictures on the Internet, and again,

23   it's a cognitive -- a distortion of my thinking,

24   thinking that if I -- if I was on the computer and there

25   were people or children from countries where it was

1    legal, then they weren't being hurt.  So I was able to

2    fool myself into believing it was okay.

3    Q.  Um, you have described your interest in child

4    pornography as being children as young as 5?

5    A.  Yes, sir.

6    Q.  That's very young?

7    A.  I know, sir.

8    Q.  Is that -- do you know why you were interested in

9    children that young?

10   A.  Um, no, and most of them were older, around 9 to 11.

11   Q.  And that was your preferred age range?

12   A.  That was my preferred age range.

13   Q.  And this was because the girls were starting to

14   develop or had not yet developed?

15              THE COURT:  Well, why don't you just ask him

16   why?  You were getting an objection, so --

17   Q.  Why 9 to 11?

18   A.  Because that was the age that Bobbie was.

19   Q.  So you still had very strong feelings about her at

20   that time?

21   A.  Yes, sir.

22   Q.  Did you ever try to meet up with her or see her

23   after that particular incident?

24   A.  Um, no.

25   Q.  So even though you had these strong feelings, you

1    were able to stay away from her and her family?

2    A.   Yes, sir.

3    Q.   What did you -- at the time did you justify your

4    collection of child pornography?

5    A.   Um, to myself, yes, I was telling myself it was --

6    it kept me from trying to have sex with an underage

7    girl.  So the pictures, I figured, would keep me from

8    acting out.

9    Q.   And what do you think about child pornography and

10   the larger effects of child pornography now?

11   A.   Oh, I've been more educated on it, in Family and

12   Children, although they had just started to touch on it,

13   that children are still being hurt.  Just because I'm

14   not the one there doing it doesn't mean that they're not

15   being hurt.  Um, they used to -- in probation they would

16   have little signs up about victims of child pornography

17   at times, newspaper articles and stuff they would put

18   up, and I would read them when they were on the wall to

19   see the impact and that way I could actually make myself

20   see that it did hurt them.

21   Q.   And has that been successful, do you have a desire

22   to collect child pornography now?

23   A.   No, I don't.  As I said, I don't want to see any

24   child hurt.

25   Q.   You eventually ordered two specific videos from the

1  postal inspectors?

2  A.  Yes, I did.  It was three.

3  Q.  It was three.  You have said in the past that you

4  did that knowing it was a law enforcement sting?

5  A.  Yes.

6  Q.  Is that true, did you know at that time?

7  A.  Yes.

8  Q.  Why, what on earth would make you order videos from

9  law enforcement knowing that they were illegal?

10  A.  I had figured the federal system has got to have

11  better help and my county wasn't able to give me the

12  help I wanted.  I figured, you know, it's better

13  government, they've got the money, you know, they've got

14  to be able to find me the help that I'm looking for.

15  Q.  And what did you think was going to happen once you

16  got arrested?

17  A.  Um, I thought I was going to end up being given more

18  intense therapy.  I figured I'd end up on probation.

19  Q.  You were arrested at that point, right?

20  A.  Yes, sir.

21  Q.  When you were arrested you talked about more recent

22  desires and fantasies you've had about children, right?

23  A.  Yes, sir.

24  Q.  And those are also fantasies you described in more

25  detail in Family and Children's Services once you got on

1   their treatment there?

2   A.   Yes, sir.

3   Q.   I'm going to kind of group them first.  This is

4   talking about Kelly and Jerry and Lindsay?

5   A.   Yes, sir.

6   Q.   There are also times when Lindsay is called Lenore?

7   A.   Yes, sir.

8   Q.   Um, and you spoke about these individuals both with

9   law enforcement and then later on with Family and

10  Children's Society, right?

11  A.   Um, well, by "law enforcement," what do you mean?

12  Q.   Well, originally, you did talk about one of the

13  specific persons in your neighborhood that you had

14  fantasies -- strong fantasies about?

15  A.   Um, Kelly, yes.

16  Q.   But the other two were also associated with Kelly?

17  A.   Yes.

18  Q.   Let's talk about those issues or those individuals.

19  Was this again when you were babysitting at your

20  mother's home?

21  A.   Um, I was babysitting, but not at my mother's.

22  Q.   Where were you baby-sitting?

23  A.   My friend Jamie's house.

24  Q.   Um, how do you know her?

25  A.   Um, I was good friends with her brother.  I've known

1   her since she was like 11.

2   Q.  Did she -- at the time that she had -- well, who are

3   her children?

4   A.  Um, Matthew and Nicole.

5   Q.  And how old is Nicole at the time?

6   A.  At the time, 6.

7   Q.  Um, was Jamie aware of the incident with Bobbie at

8   the time she was asking you to babysit?

9   A.  Yes, sir.

10          MS. PIEMONTE-STACEY:  Objection.  Was Jamie

11  aware?

12          THE COURT:  Yeah, you have to lay a foundation

13  that would explain or permit you to argue that she knew.

14  Q.  Did you make Jamie aware that you had this prior

15  incident with Bobbie?

16  A.  Um, I didn't have to because they went to Jamie when

17  I got arrested.  Tina went to Jamie to tell her.

18  Q.  And when you say -- this is back in 1994?

19  A.  In '94, yes, sir.

20  Q.  Tina is Bobbie's mother?

21  A.  Yes, sir.

22  Q.  Um, Tina went around to a lot of people to tell them

23  about what had happened with Bobbie?

24  A.  Yes, sir.

25  Q.  And was one of those people Jamie?

1    A.  Yes, sir.

2    Q.  Notwithstanding that, Jamie, um, allowed you to

3    babysit her children?

4    A.  Yes, sir.

5    Q.  And indeed, um, you heard Mr. Pierce talk about

6    letters from family friends?  She wrote a letter saying

7    that even after the child porn conviction, you could

8    still be around her kids?

9    A.  Um, yes, sir.

10   Q.  So she stood by you despite all of this?

11   A.  Yes, sir.

12   Q.  So you began babysitting at her home.  Did you have

13   the sexual attraction to her child?

14   A.  No.

15   Q.  And why not?  Why wasn't that?

16   A.  Um, Nicole was six years old and I just never

17   thought about Nicole sexually.  She didn't have a crush

18   on me, I would imagine.  That's my major key or

19   "trigger," is the word they use.

20   Q.  Now, did there come a time when other kids started

21   being around at the time you were babysitting?

22   A.  Yes, sir.

23   Q.  And this babysitting, was this overnight or during

24   the day?

25   A.  During the day.

1   Q.  Um, and were there indeed other kids coming around?

2   A.  Yes, sir.

3   Q.  And how did that happen?  What were the

4   circumstances of that?

5   A.  Um, I would pick Matt and Nicole up from the bus and

6   when I picked them up, I noticed that Kelly, who lived

7   right there, had a crush on me, so I started feeding

8   that crush.

9   Q.  And how did you feed that?

10  A.  Um, by making big eye contact with her when I would

11  talk with her.  Um, talking to her as if we were equals.

12  Q.  And, um, did that result in her trying to spend more

13  time around you?

14  A.  Yes, sir.

15  Q.  But that was something that you -- now that you can

16  see back, you intended?

17  A.  Yes, sir.

18  Q.  Did you begin to have sexual feelings for her?

19  A.  Yes, I did.

20  Q.  There's also Gerri.  Was she part of that particular

21  crowd of girls?

22  A.  Yes, she was.

23  Q.  And Lindsay, the same thing?

24  A.  Yes, sir.

25          THE COURT:  Let's see.  How old was Kelly at

1   that time?

2           THE WITNESS:  Kelly would have been 10.

3   Lindsay would have been 9.  And Gerri would have been 6.

4           THE COURT:  I'm sorry.  How old was Kelly?

5           THE WITNESS:  Kelly was 10.

6           THE COURT:  And -- I'm sorry.  How old was

7   Gerri?

8           THE WITNESS:  Gerri was 6.

9   Q.  Did you start making an emotional connection with

10  Kelly?

11  A.  Yes, I did.

12  Q.  At the time did you recognize that that was

13  troublesome?

14  A.  Yes, I did.

15  Q.  Did you also have -- um, begin having sexual

16  feelings for her, also?

17  A.  Yes, but I did not act on them.

18          THE COURT:  Are you talking about Kelly or

19  Gerri?

20          MR. WATKINS:  Kelly.

21  Q.  Did you have sexual feelings about Gerri or Lindsay?

22  A.  Yes, I did.

23  Q.  Did you act on those feelings at all?

24  A.  Um, I did things that, you know, now I see as being

25  much more than what I thought they were then.  Um, I

1    made it look like I was accidentally touching their

2    breasts -- um, Lindsay's breast and Gerri's butt.

3    Q.  Let me ask you about this.  Lindsay's breasts, was

4    she beginning to develop or had she developed at that

5    stage?

6    A.  Um, she was developing, yes.

7    Q.  And this was touching her breast over her clothing?

8    A.  Yes, sir.

9    Q.  Did you ever make any attempt to get her to remove

10   her clothing?

11   A.  No, sir.

12   Q.  With any of those three girls were you -- did you

13   penetrate any of them?

14   A.  No, sir.

15   Q.  Did they pose naked for you?

16   A.  No, sir.

17   Q.  Was the attraction to Kelly particularly strong?

18   A.  Um, I don't know if it was particularly strong or it

19   was more -- Kelly, to me, appeared to be where, if I was

20   to try it, I could probably succeed in getting her to

21   have sex, and that scared me.

22   Q.  So what did you do when you felt that?

23   A.  I gave her a drawing that -- I had given her many

24   drawings, but this one I knew, when her parents looked

25   at it, they would see that something was wrong and, you

1     know, cause her not to be around me.

2     Q.   And indeed did that happen?

3     A.   Yes, sir.

4     Q.   Did her parents confront you?

5     A.   Her mother and her uncle did.

6     Q.   And what did they tell you?

7     A.   Um, they told me that they didn't want Kelly around

8     me anymore and that she had been told not to be around

9     me anymore.  Well, they asked me about the picture and I

10    didn't deny the one image in there that -- well, that's

11    all I had in there was the one image.

12              THE COURT:  What was the image?

13              THE WITNESS:  It was an image of a man's back,

14    you know, and it was definitely supposed to be me and I

15    was very muscular at the time.  So I had me standing

16    there smiling with my back all flexed up.

17    Q.   Did it also depict your penis?

18    A.   Yes, sir.

19    Q.   And did it also depict a crying child?

20    A.   No, sir.

21    Q.   But a child?

22    A.   I don't remember any children in the picture.

23    Q.   Oh, okay.  Were you crying perhaps in the picture?

24    A.   (Pause.)  I might have been.

25    Q.   Um, what was your intent in drawing and giving that

1   picture to Kelly?

2   A.  Um, I knew that her mother had seen every picture I

3   did for her because her mom loved my artwork, too.  So I

4   knew that they would see it and they would take the

5   pictures because there were two pictures drawn of me

6   with my shirt off, which they're used to seeing me that

7   way, but to put it on paper like that, they would figure

8   out that there was something going on here that

9   shouldn't be.

10  Q.  Now, when you were arrested for receiving child

11  pornography, you spoke with investigators that day?

12  A.  Yes, sir.

13  Q.  Did you assist them in their investigation?

14  A.  Um, I believe so.

15  Q.  What did you do to assist them?

16  A.  Well, I answered any questions they asked me.  I

17  took them to -- well, I showed them where all the

18  pictures were.

19  Q.  And on your computer, the pictures, you printed them

20  out, also?

21  A.  Yes, sir.

22  Q.  Did you also show them the marijuana plants you had

23  been growing?

24  A.  Accidentally.  I forgot all about them.  I was so

25  busy pulling together the pictures of the child

1    pornography, I forgot I had the marijuana growing in my

2    room.

3    Q.  And did they interview you about your sexual

4    feelings and girls you had contact with?

5    A.  Yes, sir.

6    Q.  And did you tell them about Bobbie?

7    A.  Um, yes.

8    Q.  And did you tell them about the incident the year

9    before with Kelly?

10   A.  Yes, sir.

11   Q.  And that was about a year or about ten months before

12   you got arrested on the child pornography, right?

13   A.  I don't really recall.

14             THE COURT:  When you say "the incident with

15   Kelly," what are you talking about?

16   Q.  Where you gave Kelly the note and she gave it to her

17   parents.

18   A.  The picture.  The picture that I gave to Kelly.

19   Q.  And that was the end to any attempted sexual contact

20   by you, right?

21   A.  Yes.

22   Q.  And that was 10 months then before you were arrested

23   or some period of time before you got arrested?

24   A.  Yes, sir.

25   Q.  You were detained once you were arrested?

```
 1    A.   Yes.

 2    Q.   Taken up to Syracuse?

 3    A.   Yes, sir.

 4    Q.   Was there a program pretrial that you were in in

 5    Syracuse?

 6    A.   Yeah, the HIIP program.

 7    Q.   What is the program?

 8    A.   HIIP, High Intensity Incarcerated Program.

 9    Q.   And was there an incident up there where your blood

10    sugar got low?

11    A.   Yes, sir.

12    Q.   Describe that.  Describe what happened.

13    A.   My -- and it's all somewhat gray because my -- I

14    somewhat black out or gray out at the time.  I picked up

15    a 100 pound chair and started chasing the female sheriff

16    because the COS there are sheriffs, around the pod.

17    Q.   Um, do you have -- you don't sound like you have a

18    very vivid memory of it?

19    A.   I -- I -- I remember what I was doing and why I was

20    doing it.  I don't remember, you know, any -- I had

21    blinders on.  All I had seen was me and her.  I didn't

22    see who was around me.

23    Q.   And when -- and were you charged with an offense as

24    a result of that?

25    A.   Yes, I was.
```

1   Q.   What was the ultimate outcome of that charge?

2   A.   They dropped the charges.

3   Q.   Um, you were sentenced to serve time in the Bureau

4   of Prisons?

5   A.   Yes, I was.

6   Q.   Do you -- well, you know what the sentence was?

7   A.   73 months -- or 74 months plus five years of

8   supervised release.

9   Q.   Was there -- did the judge make any kind of

10  recommendation about treatment?

11  A.   Yes, he did.

12  Q.   What was that recommendation?

13  A.   Um, he recommended that I get treatment while in the

14  Bureau of Prisons.

15  Q.   Was there talk or did you understand anything about

16  Butner, what Butner was?

17  A.   Um, my lawyer had mentioned that she thought I was

18  going to Butner, briefly.

19  Q.   Um, did you -- well, let me ask you this.  Was there

20  any kind of sex offender program pretrial available?

21  A.   No, sir.

22  Q.   This high-intensity program, that did not include a

23  sex offender component to it?

24  A.   No, sir.

25  Q.   Did you go to the medical center at Butner?

1    A.   Yes, I did.

2    Q.   At Butner?

3    A.   No, no, no, I went to Fort Dix.

4    Q.   In New Jersey?

5    A.   In New Jersey.

6    Q.   And did you serve your entire sentence there?

7    A.   Yes, I did.

8    Q.   Was there any kind of sex offender treatment program

9    there at Dix?

10   A.   No, there wasn't.

11   Q.   Was there counseling available?

12   A.   Yes, sir.

13   Q.   And what was the nature of that counseling?

14   A.   Um, well, evidently I had it mistaken, because I

15   thought I was going to -- because of -- I went because I

16   wanted help with this, with the pedophilia.  That's why

17   I originally started going.

18   Q.   When you say "originally started going," is this

19   something you have a choice about or was it required?

20   A.   It was voluntary, 100 percent.

21   Q.   And when you got to Dix, how did you go about

22   volunteering for counseling?

23   A.   I think I had to ask around to find out where their

24   psychology department was.

25   Q.   And so it was you that -- well, there's a psychology

1    intake when you come into a prison, is that true?

2    A.  Yes, sir.

3    Q.  And did you indicate to them that you wanted help?

4    A.  I don't know if I did at that intake or not.

5    Q.  But at some point you tried to seek out counseling

6    there?

7    A.  Yeah.  When I first went in, the COs were very --

8    they cautioned me, took me into a room by myself and

9    told me to keep my crime very quiet.  So during the

10   intake I was very quiet about what I was there for.

11   Q.  And -- but you did at some point --

12            THE COURT:  Well, let me ask you this.  Did

13   they tell you why you should keep your crime quiet?

14            THE WITNESS:  Um, for my own safety.

15   Q.  I'll ask a follow-up.  After spending some five

16   years in the Bureau of Prison's custody, do you now

17   understand why the CAs and the COs told you that?

18   A.  Yes, sir.

19   Q.  And what are some of the consequences if someone

20   finds out that you have that difficulty?

21            MS. PIEMONTE-STACEY:  Objection.

22            THE COURT:  Overruled.

23   A.  Um, assaults.  You know, you'll get beat up.  In

24   fact, when I got assaulted downstairs here, that's what

25   they figured it was all about.

1   Q.  Um, and does -- in the Bureau of Prisons' milieu,

2   does that make you cautious about opening up to people?

3   A.  Um, yes, it does.

4   Q.  And does that include the staff?

5   A.  Um, yeah, because you don't know how they're going

6   to react or whether they're going to tell others.

7   Q.  Um, during the period of time when people would ask

8   you what you were in for, what would you tell them?

9   A.  Um, while I was at Fort Dix and then Allenwood, I

10   told them, um, that it was because I was growing

11   marijuana in a school zone and that I was a felon with

12   access to firearms.

13   Q.  And did that -- was that sufficient to keep you out

14   of trouble?

15   A.  Yes.

16   Q.  Did you like lying about those things?

17   A.  Um, like it?  Not really.  I had to in order to

18   remain safe.

19   Q.  Um, going to counseling, then, once you did seek out

20   that counseling, what kind of counseling did you end up

21   getting?

22   A.  Um, most of it was dealing with my emotions.  My

23   depression.  Anxiety.

24   Q.  Were you able to talk to counselors about your

25   pedophilia?

1   A.  Um, I know I told them that that's what I was

2   actually there for.

3   Q.  And did you talk about getting some kind of long-

4   term mental health care for that with them?

5   A.  Um, he didn't mention anything and I had no idea how

6   -- you know, if they even had anything.

7   Q.  But certainly nothing was suggested to you?

8   A.  No, sir.

9   Q.  From time to time in the Bureau of Prisons you would

10  meet with a case worker about your progress while in

11  prison?

12  A.  Yes, you would -- you have what they call "team," at

13  first it's every six months, and then toward the end,

14  it's every three months.

15  Q.  At any of those team meetings was there any

16  discussion about the judge's recommendation that you go

17  into the sex offender treatment program?

18  A.  Never.

19  Q.  There are records showing that you missed

20  appointments.  Do you recall missing appointments, at

21  the Bureau of Prisons, with your counselors?

22  A.  I don't really recall, but I -- you know, I do

23  remember somewhat that I did.  I was on a lot of Paxil.

24  Q.  And what was the effect of Paxil?

25  A.  Um, well, Paxil is an antianxiety medicine for

 1    social anxiety, but it has the side effect again of

 2    supposedly making it so you cannot get excited.  And

 3    that's why -- well, I was on it for the side effect.

 4    Q.  And did it also have the effect of making you sleep

 5    long hours?

 6    A.  It made me sleep all the time.

 7    Q.  And did you sometimes miss prison obligations

 8    because of that?

 9    A.  Yes, sir.

10    Q.  Were you able to work while you were in prison?

11    A.  No.

12    Q.  And why not?

13    A.  Um, Medical never cleared me.

14    Q.  You were -- was your diabetes managed while you were

15    at Dix?

16    A.  Not well.  I was usually over 300 --

17              THE WITNESS:  Um, I have to go to the

18    bathroom real, real, real bad.

19              THE COURT:  About how much more do you have?

20              MR. WATKINS:  I think about 45 minutes.

21              THE COURT:  You had a two-hour estimate --

22    well, you estimated two hours.

23         All right.  The Court's in recess until 11:15.

24              (Recess, 11:00 a.m.)

25              (Resumed, 11:20 a.m.)

1          THE COURT:  You may resume.

2          MR. WATKINS:  Thank you.

3    Q.  So, Mr. Swarm, while you were at Fort Dix did you

4    ever get any kind of sex offender counseling at all?

5    A.  Um, no real -- that's what I was having him do is

6    helping me -- or helping me with that and that's why I

7    was on the Paxil.

8    Q.  And with "him," you mean the psychologist?

9    A.  The psychologist there at Dix, yes.

10   Q.  And at some point you stopped doing that, right?

11   A.  Yes, the Paxil wasn't having the -- the side effect

12   wasn't coming around for me and they had me on 75

13   milligrams, which is the maximum dosage, so I was just

14   sleeping all the time.

15   Q.  And did you discontinue the Paxil at some point?

16   A.  Yes, I did.

17   Q.  And did you discontinue counseling at some point?

18   A.  Um, first the Paxil and then later on the counseling

19   altogether.

20   Q.  And why did you discontinue going to counseling?

21   A.  Because it wasn't working on the pedophilia, which

22   is the real reason I was going there.

23   Q.  Um, when were you released from the Bureau of

24   Prisons?

25   A.  Um, September of 2005.

1    Q.  And were you released right from Dix or did you go

2    to a halfway house?

3    A.  I went to a halfway house.

4    Q.  Where was the halfway house?

5    A.  Um, Albany.

6    Q.  And how long did you spend there?

7    A.  One month.

8    Q.  And then did you report to the probation department

9    as directed?

10   A.  Yes, sir.

11   Q.  Officer Pierce modified your conditions of

12   probation?

13   A.  Yes, he did.

14   Q.  And he went over those modifications, how he's going

15   to supervise you?

16   A.  Yes, he did.

17   Q.  And you agreed to those modifications?

18   A.  Yes, I did.

19   Q.  Um, one of the conditions was no marijuana use?

20   A.  Yes, sir.

21            THE COURT:  Essentially -- well, I mean, a

22   couple of things.

23            MR. WATKINS:  Sure.

24            THE COURT:  So when he got out, he agreed to

25   modifications in his supervised release?

1              MR. WATKINS:  Yes.

2              THE COURT:  (Pause.)  Go ahead.

3    Q.  One of the conditions was no marijuana use at all,

4    right?

5    A.  Yes, sir.

6    Q.  At the time you went into the Bureau of Prisons you

7    were consuming a lot of marijuana, right?

8    A.  Yes, I was.

9    Q.  To the point where you were growing your own to cut

10   down on costs, right?

11   A.  Yes, sir.

12   Q.  How were you able to -- and did you stop smoking

13   marijuana entirely?

14   A.  Um, yes, I did.

15   Q.  How were you able to do that?

16   A.  Um, I knew that the consequences were high, if I

17   did, so it wasn't worth doing it.

18   A.  Did you -- when you went on supervised release and

19   you started talking to personnel at the Northern

20   District of New York probation office, did you recognize

21   a difference in how they were supervising you over how

22   you had been supervised in Cortland County?

23   A.  Um, at supervision or at, um, counseling?

24   Q.  Um, first supervision, the level of supervision and

25   the level of attention you got from the Northern

1   District's probation office.

2   A.   Yeah.   Um, Mike came over to my house more often

3   than my previous probation officers had.   Um, he also

4   had me come in more often than they did.   And at first I

5   was drug tested constantly.

6   Q.   Um, and did you ever smoke marijuana during that

7   period of time you were on supervised release?

8   A.   No, sir.

9   Q.   So when is actually the last time you smoked

10   marijuana?

11   A.   Um, the day I got arrested.

12   Q.   In 2000?

13   A.   In 2000, yes, sir.

14   Q.   One of the modifications was the addition of

15   polygraph examinations?

16   A.   Yes, sir.

17   Q.   Um, when you understood and agreed to that did you

18   have reservations about the polygraph?

19   A.   Yes, I did.

20   Q.   And what were those?

21   A.   Um, I was afraid that my nervousness and anxiety

22   around it would make it so that I wouldn't pass -- well,

23   I wouldn't pass them.

24   Q.   But nevertheless you went ahead and agreed?

25   A.   Yes, sir.

1    Q.   As part of your supervised release you did the

2    evaluation with Family and Children's Society?

3    A.   Yes, sir.

4    Q.   Those first meetings at Family and Children's

5    Society, were those group therapy or one on one?

6    A.   The first were, um, one on one.  I met with Paul and

7    Sarah.

8    Q.   When you talk about about "Paul," that would be Paul

9    Gould?

10   A.   That would be Paul Gould.

11   Q.   And the two of them were the therapists there at

12   that Family and Children's Society?

13   A.   Yes, they were.

14   Q.   And when you went into treatment what were your

15   expectations of treatment, starting out?

16   A.   Um, just I really had no idea, I was just hoping it

17   would be better than what I had received in the past.

18   Q.   And indeed during the course of the one-on-one

19   therapy did it seem like it was going to be better?

20   A.   Yes, it did.  Both Paul and Sarah seemed to know

21   what they were talking about a lot more than -- well, I

22   can't even remember my psychologists', back in Cortland,

23   their names, so little that I really got to know them.

24   Q.   When you say they seemed to know what they were

25   talking about more, what do you mean by that?

1    A.   They seemed more educated.   They knew what to ask.

2    They knew how to get me more at ease so that I would

3    talk to them.

4    Q.   Was that difficult at first to talk with them?

5    A.   Yes, sir.

6    Q.   And why was that difficult?

7    A.   Um, being raised catholic, um, talking about sex is

8    pretty much something you don't do.

9    Q.   Did you, over time, grow to trust Sarah and Paul?

10   A.   Yes, I did.

11   Q.   So you were accepted into the program.   Um, the

12   group therapy, that's down in Binghamton?

13   A.   Yes, sir.

14   Q.   How far is it -- um, how long did it take you to

15   drive from Marathon down to Binghamton?

16   A.   It probably took me about 35 minutes.

17   Q.   And did you drive yourself or did you have to get

18   rides for there?

19   A.   Um, at first my dad drove and then I got a -- once I

20   got my own driver's license, I would drive myself.

21   Q.   And so you attended the group sessions in Binghamton

22   over the next few months?

23   A.   Yes, sir.

24   Q.   When you found out that the next step was group

25   therapy what were your thoughts about whether the group

1    therapy would work, at first?

2    A.   I was nervous about being in a group.

3    Q.   And why was that?

4    A.   Because I was so defensive the last time.  You know,

5    I know that if I feel that someone is being singled out

6    and picked on, I will get defensive and try and defend

7    them rather than help myself.

8    Q.   Was the Family and Children's Society different, the

9    group therapy different?

10   A.   Yes, it was.

11   Q.   And how so?  What were the differences that

12   impressed you?

13   A.   Um, they didn't do the deal with the word turning.

14   They had already told me they didn't do that, so.

15              THE COURT:  They didn't do what?

16              THE WITNESS:  Um, the word turning.  If you

17   use a certain word that can be used in more than one way

18   and then say, "Well, did you mean it this way?"  And,

19   actually, I mean, that's not really the way they said

20   it, but they did that a lot at Cortland.  And that's

21   where I really ran into problems with them.

22   A.   Um, Paul and Sarah would get you to identify

23   cognitive distortions, thinking errors, all that stuff,

24   which I had never even heard of at Cortland.  Um, they

25   got me to identify my grooming patterns, not just know

1   that there were such things, they actually got me to

2   identify mine, because mine weren't anything like what

3   most people used.

4        And then there's the circle of abuse, which I was

5   just at the very beginning of mine at the time that I

6   left.  But so if you know your circle of abuse, you can

7   stop it before you get to the part where you're abusing.

8   Q.  So the strategies and identifications used at these

9   group sessions, they resonated with you?  They made

10  sense to you?

11  A.  Yes, they did.

12  Q.  And were you able to use them in your own life?

13  A.  Um, yes.

14  Q.  Were there homework assignments included as part of

15  the group therapy?

16  A.  Yes, there was.

17  Q.  And these were things you would go home to work on

18  and bring back?

19  A.  Yes, sir.

20  Q.  And was that also helpful to you?

21  A.  Yes, it was.

22  Q.  Was that something you had done at Cortland?

23  A.  No.

24  Q.  Were you -- did you get to a point where you were

25  bringing specific issues to the group therapy and asking

1    for assistance?

2    A.  Yes.

3    Q.  Talking about the Maple Fest.  What do you remember

4    about that issue and going there?

5    A.  Um, I remember that I was getting involved with a

6    church group.  I'm not really sure if it was or not the

7    Knights of Columbus.  But they ran a booth there to

8    raise money for the church and they wanted me to help at

9    the booth.  And I had it -- before I could volunteer to

10   do that, I had to ask at Family and Children's.

11   Q.  When you say that you had to ask, why did you have

12   to ask them?

13   A.  Um, because it would -- it was an area where it was

14   -- I didn't know whether it was a good idea or not that

15   good of an idea or whether I was ready for it or not.

16   Q.  And once you got to group, what was their input?

17   A.  They advised me that it was dangerous.

18   Q.  And did that have an impact on whether you went or

19   not?

20   A.  Yes.

21   Q.  And what did you decide to do as a result of that?

22   A.  I decided not to go.

23   Q.  Did you feel comfortable bringing those issues to

24   the group?

25   A.  Did I feel comfortable?  No, but I knew I had to.

1    Q.  As the months went on, um, did your anxiety level go

2    down?

3    A.  Yes.

4    Q.  Um, do you think that you got something out of the

5    Family and Children's Society and the group therapy

6    there?

7    A.  Yes.

8    Q.  Would you want to resume that?

9    A.  Yes, very much.

10   Q.  Now, you heard yesterday that Ms. Walsh, anyway, is

11   very negative about having you return there?

12   A.  Yes, I was very disappointed with that.

13   Q.  Um, is that going to challenge your trust in her,

14   the fact that she is negative about taking you back?

15              MS. PIEMONTE-STACEY:  Objection.

16              THE COURT:  Overruled.

17   A.  I'm not going to let it -- that's -- when you sent

18   me her report, I deliberately did not read it, as soon

19   as I read the first negative parts, because I don't want

20   to lose my trust with her.  I know I have to have it in

21   order to get better, so.

22   Q.  And what about her trust in you as a result of the

23   violations, do you feel bad about violating her trust?

24   A.  Yes, I do.

25   Q.  And was that trust just to her or to other members

1    of the group?

2    A.  It's to other members of the group, too, because I

3    let them all down.

4    Q.  When you say that you had let them all down, how did

5    you let them down?

6    A.  Um, by not coming clean with them and let them know

7    of the stuff that had happened back in the spring.  You

8    know, because by the summer I was comfortable with them

9    and I should have brought the stuff up then.

10   Q.  When you say stuff that happened back in the spring,

11   what kinds of things happened back in the spring that

12   you wished you had brought to the group?

13   A.  Um, the incident where I went over with my friend

14   Cathy to pick up her bathing suit and her niece's

15   daughter hugged me.

16   Q.  As best you can discern, about what time period was

17   that?

18   A.  Um, it was right before Memorial Day.

19   Q.  Um, and describe that incident, describe how that

20   came to be?  Your friend Cathy, what were you doing with

21   her that day?

22   A.  Um, I was originally just over to her house hanging

23   out talking to her.  Um, she wanted to get her bathing

24   suit because, with Memorial Day coming up, um, the pools

25   would be open and it was warm.  So I -- and she didn't

1  have a driver's license and her car was also broken

2  down, so I drove her to her niece's house.

3  Q.  Now, did you know her niece?

4  A.  I knew her niece back before I got arrested, I knew

5  she was in her mid 20s.

6  Q.  And when you were on your way over to her niece's

7  house, did you know that her niece also had children?

8  A.  I had no idea.

9  Q.  When you got to Cathy's niece's house, what

10  happened?

11  A.  Um, we went into the house.  Um, she introduced me

12  to her niece again.  Her niece didn't remember me.

13  Q.  And this is -- her niece, at this point, is in her

14  20s?

15  A.  In her 20s.

16  Q.  Okay.

17  A.  And they also introduced me to another roommate.

18  She had a roommate there.  And they all went into the

19  laundry room and closed the door while she got the

20  bathing suit out and I stood in the living room, which

21  is the door right behind there.  And while I was in the

22  living room, and I really don't know how long it was,

23  um, two young girls came into the house and layed down

24  on the -- sat down on the couch and layed down on the

25  other couch, because they had two couches.

1  Q.  So at that point you were alone in a room with those

2  two children?

3  A.  Yes, sir.

4  Q.  But there were adults in the laundry room next door?

5  A.  Yes, sir.

6  Q.  What happened next?

7  A.  Um, there was a very brief conversation.  One of the

8  children said to me, "Who are you?  Are you Cathy's new

9  boyfriend?"  I said, "No, I'm just a friend of hers."

10  And then the other girl says to her, the first girl --

11  and I don't know their names, um, "Leave him alone."

12  And then the first one says, "Well, what are you, his

13  girlfriend?"  And at that time I decided to get out of

14  there, get out of the house.  So I yelled to Cathy

15  through the door, "Cathy, I'm going to go outside and

16  have a cigarette" and then as I starting to go out, her

17  niece's daughter runs up, hugs me around the legs, and I

18  was scared as can be, at this point.  I was actually

19  scared as soon as the two kids came into the house.  I

20  got out and then sat in my car and waited in my car

21  until Cathy came out.

22  Q.  Now, did Cathy know about your past and your

23  convictions for child pornography an attempted abuse?

24  A.  I thought she did, but I never outright told her,

25  but she lived in Syracuse and my name was all over the

1  newspapers in Syracuse.

2  Q.  So the total time that you spent in a room with

3  those two children and the adults in the adjoining

4  laundry room, how long was that?

5  A.  Maybe two minutes.

6  Q.  And when Cathy's niece's daughter grabbed you around

7  the legs, did you get some kind of sexual gratification

8  from that?

9  A.  No, sir, I was scared.

10  Q.  And you did not report that to your group, right?

11  A.  No, I didn't.

12  Q.  And why not?

13  A.  I still wasn't really all that comfortable with

14  them.

15  Q.  Um, by that time you had been in group therapy for a

16  couple of months?

17  A.  Yes.

18  Q.  Was there a point at which you became more

19  comfortable with the group?

20  A.  Yeah, by midsummer I was.  I was opening up and

21  talking quite often.  Um, you know, after telling them

22  about the Maple Festival, in the first place, and I

23  didn't feel persecuted for having the concern, that --

24  you know, looking back, that in itself did a lot to make

25  it more comfortable.

1    Q.  Um, there is the incident we've been talking about

2    with TC.  TC is a long-time friend of yours?

3    A.  Yes, sir.

4    Q.  And he did know about your prior history, right?

5    A.  Yes, he did.

6    Q.  He has adult children?

7    A.  Yes, sir.

8    Q.  He's also the caretaker of a three-year old, at the

9    time?

10   A.  Yes, his daughter lived with him and his

11   granddaughter lived with him.

12   Q.  And you went over to his home on occasion, right?

13   A.  Yes, sir.

14   Q.  And, Mr. Pierce, did you mention to Mr. Pierce that

15   you had been over to TC's house on occasion?

16   A.  No.

17   Q.  Um, the three-year old there, how often would you

18   see her while she was at the house?

19   A.  Not a whole lot.  She was there, but, you know, I

20   didn't pay much attention to her because the adults were

21   always right there.

22   Q.  Did you have any kind of sexual fantasies about the

23   three-year old?

24   A.  No.

25   Q.  Was there an occasion where the adults were not

1  right there?

2  A.  Um, once day while I was over to TC's, and talking

3  to him in the backyard, um, with his granddaughter

4  present, he decided to -- that he needed a cigarette and

5  he didn't want one of my rollees.  I roll my own

6  cigarettes.  So he got up and went inside to get a

7  cigarette.

8  Q.  So at that point you were outside alone with a

9  minor?

10  A.  Yes, sir.

11  Q.  And you understood that that was a violation of your

12  treatment contract and also your terms of supervised

13  release?

14  A.  Yes, sir.

15  Q.  How long were you out there with that minor?

16  A.  No more than two minutes.

17  Q.  And did you report that to Mr. Pierce?

18  A.  I reported it to group first.  This happened on a

19  Monday.  I had group on Wednesdays.  So I reported it

20  two days later.

21  Q.  And then to Mr. Pierce later in connection with the

22  polygraph exam?

23  A.  Right.  Well, I -- yeah.  Yeah, because the next

24  time I'd seen him was at the polygraph.  So I told him

25  before that.

1    Q.  Um, moving ahead for just a moment.  You did admit

2    to violating your terms of supervised release?

3    A.  Yeah.

4    Q.  And what did you understand the factual basis of

5    your violation of supervised release to be?

6    A.  I don't understand the question.

7    Q.  Why was it -- when you admitted that you had

8    violated your terms of supervised release, was it

9    because of the TC incident or something else?

10   A.  Um, I figured -- it was because of the TC incident.

11   Q.  Um, there was another incident described of a niece

12   that jumped into your lap?

13   A.  Yes, sir.

14   Q.  Can you describe that incident?  First, when did it

15   occur?

16   A.  Um, I really have no idea.  It was sometime during

17   the summer.

18             THE COURT:  What year are we talking about?

19   Q.  This is the summer of 2006?

20   A.  Yes.

21   Q.  It's the day that you were later violated on your

22   supervised release in October of 2006, right?

23   A.  Yes.

24   Q.  You began at Family and Children's Services, the

25   group therapy portion, in March or April of 2006, right?

1    A.   Yes.

2    Q.   So you were on that therapy at the time?

3    A.   Yes.

4    Q.   In connection with your niece, where did that

5    incident occur?

6    A.   In her mother and father's bedroom.

7    Q.   Now, her mother, what is her mother's relationship

8    with you?

9    A.   Her mother is my sister.

10   Q.   And your brother-in-law, the other man is your

11   brother-in-law?

12   A.   Yes.

13   Q.   This occurred in your mother's home, right?

14   A.   Yes, sir.

15   Q.   Where they were living at the time?

16   A.   Yes, sir.

17   Q.   And where you lived most of your life?

18   A.   Yes, sir.

19   Q.   And describe where in the house that incident

20   occurred?

21   A.   Um, it's an attic bedroom.  It actually was quite

22   cluttered and full and I was sitting on a --

23   Q.   Well, let me ask.  Whose bedroom was it?

24   A.   My sister's and her husband's.

25   Q.   And what happened with regard to that child jumping

1    on your lap?

2    A.  Um, Sarah was upstairs, in the first place, because

3    she was being real rambunctious, she's hyper, and so

4    Dennis had to have her upstairs because her sister

5    couldn't handle her anymore.  And I was upstairs talking

6    to Dennis about working on my car.  I needed my

7    windshield -- my driver's side window fixed and a horn.

8    And while I'm talking to him, um, Sarah's on the other

9    side of him bouncing on the bed and then she just jumped

10   over the top of him and landed on my lap.

11   Q.  Now, did her mother and father, were they aware of

12   your status?

13   A.  Yes, sir.

14   Q.  And were they aware that you needed to be

15   supervised?

16   A.  Yes, sir.

17   Q.  And was Mr. Pierce aware that they were aware?

18   A.  Yes, sir.

19   Q.  Did you get some kind of sexual gratification from

20   your niece jumping on your lap that time?

21   A.  No, sir.

22   Q.  Did you think to report that either to your group or

23   to Mr. Pierce?

24   A.  No, because I actually handled it the way I was told

25   to handle it.

1    Q.  When you say the way you were told to handle it, who

2    told you to handle it that way?

3    A.  Um, Family and Children's.

4    Q.  And what did they tell you about those kinds of

5    incidents?

6    A.  Um, to tell the child that they weren't allowed to

7    do that but make it so they don't think it's their

8    fault, you know, that they haven't done anything wrong.

9    And so what we told Sarah, my niece, was that I have

10    arthritis, which I do, and that it hurt very much for

11    her if she sat on my lap, so she wasn't to sit on my lap

12    because it would hurt me.  So when she jumped on my lap,

13    I made like it hurt, and I said, "Sarah, you can't be on

14    me.  You can't be on me.  It hurts," and she would --

15    and that was really the 30 seconds.  You know, she was

16    on and back off.

17    Q.  And is that a strategy you discussed in advance with

18    your sister and brother in law about how to deal with

19    those issues?

20    A.  Yes, sir.

21    Q.  There was mention of an incident at a wedding.  Can

22    you describe what you remember about that wedding -- or

23    the wedding reception, I should say?

24    A.  It was a wedding reception of a friend of mine,

25    Jason, and it was held at his father's residence in the

1  backyard, they have a really big yard, it's an old farm,

2  and it was up back on the hill.  And I went over to

3  congratulate Jason on getting married.  I wasn't at the

4  wedding, although I was invited.  I declined to go to

5  the wedding because of -- because I knew the kids were

6  going to be at the wedding.  I went to the reception

7  because I knew, again, that children wouldn't be up in

8  the back.

9  Q.  Why did you know that children wouldn't be up in the

10  back?

11  A.  Because they were drinking and they were smoking pot

12  in the back, so they don't let the kids up there for

13  that, when they were doing that.  The kids were all down

14  at the house and I brought a bag of jalapinos up for

15  Tom, that's Jason's father, and congratulated them on

16  their wedding.  I think I ate a burger and we toasted up

17  some jalapinos.  And then I, you know, I didn't stay

18  there all that long, maybe a half hour, doing all of

19  that, and then I made excuses for why I had to leave.  I

20  walked back down to my car and as I was walking down the

21  hill to my car Jason's sister's kids walked up the same

22  road that I was walking down.  I walked past them and I

23  got in my car.

24  Q.  Did you have any contact at all with them?

25  A.  I just walked past them.

1    Q.  Did you engage in a conversation or anything of that

2    nature?

3    A.  No, sir.

4    Q.  Did you get some kind of sexual gratification from

5    that contact with them?

6    A.  No, I didn't think anything of it.

7    Q.  When you said you made your excuses for leaving, why

8    did you leave that wedding reception quickly?

9    A.  Um, because of the drinking and drugs.

10   Q.  Um, you reported that incident to Mr. Pierce as

11   being "unaccompanied contact with minors," is that

12   correct?

13   A.  Yes, sir.

14   Q.  That's not something that somebody else reported to

15   him, right?

16   A.  No.

17   Q.  And, in fact, you reported all of these, the lap

18   jumping, the TC, and the bathing suit incidents, those

19   were all things that you reported to Mr. Pierce in

20   connection with a polygraph exam in October, isn't that

21   correct?

22   A.  Yes, sir.

23   Q.  How is it you came to report all of these incidents,

24   what made you -- what compelled you to report these

25   incidents to Mr. Pierce?

1    A.  Um, the first two I reported to group.  Um, the

2    incident with TC had happened right before the

3    polygraph, so, and while I was talking to them about

4    that one I remember the other one that was back -- um,

5    that was back in May, and they told me about Mike, and I

6    did, and then I failed the polygraph anyhow.  So I was

7    just beating my brains to try to figure out where else

8    was I around a child?  And that was the only other

9    instance that I could even think of where I was on --

10   well, where I was unsupervised around a child and had --

11   well, and had contact with them.

12   Q.  Um, you weren't detained on the supervised release,

13   um, the violation of supervised release in the case?

14   A.  Yes, sir.

15   Q.  Um, did you understand that you would be back on

16   therapy again?

17   A.  Yes, sir.

18   Q.  That you would do some kind of sentence and be

19   released on supervised release?

20   A.  Yes, sir.

21   Q.  Were you looking forward to therapy?

22   A.  Yes, sir.  Actually every Wednesday I would find

23   myself longing for my drive down to group sessions on

24   Wednesdays.  That's the day I really missed being out

25   the most.

1   Q.  Do you -- do you continue to have fantasies about
2   children?
3   A.  I do, but I don't -- I do not act on them and I have
4   got them to where they're very minimal now.
5   Q.  And you've been in the Bureau of Prisons now for
6   four years, so it's easy not to act on them, there are
7   no children to act on them there.  When you say you
8   don't act on them anymore, how is it you don't act on
9   them?
10  A.  Fantasies.  I don't let myself fantasize about
11  children.
12  Q.  Um, do you still masturbate?
13  A.  Not very often and when I do, if a child even
14  crosses my mind, I stop.
15  Q.  Do you still have thoughts about striking up a
16  relationship with Penny or a marriage to Bobbie at some
17  point when she forgives you?
18  A.  Um, Bobbie, I know that's never going to happen.  My
19  biggest goal with Bobbie is just to get her to forgive
20  me.  I've apologized, you know, four times publicly and
21  all I can really do for now.  Um, Penny, you know, she's
22  the only one I've ever really been romantic with, so she
23  might be the only one I ever really related to that way.
24  Q.  Um, you touched on it briefly in confined settings,
25  but tell me about your diabetes and how you manage that

```
 1    when you're on the outside?
 2    A.   On the outside I actually do a lot better with it.
 3    I have a little kit that I bring, my test machine, my
 4    catheter with me, my strips, my insulin, my glucose, and
 5    my needles.  Everything is kept right in that little kit
 6    and I take it everywhere I go.  That's how I actually
 7    knew if my sugar was getting low, is I would take my
 8    machine out and have a test.  And, you know, I brought
 9    it everywhere I was going to go, unless I was going to
10    be like, you know, five minutes.  If I were to drive out
11    to the store to get cigarettes, I wouldn't bring it, but
12    if I was going to be longer than that, I would bring my
13    kit.
14    Q.   How often during a typical day on the outside do you
15    have to inject heroin -- um --
16               (Laughter.)
17               THE COURT:  You're thinking about your other
18    usual clients.
19               MR. WATKINS:  I'm never going to live that one
20    down.
21               (Laughter.)
22    Q.   How often in a day do you inject insulin?
23    A.   Um, back then it was three or four times with
24    regular and once a day with the Lantus.
25    Q.   And in that way can you keep your insulin under
```

1   control?

2   A.   Yes, sir.

3   Q.   But there are always unexpected spikes and drops in

4   your sugar?

5   A.   Yes, sir.

6   Q.   Um, you heard one of the things talked about is

7   perhaps living on on your own in an apartment or in a

8   halfway house?

9   A.   Yes, sir.

10  Q.   Or a rooming house where you would have your own

11  room?

12  A.   Yes, sir.

13  Q.   Um, you talked about being concerned about not

14  having somebody around if you went into a blackout

15  stage?

16  A.   Yes.

17  Q.   How do you expect to deal with that now?

18  A.   Um, well, the only practical way would be a "Life

19  Alert," they do more than just when you fall down now.

20  So I figured I could get a Life Alert and that way, if

21  I'm starting to convulse, I can actually hit the thing.

22  Where I can't dial a phone, I can hit one button.

23  Another way to do it, although I don't know if I

24  qualify, is to get one of the medical dogs that are now

25  trained for hypoglycemia, which the dog would let me

1  know before I even start to get bad.

2  Q.  You heard Dr. Saleh talk about medication

3  possibilities, the chemical castration that you sought

4  before.  You've also talked to him about some

5  debilitating and even life-threatening side effects of

6  that medication.  Having heard all of that, what are

7  your thoughts about using those medications?

8  A.  I'm still all for it, almost as much as back before

9  -- just as much as back before when I first looked at

10  it, because I really think that that's probably the

11  quickest way to ending my nightmare.

12  Q.  Um, what you testified to though is you've been able

13  to get your fantasies about minor children out of your

14  mind.  Why would you also want to do the chemical

15  castration then?

16  A.  If he thinks it would help, you know, I'm willing to

17  do whatever it's going to take to get this to where I

18  don't have to struggle so hard with it.

19  Q.  If released, what are your plans?  Where would you

20  go?

21  A.  Um, originally I was planning on staying with my

22  friend, Charlie.  Um, I'm on disability, so I qualify

23  for government housing and what I want to do is --

24  actually if I go back to Devens, I'll talk to the

25  counselors there, they've got a new social worker.  If I

1  get the social worker to help me get the disability

2  started again and get me into government housing before

3  I get released, that way I'd be released to a place

4  where I'd be on my own, which I also really want to try

5  and live on my own.  I've never done it.

6  Q.  Do you think there will ever become a point where

7  you don't need or don't want therapy?

8  A.  I might come to a point where I don't need therapy,

9  but I'm never going to not have to use things that I've

10  learned in therapy.  I will always have to make sure

11  that my friends know that if I'm around kids, um, to

12  watch me.  I will also -- God, I'm always going to have

13  to be very careful if I see that a young girl has got a

14  crush on me, then I've got to get away from her right

15  away, not to talk to her, not to -- if I do talk to a

16  child, don't be so intent on it where they think that

17  I'm paying special attention to them, because those are

18  my grooming patterns and the crush is my trigger.  I'm

19  always going to have to look for that.  Always.  I know

20  they're going to teach me a lot more.  You know, I've

21  only got not even a full year in, um, in counseling, but

22  that's what I know in just the time that I've been

23  there.

24         MR. WATKINS:  That's all the questions I have,

25  your Honor.

1          THE COURT:  All right.  Thank you.

2          (Pause.)

3          THE COURT:  You may proceed.

4          MS. PIEMONTE-STACEY:  Thank you, your Honor.

5

6     CROSS-EXAMINATION BY MS. PIEMONTE-STACEY:

7     Q.  On the offense for which you were brought back into

8     federal custody, the receipt and possession of child

9     pornography, you had ordered three videotapes, hadn't

10    you?

11    A.  Yes.

12    Q.  And one was entitled, "Potty Trained," right?

13    A.  Yes.

14    Q.  One was entitled "Get in that Tub," correct?

15    A.  Um, I guess.

16    Q.  And one was entitled "What Are Brothers For."  Do

17    you recall that?

18    A.  Yes.

19    Q.  And all of those videos showed prepubescent kids

20    engaged in sexual activity, right?

21    A.  Yes, ma'am.

22    Q.  And the ages of the children were 6, 8, and 9, isn't

23    that right?

24    A.  Um, I don't recall.

25    Q.  And you, um, said, you testified earlier that you

1    ordered the videos, um, because you needed -- you were

2    reaching out for help, you knew it was law enforcement,

3    right?

4    A.   Yeah, I knew it was law enforcement.

5    Q.   But you didn't have to order three videos to get

6    help, did you?

7    A.   No, I didn't.

8    Q.   And when you ordered the videos, you said, quote:

9    "I am looking for young preteen girls having hardcore

10   sex of all kinds.  I would like to get full-length

11   movies and pictures.  The younger the better," end

12   quote.  Do you recall that?

13   A.   No, I don't.

14   Q.   The exhibit book in front of you, I direct your

15   attention to Exhibit 27.  And in the bottom right-hand

16   corner, Paragraph 9, that might be easier.

17   A.   I don't have that page at all.

18   Q.   Exhibit 37, Paragraph 9.

19   A.   Oh, 37?

20   Q.   Yes.

21              THE COURT:  I thought she said 27?

22              THE WITNESS:  So did I.

23              MS. PIEMONTE-STACEY:  I apologize, your Honor.

24              (Pause.)

25              MS. PIEMONTE-STACEY:  Yes, I'm sorry, your

1   Honor, it's 27.  I'm sorry.  I did say it.

2              THE WITNESS:  So 27.

3              MS. PIEMONTE-STACEY:  And that's the

4   presentence report.

5              THE COURT:  What paragraph?

6              MS. PIEMONTE-STACEY:  At Paragraph 9, and I

7   also have it up on the screen as well.  It's a quote.

8   "I am looking for young" --

9              (Pause.)

10  Q.  "I am looking for young preteen girls having

11  hardcore sex of all kinds.  I would like to get full-

12  length movies and pictures.  The younger the better."

13  Do you see that?

14  A.  Yes.

15  Q.  Have I read that correctly?

16  A.  Yeah.

17  Q.  And does that refresh your recollection that that's

18  what you said when you ordered the videos?

19  A.  Um, not really.  I see it there, but that's it.  But

20  I don't really remember it.

21  Q.  What you didn't say is "I know this is law

22  enforcement.  Get me help"?

23  A.  Um, if I had said, "I know this is law enforcement,"

24  then they're not going to come to my door.

25  Q.  Now, after the officers came in and executed the

1     search warrant, they read to you your **Miranda** rights,

2     right?

3     A. Yes.

4     Q. And you told officers that you were physically

5     attracted to young preteens girls, didn't you?

6     A. Yes, I did.

7     Q. And, um, I think you testified that you also told

8     them how that physical attraction to your step-niece

9     resulted in your 1994 conviction, right?

10     A. Yes.

11     Q. And that you had over 300 images of child

12     pornography on your computer, right?

13     A. Yes, but most of them are doubles and stuff like

14     that, though.

15     Q. And despite the history and despite your offense,

16     which you told Dr. Saleh and testified to here today,

17     that you're extremely protective of children, is that

18     right?

19     A. Yes, I used a common distortion to try to convince

20     myself that I wasn't going to hurt them.

21     THE COURT: Here, try to talk into the

22     microphone loudly, so I can hear you.

23     Q. But acting protective of children was actually a way

24     that you would get to children, wasn't it?

25     A. Yes, that is another part of my grooming habits.

1    Q.   And that's what you told Dr. Saleh, right?

2    A.   Um, I don't recall, but --

3    Q.   Now, in 2008, when you missed -- I'm sorry, when you

4    met with Dr. Saleh, you told him that one of your goals

5    was to complete treatment and to get out from underneath

6    supervised release, do you recall that?

7    A.   Um, yes.

8    Q.   And you also told him you'd like to buy a home,

9    maybe find a wife, correct?

10   A.   Yes.

11   Q.   And today you testified that you were close to 30

12   when you got over your relationship with Penny.  Do you

13   recall that?

14   A.   Yes.

15   Q.   But to Dr. Mills, in 2008, you said you wanted to

16   rekindle that relationship with Penny, didn't you?

17   A.   Um, what I got over was the suicidal part where I

18   get hurt so bad.  I, personally, if Penny was willing to

19   get back with me, yes, I would date her again.

20   Q.   And it was in that context that you also told

21   Dr. Mills that you wanted to move to Germany because

22   they have less laws and it's a more free economy than

23   the United States.  Do you recall that?

24   A.   Yes.

25   Q.   Now, you told Dr. Saleh that your relationship with

1  your father had been strained because he abused your

2  sister, correct?

3  A.  Yes.

4  Q.  And I think you testified that not only did your

5  father abuse your sister, um, but he had molested other

6  children as well, correct?

7  A.  Yes.

8  Q.  And was convicted of a sex crime, right?

9  A.  I am not really sure of what he was convicted of.

10  Q.  And I'll just ask you to refer to Exhibit 31, Page

11  3, and that's Dr. Mills' report.  (On screen.)  And when

12  you get there, let me know.

13  A.  I'm on it.

14  Q.  Okay.  Under "Present History," the second

15  paragraph, toward the end of it:  "His father was

16  convicted of a child sex crime, but was never registered

17  as a sex offender."  Do you recall telling that to

18  Dr. Mills?

19  A.  Yes.

20  Q.  And, um, that was one place you were thinking of

21  living if released from prison, correct?

22  A.  Um, no.

23  Q.  Not now?

24  A.  Not now.

25  Q.  Okay.  Now, you began drinking at the age of 19?

1    A.   Yes.

2    Q.   And I think you said it escalated to daily use and

3    blackouts, is that right?

4    A.   Yes.

5    Q.   And you told Dr. Saleh that during the '80s you were

6    drinking heavily and you had blackouts a lot, is that

7    right?

8    A.   Yes.

9    Q.   And you also told him that you had been sober since

10   mid 2006, do you recall that?

11   A.   Yes.

12   Q.   And, um, you have said that alcohol makes you

13   "nonthinking" and "mean," is that right?

14   A.   Um, it's partially right.  I generally don't get

15   mean, I get huggies, and I -- but when I would hug

16   people, I would get carried away and hug them too hard.

17   Q.   Okay.  Well, I'll refer you to exhibit --

18   A.   Oh, I believe I've said that, but, you know, it's --

19   the full of what it is is what I just said.

20   Q.   Exhibit 27, um, and I have it up as Paragraph 76:

21   "The defendant relates that alcohol makes him

22   nonthinking and mean."  Do you recall saying that?

23   A.   Yes.

24   Q.   You told Dr. Mills that "alcohol was a mood

25   intensifier and it made you more likely to behave

1    inappropriately," right?

2    A.  Yeah, if I'm angry and I drink, I'm going to get

3    more angry.  If I'm sad and I drink, I'm going to get

4    more sad.

5    Q.  And despite this, in 2006, you told Dr. Pinkowski, I

6    believe, during an intake screening, that you weren't an

7    alcoholic and you weren't interested in "substance

8    abusory health services."  Do you recall that?

9    A.  I don't.  Dr. who?

10   Q.  Let me refer you to Exhibit 5.  I may be

11   mispronouncing his name.  It's a document from the

12   federal Bureau of Prisons' psychology data systems,

13   dated 12-18-05.  Do you see that document?

14   A.  Yeah.

15   Q.  And it says "Author, Michael J. Pinkowski," next to

16   "Author"?

17   A.  Yeah, that could be the name.

18   Q.  Okay.  And do you see the title of this?

19   A.  Yeah.

20   Q.  And so if you look at Page 2 of that document, I'm

21   asking you to look at the last paragraph:  "Though he

22   reported a history of overuse of alcohol, he said he did

23   not regard himself as an alcoholic and he was not

24   interested in substance abuse rehabilitation services."

25   Did I read that correctly?

1  A.  Yes.

2  Q.  Do you recall telling that to Dr. Pinkowski?

3  A.  Yes, it was at the time when I drank in 2006.  I

4  never drank more than two beers.

5  Q.  And at the same time as part of this intake, um, the

6  doctor told you that if you needed services in the

7  future, this is how you could go about contacting the

8  psychology services, is that right?

9  A.  Um, yes.

10  Q.  Um, you ended up -- you first used marijuana, I

11  believe, at the age of 18, is that right?

12  A.  Yeah.

13  Q.  And you ended up smoking two times a day, correct?

14  A.  Yes.

15  Q.  And you last smoked marijuana in 2000, correct?

16  A.  Yes.

17  Q.  And you also experimented with many other drugs

18  including cocaine?

19  A.  Yes.

20  Q.  Now, you've been on and off, um, in mental health

21  therapy since 1987, is that right?

22  A.  Yes.

23  Q.  And you testified earlier that you went for mental

24  health treatment for one session for depression.  Do you

25  recall that?

1    A.  Yes.

2    Q.  And, um, do you remember being referred to Cortland

3    County Mental Health Clinic for depression in April of

4    1987?

5    A.  No.

6    Q.  I'll ask you to turn to page -- I'm sorry.  Exhibit

7    27.

8    A.  (Turns.)

9    Q.  Paragraph 70.

10   A.  (Turns.)

11   Q.  In the second sentence:  "In April of 1987, the

12   defendant was referred to the Cortland County Mental

13   Health Clinic in Cortland, New York while serving a term

14   of probation in the Cortland County Probation

15   Department."  Did I read that correctly?

16   A.  Yes.

17   Q.  And follow-up therapy was recommended, but you did

18   not continue, did you?

19   A.  I never heard him telling me to go back, I was so

20   distraught when I went in to see him.  When I went in,

21   I -- I didn't hear anything about this until -- until

22   just recently when I got the stuff and I found out he

23   actually diagnosed me with extreme depression at the

24   time.  I had no idea back then.  I just thought he could

25   be wrong.

1  Q.  And you testified earlier today that you stopped

2  because you thought it was more disruptive than helpful,

3  is that right?

4  A.  A different therapy, yes.

5  Q.  And you told Dr. Saleh that you stopped because you

6  felt better.  Do you recall that?

7  A.  No.

8  Q.  I'm showing you what's been marked as Exhibit 1 at

9  Page 10.  "Mr. Swarm reportedly did not pursue

10  treatment," and it's referring to that treatment in

11  April of 1987, "At that time," quote, "because I felt

12  better," end quote.  Do you remember telling that to

13  Dr. Saleh?

14  A.  Yes, okay.  I didn't know which time you were taking

15  about.  I thought you were talking about where I was --

16  Q.  So in 1987, you felt better and you stopped

17  treatment, right?

18  A.  Um, I didn't really get into their treatment at that

19  time.  I only went the one time.  I had seen him once

20  and that was it, because I didn't think he had given me

21  a date to go back.  And the truth is I didn't really

22  feel better, but I got over the depression.  It was at

23  the time my friend -- my best friend had just been sent

24  to prison for five years and I was really upset about

25  it.  That's why I went with the depression at that time,

1    because I thought I was going to get even worse with the

2    suicide attempts.  And I'd went in and seen him, I'm

3    balling from eyeball to eyeball, I can't stop, and he

4    didn't, you know -- now I know how psychology works.

5    I'd never been to a psychologist at the time.  And they

6    do tell you to make another appointment.  I'm used to

7    them doing that at the doctor's office, too.  I never

8    heard him say to make another appointment, so I just

9    thought that he didn't believe me.

10   Q.  So Dr. Saleh's wrong when he says you stopped

11   because you felt better?

12   A.  No, I'm sure I said that to Dr. Saleh.  I'm trying

13   to remember years back.

14   Q.  Now, you were reevaluated again at the clinic in

15   1994 and at that time you were diagnosed with

16   pedophilia, correct?

17   A.  Yes, ma'am.

18   Q.  And that was after the attempted sexual engagement

19   and abuse, is that right?

20   A.  Yes.

21   Q.  And you stayed there in therapy until 1995, July, I

22   believe, correct?

23   A.  That's my recollection, yes.

24   Q.  And then two months after your probation ended, you

25   withdrew from treatment, correct?

1  A.  Yes.

2  Q.  Three years later, in 1997, um, you went back to

3  Cortland County Mental Health because you had been

4  accused by family members of inappropriate sexual

5  behavior, is that right?

6  A.  Um, I actually -- I went back because I wanted to

7  get castrated.

8  Q.  Okay.  Again I'm showing you --

9  A.  They happened at the same time and that's why -- the

10  accusations is why I wanted to be castrated.

11  Q.  Okay.  And earlier today you testified that you went

12  back because your fantasies were way high, right?

13  A.  Right.

14  Q.  You didn't mention the accusations of inappropriate

15  sexually abusive behavior, did you?

16  A.  The thing that was causing me to act out was the

17  fantasies that I was having at the time.  It means I

18  didn't stop the fantasies.  I set myself up to where I

19  could get in trouble.

20  Q.  And you were how old in 1997?

21  A.  34.

22  Q.  And you disclosed victims in that age range, didn't

23  you, in sex offender treatment?

24  A.  At that time, yes.

25  Q.  Now, in June of 2001, you reported, um, that you

1   were having -- and this is while you were in the Bureau

2   of Prisons, you reported audio hallucinations of voices

3   calling your name and murmuring.  Do you recall that?

4   A.  Yes, I do.

5   Q.  And you also denied at that time being a perpetrator

6   of sexual abuse, didn't you?

7   A.  Again we were told not to talk about something like

8   that.  It endangers you if you're in jail and you tell

9   people that.

10  Q.  Certainly you can tell that to your psychologist

11  who's treating you, right?

12  A.  Um, I don't know this psychologist.  I don't -- at

13  the time I'm scared.

14  Q.  Okay.  Now, in 2001, you failed to show up for some

15  psychiatric appointments with Dr. Baruch, I believe,

16  B-A-R-U-C-H.  Do you recall that?

17  A.  The doctor at, um --

18  Q.  Yes.

19  A.  I recall that I was quite often late and I had

20  missed some.

21  Q.  But when you did show up, you mentioned again an

22  audio hallucination of your name being whispered and

23  visual hallucinations of birds flying in the dining

24  hall.  Do you recall that?

25  A.  Um, I remember saying that at the county -- at the

1  county jail.  I remember saying that.  I see it there.

2  I might have said it again there.  I was actually --

3  Q.  Let me show you what's been marked as Exhibit 12 in

4  this trial.  (On screen.)  About midway.  "Inmate did

5  mention experiencing recent AH of his name being

6  whispered and BH of birds flying in the dining hall.

7  States he's had AH of this nature since his early 20s."

8  Did I read that correctly?

9  A.  Yeah.

10  Q.  Now, in 2002, um, a treatment plan was developed for

11  you in the Bureau of Prisons.  Do you recall that?

12  A.  Um, not really.

13  Q.  Okay.  And that was with Dr. Berman?

14           THE COURT:  When was this, at Dix?

15           MS. PIEMONTE-STACEY:  Yes.

16           THE COURT:  What exhibit, please?

17           MS. PIEMONTE-STACEY:  I'm sorry, your Honor,

18  Exhibit 10.

19  A.  Okay, then the other doctor would have been the

20  doctor from Syracuse.  And, Yes, I do remember telling

21  them in Syracuse --

22           THE COURT:  Well, I don't think she's asked

23  you a question.

24           THE WITNESS:  Well, this clarified why I

25  didn't remember it, because I had the wrong time.

1          THE COURT:  Okay.

2    Q.  And so you see the title of this document of Exhibit

3    10 is called "Treatment Plan," right?

4    A.  Yeah.

5    Q.  So in 2002, a clinical psychologist, Dr. Berman, um,

6    worked with you to develop a treatment plan.  Do you

7    have a memory of that?

8    A.  I remember going and seeing him.  He didn't tell me

9    what plan he was setting up, though.

10   Q.  Okay.  And the plan included that you'd comply with

11   your medications, right?

12   A.  Yeah.

13   Q.  You'd be followed regularly in psychiatry, correct?

14   A.  Yes.

15   Q.  You'd attend one-on-one counseling sessions?

16   A.  Yeah.

17   Q.  And that you would work on your pedophilia and your

18   borderline personality issues.  Do you recall that?

19          THE COURT:  Where is that?  It's not the

20   diagnosis.

21          MS. PIEMONTE-STACEY:  I'm sorry.  Page 2.

22          (Pause.)

23          MS. PIEMONTE-STACEY:  And, your Honor, just

24   for clarification, the diagnosis of pedophilia is on

25   Exhibit 10, Page 1, under "Access I," it has "cannabis"

1   and then "pedophilia."  "Access II" is "borderline."

2          THE COURT:  Oh, I see.

3   A.  I knew about the pedophilia.  I didn't know that he

4   had diagnosed me with borderline --

5   Q.  Okay.  And at that time, um, you were clearly

6   anxious with the treatment process, right?

7   A.  Anxious?

8   Q.  Were you nervous about it?

9   A.  Yes.

10   Q.  Did your nervousness interfere with your compliance

11   with the program?

12   A.  Um, I didn't know what the program was.  I tried to

13   show up when he -- when he would have me go in.  I was

14   trying to get Paxil because I had heard about the side

15   effects of Paxil.

16   Q.  Well, and in July of 2002, um, you spoke to

17   Dr. Berman about castration, didn't you?

18   A.  Probably.  I talked to just about all of my

19   psychologists about that.

20   Q.  Okay, I'll show you Exhibit 9.  (On screen.)  On

21   July 1st, 2002, you had an individual therapy session

22   with Dr. Berman, correct?

23   A.  Yes.

24   Q.  And I have it highlighted.  He talked about how his

25   current charge is "his attempt at getting himself

1  castrated," is that correct?

2  A.  I believe so.

3  Q.  And do you believe "drastic measures would end his

4  more relationship issues with females," is that right?

5  A.  Yes.

6  Q.  And at that time you also acknowledged to Dr. Berman

7  that child pornography had become an addiction with you,

8  right?

9  A.  Yes.

10  Q.  Now, fastforwarding to --

11         THE COURT:  Could I just ask you a question

12  for my understanding.

13     So Exhibit 9 is July 1, 2002, the individual

14  therapy session where Mr. Swarm says he wants to be

15  castrated.  Exhibit 10 is July 17, 2002, the same

16  month.  The diagnosis is:  "Diagnostic impression, Axis

17  I, cannabis-dependent pedophilia treatment plan."  Well,

18  then "access to borderline personality disorder."  Under

19  "treatment plan," the problems described, at least

20  initially, is "borderline personality disorder."

21         MS. PIEMONTE-STACEY:  Uh-huh.

22         THE COURT:  Other than the reference on the

23  second page to -- it says:  "Treatment focused on

24  building rapport to address" -- what's "IM"?

25         MS. PIEMONTE-STACEY:  "Inmate."

1           THE COURT:  -- "issues such as pedophilia" --

2    well, "IM's interpersonal fragility and also to

3    facilitate work on more underlying issues such as

4    pedophilia and borderline characteristics."  Um, and

5    that he was anxious.  But other than that it -- and

6    Mr. Swarm's testimony was that Dix didn't give him any

7    specific sex offender treatment.

8        Do you think these documents are consistent with

9    that or contradict that contention?

10          MS. PIEMONTE-STACEY:  I think it's both.  I

11   think it's consistent in that he was never enrolled in a

12   sex offender treatment program that I could see.  I

13   could find no record or no individual who had a

14   recollection of him being involved in a sex offender

15   treatment program.  That there were individual sessions,

16   I think that they were trying to get at it, but not a

17   formal sex offender treatment program.  And I don't know

18   why.

19          THE COURT:  Yeah, you don't know why, and it's

20   a good thing that Dr. Hernandez is here because I'm sure

21   Judge Skullen in New York, just like me when I get a

22   child pornography case or something else, had

23   recommended the person get sex offender treatment.  Um,

24   very occasionally I get a letter from the Bureau of

25   Prisons saying, "We did or didn't follow the

1    recommendation."  Almost always I get no response at

2    all.  I don't know.  And, you know, here we are, um, 8

3    years, 9 years later in a very extensive, expensive

4    proceeding and with Mr. Swarm locked up three years.  I

5    think any judge would wonder whether any of us would be

6    here today if he had gotten what was recommended at the

7    time.

8         Were you offered the opportunity to go to Butner

9    and get sex offender treatment?

10              THE WITNESS:  No, I wasn't even told about it.

11              MS. PIEMONTE-STACEY:  Even after your

12   certification under the Adam Walsh Act?

13              THE COURT:  Well, no, I'm talking about during

14   the time he was serving his sentence for having child

15   pornography where he says -- you know, when he ordered

16   the films, the videos, "The Younger the Better."

17              MS. PIEMONTE-STACEY:  And it is my

18   understanding that, at least today, if the Bureau of

19   Prisons isn't going to follow the recommendation,

20   there's some written correspondence, and I didn't find

21   any of that in the file either.

22              THE COURT:  Well, if they say that's their

23   policy, um, I don't believe it's their practice.  I've

24   received, once or twice in 25 years, such a letter, but

25   I've had many people before me on supervised release who

 1   have told me that they have not been offered, for

 2   example, the drug treatment programs that the Court

 3   recommended while they were in prison.  And these are

 4   three parts of the Department of Justice.  You know, the

 5   FBI ran the undercover operation, right?

 6             MS. PIEMONTE-STACEY:  Yes.

 7             THE COURT:  And the U.S. Attorney's Office

 8   prosecuted it, and the Bureau of Prisons is in the

 9   Department of Justice.  This isn't just dysfunctional,

10   it diverts limited resources to the same people over and

11   over.  If they had the treatment that apparently the

12   FBI, the prosecutors, the judge thought they needed in

13   the first five years they were in prison, maybe we

14   wouldn't have to, in New York and in Massachusetts,

15   repeatedly be doing the same person while there are

16   probably other dangerous people out there who aren't be

17   investigated, prosecuted or tried, because we're

18   consumed with the same people over and over and over

19   again.  Just an observation and not primarily for you.

20   But I'm glad Dr. Hernandez is here to hear it.

21             MS. PIEMONTE-STACEY:  Thank you, your Honor.

22   Q.  I believe I was moving to 2007, um, where you had

23   another intake screening with, I believe, Dr. Shore.  Do

24   you recall that?

25   A.  That was at Devens?

1    Q.  Exhibit 20.  (On screen.)

2    A.  Um --

3    Q.  And that was at Devens?

4    A.  At Devens.  I remember it.  Yeah.

5    Q.  Okay.  And at that time you reported a history of

6    audio hallucinations, do you recall that?

7    A.  Yeah.

8    Q.  And, um, you said, quote, "I thought I heard my name

9    a lot."  Do you remember that?

10   A.  Yeah.

11   Q.  You also reported seeing "a little red devil and an

12   angel that chased the devil away."  Do you remember

13   that?

14   A.  I remember that.

15   Q.  And you refused psychological services at that

16   time.  Is that correct?

17   A.  Yes.

18   Q.  And you were again informed how to contact

19   psychology if you needed them, right?

20   A.  Yes.

21   Q.  And on January of 2007, you were evaluated by

22   Dr. Brooks, Mark Brooks?

23   A.  Yes.

24   Q.  And at that time, and this is January 30th, 2007,

25   you denied any past or present hallucinations of any

1    kind, is that right?

2    A.   Um, I guess so.  And they're all past.  Even the one

3    you were just reading, before that was stuff that had

4    happened at the Syracuse County Office Building, which

5    is apparently a hospital, the county courthouse, while I

6    was getting -- well, in 2000.

7    Q.   And you -- and I'm reading from Page 2 of Exhibit

8    19:  "The inmate denied any past or present

9    hallucinations of any kind."  Did I read that correctly?

10   A.   Yeah.

11   Q.   And at that same time you also, um, told Dr. Brooks

12   that you didn't want or need any psychology services.

13   Do you recall that?

14   A.   Yes.

15   Q.   And again you were informed how to reach psychology

16   if you had any concerns or --

17   A.   Yes.

18   Q.   Now, you told Dr. Mills that you actually faked

19   hallucinations in order to get medications in jail,

20   didn't you?

21   A.   That's why I was doing it.

22   Q.   And you wanted the medications to use them

23   recreationally, didn't you?

24   A.   Yes.

25   Q.   And in 2008 you told Dr. Saleh that you were

1  masturbating three times a week.  Do you recall that?

2  A.  Yes.

3  Q.  And that your masturbatory fantasies were adult

4  women and prepubescent girls, is that right?

5  A.  Yes.

6  Q.  And you told Dr. Saleh that the youngest you got

7  excited about was 7, but 9 to 11 was your preferred age

8  rage, is that right?

9  A.  Yes.

10  Q.  In 2008?

11  A.  Yes.

12  Q.  And you've never enjoyed an intimate relationship

13  with an adult female, have you?

14  A.  Not other than the one-night stand with Laurie.

15  Q.  Okay.  You told the sex offender treatment program

16  providers, Ms. Walsh, that you were terrified of females

17  your own age, didn't you?

18  A.  Um, I'm terrified of -- I'm terrified of the

19  emotions and not just females my own age, but any

20  physical relationship, because if it gets to the

21  physical part, my emotions get so intense that when it

22  ends I try to hurt myself.

23  Q.  So referring you to Exhibit 21, in the bottom page

24  Bate's-stamped SWD-9 in the right corner:  "Mr. Swarm

25  states he is terrified of females his own age that

1   express sexual interest in him."  Did I read that
2   correctly?
3   A.   Yes.  But it's a little more than just my own age.
4   Q.   And you also told your sex offender treatment
5   providers that you believed sexual contact with
6   teenagers should be legal.  Do you recall that?
7   A.   Yes.
8   Q.   Now, you call your victims by the word "victim" only
9   because you were told to do so by authorities, is that
10  right?
11  A.   Not really.
12  Q.   I refer you to Exhibit 21, SWD-12, in the right
13  corner, the last sentence:  "He has verbalized that he
14  uses the term 'victim' with regard to his victims only
15  because he was told to do so by authorities."  Did I
16  read that correctly?
17  A.   Yes, and at that time that was true.
18  Q.   Okay.  Now, during that time, and we're talking
19  about 2006, is that right?
20  A.   Yes.
21  Q.   You admitted to molesting five of your six victims,
22  is that right?
23  A.   Yes.
24  Q.   But you had filled out victim sheets for eight
25  victims, isn't that right?

1   A.  Yes.

2   Q.  And to Dr. Mills you reported seven to nine victims,

3   correct?

4   A.  Um, it said seven to nine, so eight's in the middle.

5   Q.  You have more victims in your past, don't you?

6   A.  Um, some of them aren't even real.  I got so scared

7   at the, um, lie detector tests that I was just trying to

8   think of anything that could possibly be what they're

9   talking about.

10   Q.  You groomed each of your victims?

11   A.  Um, Penny is a victim and I didn't groom her.

12   Q.  You developed a friendship with your victims?

13   A.  Yes.

14   Q.  The children trusted you and thought you were a

15   caring person, right?

16   A.  Yes.

17   Q.  You offered to teach them to draw, right?

18   A.  Um, I might have offered to teach Kelly to draw.

19   Q.  You also babysat for some of your victims?

20   A.  Um, Bobbie, yes.

21   Q.  And, um, you admitted to placing your hand over the

22   breast of two of your victims?

23   A.  Yes.

24   Q.  Now, in terms of Penny, um, you testified that it

25   was you who submitted to her sexual advances, right?

1    A.  Um, it wasn't mutual, you know.  She may have kissed

2    me first, but I didn't stop her at all, and, you know,

3    from there on it's both.  She got past that part that I

4    don't know how to do, the first, um -- the first move I

5    don't know how to do it to this day.

6    Q.  And, um, to the sex offender treatment and the sex

7    offender treatment program, you admitted to thousands of

8    incidents with Penny over a three-year period of time.

9    Do you recall that?

10   A.  Yes.

11   Q.  And you weren't really stoned all those thousands of

12   times, were you?

13   A.  No.

14   Q.  Now, you testified today about Stephanie, who was 11

15   years old.  Do you recall that?

16   A.  Yes.

17   Q.  And you were 29 years old at the time?

18   A.  Yes.

19   Q.  And, um, you gave two reasons why you wouldn't act

20   out with Stephanie.  Do you recall that?

21   A.  Yes.

22   Q.  The first reason was you didn't know how to initiate

23   contact, right?

24   A.  Yes.

25   Q.  And the second was you didn't know her that well,

1   right?

2   A.   Right.

3   Q.   But you'd never said you wouldn't act out because

4   she was 11, did you?

5   A.   At that time I wasn't even thinking of it that way.

6   Q.   Today?

7   A.   Today I wouldn't at all.

8   Q.   But today you didn't testify that way, did you?

9   A.   Because I'm testifying about back then.

10   Q.   Okay.  And you testified today that you didn't act

11   or get up against her, right?

12   A.   Right.

13   Q.   But you told --

14   A.   I touched her breast.

15   Q.   You told Dr. Mills that you held her breast, didn't

16   you?

17   A.   Yes.

18   Q.   And you didn't disclose Stephanie in the sex

19   offender treatment program, didn't you?

20   A.   I might have disclosed her as a different name.

21   Q.   I'd like to refer you to Exhibit 21, a chart that

22   appears on Page SWD-16.  16.  And you admit to six child

23   victims, right?

24   A.   Yes.

25   Q.   The first was Penny, right?

1   A.   Yeah.

2   Q.   The second was Kelly?

3   A.   Yeah.

4   Q.   The third was Bobbie?

5   A.   Yeah.

6   Q.   The fourth was Lenore, also known as Lindsay?

7   A.   Yeah.

8   Q.   The fifth was Jenny?

9   A.   Yeah.

10   Q.   The sixth was Gerri?

11   A.   Yeah.

12   Q.   And Stephanie does not appear there, does she?

13   A.   No, she does not.

14   Q.   Now, you also testified today about Kelly, who was a

15   neighbor who was ten years old.  Do you recall that?

16   A.   Yeah.

17   Q.   And, um, you were never alone with Kelly, right?

18   A.   No.

19   Q.   If you were you would have acted out sexually,

20   correct?

21   A.   No.

22   Q.   I'd like to direct your attention to the same

23   exhibit that I have up, Exhibit 21, under the comments

24   section, approximately four lines down.  "If he had been

25   alone with Kelly, he would have acted" -- well, let me

```
 1    start over.
 2         "He does not verbalize or report having engaged in
 3    any sexual activity with Kelly; however, Mr. Swarm
 4    verbalized that if he had been alone with Kelly, he
 5    would have acted out sexually."
 6         Did I read that correctly?
 7    A.  Yes.
 8    Q.  And you had frequent sexual fantasies involving
 9    Kelly?
10    A.  Yes.
11    Q.  Now, you also testified today about Bobbie or
12    Stephanie, correct?
13    A.  Yes.
14    Q.  And to the sex offender treatment program you
15    reported 20 to 25 incidents of molestation, right?
16    A.  Yes.
17    Q.  Over the course of two years?
18    A.  Yes.
19    Q.  And you were 29 to 31 at that time?
20    A.  Yes.
21    Q.  And she was between the ages of 9 and 11?
22    A.  Yes.
23    Q.  You let her see your erection, right?
24    A.  Yeah.
25    Q.  Put her hand on the fly?
```

1    A.   Yeah.

2    Q.   Brushed away her hair from her face?

3    A.   Yes.

4    Q.   Told her you loved her?

5    A.   Yes.

6    Q.   Told her you wanted to kiss her, right?

7    A.   Um, a different tense.  When I said it, I had

8    actually said it, "I had wanted to kiss you," and that's

9    why I was -- I was trying to tell her that I needed her

10   to turn me in.

11   Q.   And when you testified today about these behaviors,

12   you said that Bobbie didn't shy away, correct?

13   A.   Well, no, not to all of the behaviors.  There's

14   different time periods that we're going through here.

15   The ones she didn't shy away from was when I was

16   exposing myself to her and touching myself.

17   Q.   And that's when she was 9 years old, right?

18   A.   Um, 9 through 11.

19   Q.   You exposed yourself to her from the ages of 9 to

20   11?

21   A.   No, I actually started exposing myself at Age 10.

22   At 9, I just looked at her.  I didn't touch.  I didn't

23   show her me.

24   Q.   And what age was she when you rubbed your penis

25   against her underwear while she slept?

1    A.   Between 10 and 11.

2    Q.   And again you talked about the fact today that there

3    was no sexual contact with Bobbie because once she

4    didn't want it because she, one, was sleeping, two, it

5    was just --

6    A.   Not "no sexual contact."  No -- I didn't -- "No

7    penetration" was the phrase used, not "no sexual

8    contact."  Me rubbing myself against her underpants is

9    sexual contact.

10   Q.   And again today you didn't testify to the fact that

11   she was 9 was a reason not to penetrate her, did you?

12   A.   That's also a reason, but --

13   Q.   Now, you said you were worried about babysitting her

14   for a month.  Do you recall that?

15   A.   Yes.

16   Q.   But you didn't just say no to babysitting, did you?

17   A.   Um, I did say no and they insisted.

18   Q.   You didn't leave the house, did you?

19   A.   And leave them alone?

20   Q.   You didn't fail to be there when they wanted to drop

21   Bobbie off for babysitting?

22   A.   Again, I was the one -- I would have been the only

23   adult there.

24   Q.   You didn't go to the sex offender treatment program

25   in Cortland and say, "I need help.  I'm in a situation,"

1    did you?

2    A.  I didn't know about the sex offender program at that

3    time.  It was afterwards that I find out about it.  I

4    did look in the phonebook to try and find help, but I

5    could only find contacts for "If you've been

6    victimized," I couldn't find any contacts for "If you're

7    afraid you're going to be victimized or if you have."

8    Q.  And earlier today you said that you didn't fantasize

9    about that anymore, talking about Bobbie, do you recall

10   that?

11   A.  Right.

12   Q.  But you told Dr. Mills that Bobbie was your primary

13   sex fantasy, didn't you?

14   A.  Right.  But now I've changed that because I do not

15   want to -- I won't let myself think of children

16   anymore.  If I -- if it even comes across my mind, I

17   stop.

18   Q.  And you testified today about Lenore or Lindsay?

19   A.  Lindsay, yes.

20   Q.  And she was 10 and you were 37, right?

21   A.  She was 9.  Kelly was 10.

22   Q.  She was 9 and you were 37, correct?

23   A.  Yes.

24   Q.  And you touched Lindsay's breast, didn't you?

25   A.  Yes.

1    Q.  And Jenny, another one of your victims, was 11.  She

2    was your friend's daughter, right?

3    A.  Yes.

4    Q.  And you had 11 incidents with Jenny, right?

5    A.  Yes.

6    Q.  And you were 32 at the time, correct?

7    A.  Yes.

8    Q.  And one of the things you did with Jenny is you

9    stole her underwear off the bathroom floor and used it

10   to masturbate, is that correct?

11   A.  Yes.

12   Q.  And you also had a victim named Gerri, who was a

13   neighbor who was 6, right?

14   A.  Yes.

15   Q.  And you testified today that you rubbed her butt,

16   correct?

17   A.  Yes.

18   Q.  But there were two incidents with Gerri, right?

19   A.  Um, I believe so.

20   Q.  At least that you reported to sex offender

21   treatment?

22   A.  Yes.

23   Q.  And, um, one of the things you did with Gerri is you

24   rubbed your clothed penis against her, didn't you?

25   A.  No.

1   Q.  I refer you to Exhibit 21.  I'm actually going to

2   circle it on the screen.

3        "Mr. Swarm committed frottage rubbing his clothed

4   penis against Gerri on two occasions."

5        Do you recall disclosing that in sex offender

6   treatment?

7   A.  Um, I don't recall rubbing -- saying it that way.

8   Q.  But do you recall rubbing your clothed penis again

9   Gerri?

10  A.  Um, I didn't rub my clothed penis again Gerri.

11  Gerri stuck her hand on my penis and rubbed me through

12  my jeans.

13  Q.  At 7 years old, Mr. Swarm?

14  A.  At 6 years old.  She had already been molested prior

15  by a 14-year old, 15-year-old boy.

16  Q.  And children who previously have been molested are

17  your preferred victims, right?

18  A.  Yes.

19  Q.  Now, um, you originally said that you believed no

20  harm was coming to a child in child porn because it was

21  legal in the country of origin, correct?

22  A.  Yes.

23  Q.  And you felt no responsibility to these victims of

24  child pornography because you did nothing directly to

25  them, right?

1    A.    Right.

2    Q.    And at home, on your computer, you maintained a

3    library of the child pornography that you had?

4    A.    Yes.

5    Q.    You had printed digital images as well, correct?

6    A.    Yes.

7    Q.    You -- they were of prepubescent females, right?

8    A.    Yes.

9    Q.    And you characterized them by hair color, eye color,

10   et cetera, right?

11   A.    Yes.

12   Q.    And you think "60 Minutes" is partly to blame for

13   your collection of child pornography?

14   A.    Not to blame.  They weren't to blame for it.  That's

15   how I learned about it.  They didn't make me do it, they

16   just -- a program they had told me about how -- about

17   child pornography.

18   Q.    So reading from Exhibit 31, Page 8, Dr. Mills'

19   report:  "Thus, he believes that the '60 Minutes' TV

20   show bears some responsibility," those aren't your words

21   to Dr. Mills?

22   A.    He's not even saying they're my words.

23              THE COURT:  Ms. Stacey, we're going to have to

24   stop at about 10 minutes of 1:00.  I have something from

25   about 1:00 to 2:00.  So we'll take the lunch break

1    then.  And I'm not suggesting you're being anything but

2    efficient, um, but do you have a sense of how long

3    you're going to be with Mr. Swarm because the goal is to

4    get Mr. Hernandez -- to get Dr. Hernandez's testimony

5    today and then your closing arguments.

6            MS. PIEMONTE-STACEY:  I think about a half

7    hour, your Honor.

8            THE COURT:  Okay.  So why don't we go about

9    another five minutes now and the rest of it will have to

10   be at 2:00.

11           MS. PIEMONTE-STACEY:  Thank you, your Honor.

12   Q.  You also blame Cortland Mental Health for not

13   providing you the treatment with regard to child

14   pornography, right?

15   A.  (Pause.)  Again I believe this is what his

16   conclusion is from me saying that I didn't get any

17   help.  It's not what I said, it's what his conclusion is

18   of what my statements are.

19   Q.  Now, in 2008 you told Dr. Saleh that your pedophilic

20   symptoms were something that would never go away, right?

21   A.  Yes.

22   Q.  And you told Dr. Mills that you weren't only

23   attracted to female minors, but that you were attracted

24   to those who had been previously molested, right?

25   A.  Yes.

1    Q.   And your child pornography was something you

2    couldn't stop, right?

3    A.   I don't believe so.

4    Q.   You previously saw a record when you had said it was

5    an addiction, right?

6    A.   Yeah.

7    Q.   And I'll show you, from Page 16 of Exhibit 1,

8    Dr. Saleh's report.  He added, quote:  "I got into this

9    (child pornography).  I couldn't stop.  I wanted to get

10   castrated, I wanted to get help, but I was afraid of

11   getting arrested."  Did I read that correctly?

12   A.   Yes.

13   Q.   But then today, without treatment, you're only

14   attracted to adult woman, is that right?

15   A.   I have taken some treatment that was actually

16   helpful at Family and Children's and between what

17   they've taught me and got me to actually accept, which I

18   had never been forced to accept it, I now know that I

19   can -- it will never go away, but I can get my fantasies

20   to where they're not so bad.  And, you know, that's why

21   I wanted to have chemical castration, in the first

22   place, was to get that all to end.

23   Q.   And those are the fantasies of young children,

24   girls, right?

25   A.   Right.

1   Q.  You took Paxil in 2003 to suppress your sexual

2   urges, but it didn't help you, right?

3   A.  Right.

4   Q.  And you were also prescribed Prozac?

5   A.  Yes, earlier.

6   Q.  For the same issues, right?

7   A.  Yes.

8   Q.  And you stopped these medications, right?

9   A.  Because they were not effective.

10  Q.  And when you began sex offender treatment in 2006,

11  you signed a contract with a treatment provider, do you

12  recall that?

13  A.  Yes.

14  Q.  And --

15          THE COURT:  Actually this is about the point

16  where we need to stop.  It looks like you're making a

17  transition.  I'll give you about thirty minutes -- as I

18  say, you're certainly being efficient, when we come

19  back.  Mr. Watkins, you're going to have to be prepared

20  to be focused in any redirect examination because we've

21  got a lot to get done this afternoon.  Okay?

22          MR. WATKINS:  I don't expect it to be long at

23  all, your Honor.

24          THE COURT:  All right.  Thank you.  And

25  hopefully you'll both be focused with regard to

```
 1    Dr. Hernandez, whom I know has a plane at 6:00 tonight.
 2    Okay?
 3            The Court is in recess.
 4                    (Lunch recess, 12:50 p.m.)
 5                    (Resumed, 2:10 p.m.)
 6            THE COURT:  Okay.  We're ready to resume with
 7    the cross-examination of Mr. Swarm.
 8            MS. PIEMONTE-STACEY:  Thank you, your Honor.
 9
10    CROSS-EXAMINATION BY MS. PIEMONTE-STACEY:  (Continued.)
11    Q.  Mr. Swarm, when you began sex offender treatment at
12    Children's and Family services, you signed a contract,
13    right?
14    A.  Yes.
15    Q.  And one of the terms of that contract is you would
16    remain sober and drug free, right?
17    A.  I don't remember sober, but drug free, yes.
18    Q.  Okay.  I show you Exhibit 21.  Um, Paragraph 5 on
19    the Exhibit 21, that's Bates' stamped CSWD-5, Paragraph
20    5: "I will remain sober and drug free."  Did I read
21    that correctly?
22    A.  Yes.
23    Q.  Okay.  And you started at Children's and Family in
24    January of 2006?
25    A.  To the best of my recollection, yes.
```

1   Q.   And you told Dr. Saleh that you have been sober

2   since May of 2006, correct?

3   A.   Yes.

4   Q.   Now, you also agreed to comply with the program

5   rules?

6   A.   Yes.

7   Q.   And one of the things you agreed to do was not to

8   commit reoffenses and avoid situations where you might

9   set up reoffenses, is that right?

10  A.   Yes.

11  Q.   But you allowed yourself to be in the presence of

12  children, right?

13  A.   Yes.

14  Q.   And you touched some of the children?

15  A.   No.

16  Q.   Um, didn't you have a child in your lap?

17  A.   The child jumped on my lap.

18  Q.   And you also agreed to request approval before

19  having any contact with children, right?

20  A.   Yes.

21  Q.   Um, before staying overnight with children, right?

22  A.   Yes.

23  Q.   And, um, before going to places that attracted

24  children?

25  A.   Yes.

1   Q.  And, in fact, that's one of the reasons you went to

2   group and said, "Can I go to Maple Fest?  What do you

3   think?"  Right?

4   A.  Right, but I'm not -- I can't request to be able to

5   spend the night where there's a child at.  That's just a

6   no-no.

7   Q.  Okay.  Um, let me just show you Exhibit 21,

8   Paragraph 24, on a page that's Bates stamped at the

9   bottom "SWD-6."  Do you see that?

10  A.  Yeah.

11  Q.  And it says:  "I will request approval before having

12  any contact with children, staying overnight with

13  children, living with children, and going to places that

14  attract children, boys and girls clubs, parks, arcades,

15  etc."  Did I read that correctly?

16  A.  Yes.  I just thought I wasn't allowed to at all.

17  Q.  Thank you.  But you frequented homes and

18  acquaintances where young children resided during your

19  release and you didn't ask permission, right?

20  A.  Um, I got permission from Michael Pierce.

21  Q.  Well, you didn't get permission from Michael Pierce

22  to be at TC's home with his 3-year old, did you?

23  A.  No, I didn't.

24  Q.  Now, on the sex offender reports that you submitted

25  to Mr. Pierce, um, you lied about the number of past

1    incidents, didn't you?

2    A.  Yes.

3    Q.  And you associated and visited a friend, Charlie,

4    who was a felon, while you were on supervised release,

5    didn't you?

6    A.  Yes.

7    Q.  And Charlie is the man that you talked about

8    originally going to stay with if you were released,

9    right?

10    A.  Yes.

11    Q.  And on October of 2006, while in sex offender

12    treatment, you had a "Hustler" pornography DVD that you

13    said you found by the river, right?

14    A.  Yes.

15    Q.  But you didn't tell your sex offender group about

16    that DVD until you had had it for several weeks, right?

17    A.  Yes.

18    Q.  And you didn't tell your probation officer until

19    your group told you to go to the probation, right?

20    A.  Yes.

21    Q.  And you testified about how in October of 2006 you

22    were left alone with a three-year old, right?

23    A.  Yes.

24    Q.  And then while on supervised release and in

25    treatment in 2006 you slept in a home where a minor was

1   living, didn't you?

2   A.  No.

3   Q.  Were you living at a home and a minor came over your

4   mother's home?

5   A.  My father's home and I left and went over to my

6   friend Tim's house.

7   Q.  And you testified about the situation where you went

8   to the house with your friend and her niece was there,

9   they had two six-year-old girls, right?

10  A.  Yes.

11  Q.  And you testified that one of the children hugged

12  you?

13  A.  Yes.

14  Q.  And then you went to a second house with this female

15  friend and there was another minor that also lived

16  there, right?

17  A.  There were minors that lived there, but I went

18  outside with the older daughter, who was not a minor, a

19  19 year old.

20  Q.  The minor also lived at the other house, right?

21  A.  Right.  I didn't know that there were minors at the

22  house until I got there.

23  Q.  And you testified that you were scared at the first

24  house when the two six-year-old kids came in, right?

25  A.  Yes.

1   Q.  But you didn't turn around and leave immediately,

2   did you?

3   A.  No, I didn't.

4   Q.  You didn't disclose this interaction with these kids

5   in sex offender treatment, did you?

6   A.  No, I didn't.

7   Q.  And when the six year old hugged you, it was around

8   the knees, right?

9   A.  Yes.

10  Q.  And so the child's head was at your groin area,

11  wasn't it?

12  A.  Yes.

13  Q.  And you didn't disclose that in sex offender

14  treatment, did you?

15  A.  Not at the time.  I actually did disclose it later

16  on.

17  Q.  Now, you testified earlier today, um, that when you

18  visited TC in 2006, that he knew about your attraction

19  to children.  Do you recall that testimony?

20  A.  Yes.

21  Q.  I'd like to refer you to Exhibit 34, Bates stamped

22  SW-00745 on the bottom.  These are --

23              MR. WATKINS:  Your Honor, I'm going to object.

24              MS. PIEMONTE-STACEY:  The beginning of the

25  sentence says "The offender relates," so this is a

1    statement from Mr. Swarm to his probation officer.

2              MR. WATKINS:  I'm not sure of the purpose.

3    Mr. Pierce testified already that TC indeed was aware of

4    Mr. Swarm's --

5              THE COURT:  But I think this would go to the

6    credibility of that testimony.  Overruled.

7              MR. WATKINS:  Of Mr. Pierce's testimony?

8              THE COURT:  No, no, this says:  "The offender

9    relates he was unaware this child was at the house when

10   he would visit and TC is not aware of his attraction to

11   children."  I think Mr. Swarm testified that TC was

12   aware of his history, correct?

13             MR. WATKINS:  As Mr. Pierce has also testified

14   to.

15             THE COURT:  Right, but this would be a

16   prior -- well, I didn't mean to touch that.  But this

17   would be a prior inconsistent statement with which the

18   witness is being confronted and it's in one of the

19   exhibits that's been admitted.  So the objection's

20   overruled.

21   Q.  And so you told Mr. Pierce, Probation Officer

22   Pierce, um, that you were aware there was a child at

23   TC's house when you would visit and that TC was not

24   aware of your attraction to children, correct?

25   A.  Yes.  I was also told that if TC had said that he

1    knew and he had left me alone with his granddaughter,

2    she'd be taken from him.  So to cover for TC until he

3    said that it was okay, I was not going to admit and tell

4    them that he didn't know, because I wasn't going to get

5    his granddaughter taken from him.

6    Q.  And so you chose to lie to your probation officer to

7    cover for TC, is that right?

8    A.  I did not want that granddaughter to be taken away

9    from him.

10   Q.  And you visited TC one to two times a month for

11   several months, right?

12   A.  Approximately, yeah.

13   Q.  And you didn't disclose this in sex offender

14   treatment, did you?

15   A.  No.

16   Q.  Now, you testified earlier today that, I believe

17   it's August of 2006, you went to a wedding and there

18   were children in attendance, correct?

19   A.  A reception.

20   Q.  Okay.  And you were left alone with two minor girls

21   at the wedding, weren't you?

22   A.  No, I was not.

23   Q.  I'm going to refer you back to that same document,

24   Exhibit 34, Bates stamped MW-745 at the bottom --

25               THE COURT:  What document is this document?

1          MS. PIEMONTE-STACEY:  It's Exhibit 34.  And

2      the Bates stamp is --

3          THE COURT:  No, what is it?

4          MS. PIEMONTE-STACEY:  Oh, it's the

5      chronological notes of the probation officer.

6          THE COURT:  Okay.

7          MS. PIEMONTE-STACEY:  I'm sorry, your Honor.

8          THE COURT:  Okay.

9   Q.  And I'm circling the area.  "The offender also

10  admitted attending a wedding in August of 2006 where

11  children were in attendance."  Did I read that

12  correctly?

13  A.  "Where children were in attendance," yes.

14  Q.  "He admitted being left alone with two girls, who

15  are 8 or 9 years old, while walking back to his

16  vehicle."  Did I read that correctly?

17  A.  Yes, but he didn't quote me correctly.  Like I said

18  earlier, I --

19          THE COURT:  Yeah, I understand what you said

20  earlier.  Thank you.  There doesn't seem to be a

21  material inconsistency there.

22  Q.  And as you testified here today, um, you don't know

23  the address that if released you would live at, correct?

24  A.  Correct.

25  Q.  You don't have a release plan in place, correct?

1   A.  Correct.

2            MS. PIEMONTE-STACEY:  May I have a moment?

3            (Pause.)

4            MS. PIEMONTE-STACEY:  I have nothing further,

5   your Honor.

6            THE COURT:  Is there redirect?

7            MR. WATKINS:  Yes, your Honor, just a couple

8   of questions.

9

10  REDIRECT EXAMINATION BY MR. WATKINS:

11  Q.  May I get the screen here.  (On screen.)  Mr. Swarm,

12  did you --

13           MR. WATKINS:  If I may have just a moment,

14  your Honor.  This was an expected question.

15           (Pause.)

16  Q.  You filled out monthly supervision reports for

17  Mr. Pierce while you were on supervised release

18  revocation?

19  A.  Yes, I did.

20  Q.  I'm sorry.  -- while you were on supervised release?

21  A.  Yes, I did.

22  Q.  Um, one of those was in September of 2005?

23  A.  Yes.

24  Q.  Do those supervision reports require you to, um,

25  list any felons with which you were associating?

1   A.   Yes.

2   Q.   Was Charlie Huff one of the people that you told

3   Mr. Pierce that you were associating with?

4   A.   Yes.

5   Q.   So Mr. Pierce knew all along that you were visiting

6   Mr. Huff during your period of supervised release?

7   A.   Yes, he did.  I even asked for permission to do so.

8   Q.   I'm going to turn to Exhibit 25, which Ms. Stacey

9   showed you.  (On screen.)  And she highlighted Condition

10  Number 5.  I'm going to try to do it better.

11       She pointed out that it required you to remain

12  sober and drug free?

13  A.   Yes.

14  Q.   Can you read the rest of the sentence?

15  A.   "If addicted I will continue to practice my

16  sobriety/addiction program.  If" --

17             THE COURT:  Abstinence.

18  A.   -- "abstinence is required of me, I will remain

19  abstinent."

20  Q.   Were you ever required to remain abstinent from

21  alcohol?

22  A.   No.

23  Q.   Was it a condition of your supervised release that

24  you not drink to excess of alcohol?

25  A.   Yes, sir.

1  Q.  And did, in fact, admit to Mr. Pierce when you did

2  occasionally drink, say, on New Year's Eve?

3  A.  Yes.

4  Q.  Did Mr. Pierce ever communicate any difficulty or

5  any reticence about that?

6  A.  No.

7           MR. WATKINS:  Those are all of the questions

8  that I have, your Honor.

9           MS. PIEMONTE-STACEY:  Nothing further, your

10  Honor.

11           THE COURT:  All right.  Mr. Swarm, I may have

12  a few for you.  I guess it's the following two areas.

13  And counsel know that if they have any objections, they

14  shouldn't be timid about stating them.

15      Do you understand -- what is it, exhibit -- which

16  exhibit has the current conditions of supervised release

17  that would be in place if he is released?

18           MS. CONNOLLY:  Exhibit 25, your Honor.

19           (Pause.)

20           MS. CONNOLLY:  It's approximately four pages

21  in.

22           THE COURT:  Right.  In fact, could somebody

23  put them up or do you -- would you put up the special

24  conditions of supervision.

25           (On screen.)

1        THE COURT:  Mr. Swarm, do you understand that

2  if you were released you'll be subject to these

3  conditions of supervision for four and a half years?

4        THE WITNESS:  Yes.

5        THE COURT:  And do you understand that among

6  other things the conditions of supervised release

7  require that you not use any illegal drug or substance

8  including marijuana?

9        THE WITNESS:  Yes, sir.

10       THE COURT:  When's the last time you smoked

11  marijuana?

12       THE WITNESS:  Um, prior to my arrest in 2000.

13       THE COURT:  And when did you get out of prison

14  following your arrest in 2000?

15       THE WITNESS:  Um, 2005, September.  September

16  of 2005.

17       THE COURT:  And were you subject to drug tests

18  after that?

19       THE WITNESS:  Yes, sir.

20       THE COURT:  Did you ever test positive for

21  marijuana?

22       THE WITNESS:  No.

23       THE COURT:  Did you ever use marijuana?

24       THE WITNESS:  No.

25       THE COURT:  And is it your intention to

1    refrain from using marijuana if you're released again?

2                THE WITNESS:  Yes, sir.

3                THE COURT:  Do you think you'll succeed in

4    that effort?

5                THE WITNESS:  I can't be 100 positive, but I'm

6    99 percent sure I will.

7                THE COURT:  Why?

8                THE WITNESS:  Um, because I've been away from

9    it for so long.  I really don't crave it anymore.

10                THE COURT:  And what if you start craving it

11    again?

12                THE WITNESS:  Knowing the consequences would

13    stop me from doing it.

14                THE COURT:  What would the consequences be?

15                THE WITNESS:  Um, well, being kicked out of

16    group again, which I don't want to do.  If I get back in

17    with Sarah, I want to stay there.  Um, coming back to

18    prison again.  And possibly going through all of this

19    again.

20                THE COURT:  What do you mean by "going through

21    all this"?

22                THE WITNESS:  Being held past my release date

23    in consideration for the Adam Walsh Act.  Possible

24    commitment to prison for life.

25                THE COURT:  Do you understand that if you are

1    committed you may get the treatment that you've never

2    had on the outside?

3                THE WITNESS:  Yeah, I do.

4                THE COURT:  And you say you want treatment,

5    right?

6                THE WITNESS:  Yes, I do.

7                THE COURT:  Why don't you want it in custody?

8                THE WITNESS:  I don't work well with the

9    government -- and I know you are part of the government,

10   the justice system, but it's something that -- and it's

11   something that I'm working on personally myself.  It's

12   also that.  But when I'm confined, I'm going to be more

13   likely to resist than if I'm outside.

14               THE COURT:  And Ms. Stacey has just reviewed,

15   in her questioning of you, the number of times you

16   didn't obey or completely obey conditions of probation

17   or supervised release before, right?

18               THE WITNESS:  Yes, sir.

19               THE COURT:  Why should I think you'll do

20   better in the future than you've done in the past?

21               THE WITNESS:  I've seen the great consequences

22   of not do doing it and, you know, I've got more strict

23   conditions now.

24               THE COURT:  All right.  And when's the last

25   time you touched a prepubescent child, as we've been

1    calling it, a child say 13 or under?

2              THE WITNESS:  Um, that I've touched?  You mean

3    been touched by or that I've actually touched the

4    child?

5              THE COURT:  Well, let's use the expansive

6    definition to begin with.

7              THE WITNESS:  Where there was contact?

8              THE COURT:  Where there was contact with a

9    child.

10             THE WITNESS:  Um, the last time would have

11   been at TC's house.

12             THE COURT:  When was that?

13             THE WITNESS:  I don't know the date.

14             THE COURT:  I mean, what year?

15             THE WITNESS:  In 2006.

16             THE COURT:  And is 2006 when you were detained

17   for violations of your conditions of supervised release?

18             THE WITNESS:  Right.

19             THE COURT:  Okay.

20             (Pause.)

21             THE COURT:  Do my questions suggest any

22   further questions to counsel?

23             MR. WATKINS:  No, your Honor.

24             (Pause.)

25             MS. PIEMONTE-STACEY:  You just testified,

1    Mr. Swarm, that the last time you touched a child was in

2    2006 at TC's home, was that right?

3              THE WITNESS:  Yes.

4              MS. PIEMONTE-STACEY:  And that's another new

5    incident that has never been disclosed until just now,

6    right?

7              THE WITNESS:  No, that was why I got violated

8    on probation in the first place.

9              MS. PIEMONTE-STACEY:  Thank you.

10             THE COURT:  Okay.  You may take your seat.

11             (Steps down.)

12             THE COURT:  All right.  Has it been resolved

13   who's going to call Dr. Hernandez?  The government?

14             MS. PIEMONTE-STACEY:  Um, the government will

15   call Dr. Hernandez.

16             THE COURT:  All right.

17             MR. WATKINS:  I think we have a couple of

18   agreed-upon exhibits to go with Mr. Hernandez.

19             THE COURT:  Okay.  Dr. Hernandez, would you

20   please approach the witness stand and be sworn.

21             (DR. ANDRES HERNANDEZ, sworn.)

22             MS. PIEMONTE-STACEY:  Your Honor, the

23   government would offer, as Exhibit 43, Dr. Hernandez's

24   CV.

25             THE COURT:  Okay.  It shall be admitted as

```
 1   Exhibit 43.
 2                 (Exhibit 43, marked.)
 3                 MR. WATKINS:  Two other exhibits are connected
 4   with Dr. Hernandez.  Would the Court like all of them
 5   now?
 6                 THE COURT:  I think that would be efficient,
 7   yes.
 8                 MR. WATKINS:  Um, the respondent would move
 9   for admission of a June 28th, 2010 memorandum for Karen
10   Stenour, PhD, from Andres E. Hernandez.
11                 THE COURT:  And these are agreed exhibits?
12                 MS. PIEMONTE-STACEY:  There's no objection,
13   your Honor, yes.
14                 THE COURT:  Okay.  So that would be Exhibit
15   44.
16                 (Exhibit 44, marked.)
17                 MR. WATKINS:  I'm afraid I just have one extra
18   copy.
19                 THE COURT:  That's fine.
20                 MR. WATKINS:  And the second exhibit would be
21   the U.S. Department of Justice Federal Bureau of Prisons
22   Institutional Supplement, which is number BUT --
23   standing for "Butner," I assume?
24                 THE WITNESS:  Yes.
25                 MR. WATKINS:  5218.1, dated February 1st,
```

1    2009.

2                THE COURT:  Okay.

3                MS. PIEMONTE-STACEY:  No objection.

4                (Exhibit 45, marked.)

5                THE COURT:  Okay.  And have we already

6    admitted the document concerning pharmacological

7    treatment?

8                MS. PIEMONTE-STACEY:  Yes, your Honor, I

9    believe it's in as Exhibit 39.

10               THE COURT:  Okay.

11               (Passes up documents.)

12               THE COURT:  You may proceed.

13               MS. PIEMONTE-STACEY:  Thank you, your Honor.

14

15               * * * * * * * * * * * * * * * * * * * *

16               DR. ANDRES HERNANDEZ

17               * * * * * * * * * * * * * * * * * * * *

18

19   DIRECT EXAMINATION BY MS. PIEMONTE-STACEY:

20   Q.  Dr. Hernandez, where are you employed?

21   A.  Federal Bureau of Prisons at FCI Butner.

22   Q.  And --

23               THE COURT:  Excuse me.  Actually we ought to

24   get his full name for the record.

25               MS. PIEMONTE-STACEY:  Oh, I'm sorry.  I

1    thought we had done that.

2    Q.  Would you please state your full name for the

3    record.

4    A.  Andres Hernandez, A-N-D-R-E-S, and Hernandez is

5    H-E-R-N-A-N-D-E-Z.

6    Q.  And you're currently employed by the Bureau of

7    Prisons in what capacity, Dr. Hernandez?

8    A.  I am the clinical coordinator of the commitment and

9    treatment program at FCI Butner.

10   Q.  And could you briefly -- your CV is in evidence as

11   Exhibit 43.  But could you just briefly describe what

12   that entails?

13   A.  Um, I have primary responsibility and oversight for

14   the implementation of the treatment program for civilly

15   committed and civilly detained inmates at FCI Butner

16   pursuant to 4248.

17   Q.  And, um, what is the treatment program?

18   A.  Um, it is a -- predominantly a psychological

19   treatment program intended to reduce sexual

20   dangerousness.

21   Q.  And could you describe the program?

22   A.  The program is a residential or inpatient treatment

23   program for individuals who again have been either

24   detained or certified or civilly committed under 4248.

25   It is a long-term comprehensive treatment program

1    designed to, um, reduce sexual dangerousness.  We employ

2    a wide range of therapeutic modalities.  And in a

3    nutshell that's what it is.

4    Q.  And when you say a "long-term comprehensive

5    treatment program," what do you mean by that?

6    A.  It is holistic, we are treating the entire

7    individual, not just his sexual behavior problem.  Um,

8    so it is -- it is also long-term and task-based meaning

9    that we are putting the individuals in treatment through

10   a highly-individualized treatment program that addresses

11   all of their deficits.  And it is done so without a

12   particular -- um, I should say without a rigid treatment

13   plan, um, that is, it's more of a class that they have

14   to pass.  They really need to master the competencies

15   and demonstrate the skills that we are trying to teach

16   them.

17   Q.  And, um, in this treatment program, do you divide it

18   into phases?

19   A.  Yes, we have four phases.  Um, the first phase of

20   treatment, um, is designed to orient the individual to

21   the treatment program expectations.  Um, during this

22   phase of the treatment program, we are also evaluating

23   the individual for treatment.  Um, individuals who come

24   to us already have, um, sometimes several psychological

25   evaluations.  This is an evaluation for treatment

1    purposes and to develop a comprehensive treatment plan.

2         In the second phase we begin to teach them basic

3    skills, um, and these range from problem resolution

4    skills, relational skills.  Um, we also address their

5    criminal, criminogenic or criminal thinking or criminal

6    thinking errors.  Um, we are addressing their

7    communication skills.

8         Phase three is a phase where we target a lot of

9    the sex offender specific areas.  We target the sexual

10   behavior problem.  We, um, direct the offender or the

11   patient to come up with a comprehensive list of his

12   sexual behavior problems and the victims of those

13   behaviors.  Um, we are helping the offender here manage

14   his sexual deviance.  So a significant component of

15   phase three has to do with skills that we teach to

16   manage the sexual behavior problem.

17        And phase four is an integrative phase.  Here we

18   begin to put all the pieces together.  The patients then

19   draft a final relapse prevention plan.  They also draft

20   what we call a "Good Lives Plan."  Um, this is a more of

21   a prosocial approach-oriented plan, so it has less to do

22   with avoiding risk factors, which is the essential part

23   of relapse prevention, and it has more to do with

24   leading a prosocial, a good life, something that is

25   intrinsically motivating.  And we also, um, prepare them

1   for their anticipated release to the community, um, and

2   do a lot of cognitive rehearsal, table-top exercises in

3   which they deal with the conditions of release and risk

4   factors and so on and so forth.  So it's a great

5   oversimplification of four very complex and time-

6   intensive phases.

7   Q.  And, um, is a fifth phase contemplating the Bureau

8   of Prisons?

9   A.  It has been contemplated more in concept.  Um, when

10  we originally designed the clinical protocol we did

11  design it with a phase five, which was intended to be a

12  transitional phase, um, between treatment under total

13  confinement and release to the community.  Um, the

14  Bureau of Prisons and those who make those type of

15  decisions regarding resource allocation and program, um,

16  development have not yet decided on what particular

17  model, if any, is going to be adopted for phase five.

18  So what I oversee currently is phases one through four.

19  Q.  And in addition to overseeing phases one through

20  four, do you also treat patients in phases one through

21  four?

22  A.  I do.

23  Q.  Now, when you say that it's task based not time

24  based, can you explain that concept for us?

25  A.  In many treatment programs -- and I'd like to give

1    you an example of when I directed the sex offender

2    treatment program, um, for the Bureau of Prisons from

3    1997 to 2007, um, it was more of a time-based program

4    and the reason for that is because there was an end date

5    and once that end date, um, was there, I couldn't hold

6    the individual past that regardless of the progress that

7    he had made.  In this model of indefinite commitment, I

8    want to make sure that that -- that the individual, the

9    patient has mastered all of the skills associated with

10   each phase before promoting him to the next phase and

11   certainly recommending him for conditional release.

12   Q.  And when you say this "model of indefinite

13   commitment," does that mean that no person committed to

14   the program will ever be released?

15   A.  Oh, that's not true at all.

16   Q.  What does the "model of indefinite commitment" mean?

17   A.  Well, civil commitment is indefinite, indefinite

18   until the progress has been achieved, that is, a

19   significant reduction in sexual dangerousness so that

20   the individual can be released to the community.

21   Q.  And how do you test progress?

22   A.  Well, what we treat are areas, um, that have been

23   scientifically associated with a reduction in criminal

24   and sexual recidivism.  Um, so on a regular basis, we

25   are assessing progress on all of those areas, um, those

1    areas may be as probably as few as 25 and can be as many

2    as 50 areas of treatment that we are targeting.  On a

3    quarterly basis we do systematic ratings, both

4    quantitative and qualitative ratings of progress, and we

5    communicate with our patients the progress that they're

6    making, um, and that's how we evaluate progress.

7    Q.  When you say that you use a number of therapeutic

8    modalities in the treatment program, what does that

9    mean?

10   A.  We are predominantly a cognitive behavioral

11   treatment program.  We also employ, um, a model of

12   treatment, um, sort of a -- it's a combination of

13   different things that are considered state-of-the-art in

14   the field right now.  Um, we certainly adopt a self-

15   regulation model and we also adopt the "good life

16   model," and those things, and those theoretical models

17   are infused in the treatment in a cognitive behavioral

18   relapse-oriented -- relapse-prevention-oriented

19   treatment that we have designed.

20   Q.  What are the types of treatment that someone in the

21   treatment program would go through, for example, are

22   there individual therapy sessions?

23   A.  There are individual therapy sessions that occur on

24   a weekly basis.  Um, there are also group therapy

25   sessions.  Um, patients may be in treatment anywhere

1    from 12 to 15 hours per week, um, and that is structured

2    treatment.  The treatment also occurs within a

3    therapeutic milieu, a therapeutic community.  Um, so in

4    essence they are in a therapeutic environment 24 hours a

5    day 7 days a week, they are participating in the

6    treatment.  We also, um, include, um, psychopharmacology

7    as part of the treatment, um, and have other treatment

8    modalities, for example, more specific to sex offender

9    and that is the use of the penile plethysmography.

10            THE COURT:  Let me take a step back.  When you

11   say psychopharmacology is used, what kinds of

12   medications are you referring to?

13            THE WITNESS:  We use the full range of

14   pharmacological agents that are used for the management

15   of paraphilic disorders.  Those include the

16   antidepressant medications or the selective serotonin

17   reuptake inhibitors, the SSRIs.  We also use

18   antiepileptic medicines, anxiolytics, for anxiety.  We

19   also use antipsychotics, the more atypical or new

20   generation antipsychotics.  And we also use the hormonal

21   agents, um, the so-called chemical castration agents,

22   and those are used as a, um, sort of a last resort.

23   Given their particular clinical properties, we start

24   with other agents first.

25            THE COURT:  Do those include drugs that are

1    sometimes called antiandrogens?

2              THE WITNESS:  Yes, your Honor.

3              THE COURT:  They lower testosterone?

4              THE WITNESS:  Yes.

5              THE COURT:  And you use those in your

6    program?

7              THE WITNESS:  We do.  We do and we have.

8              THE COURT:  Go ahead.

9    Q.  In order to treat someone pharmacologically, is a

10   medical clearance necessary?

11   A.  Yes.

12   Q.  And how does that happen?

13   A.  We are lucky that we are a care level three facility

14   and that means that we can provide medical care to

15   individuals who are chronically sick.  So we have a

16   well-staffed medical department also adjacent to a

17   federal medical center where we have additional medical

18   resources.  The process would involve getting a physical

19   and meeting with the psychiatrist.  Our psychiatrist at

20   MCI Butner, um, is one of the few if not the only

21   specialist in this particular area.  We've been working

22   with him for a number of years.

23   Q.  And about where is he located, the psychiatrist?

24   A.  At FCC Butner.  He works several institutions.

25   Q.  If someone is committed and -- under 4248, is

1    enrolled in the sex offender treatment program out of

2    4248, do you jump right to the pharmacological treatment

3    if that's what is being requested?

4    A.  No.

5    Q.  Why not?

6    A.  Um, we need, first and foremost, an evaluation and

7    we'll need to determine what are the clinical needs.

8    Um, being in custody, under confinement, the sort of the

9    immediate or pressing need for, um, implementation of

10   one of these pharmacological agents is quite different

11   than it would be in the community where there might be

12   more of a pressing need to get a paraphilic condition or

13   sexual urges under control.  So we do take our time and

14   carefully evaluate the patient's readiness for these

15   medicines.  And that the process itself of getting

16   someone medicated is a lengthy process.  We need to give

17   the medicines adequate time.  I heard testimony this

18   morning from Mr. Swarm that he had a poor response to

19   some of the SSRIs.  There are several other medications

20   that can be tried before the antiandrogens are

21   implemented.

22   Q.  And for someone on pharmacological treatment, is it

23   a matter of just taking the antiandrogens or is there a

24   holistic component of pharmacological treatment?

25   A.  No, in fact, the pharmacological treatment should go

1    hand and hand with the -- like a comprehensive sex

2    offender treatment program.  Our clinical practice

3    guidelines in the BOP are quite explicit about that.

4    Q.   And why do you combine pharmacological treatment

5    with the sex offender treatment program?

6    A.   Because the clinical response or the therapeutic

7    response to some of these pharmacological agents will do

8    nothing or little to, um, the cognitive maps that a

9    patient has.  Um, I heard testimony this morning of

10   Mr. Swarm feeling that these young girls had a crush on

11   him and certainly the medication is not going to affect

12   that kind of cognitive error or thinking error.

13   Q.   You had talked about the penile plethysmograph,

14   which is also known as the "PPG," is that right?

15   A.   Yes.

16   Q.   What is it and why is it used?

17   A.   It is a laboratory technique that we use

18   predominantly to assess deviant sexual arousal.  It is

19   done in a laboratory.  We attach a gauge to the

20   individual's penis and expose him to nonpornographic

21   auditory and visual stimuli depicting, um, several

22   categories, both coercive, persuasive categories, um,

23   different gender, um, both gender groups, as well as age

24   groups, and we measure a differential of what are the

25   arousal patterns.  This also is used to assess progress

1    in treatment, should there be a behavioral treatment

2    program designed to lower or inhibit the sexual response

3    to specific stimuli.

4    Q.  Um, do you also, in the treatment program, make use

5    of a polygraph?

6    A.  We do.

7    Q.  And for what reasons?

8    A.  We use the polygraph to verify the accuracy or the

9    completeness of the patient's self-reported sexual

10   offense history.

11   Q.  And as a gauge of progress, do you use it just once

12   or throughout the course of treatment?

13   A.  Um, we don't use it until they have completed

14   phase -- one of the components of phase three, which is

15   the sexual history -- the sexual offense history.  So

16   failure to pass that polygraph will result in an

17   additional polygraph and perhaps some additional

18   intervention.

19             THE COURT:  Ms. Stacey -- and I'm going to

20   give you extra time.  I'm interested in hearing this, as

21   you know.  But the time that is allocated for the

22   government's presentation, including closing, expires

23   right about now.  I'm not going to cut you off.  Do you

24   have an estimate, though, of how long you're likely to

25   be with the witness?

1          MS. PIEMONTE-STACEY:  Um, on my notes I have

2     just three or four questions left and I was following up

3     on a couple of issues.

4          THE COURT:  That's fine.  No problem.

5          MS. PIEMONTE-STACEY:  So I think by 3:30 --

6          THE COURT:  Okay, no problem.  You're not

7     wasting my time, so.  I just wanted to get an estimate.

8          MS. PIEMONTE-STACEY:  Thank you, your Honor.

9     Q.  So if someone's committed to the treatment program

10    and a determination is made that pharmacological

11    treatment is suitable, does that -- can a person elect

12    to discontinue pharmacological treatment?

13    A.  Yes.

14    Q.  And what are some of the reasons that you're aware

15    of that they may elect to do that?

16    A.  Um, poor tolerance to side effects.  There's really

17    no way to predict what type of side effects, if any, the

18    individual will have, and bad side effects are the

19    number one reason for discontinuing the treatment.  The

20    second one is, um, a completely inhibited sexual

21    response.  Some patients certainly do not want their

22    sexual libido to be obliterated by these chemical agents

23    and that is another reason for discontinuing the

24    treatment.

25    Q.  And I just -- the last question I think here I would

1  like to ask is could you describe, um, more the

2  therapeutic community that exists at Butner?

3  A.  The therapeutic community is a model that the BOP

4  has been using in the recent years in many of our

5  residential treatment programs.  Essentially what it is,

6  it has to be -- the treatment has to be within a

7  treatment unit that supports treatment.  It doesn't help

8  the interests of treatment to have the offender come to

9  the therapist's office for a group, um, and then go back

10  to a fundamentally criminogenic environment where he

11  lives.  So the therapeutic community is guided by

12  prosocial values, principles, and they participate

13  actively in self governance and in again separating

14  themselves from the culture of prison and the prison

15  code.

16  Q.  And are the psychologists' office and group

17  treatment rooms, et cetera, all in the same community

18  where they're living?

19  A.  Um, our offices are in the housing unit.  The

20  treatment unit is in an adjacent housing unit.

21  Preferably our offices would be in the same housing unit

22  as the treatment unit, but for pragmatic reasons that's

23  not possible at this time.

24  Q.  Um, do they have access to a therapist when

25  necessary?

```
 1    A.  Yes.

 2              MS. PIEMONTE-STACEY:  I have nothing further,

 3    your Honor.

 4              THE COURT:  Thank you.

 5              (Pause.)

 6              THE COURT:  Could I be reminded of what the --

 7    you're probably going to ask about this exhibit number.

 8    The pharmacological treatment plan is?

 9              MR. WATKINS:  39.

10              THE COURT:  39.  Thank you.

11              MR. WATKINS:  And I do hope to get there

12    quickly.

13

14    CROSS-EXAMINATION BY MR. WATKINS:

15    Q.  Dr. Hernandez --

16              THE COURT:  Hold on one second.

17              (Pause.)

18              MR. WATKINS:  Your Honor, it was originally

19    identified as Exhibit G, which was in another binder.

20              THE COURT:  That's all right.  I have the one

21    that was attached to my -- okay, it's G.  Okay.  Thank

22    you.  Go ahead.

23    Q.  Dr. Hernandez, just to straighten a couple of things

24    out.

25              Prior to the civil or the commitment treatment
```

1  program, the CTP that you're now involved with, you were

2  involved with the sex offender treatment program, right?

3  A.  Yes.

4  Q.  And that was the program within the Bureau of

5  Prisons for sentenced prisoners who were recommended for

6  sex offender treatment while in custody, right?

7  A.  Yes.

8  Q.  In addition there's a third kind of program for sex

9  offenders and that's a sex offender management program?

10  A.  Yes.

11  Q.  And that's based in a lot of different institutions

12  all around the country, right?

13  A.  Yes.

14  Q.  And that's not a voluntary program, that's something

15  that everybody identifies a sex offender goes through

16  prior to release, right?

17  A.  Well, it's both voluntary and involuntary.  The

18  aspect that you are describing is, in fact, involuntary

19  in that it involves designation to the institution.

20  However, participation in the treatment services while

21  at the institution is voluntary.

22  Q.  And that's the management program, right?

23  A.  Yes.

24  Q.  The treatment program is entirely voluntary, right?

25  A.  Yes.

1    Q.  And you were the head of that treatment program

2    while at -- while it was at Butner?

3    A.  Yes.

4    Q.  Really from its inception, it started right about in

5    1997 when you started at the Bureau of Prisons?

6    A.  Um, the program itself started in 1989, um, and I

7    became director in 1997.  I was afforded the opportunity

8    to make some changes.  So for, um, for all practical

9    purposes, the SODP, as we know it today, was the program

10   that I started in 1997.

11   Q.  Right.  And moving back now to the commitment

12   treatment program, the CTP that you're now in charge of,

13   that presently has a clientele of two, right, two

14   persons?

15   A.  No.

16   Q.  How many people are in the committed treatment

17   program?

18   A.  Well, we have roughly 90 individuals who are

19   detained pursuant to the Act and we have four

20   individuals who are participating in treatment, two of

21   whom have been civilly committed.

22   Q.  All right.  Two of them have been committed, the

23   other ninety are awaiting action by the Eastern District

24   of North Carolina, right?

25   A.  Yes, and two individuals who are certified and are

1    awaiting the same action who are participating in

2    treatment.

3    Q.   Right, and they just volunteered?

4    A.   Yes.

5    Q.   Of the ninety that are awaiting, they are not in

6    active treatment under this five phase protocol, is that

7    correct?

8    A.   That is correct, yes.

9    Q.   So it's four people, the two that have been

10   committed from the District of Massachusetts and two

11   volunteers from down in the Eastern District of North

12   Carolina?

13   A.   Yes.

14   Q.   Um, when you testified that you used antiandrogens

15   in the program and you have used it, are you using it

16   presently as to any of those four individuals?

17   A.   No.

18   Q.   So when you testified, what you meant to say is

19   you've used it in the past for the sex offender

20   treatment program, right?

21   A.   Yes.

22   Q.   And how many individuals was that used on in the sex

23   offender treatment program?

24   A.   Um, right off the top of my head, I can tell you

25   probably four individuals, um, total.

1    Q.  And is it safe to say that over -- from 1997 until

2    -- when did it leave there, 2006?

3    A.  2007.

4    Q.  -- to 2007, that thousands of individuals moved

5    through the Butner treatment program?

6    A.  Um, hundreds, um, certainly over a thousand,

7    although I can't say several thousand, but a fair

8    number.

9    Q.  And, again, it was four people that got this

10   treatment, the antiandrogen treatment?

11   A.  Yes.

12   Q.  And those were people who volunteered?

13   A.  Yes.

14   Q.  And, um, those are people close to the end of their

15   sentence preparing to go out in the community?

16   A.  Within the last two years.

17   Q.  And, in fact, that was a requirement for the

18   treatment program, is that you had to be within the last

19   couple of years to even be in the treatment program, is

20   that correct?

21   A.  Yes.

22   Q.  The sex offender treatment program is now -- well,

23   it's located at a few places, but one one of them is out

24   at Fort Devens?

25   A.  Well, there is still only one residential program

```
 1    and that is at Devens.
 2    Q.  Correct, and that's the sex offender treatment
 3    program that used to be down at Butner, but now it's
 4    come up here, right?
 5    A.  Yes.
 6    Q.  Um, not to -- well, I'll ask you.  Did that move up
 7    to Devens in order for the commitment treatment program
 8    to be started down at Butner?
 9    A.  Yes.
10    Q.  And are you still in -- well, I'll start that
11    again.
12         Who is in charge of the sex offender treatment
13    program at Butner now?
14    A.  I am.
15    Q.  Um, and there are individuals presently going
16    through treatment -- these are sentenced individuals
17    going through treatment as part of that program?
18    A.  No, um, the -- perhaps I misunderstood your
19    question.  Um, the CTP does not serve individuals who
20    are sentenced.  Anyone who is serving a criminal term
21    and wants sex offender treatment is served in one of the
22    either outpatient sex offender treatment programs at one
23    of our nonresidential treatment sites or the only
24    residential treatment program here in Devens,
25    Massachusetts.
```

Q.   Okay.   We're talking now about the sex offender

treatment program here at Devens, Massachusetts.   Um,

are you in charge of that program, also?

A.   I am not.

Q.   And who is in charge of that program?

A.   Dr. Cheryl Renault.

Q.   And how many individuals are in that program?

A.   I believe that their capacity is roughly 110.

Q.   And are there individuals there who are receiving

antiandrogen treatment?

A.   I don't know.

Q.   Would that be something that you would be required

to know about in your present position?

A.   No.

Q.   When one wants to go on antiandrogen therapy, is

there approval from other individuals in the Bureau of

Prisons other than just yourself and the medical doctor?

A.   Yes, there is a central office approval process.

Q.   So even though you might say "yes" and the doctor

might say "yes," they can still say "no"?

A.   Conceivably, yes.

Q.   And the program is somewhat costly, is that fair to

say about the antiandrogens?

A.   They are costly, yes.

Q.   And the Bureau of Prisons is cognizant of cost

1  issues at all times, correct?

2  A.  Um, yes, I would say so.

3  Q.  Specifically as to medications they will -- they

4  have made that a target of cost savings, is that safe to

5  say?

6  A.  I would think so, although that really is beyond the

7  scope of my knowledge and expertise.

8  Q.  Um, have you ever written on the subject of

9  antiandrogen therapy?

10  A.  I have not.

11  Q.  And what studies or -- where does your knowledge of

12  antiandrogen therapy come from, what is the leading

13  study that you've looked at?

14  A.  Well, I've been practicing in this area of sex

15  offender treatment for a little over 18 years, so during

16  that -- during those 18 years I have attended, um, many

17  continuing education programs, professional

18  conferences.  I participate in programs of self-study,

19  read articles myself, textbooks.  Um, there are several

20  articles, texts that I have read on the subject matter.

21  Q.  By you are not a medical doctor, is that true?

22  A.  That is true.

23  Q.  And you could not prescribe these antiandrogens,

24  right?

25  A.  Right.

1   Q.   And it is not -- I think you said it's the last line

2   of therapy that you would consider for an individual?

3   A.   Generally, yes.

4   Q.   When you say "generally," when would it specifically

5   be other than the last line?

6   A.   Um, certainly it would not be the first line of

7   intervention, um but given the severity of a paraphilic

8   disorder, um, the behavioral disinhibition of the

9   patient, um, those are factors that certainly would be

10  considered in, um, establishing a higher priority for

11  consideration of hormonal agents.

12  Q.   Okay.   I show you what's been marked as Exhibit 39.

13  And it's also in your book that's in front of you.   Um,

14  is this indeed a publication by the Bureau of Prisons'

15  guidelines, clinical guidelines concerning the treatment

16  of inmates with paraphilias?

17  A.   Um, it's not a publication, it's an internal

18  document that outlines clinical practice guidelines.

19  Q.   When you say an "internal document," at some point

20  this clinical practice guide was on the website, the

21  Bureau of Prisons' website?

22  A.   I -- which one are you talking about, the public

23  website?

24  Q.   Yes, the public website.

25  A.   Okay.   I was not aware of that.

1   Q.  Um, and generally speaking, um, the Bureau of

2   Prisons publishes lots of policies and procedures

3   on-line in the public domain?

4   A.  Yes.

5   Q.  Um, and this is dated October of 2005?

6   A.  Yes.

7   Q.  And is this still a clinical practice guideline

8   that's followed by the Bureau of Prisons?

9   A.  Yes.

10  Q.  Um, so to circle on back, Devens has a residential

11  sex offender treatment program without access to the

12  same tools that you do or you have down in Butner as far

13  as treatment modalities?

14  A.  Um, theoretically, yes, but I cannot testify to what

15  they do and how they do it.

16  Q.  Um, and you've testified that on four individuals

17  you did use antiandrogen drugs as far as the sexual

18  offender treatment program and the residential program

19  at Butner?

20  A.  Yes.

21  Q.  When you the director of the sexual offender

22  treatment program, Butner at the time was the only

23  residential program, correct?

24  A.  Yes.

25  Q.  To get in there it required a judicial

1   recommendation on the judgment?

2   A.  No.

3   Q.  Um, as in all things in the Bureau of Prisons it

4   helped to have a judicial recommendation?

5   A.  Absolutely.

6   Q.  Um, and there are protocols about where you are in

7   line for a program depending on whether there's a

8   judicial recommendation or not?

9   A.  Um, not to my knowledge.

10  Q.  Do you make the decision about who gets sent to you

11  in the sex offender treatment program?

12  A.  Um, yes, I made the final admission decision if they

13  met the criteria of those individuals who were actually

14  referred to me, um, and provided that I have bed space,

15  I did make that admission decision.

16  Q.  Um, you talk about persons that were referred to

17  you.  Who would do the referring to you?

18  A.  Um, the vast majority would come upon the initial

19  commitment by the community corrections office pursuant

20  to a judicial recommendation and then other referrals

21  came from field institutions, um, as based on a referral

22  from the chief psychologist or the case manager.

23  Q.  Turning to a referral from a community corrections

24  manager to you as a result of a judicial recommendation,

25  would all of those -- um, should all of those come to

1 | you for your review?
2 | A.  Yes.
3 | THE COURT:  Well, let me ask you the
4 | following.  This is a sex offender treatment program for
5 | people who are serving a prison term, correct?
6 | MR. WATKINS:  Yes.
7 | THE COURT:  What's the relevance to the
8 | immediate proceeding?
9 | MR. WATKINS:  Um, your Honor asked, during
10 | Mr. Swarm's testimony, about why he didn't get it, and
11 | that was purely informational and --
12 | THE COURT:  All right, I am concerned about
13 | that, and I thought that if he were asked the question,
14 | the doctor might tell me that they had a limited number
15 | of beds, or whatever.  If you can do it efficiently, do,
16 | but we --
17 | MR. WATKINS:  All right.
18 | Q.  If someone was referred to you and you rejected
19 | them, for whatever reason, would there be something in
20 | the central file indicating that that person had been
21 | rejected?
22 | A.  Yes, the normal protocol would certainly require me
23 | to produce a memorandum indicating the reasons why the
24 | individual was not admitted.  And generally, um, I heard
25 | your Honor talk about, this morning, that in 25 years

1    you've only received a handful of notifications.  The

2    protocol with regard to --

3              THE COURT:  With regard to any kind of

4    recommendation relating to medical, not just sex

5    offender.

6              THE WITNESS:  And that's quite unfortunate.  I

7    felt bad because the normal protocol would require the

8    case manager to notify the sentencing court of the

9    admission decision and why -- the circumstances of the

10   admission decision, and that would have provided the

11   Court a reason.

12             THE COURT:  Well, it -- it's just -- well, you

13   can go back.  I've been a judge for 25 years, um, and

14   before that I worked with the Bureau of Prisons when I

15   was an Assistant to the Attorney General of the United

16   States and a federal prosecutor here.  But there are a

17   number of -- and I generally refrain from making

18   recommendations thinking the Bureau of Prisons will know

19   what to do, but in some instances the presentence report

20   or other information persuades me that there's something

21   important and I do make a recommendation.

22        For example, at some point it became public, about

23   20 years ago, I recommended medical treatment for the

24   boss of the New England Mafia, Raymond J. Patriarca, who

25   came to me with a constellation of medical problems and

1      one of the arguments for a lower sentence was that he's

2      got all these medical problems and the response was that

3      the Bureau of Prisons can take care of him, but maybe he

4      got -- well, he must have gotten some medical

5      treatment.  But there are instances where I've

6      recommended it and I don't hear anything and then

7      somebody's on supervised release and they're about to be

8      revoked and they say, "Well" -- you know, what we've

9      heard here, "the recommendation wasn't followed."

10             I do imagine that with the prosecution priorities

11     of the Department of Justice in the last ten years,

12     there could have been a great increase in the number of

13     people, for example, convicted of possessing --

14     receiving and possessing child pornography, but I don't

15     know if there was a corresponding increase in the

16     resources of the Bureau of Prisons.  You're smiling.  My

17     guess is there wasn't.

18                 THE WITNESS:  Well, historically the Bureau of

19     Prisons has provided proportionately less than 1 percent

20     of treatment beds for the total sex offender population,

21     um, which is a very small number.  Now, pursuant to the

22     Adam Walsh Act, we now have more treatment available,

23     but that is not residential treatment.

24                 THE COURT:  Well, let me ask you this.  Are

25     you saying that the Bureau of Prisons, um, provides beds

1   for residential treatment for people serving a sentence,

2   who are sex offenders, for about 1 percent of the

3   population of sex offenders in prison?

4             THE WITNESS:  Yes.

5             THE COURT:  Well, as I said, this is all in

6   the Department of Justice.  If -- you know, it's

7   valuable to protect the community for the danger

8   somebody represents for the period of time they're

9   serving their sentence, but our whole system of justice

10  -- you know the point.

11            THE WITNESS:  I do.

12            THE COURT:  You'd think that if they're going

13  to prosecute more of these cases and incarcerate more of

14  these people, then they ought to give you more resources

15  to deal with it.

16       Go ahead.

17  Q.  And in regard to the treatment program, there are

18  ninety individuals who are being considered for

19  commitment in the Eastern District of North Carolina

20  currently?

21  A.  Yes.

22  Q.  And you are expecting that perhaps a majority, if

23  not more, will be actually committed to the commitment

24  treatment program?

25            MS. PIEMONTE-STACEY:  Objection.

1              THE COURT:  What's the objection?

2              MS. PIEMONTE-STACEY:  That's he's asking him

3    to speculate on what percentage of the ninety awaiting

4    certification will be committed.

5              THE COURT:  Okay, why don't you put another

6    question.

7    Q.  Have you or anybody else involved with the

8    institution of the civil -- or the committed treatment

9    program, established a target for the number of beds

10   that you're going to have?

11   A.  Um, we have not.  Um, certainly we will meet the

12   demand.  We anticipate that some percentage will be

13   committed and some percentage will not.  Again, to say

14   any more about that would be complete speculation on my

15   part.

16   Q.  And this would be also ongoing as more commitees are

17   committed?

18   A.  Yes.

19   Q.  I'm going to turn now to your June 28th, 2010

20   memorandum concerning the commitment treatment program.

21   You see it up in front of you?

22              THE COURT:  What exhibit is that?

23              MR. WATKINS:  This is Exhibit 44.  It was just

24   introduced.

25   Q.  I'm going to try to turn to Page 2 of that and

1  highlight down here the phases of the treatment

2  process.  (Highlights.)  Do you see what I've

3  highlighted there?

4  A.  Yes, I do.

5  Q.  It talks about phases 1 through 4, which I think you

6  testified are the only phases you have, that there's no

7  phase five at this point, right?

8  A.  Um, that's right.

9  Q.  And what you've written here in your memo is that

10 all of the phases are indeterminate, right?

11 A.  Yes.

12 Q.  Um, but nevertheless you put:  "Although the CTP

13 patient may potentially complete phases one through four

14 in approximately 25 months under optimal circumstances

15 or with highly motivated and capable patients, the

16 treatment protocol is not time based, it is task based."

17       Is it fair to say that 25 months is the barest

18 minimum that you would expect somebody to be in phases 1

19 through 4 of your program?

20 A.  Yes.

21 Q.  And you've testified that because the antiandrogens

22 are really the last line and you'd want to exhaust all

23 the other options first, that you would not consider

24 that until after all those other phases have been

25 completed?

1    A.  Um, no.

2    Q.  So would you -- but you would not consider somebody

3    for androgen treatment -- antiandrogen treatment

4    immediately upon commitment?

5    A.  I would consider it, um, if there was a clinical

6    reason for that.  The intervention, however, may be

7    something else besides the antiandrogen treatment.

8    Q.  Um, and I think the gist of your testimony is you

9    would think someone with hypersexuality might be

10   somebody that would be considered appropriate for

11   antiandrogens?

12   A.  Um, might be, but they may be equally or perhaps

13   more responsive to SSRIs.  It's difficult to know.  Each

14   patient has a very unique response.

15   Q.  Okay.  And so you would certainly -- um, I think I

16   understand it then.  You would certainly try the SSRIs

17   again before going to the antiandrogen therapy, right?

18   A.  Yes.

19   Q.  And I think what you testified is that the reason to

20   do antiandrogen therapy while you're in prison is

21   problems within prison, hypersexuality kinds of assaults

22   within prison, perhaps?

23   A.  No.

24              MS. PIEMONTE-STACEY:  Objection.

25   Q.  Well, why don't you tell me in what cases would you

1   use an antiandrogen therapy in preparation for someone's

2   release?

3   A.   In -- as I stated before, if the paraphilic disorder

4   is severe, um, if the response to the SSRIs and other

5   pharmacological agents is -- produces subclinical

6   results, then the antiandrogen medications would be

7   considered for the management of the paraphilic disorder

8   and that is also in anticipation of their release.

9   Q.   And then the Bureau of Prisons would follow up on

10  that once the person was released into the community?

11  A.   That has, from my perspective, has yet to be

12  determined of what the Bureau of Prisons involvement

13  will be upon an individual committed under 4248 and what

14  responsibility the BOP will have, um, during the

15  conditional release phase.

16  Q.   Okay.  Why don't we talk about that.  Now, is that

17  part of phase five that there is yet no plan for, right?

18  A.   Yes.

19  Q.   So right now the Bureau of Prisons has no plans for

20  the management of persons on conditional release?

21  A.   The current plan is, it appears, um, and I'm --

22               THE COURT:  When you're talking about

23  "conditional release," are you talking about supervised

24  release or conditional release for somebody who's been

25  civilly committed?

1          MR. WATKINS:  Correct.

2          THE COURT:  Okay.

3          MR. WATKINS:  And maybe I should make sure the

4    doctor is on the same page with us.

5    Q.  If someone is committed to the custody of the

6    Attorney General pursuant to 4248, like 4246, they are

7    committed to the custody of the Attorney General.  The

8    Attorney General can then ask a court to conditionally

9    release someone into the community, correct?

10   A.  Yes.

11   Q.  Once they are conditionally released into the

12   community, they are generally supervised by probation

13   officers, is that correct?

14   A.  Yes.

15   Q.  And so it looks a lot to us, on the criminal side,

16   like supervised release once they are released into the

17   community?

18   A.  Um, that is the model that is being applied to the

19   one case for whom conditional release is being

20   considered by the court.

21   Q.  And is there some kind of working group within the

22   Bureau of Prisons to try to determine how phase five is

23   going to work?

24   A.  My understanding is that administrators, psychology

25   administrators and perhaps from other disciplines, are

1    discussing, um, plans for either a phase five or some

2    model that would address the needs of this transitional

3    phase.

4    Q.   But that's not something that you're involved with?

5    A.   Um, no, I am not.

6    Q.   Um, your treatment memo here, of June 28th, talks

7    about the five phases being the total of the treatment

8    program that you're running at Butner?

9           MS. PIEMONTE-STACEY:  Objection.  That

10   document says "complete phases one through four."

11   Unless he's referring to something else.

12          THE COURT:  Well, I'd have to see the

13   document.

14      About how much more do you have for

15   Dr. Hernandez?

16          MR. WATKINS:  Not terribly long.  I think we

17   kind of plumbed the depths here.

18   Q.   Um, so if you had to consider releasing somebody

19   today out into the community, of someone who has shown

20   significant progress in your treatment program, there

21   would be no place for them to go now?

22   A.   Well, although this is really unchartered territory,

23   that is, the release of a civil committee under 4248,

24   the current plan is not to simply just dump that

25   individual into the community.  That individual will go

1   out with a series of recommendations for aftercare

2   treatment, conditions of supervision and monitoring in

3   the community.  Um, so those conditions are the -- or

4   have been recommended already.  Implementation of that

5   plan, it appears that is going to be the responsibility

6   of the United States Probation Office.

7   Q.  So at least now sitting here, once someone is

8   released, they'll be released out on to conditions of

9   supervised release, or conditional release, we'll call

10  it, but there will be conditions under which the

11  probation department will be supervising them?

12  A.  That's what it looks like.

13  Q.  And these could include the use of many of the

14  conditions of continued treatment at a local group

15  treatment facility, they could include home detention,

16  GPS monitoring, they could include restrictions on

17  associations, um, notifying people in the area of the

18  offender's existence?

19  A.  Yes, all of the above.

20  Q.  Um, at some point -- well, let me ask you this.

21  Have you ever participated in a 4246 hearing to

22  conditionally release someone, a regular mental health

23  case?

24  A.  I have not.

25  Q.  At some point the Bureau of Prisons will have to

1    come in on these cases to certify to a judge that the

2    person is no longer dangerous?

3    A.   Yes.

4    Q.   Is that going to be your call alone?

5    A.   Um, I doubt it.

6    Q.   Whose call will it be when someone is determined by

7    the Bureau of Prisons to be -- to no longer present a

8    serious risk of reoffending?

9    A.   Um, as I understand it, the statute refers to the

10   director of the facility will promptly notify the court

11   and, in the interpretation of the statute, that

12   typically refers to the warden.

13   Q.   But as we know the warden is not a doctor, the

14   warden takes recommendations given to him by his staff,

15   right?

16   A.   Yes.

17   Q.   And that means many people look at it and sign off

18   on it before the warden recommends it, right?

19   A.   Yes.

20   Q.   Who are those -- do you know who those people are

21   going to be 4248 cases?

22           THE COURT:   What's the relevance of that?

23           MR. WATKINS:   I think the answer is there is

24   nobody to decide who's going to get released at this

25   time.

 1              MS. PIEMONTE-STACEY:  Your Honor --

 2              THE COURT:  Well, this may be moot.

 3         Do you know who, in addition to you, would make a

 4    recommendation for the warden?

 5              THE WITNESS:  Um, within our program there is

 6    also a forensic evaluation component.  Um, those

 7    psychologists will be evaluating the progress as well

 8    and will be making a determination as to whether the

 9    individual is sexually dangerous.  So that will be yet

10    another opinion.  At some point I will come up with the

11    opinion, um, if the individual has, in fact, completed

12    treatment and achieved the maximum benefit, um, that

13    "This is all I can provide," and I will attest to that

14    to the warden and from there on it is up to, um, other

15    people to file motions with the court and what not.

16              THE COURT:  Well, actually, when you say --

17    you just said at some point you'll decide you've

18    provided the maximum benefit you can provide, correct?

19              THE WITNESS:  Yes.

20              THE COURT:  What do you understand would

21    happen if you feel you've given the person the maximum

22    possible benefit and you believe the person would still

23    have serious difficulty from refraining from sexually

24    violent conduct?

25              THE WITNESS:  Well, um, you know, the

```
1    completion of phase four would be synonymous with
2    having, in fact, very good control over the refraining
3    potential.
4              THE COURT:  I see.  But what if somebody
5    didn't successfully complete phase four, you would just
6    recommend that he be civilly committed indefinitely?
7              THE WITNESS:  Yes, and most likely that
8    individual would not be progressing to phase four.
9    Phase four is a very advanced, um --
10             THE COURT:  So potentially somebody, either
11   because they weren't interested or weren't able, might
12   be committed for life?
13             THE WITNESS:  Potentially, yes, that could be.
14             (Pause.)
15             THE COURT:  Do you have any more questions?
16             MR. WATKINS:  No, your Honor.
17             THE COURT:  I've got a couple, but why don't I
18   put them now, in the interest of efficiency, and then
19   the Government may have some redirect.  And some of this
20   I just want to confirm my understanding of what you
21   testified to.
22        I think you just testified that you think it would
23   take ordinarily a minimum of 25 months for somebody to
24   successfully complete the four phases?
25             THE WITNESS:  May I explain that a little
```

1    more?

2               THE COURT:  Yes.

3               THE WITNESS:  Um, currently we have

4    essentially what amounts to a one-to-one staff to

5    patient ratio.  Um, these four individuals are receiving

6    treatment that is very intensive, it's very good by very

7    experienced professionals.  All four of them are highly

8    motivated and capable.  Um, so in those circumstances,

9    25 months is, in fact, possible.

10          When you have a group of two or a group of three,

11   um, the work can be done more expeditiously than if I

12   have 10 individuals in the same group, that particular

13   group may take three times as long, if not more.  So in

14   the most optimal set of circumstances, which are the

15   present circumstances, it would be 25 months.

16               THE COURT:  And you've had -- when did you

17   first start working with some of these four people?

18               THE WITNESS:  Um, when the first case was

19   civilly committed in Judge Saris's court.

20               THE COURT:  Do you recall approximately when

21   that was?

22               THE WITNESS:  February of 2009, I believe.

23               THE COURT:  All right.  So nobody's graduated

24   yet?

25               THE WITNESS:  Not yet.

1          THE COURT:  What is your understanding as to

2     whether it would be possible for Devens to administer

3     antiandrogens -- or I'll explain this a little

4     differently.

5          You didn't hear all the testimony, but if I find

6     that the standard for civil commitment is not met, I

7     would order Mr. Swarm's release.  But there may be a

8     reason that he start antiandrogen therapy before

9     release, ideally.

10         Do you know whether Devens would have the capacity

11    to administer antiandrogen therapy now?

12         THE WITNESS:  I don't know, but for a fact I

13    find it unlikely, um, given that without participation

14    in a sex offender treatment program in-house, a

15    treatment program, that it would be against the clinical

16    practice guidelines to administer the hormonal

17    treatment.

18         THE COURT:  Okay, because it's not part of a

19    holistic program, (A).

20         How long does it ordinarily take for somebody to

21    develop a release plan?

22         THE WITNESS:  A release plan is formulated

23    generally within the CTP in phase three and four.  Um,

24    it is an ongoing process.  I -- in one case I have

25    already, um, stipulated many conditions in anticipation

```
 1    of completion of phase four.  We may add or modify those

 2    conditions as the patient completes phase four and is

 3    actually getting ready for release.

 4              THE COURT:  And I think you testified that you

 5    felt that it was better -- well, it was more promising

 6    to do therapy concerning a sex offender when he's in

 7    confinement rather than in the community because he's 7

 8    days a week, 24 hours a day, in the therapeutic

 9    community.  Did I understand you right?

10              THE WITNESS:  Well, it depends.  It depends on

11    the individual.  For some, um, the level of intervention

12    is outpatient therapy or treatment in the community.

13    For other individuals for whom, um, the sexual behavior

14    problem is more severe, there is greater, um,

15    disinhibition, um, constant violations of the conditions

16    in the community and for those individuals, um, a

17    treatment and treatment stabilization during confinement

18    is preferable.

19              THE COURT:  And in view of the fact that the

20    person eventually has to live in the community, he's no

21    longer civilly committed, why is that the case?

22              THE WITNESS:  Um, the process of stabilization

23    is a process that may take a long time, um, and in

24    addition to that, we also want to equip the individual

25    with psychological or mental tools, um, because the
```

1    medicine really does very little all by itself.

2            THE COURT:  And so my present understanding is

3    that if Mr. Swarm is civilly committed, in your opinion

4    it would take a minimum of 25 months for him to

5    successfully complete the treatment program to the

6    extent that he would no longer have a serious difficulty

7    of refraining, if released on certain conditions.

8    Essentially is the treatment you would give him, a

9    person civilly committed, comparable to the treatment

10   that would be given to a person in the sex offender

11   treatment program serving a sentence if he got one of

12   these limited beds during the period that he was serving

13   his prison sentence?

14           THE WITNESS:  Having operated both programs, I

15   can tell you that there are, um, there is considerable

16   overlap.  However, the treatment protocol in the CTP is

17   far more intense, far more individualized, um, and

18   certainly would meet all of the needs of the

19   individual.  The sex offender treatment program, our aim

20   was to meet the majority of the clinical needs, because

21   we weren't moving many inmates through the program.  Um,

22   in this treatment protocol, the margin of error is very

23   small, um, just because the stakes are so high.

24           THE COURT:  Okay.  Do my questions suggest

25   further questions to counsel?

1          (Silence.)

2          THE COURT:  Apparently not.

3          MR. WATKINS:  Oh, I do, your Honor.

4          THE COURT:  Okay.

5          MR. WATKINS:  The one-to-one treatment that

6    the four individuals are getting down there now, that

7    one-to-one ratio will change as individuals are

8    committed to the custody of the Attorney General?

9          THE WITNESS:  It is going to be a fluid ratio.

10         MR. WATKINS:  And do you have authorization to

11   hire staff to maintain a specific ratio?

12         THE WITNESS:  Um, not at this point.  I have

13   several vacant positions.  I'm hiring one additional

14   psychologist in anticipation of the influx of new

15   patients we're going to receive with these new civil

16   commitment trials.

17         MR. WATKINS:  And as you testified, of course,

18   the optimum is one to one, which you have now, but you

19   do not expect to be able to maintain that for very long

20   once you have to --

21         THE WITNESS:  Yes, I don't expect that.

22         MR. WATKINS:  And then that 25 months will

23   necessarily be longer?

24         THE WITNESS:  It will be longer for some.  Um,

25   it will stay at 25 months for others.  Again, it's an

```
 1    individualized treatment program.  Um, your client
 2    clearly has some foundation in treatment.  That will
 3    make the treatment easier.  Um, he is treatment minded
 4    and he appears motivated.  Um, so from that perspective
 5    I anticipate on the lower end.  Then there are some
 6    individuals for whom the treatment will last many years,
 7    they have, um, you know, very significant needs and
 8    considerable impairment.
 9              MR. WATKINS:  Just to be sure, you have
10    mentioned Mr. Swarm here.  Even having heard him testify
11    here, the actual minimum would be 25 months to make it
12    through all of those phases and it could be much
13    longer?
14              THE WITNESS:  Um, yes.
15              MR. WATKINS:  Thank you.
16              MS. PIEMONTE-STACEY:  Dr. Hernandez, if
17    Mr. Swarm was committed, is there room for him in the
18    commitment and treatment program?
19              THE WITNESS:  Yes.
20              MS. PIEMONTE-STACEY:  Nothing further.
21              THE COURT:  Okay.  Thank you, very much.
22    You're excused.  I appreciate you're coming in.
23              (Steps down.)
24              THE COURT:  All right.  Does that complete the
25    evidence?
```

```
 1                  MR. WATKINS:  Is does from the respondent's
 2       side.
 3                  THE COURT:  And from the government?
 4                  MS. PIEMONTE-STACEY:  Yes, your Honor.
 5                  THE COURT:  Two things.  One, I thought it was
 6       from this "Pharmacological Treatments of Inmates with
 7       Paraphilias" that I was reading when I questioned
 8       Dr. Saleh and asked him, "Do you agree with this about
 9       different degrees of pedophilia?"  But I didn't quickly
10       see if it was.  Is it a different document that I was --
11                  MS. CONNOLLY:  No, I think it's the same
12       document, your Honor.  I think it's on page -- it's Page
13       Number 2 of that Exhibit 39.  It's Bates numbered on the
14       lower right corner.
15                  THE COURT:  Oh, there it is.  I see it.  I
16       must have been reading from a different copy.
17            Mr. Watkins, are you flying to Arizona today?
18                  MR. WATKINS:  Um, no, I put that off until
19       tomorrow morning.
20                  THE COURT:  Well, all right.  This is what I
21       wanted to figure out, because if you weren't going at
22       all, I would have you argue tomorrow morning.  But
23       you're planning to go -- if I give you about 15
24       minutes -- here, I'll offer you some options.  Because
25       my present intention is to decide this matter on Friday
```

1   morning at about 11:00.  And, you know, if something

2   intervenes and I fall short of that, we'll let you

3   know.  I want to hear closing argument and I want it to

4   be useful.  I can start in about 15 minutes, if you're

5   all ready to go.  Is that your request?

6           MR. WATKINS:  That is, your Honor.  I think we

7   can get going now and I think it makes sense to address

8   this.  And at this point, having said that --

9           THE COURT:  Okay.  Is that okay with the

10  government, too?

11          MS. CONNOLLY:  Yes, your Honor.

12          THE COURT:  All right.  I have an appointment

13  at 5:15 and some flexibility in connection with it.  But

14  we'll take a 15-minute break until 4:00.  We'll let the

15  stenographer catch his breath.  It's been a long day.  I

16  want you to organize your thoughts.  And I plan to hear

17  from you for about 30 minutes each or up to 30 minutes

18  each, but if I ask you so many questions that you

19  haven't finished what you want to tell me, then I'll let

20  you finish what you want to tell me.

21          All right?  You're all doing a very good job.

22          MS. CONNOLLY:  Thank you, your Honor.

23          THE COURT:  The Court is in recess.

24          (Recess, 3:45 p.m.)

25          (Resumed, 4:00 p.m.)

1          THE COURT:  Okay.  The burden of proof is on

2     the government, so I think the government ought to go

3     first and I'll give you a chance for a brief rebuttal.

4     I can't help but think it's like a criminal case, unless

5     you prefer to go second.  But I think it will be best

6     for me if you went first.  Okay?

7          MS. CONNOLLY:  Thank you.

8          THE COURT:  But I'll tell you there are a

9     couple of discreet questions I'm interested in.  I just

10    want to see what's briefed and what isn't and some of

11    this may get clarified if I look again at the trial

12    briefs, but -- but what are the qualifying convictions

13    or what is the qualifying conviction that triggers the

14    Adam Walsh Act?

15        I think it's undisputed that Mr. Swarm has

16    pedophilia.  Is it serious?  At least before the hearing

17    started, I think Mr. Swarm was disputing the severity.

18    And I guess I'm interested in your views on when the

19    last act of child molestation occurred, which is

20    different than the last violation of supervised

21    release.  And then I'm interested in everything else you

22    want to tell me.  So why don't you go ahead.

23         MS. CONNOLLY:  Thank you, your Honor.

24

25    CLOSING ARGUMENT BY MS. CONNOLLY:

1     May it please the Court, the government's closing

2     in this matter will be delivered in two parts.  First,

3     I'll present an overview of the evidence in the context

4     of the case and then the Government will specifically

5     address the statute, 18 U.S.C. Section 4248, and marshal

6     the evidence that supports the government's burden that

7     Mr. Swarm is a sexually-dangerous person within the

8     meaning of that statute.  And, of course, if the Court

9     has questions as I go along, please feel free.

10     As has been acknowledged by everybody here, this

11     is a very serious proceeding.  It's a very important

12     proceeding.  The stakes couldn't be higher.  As the

13     calculus under the Adam Walsh Act pits, as it does in

14     opposition, one man's liberty with the safety of the

15     community.  Squarely put, the issue before this Court is

16     whether after this hearing, pursuant to 18 U.S.C. 4248,

17     there's clear and convincing evidence that Mr. Swarm is

18     a sexually-dangerous person and if the Court so finds

19     that, according to the statute, the Court shall commit

20     Mr. Swarm to the custody of the Attorney General.

21     As this court recently wrote in the **Wilkinson**

22     decision, "Clear and convincing evidence is an

23     intermediary level of burden of proof.  It's certainly

24     less than beyond a reasonable doubt, but it's more than

25     a preponderance."  And it's evidence that the Court

1    noted would place in the Court, the factfinder, "an

2    abiding conviction that the truth of the contentions are

3    highly probable."

4         And the four elements that the government needs to

5    prove here is whether Swarm has a qualifying conviction,

6    Swarm has a serious mental impairment, and as a result

7    of that serious mental impairment, Mr. Swarm is not

8    adequately able to control his behavior and particularly

9    that Mr. Swarm will have serious difficulty in

10   refraining from sexually violent conduct or child

11   molestation if released.

12        Turning to the first element, which the Court

13   addressed a moment ago, as to the proof of the predicate

14   requirement under the Adam Walsh Act, um, whether Swarm

15   is a person who has engaged or attempted to engage in

16   sexually-violent conduct or child molestation, that

17   element is clearly satisfied in this case.  Swarm's 2001

18   federal conviction for the receipt and possession of

19   child pornography, which could be found on Exhibits 22

20   and 23, and his 1994 state conviction for attempted

21   sexual abuse in the second agree and attempted child

22   endangerment --

23             THE COURT:  And what were the acts underlying

24   the '94 conviction?

25             MS. CONNOLLY:  Um, those are Exhibits 28 and

1    29, your Honor, and the attempted child endangerment and

2    the attempted sexual abuse in the second degree had to

3    do with the touching of the thigh and kissing, um, and

4    the babysitting contact with Bobbie.  Though as we'll

5    discuss a little bit more, the facts that were disclosed

6    at that time and form the basis for that conviction are

7    certainly less than what we ultimately have come to know

8    about what happened in that conduct.

9        I don't think that the respondent disputes that

10   the predicate -- the predicate acts have been met and

11   that he is a person who has engaged or attempted to

12   engage in sexually violent conduct and molestation.

13           THE COURT:  And this actually touches upon

14   something that I discussed with you at the outset.

15   While the term "sexual violence" -- "refraining from

16   sexual violence" is used in connection with the ultimate

17   question, um, you don't argue that the risk of

18   possessing child pornography is something that could

19   itself do it.  I couldn't properly detain him if I

20   thought there was this -- that he'd have serious

21   difficulty refraining from looking at child pornography.

22           MS. CONNOLLY:  In this case, your Honor,

23   that's right.  Even though child pornography is illegal,

24   the government is not, in this case, arguing that that

25   alone would be sufficient.

1              THE COURT:  Okay.  But you do argue that

2      that's sexually violent conduct for the purpose of

3      committing a predicate crime triggering the Adam Walsh

4      Act?

5              MS. CONNOLLY:  Um, yes, your Honor.

6              THE COURT:  Okay.  Go ahead.

7              MS. CONNOLLY:  Um, I'm jumping ahead a little

8      bit here, but I think it will help the context of going

9      forward.

10          There is a CFR that the Bureau of Prisons has

11     adopted for the definition of "child molestation" and

12     for purposes of this case involving Mr. Swarm the

13     government is not alleging that he is at a risk of

14     offending through sexually violent conduct in the future

15     so much as he is, in this second piece, which is child

16     molestation, and for child molestation we are relying on

17     this CFR from the Bureau of Prisons that defines "child

18     molestation" as "any unlawful conduct of a sexual nature

19     with or sexual exploitation of a person under the age of

20     18 years."

21             THE COURT:  Wait.  I'm not -- I don't recall

22     seeing that regulation before.  What's the citation?

23             MS. CONNOLLY:  It's 28 CFR Section 549.93.  I

24     don't know if the Court --

25             THE COURT:  549. -- what?

1          MS. CONNOLLY:  -- .93.  I just came across it

2     as I was noting that the Adam Walsh Act doesn't define

3     "sexual violence" nor does it define "child

4     molestation," so I was --

5          THE COURT:  Well, I think there may be a

6     problem with using that definition because he would have

7     to have serious difficulty refraining as a result of

8     serious pedophilia and pedophilia, I've been educated to

9     understand, is an attraction to prepubescent children

10    usually under 13.  I'm not sure this distinction is

11    going to make a difference, but I'm also not sure that

12    at least in the context of -- I mean, I'll consider

13    this.  But it just occurs to me there's a question as to

14    whether that's the right definition.

15         MS. CONNOLLY:  And fairly, your Honor, the

16    Adam Walsh Act contemplates that something less than

17    sexually violent conduct can be sufficient for --

18         THE COURT:  All right.  I just had the same

19    discussion with my law clerks.  If he was a threat of

20    raping a woman over 18 years old, that would be sexually

21    violent conduct, but not child molestation under the

22    CFR, but the evidence would not be sufficient.  He's not

23    a threat to rape an adult, according to the evidence.

24         MS. CONNOLLY:  Based on what we know of his

25    history.

1          THE COURT:  Right.  But the issue here, I

2    agree with you, is child molestation.

3          MS. CONNOLLY:  Yes, your Honor.

4      So turning to the second element -- the first

5    element being the predicate requirement that he's

6    sexually dangerous has been met, that he's a person

7    who's engaged in sexually violent conduct or child

8    molestation, the second element that the Government has

9    established in this case is that Mr. Swarm suffers from

10   a serious mental illness, abnormality or disorder.  And

11   we've learned from the examiners that this court has

12   appointed Dr. Fabian Saleh and Dr. Barry Millis and, in

13   fact, really the respondent himself doesn't contest that

14   he suffers from a paraphilic disorder, pedophilia.

15   Dr. Mills and Dr. Saleh describe it as a "paraphilic

16   disorder non-exclusive, attracted to girls."  And I

17   don't think there's any dispute to the evidence that's

18   been presented to the Court that Mr. Swarm continues to

19   suffer from pedophilia.

20      Additionally, both Dr. Mills and Saleh opined that

21   Mr. Swarm suffers from a personality disorder.

22          THE COURT:  Let me just take a step back.

23   It's your -- and part of the reason I was looking for

24   this is that the Bureau of Prisons and Dr. Saleh, at

25   least, agreed that what could have -- well, you can have

1    pedophilia, but it might not always be serious.  There's

2    a continuum.  And that's my general understanding of the

3    DSM.

4        I think it's your argument that Mr. Swarm's

5    pedophilia is serious, right?

6           MS. CONNOLLY:  Yes, your Honor, I was getting

7    to that.

8           THE COURT:  All right.  In due course you'll

9    tell me why it's serious.  Go ahead.

10          MS. CONNOLLY:  Um, what we've learned from

11    Drs. Mills and Saleh, in addition to the pedophilia, is

12    that he also suffers from a personality disorder and

13    that he displays traits of an antisocial, a borderline,

14    and a narcissistic personality, um, and those kind of

15    traits are also carried through in some of the Bureau of

16    Prison notes and other treatment notes that you'll have

17    in the evidence before you.  Dr. Mills also concluded

18    that Mr. Swarm had an underlying polysubstance abuse

19    that was in remission due to his incarceration.  That's

20    at Exhibit 31, Page 13.

21        It is agreed by Dr. Mills and Dr. Saleh that

22    Mr. Swarm's pedophilia presents here as a serious mental

23    illness, abnormality, or mental disorder.  Dr. Saleh

24    wrote in his reports, both in 2008 and in 2011, um, that

25    this is a serious, um, pedophilia.  Dr. Mills testified

1    on the stand that Mr. Swarm's pedophilia wasn't the

2    worst he's seen, but it's not the slightest case he's

3    seen, that it's somewhere in the middle.  And then today

4    I was struck, after listening to Mr. Swarm's testimony,

5    that nothing could underscore the seriousness of the

6    pedophilia as much as when you hear the struggle that

7    Mr. Swarm has had since reaching adulthood in

8    controlling these pedophilic urges that he has.  So I

9    think that, um, the evidence that has been presented

10   here is clear and convincing that the pedophilia that

11   Mr. Swarm suffers from is serious.

12        And finally, combining the third and the fourth

13   elements, and what has largely been the focus of the

14   trial here, as to whether Mr. Swarm, as a result of the

15   serious pedophilia, would have serious difficulty

16   refraining from sexually violent conduct or child

17   molestation if released.  And parsing from the often

18   repeated disclaiming you might see in a mutual fund

19   prospectus, and while it may be true in stocks that past

20   performance is not indicative or predictive of future

21   behavior, however, when it comes to human behavior, the

22   past is often the most reliable indicator we have, and

23   Swarm's history offers us several key factors in

24   determining if Swarm can, in fact, control his conduct

25   in light of these strong and really unrelenting

 1   pedophilic urges that he testifies about.

 2        Dr. Saleh and Dr. Mills and, in fact, Sarah Walsh,

 3   and the treatment records that have been introduced into

 4   evidence, Exhibits 21 and 33, reveal that Mr. Swarm has

 5   a deeply ingrained and a longstanding unabated

 6   pedophilia with his preferential age being young girls,

 7   girls as young as seven -- although in the context of

 8   the child pornography it was five, and he has testified

 9   that his preferred age range are girls from the ages of

10   9 through 11.  That's information that could be found in

11   Exhibit 1, Page 9, Exhibit 31, Page 6.  And depending on

12   Mr. Swarm's disclosure, he's had anywhere from six to

13   nine child victims.  And the term "victim" here carries

14   with it a connotation and a connotation of injury or

15   harm because the children who have found themselves to

16   be the object of Mr. Swarm's affection are, in fact,

17   victims.

18        In Exhibit 31, Page 6, Exhibit 21, Page 6,

19   Mr. Swarm admits that he groomed these children for his

20   attention.  He admitted to Dr. Mills and here today in

21   court that he's not only attracted to female minors, but

22   he is specifically attracted to those who have been

23   previously molested.  And that's at Exhibit 31, Page 5.

24   And how deep seeded must Swarm's pedophilia be that he

25   would try to physically castrate himself, that he would

1    seek, in 1997, as far back as '97, to be chemically

2    castrated, and to come in here today seeking again,

3    asking to be chemically castrated.

4            THE COURT:  I'm sorry.  When did he ask to be

5    chemically castrated?

6            MS. CONNOLLY:  In 1997 when he went to the

7    Cortland Community Mental Health Center.

8        And then, based on his testimony today, um, he

9    deliberately allowed himself to be caught up in a

10   federal sting operation ordering not one, not two, but

11   three child pornographic videos as a cry for help.

12           THE COURT:  Yeah, I don't, at the moment, buy

13   that that was conscious.  If it was a subconscious cry

14   for help, some psychiatrist will have to diagnosis that.

15           MS. CONNOLLY:  And as we went through the

16   testimony today with Mr. Swarm and on cross-examination

17   by Ms. Stacey of Mr. Swarm, and you look at the victims,

18   you detect this pattern of violating young girls by

19   insinuating himself in what should be positions of

20   trust.  Ms. Stacey called our attention to Exhibit 21,

21   Page SWD-16, there's a chart in the middle of the page.

22   This was part of the Family and Children's Society

23   assessment of Mr. Swarm when he listed his victims and

24   the relationship of those victims.  They were

25   neighbors.  They were friends' children.  They were his

1    step-niece.  His sister's friend.

2           THE COURT:  Yeah, but I actually think the

3    expert testimony showed that the more dangerous

4    paraphiliacs are those, you know, who snatch a stranger

5    or something like that.

6           MS. CONNOLLY:  Well, with the grooming

7    behaviors that Mr. Swarm himself has identified and when

8    you see the pattern, by insinuating himself -- he's not

9    an impulsive pedophile, if that's what the Court is

10   inferring, he's very methodical in how he goes about

11   developing the relationship, the emotional bond before

12   the physical bonds are established.  That there's a

13   pattern with each one of his victims and that that goes

14   on for, in some cases, many years.  His niece, Bobbie,

15   for example, that grooming behavior went on for quite

16   some time before the, um -- he was, um, touching her

17   physically in that situation.

18         At the age of 18 or 19 he insinuated himself into

19   his younger sister's friendship with Penny, a sister

20   whom he knew and was upset by the fact that, um, she was

21   sexually molested by his father.  Um, and this 13-year-

22   old girl who even, according to Swarm's own testimony,

23   had had kind of a tough childhood, Swarm had relayed to

24   Dr. Saleh that before he had commenced a sexual

25   relationship with Penny at 13, that half of his friends

 1    had already slept with her.

 2         And then at some point when she left her home due

 3    to some upheaval in her own home, as Mr. Swarm

 4    testified, she came to live with Swarm's family and

 5    thereafter he engaged her in a three-year sexual

 6    relationship, um, and he recounted numerous sexual

 7    contact with her over that period.  And whether Penny

 8    had reached puberty at the time or whether Swarm

 9    maintained she instigated the sexual conduct apparently

10    for three years, at some point when she was 16 it's

11    uncontroverted that she, not Swarm, ended the

12    relationship.

13         I believe there's no dispute that Penny could not

14    have legally consented to a sexual relationship with

15    Swarm when she was 13.  So whether this is an act of

16    pedophilia in the clinical sense is not a mitigating

17    factor here, rather it reveals Swarm's compulsive and

18    fixated sexual nature which in hindsight he minimizes

19    and deflects responsibility, um, showing little care for

20    the potential harm he caused Penny.

21         Then in '94 there was his 11-year-old step-niece

22    Bobbie.  At this time Swarm is approximately 29 and he's

23    babysitting his brother's stepdaughter.  He was

24    entrusted to watch her at night and he used this

25    occasion over the course of years, as he testified, from

1    ages 9 to 11, um, to put himself in a position where he

2    was able to gratify himself at night while she slept and

3    sometimes watched him.  He exposed himself to her.  And

4    then he admits, although not until most recently, in

5    2006, that he did, in fact, brush his penis up against

6    her vagina when she had her underwear on sleeping at

7    night.  But he tells the police, in 1994, when he's

8    charged with this crime, that he only touched her thigh

9    and kissed her.  That's in Swarm's voluntary statement

10   in Exhibit 29.

11        As Dr. Saleh testified, these touches are sexual

12   touchings in the sense that Mr. Swarm is touching a

13   child to gratify himself sexually.  And if you read his

14   statement in Exhibit 29 carefully, he's still minimizing

15   his behaviors.  As we learned yesterday from Sarah

16   Walsh, in Exhibit 41, and we heard directly from

17   Mr. Swarm today, that that conduct was much more than a

18   touch of the thigh or a brush of the hair and it went on

19   for an extensive period of time.  But -- and, in fact,

20   Bobbie, after that 1994 conviction, um, comes forward

21   afterwards with more incidents of violations, and that's

22   written in the presentence report.  Bobbie was contacted

23   and interviewed as part of the presentence report, which

24   is an exhibit in evidence.  It's Exhibit 27.  I call the

25   Court's attention to the pages marked SW-00040 and

```
 1    00045.
 2              MR. WATKINS:  Could I just, for the record,
 3    I'm pretty sure I objected to it at trial.  I know it
 4    might be part of the --
 5              THE COURT:  We'll get to it later.  Time is
 6    short.
 7              MS. CONNOLLY:  Um, so it's not until 2006,
 8    almost twelve years after the criminal conduct, when he
 9    becomes engaged in the Family and Children's Society,
10    that he reveals that he, as a grown man, committed this
11    sexual offense against Bobbie and here she was an
12    11-year-old child entrusted to his care.  He took
13    advantage of her.  And it shows that Swarm, as I've said
14    before, is not an impulsive sex offender, he's very
15    methodical in building that emotional relationship with
16    Bobbie and the trust to get to her.
17              THE COURT:  Well, the fact that he's
18    methodical and the fact that -- well, let's just say the
19    fact that he's methodical and not impulsive, doesn't
20    that show over time some ability to refrain, not
21    previously ultimately to refrain from touching, but in
22    terms of how impaired somebody is volitionally, which is
23    the heart of the issue for civil commitment, doesn't --
24    isn't this kind of a double-edged sword?
25              MS. CONNOLLY:  Well, your Honor, I can make
```

 1    two points on that.  One, it is true that certain

 2    people, if you believe the testimony of the experts,

 3    have absolutely no control over their sexual conduct,

 4    um, and that's true that's not Mr. Swarm, but the Adam

 5    Walsh Act doesn't require that kind of complete

 6    inhibition and absolutely no role of volitional

 7    control.

 8          I think what makes it dangerous in Mr. Swarm's

 9    case is when you look at the constellation of factors

10    and his history, um, it becomes troublesome.  That he

11    develops these relationships with the girls, he grooms

12    them, he perceives that they have a crush on him and he

13    builds that emotional relationship, and it's just as

14    damaging for the child, for the object of his sexual

15    affections, if it's a neighbor or a step-niece, as it

16    would be a stranger that he grabbed in a bush

17    somewhere.  That this pattern of breaking someone's

18    trust or building this trust then violating this trust

19    for his own sexual gratification is child molestation

20    with regard to the context of the Adam Walsh Act and we

21    believe the evidence shows that he has not been

22    successful when he has been released in refraining

23    from --

24          THE COURT:  No, I believe that the touchings

25    of Bobbie constitute child molestation in 1994 and both

1   trigger the Adam Walsh Act and are the sort of things I

2   would have to be concerned -- you know, I have to

3   determine whether he's going to have serious difficulty

4   refraining from doing something like that again.

5           MS. CONNOLLY:  Correct.  I think it's

6   interesting that he deflects the responsibility by

7   handing an 11-year old a letter saying, "Turn me in."

8   Once again, as the adult, he's not taking responsibility

9   to say, "I've got to turn myself in here.  I'm not going

10  to ask my 11-year old step-niece to turn me in for

11  behavior I know is wrong."

12          Again, this kind of reveals the kind of compulsive

13  and obsessive thoughts he has.  And it's true that, as

14  he testified and as I believe Dr. Mills testified, and

15  it's in his report, Exhibit 31, in 2008, um, Bobbie is

16  still Mr. Swarm's primary sexual fantasy and he still

17  has this impossible dream of wanting to marry her.

18  That's Exhibit 31, Page 5.  So it's still a very -- it

19  still appears, based on the reports of the experts, to

20  be a very intense fantasy and it still seems to motivate

21  him, um, in his sexual pursuits.

22          There was the information we heard today about a

23  neighbor's child, Kelly.  Swarm touches her over her

24  clothing -- again this is for his pleasure and

25  gratification, and he gives the child a picture to warn

1    him -- to warn her parents about him.  Um, that's -- you

2    could look at Sarah Walsh's notes, Exhibits 33 and 21.

3    Once again he's deflecting responsibility.

4              THE COURT:  What year was that?

5              MS. CONNOLLY:  Um, Kelly, I believe, was

6    199 -- one moment, your Honor.

7              (Pause.)

8              THE COURT:  I think I have it.  I have it

9    somewhere.  We can find it later.

10             MS. CONNOLLY:  We'll get that for you in one

11   minute.

12        And then today he explained something that was not

13   clear from the records that the six-year-old child,

14   Gerri, um, who he identified as one of the victims of

15   his molestation, the six-year old rubbed her hand over

16   his clothed penis.  Um, again, this is for his

17   gratification, not for the child's, and he tells us

18   today that the six-year old had previously been molested

19   by some fourteen or fifteen-year old.

20        Um, he testified that he had stolen another

21   neighbor's child's underwear so he could use it for

22   masturbation.  That's Exhibit 27, Page SWD-16.

23        And turning to more recent conduct, um, the

24   defense -- the respondent makes note of the fact that

25   Mr. Swarm has not violated in the past decade, and

1  that's true, and it's also true that he's been

2  incarcerated for --

3            THE COURT:  I'm sorry.  He has not?

4            MS. CONNOLLY:  He has not committed a sexual

5  offense for the last decade.  And while that's true,

6  it's also true that he's been incarcerated for most of

7  the last decade, um, with the exception of September of

8  2005 to October of 2006.

9        So, um, if we look at the short amount of time

10  when he was out on supervised release -- and as the

11  Court heard --

12            THE COURT:  When was it in '05?

13            MS. CONNOLLY:  September of 2005, he was

14  released, and he violated -- and the violation hearing

15  revoked the terms of his supervised release in October

16  of 2006, the end of October.

17        So if we look at that short period of time,

18  approximately one year that he's on supervised release,

19  um, he's still showing, um, very poor judgment despite

20  the terms of his supervised release and the treatment

21  contract in terms of where he puts himself.  So within

22  six months of that supervised release, by June and July,

23  he's having unsupervised contact with minors, he's not

24  disclosing this in group, he's not telling his probation

25  officer, and that doesn't come up until we have a

1    polygraph.

2            THE COURT:  But I just want to see if we're on

3    the same page and, of course, what you're arguing is not

4    irrelevant that unsupervised association with the

5    children was a violation of the conditions of his

6    supervised release.  Do you argue that he engaged in any

7    child molestation in the year he was out on supervised

8    release?

9            MS. CONNOLLY:  To be candid with your Honor,

10   we don't have evidence that he engaged in child

11   molestation because we haven't really had a full

12   disclosure from Mr. Swarm about some of the conduct that

13   happened.  Even today we're still hearing more bits and

14   pieces, putting together the pattern.  But what's

15   troublesome about this unsupervised behavior, I think,

16   um, from the Court's point of view, is that he doesn't

17   report it.  If it was no big deal, then why didn't he

18   report it?  Why did he try to hide it?

19           Second of all, his own testimony is --

20           THE COURT:  Because there's something of an

21   answer to this, that it comes out that offenders, sex

22   offenders are often not completely candid the minute

23   they go into a group, but as they get more engaged, they

24   become more forthcoming.  And I think the probation

25   officer, Mr. Pierce, thought it was a positive thing and

1     not a negative thing that Mr. Swarm was, you know,

2     reporting the imperfections in his compliance with the

3     conditions of supervised release and Ms. Walsh was, you

4     know, commending the progress up to a point.

5              MS. CONNOLLY:  Well, that's the interesting

6     thing, your Honor.  In June and July of 2006, everyone

7     thinks this is great.  Mr. Swarm's making these little

8     disclosures.  Now, what they come to find out in

9     October, there was a lot more there that met the eye.

10    While he was having us focus on these smaller things,

11    whether it was a DVD, or the "Hustler," or those things,

12    he's not telling them about these other things, the

13    other contacts.  And, for example, his contact with TC,

14    um, it's not clear from the records that that was a

15    physical contact and that's what he testified to here

16    today in response to the judge's question.  So there may

17    be more of that, but we don't really know.

18         And the other troublesome piece of it is that, um,

19    um, when you watch Mr. Swarm testify about how scared he

20    got being in a room with two young girls when they made

21    some offhand comment about boyfriend/girlfriend that he

22    had a -- you know, I'm using a colloquial expression, a

23    "panic attack."  He had to get out of that house.  Those

24    triggers are so close to the surface in him that they

25    can be set off as a hair-pin trigger.  And good for

1    Mr. Swarm, he left the house that day.

2          Um, but it's this -- it's the house he -- it's the

3    house that he goes back to, because of children he

4    interacts with, and this is how this pattern of grooming

5    kind of starts.  And he -- you know, for one day he was

6    good at stopping it.  The problem is, and this is why

7    probation violated him, I think, it's the accumulation

8    of these kinds of showing bad judgment and not seeming

9    to kind of get with the program.  He's still very

10   secretive.

11         THE COURT:  Yeah, but showing -- and I wrote

12   about this at some length in *Wilkinson,* you know, I need

13   to be careful.  Showing bad judgment is not a basis to

14   be civilly committed.  If you have judgment and can

15   control your conduct, but make bad decisions, that's for

16   the criminal process to deal with, not for civil

17   commitment.  If you're impaired volitionally and you

18   cannot, as a result, control your conduct in a dangerous

19   way, then you're subject to civil commitment.  Do you

20   agree with that generally?

21         MS. CONNOLLY:  I do, your Honor.  And if we

22   had to similarly commit people for bad judgment, there

23   wouldn't be enough places in all the prisons for all of

24   them.

25         THE COURT:  Okay, and you've gone 30 minutes

1  already and I haven't heard everything you want to tell

2  me, and that I want to hear, but I thought I'd give you

3  a status report.

4           MS. CONNOLLY:  Okay, I'll --

5           THE COURT:  But don't deal with this by

6  talking faster.

7           MS. CONNOLLY:  (Laughs.)  All right.

8       The pattern of Swarm's conduct during his

9  supervised release is placing himself in situations

10  where he's going to have contact.  For example, going to

11  a Disney movie, "8 below."  And the probation officer,

12  it appears, probably could have violated him for that,

13  but didn't.  He talked to him about it and said, "That's

14  not a good choice.  You shouldn't be at children's

15  movies and dark movie theaters with kids."  And so Swarm

16  should be perhaps a little bit more sensitive to the

17  triggers and have -- and as I explained to the Court,

18  how scared he became when he was left alone with the two

19  girls.

20       And the kinds of touches he has -- and I think

21  Ms. Stacey on cross-examination brought this up, when a

22  young child hugged him around the knees, um, the child's

23  face was in his crotch.  These are not innocuous

24  incidental touches.  It's part of a pattern that Swarm

25  has, he grooms the children, and he'll tell you himself

1    that he emotionally and physically identifies with these

2    prepubescent children.  Um, and there's scant credible

3    evidence to believe that Swarm's attraction, if any, to

4    adult women is anywhere near as intense as his desire

5    for young girls.

6         In treatment in 2006, he reported he was terrified

7    of women his own age.  That's Exhibit 21, Page 9.  This

8    is consistent also with reports to the mental health

9    provider at the Bureau of Prisons when he was there in

10   2001 and 2002.  Even in his choice of pornography, it's

11   child pornography that he claims he's addicted to, not

12   adult pornography.  That's Exhibit 1, Page 9, also on

13   Exhibit 21.  The images of little girls engaged in sex

14   is a recurrent fantasy in his masturbation practices and

15   that, as Dr. Saleh explains, reinforces his disorder

16   because he finds gratification in these pedophilic

17   images and fantasies.

18        So the government would contend that Mr. Swarm's

19   self-report last week to Dr. Saleh, on the eve of this

20   hearing, that he stopped thinking about, um, young girls

21   when masturbating, starting back in last February of

22   2010, and now only masturbates once a month to fantasies

23   of adult women, does not change his longstanding

24   hardwired attraction to young prepubescent girls whether

25   in person or in his pornography.  And further, his

1    recent report is simply at odds to the overwhelming

2    contrary evidence in the records and in his testimony

3    here today.

4         Neither Dr. Mills or Dr. Saleh believe that

5    Swarm's pedophilia is curable, at best it can be managed

6    through intensive treatment and therapies.  Sarah Walsh

7    testified that Swarm needed intensive treatment due to

8    the fixated nature of his pedophilia and that the

9    once-a-week group therapy session, in her opinion, was

10   inadequate.  And so as a result of Swarm's longstanding

11   deep-rooted serious pedophilic disorder, the question

12   before the Court is will he have serious difficulty

13   refraining from child molestation if released.

14        And here the government is looking at this BOP

15   regulation, um, in helping it focus in and focus the

16   Court in on child molestation being any conduct of a

17   sexual nature, um, with or the exploitation of a person

18   under the age of 18.  Um, the government maintains the

19   evidence clearly and convincingly supports the

20   conclusion.  Um, and, in fact, Swarm himself seems to

21   believe he would have serious difficulty refraining,

22   which is why he's gone to such great lengths and

23   extremes to stop these urges that are in his head,

24   whether it's through the trying to castrate himself

25   chemically or physically, um, whether it is, um, other

1  types of conduct -- he tried to commit suicide a couple

2  of times, um, these images haunt him and they're very

3  present in his thoughts apparently from what we read in

4  the records and really in what he's revealed to us

5  today.

6       Um, he's engaged in decades-long child

7  molestation, except for the period of his incarceration,

8  and if the past is prelude, um, we have to conclude that

9  Swarm's inability to refrain from child molestation,

10  when confronted with an opportunity, um, supports -- is

11  supported really by what Sarah Walsh told the Court, um,

12  that Swarm is a high risk of reoffending.  Dr. Saleh and

13  Dr. Millis, using the recognized actuarial tools, the

14  Static 99 and 99R similarly score him at a 6 or a 5,

15  reduced for age, um, which puts him in the moderate to

16  high-risk group for reoffending, but neither doctor

17  relied on that one data point alone.

18       And so what we're looking at is --

19            THE COURT:  But didn't both of them ultimately

20  testify that if Mr. Swarm was released on the current

21  conditions of his supervised release, in their opinion

22  he would not have serious difficulty in retraining from

23  child molestation?

24            MS. CONNOLLY:  Well, your Honor, um, if I may

25  get to that in a moment?

1          THE COURT:  All right.

2          MS. CONNOLLY:  If I may?

3          THE COURT:  About how much more do you --

4          MS. CONNOLLY:  I didn't mean to put the Court

5     off.

6          THE COURT:  No, that's okay.  About how much

7     more do you feel you have?

8          MS. CONNOLLY:  Just a little bit more.

9          THE COURT:  Okay.

10          MS. CONNOLLY:  What Ms. Walsh describes as

11    Mr. Swarm's deviance makes him a very unreliable

12    narrator, um, about events in his own life and his own

13    thoughts and feelings.  Um, one cannot measure

14    Mr. Swarm's future behavior based on his own reports.

15    There are too many instances of what his therapists call

16    "cognitive distortions" or what might be less charitably

17    referred to as "lack of candor."

18         Um, he -- he has had these interviews with

19    Dr. Saleh and Dr. Mills and based on that they have come

20    to certain conclusions.  Um, what we find perhaps more

21    significant is that unlike Dr. Mills and Dr. Saleh who

22    talk about hypothetical appropriate treatment for Swarm,

23    Sarah Walsh actually was tasked with and invested a year

24    trying to work with Swarm in sex offender treatment in

25    conjunction with the close supervision of the probation

1    officer, Mike Pierce, and all those terms of release

2    that are found in Exhibit 25, with the exception of home

3    confinement and maybe some tweaking of the alcohol

4    policy, were in place and she found she could not manage

5    him even with all those conditions.

6         So I appreciate that Dr. Saleh and Dr. Mills have

7    opined based on, if you will, some hypotheticals here,

8    but when Ms. Walsh --

9              THE COURT:  What are the hypotheticals?

10             MS. CONNOLLY:  Well, I think the Court was

11   putting to them whether there was home confinement,

12   whether there was pharmacological treatment, um, whether

13   there was a home for him to be confined to, um, and

14   whether there's a provider who would give him these

15   treatments in a community where he's located.  Um, I

16   think that there's a lot of speculation in that.

17        I also think that Dr. Saleh's testimony in court

18   vacillates from the report, if you think about it

19   initially, because in 2008 and in 2011, Dr. Saleh makes

20   his reports and in the beginning of the report he has a

21   very comprehensive list of everything he reviewed and

22   considered, and that included Exhibit 25, the updated

23   terms of release upon, um -- after the revocation of the

24   supervised period of supervision there.  So he had all

25   that before him and he concluded not once, but twice,

1    that Mr. Swarm was a sexually dangerous person and in

2    2008 said that he should be confined to a secured

3    facility.

4         Here in court he seems to vacillate, but when you

5    really think about it, what he's saying is, "Yes, if you

6    could confine him to his home so that he has no outlet

7    to children, then I would say he's not sexually

8    dangerous," which is the same as saying, "He needs to be

9    in a secure and controlled environment."

10             THE COURT:  I think when he was -- I'll check

11   it, but given information short of that, he wasn't

12   depending on that lengthy home detention.

13             MS. CONNOLLY:  Well, the home detention, in

14   fact, I believe in the response to the Court, Dr. Saleh

15   said that he didn't think even after six months of home

16   detention he would release Swarm to the community.  He

17   thought a step-down approach would be a better way to

18   go, which is also what Probation Officer Pierce had

19   talked about.

20        Both Dr. Saleh and Dr. Mills, um, talk about if

21   pharmacological treatment should be given, it would be

22   best to do that inpatient, at least initially, and as we

23   sit here today we don't know where that could happen,

24   um, which in the interests of time, I will jump ahead

25   here and say that the risk we have here, I think, your

1   Honor, is that we're conflating two different concepts

2   under the Adam Walsh Act under 4248.

3        The first is what we're here to do today, which is

4   to determine, yes or no, is Mr. Swarm a sexually

5   dangerous person?  We believe the evidence is clear and

6   convincing that he is.  That he would have a serious

7   difficulty refraining.  And we would, um, conclude that

8   the Court should so find.  And then the next phase, when

9   we're thinking about conditions of release, is really

10  that piece that Dr. Hernandez started to get into with

11  Mr. Watkins, which is for his conditional release, there

12  is a plan put in place, and then it's up to the Court,

13  by a preponderance of evidence, to determine whether he

14  would be sexually dangerous if released on those

15  conditions.  But that, as I understand the structure of

16  the statute, is not, in the first instance, um, where

17  this hearing is supposed to be about.

18            THE COURT:  Well, but the answer is something

19  intermediate and you agree with this in your trial brief

20  and I think you still do.  This is not the time for me,

21  deciding the civil commitment case, to fashion any new

22  conditions of release.

23            MS. CONNOLLY:  That's correct, your Honor.

24            THE COURT:  But on the other hand, um,

25  Dr. Saleh, even though he had seen the conditions of

1    supervised release, testified that he wrote his report

2    based on assumptions that he made explicit including

3    that Mr. Swarm would get no treatment when he got out.

4    And once he focused, after I ordered him a couple of

5    weeks ago, on the conditions of supervised release, he

6    said, "On those conditions, I'm not -- I, Dr. Saleh, am

7    not convinced that he would have serious difficulty

8    refraining."  So I -- I'm not going to design my own

9    program for him, but I -- but as you recognized

10   properly, I think, at the outset of this hearing, um, I

11   do consider the conditions of supervised release that

12   exist.

13        And I'll take a step further, and this will be

14   familiar to Mr. Watkins who does criminal work and maybe

15   not so much to you, but the conditions have to be

16   feasible in my mind.  Um, the First Circuit decided the

17   *Tutura* case about 20 years ago, Carmen Tutura, and my

18   present thinking is, um, I can consider -- I have to

19   consider whether pharmacological treatment would be

20   available to him, reasonably available to him, and if

21   not, then not depend on that in the calculation of

22   whether he's going to be a serious -- whether he's going

23   to have serious difficult refraining.

24        MS. CONNOLLY:  Well, your Honor, to that point

25   I think the concern is there's an awful lot that goes

1    into that one question and a lot of it is very medically

2    dependent on Mr. Swarm, whether he could tolerate the

3    drugs, whether a doctor would recommend these drugs for

4    him?  I know Dr. Mills said that he wasn't a candidate

5    for the chemical pharmacological treatment, Dr. Saleh

6    said he was, and what's interesting is that neither one

7    of them examined him.  So both of them are kind of

8    speculating a little bit about what they would

9    anticipate the result would be.

10         So I think until an actual medical workup is done

11    to see if it's even feasible, um, that it remains kind

12    of a moving target and not something that this Court

13    ought to base someone's sexual dangerousness on, which

14    is why I think the statute is set up the way it is so

15    that, in the first instance, that the Court doesn't have

16    to set up a plan for each individual sexual offender.

17    That's up to the director of the facility and --

18         THE COURT:  I've got that point.  Do you have

19    one or two more you want to make, promptly?

20         MS. CONNOLLY:  Very promptly, your Honor.  We

21    think that the evidence, and especially powerful

22    evidence today, was Mr. Swarm, as I said before,

23    struggling, a life-long struggle with these urges, with

24    these fantasies, with the images of children, trying to

25    keep himself to stay away from children, finding himself

1    doing things like babysitting and watching neighbors and

2    those types of things, putting himself in harm's way, is

3    clear and convincing evidence that, based on his history

4    and everything the Court heard, that he would have

5    serious difficulty refraining from acts of child

6    molestation.  Thank you, your Honor.

7                    THE COURT:  Thank you.  Mr. Watkins.

8                    MR. WATKINS:  Thank you, your Honor.

9

10   CLOSING ARGUMENT BY MR. WATKINS:

11        Since the government started out with the clear

12   and convincing standard, I will also point out that the

13   Court wrote, quite correctly, that clear and convincing

14   is evidence that "instantly tilts in the direction of

15   the proponent."  Here it does not instantly tilt in

16   favor of serious difficulty, nor does it instantly tilt

17   in the direction of serious difficulty refraining.

18        The first question I want to answer, and the

19   government dodged around it a little bit, is when is the

20   last instant of molestation?  I think we got to it

21   eventually and I would say that that is Kelly, that was

22   1999, that is the incident where Mr. Swarm, quite

23   candidly, told the Court what his feelings were and what

24   he did in pursuit of those feelings.

25                    THE COURT:  What did he do with regard to

1  Kelly?

2          MR. WATKINS:  He didn't do anything to her

3  other than give a letter for her to give to her parents

4  to -- or art work, that is, to give to her parents so

5  that she would not be placed in his vicinity.

6          THE COURT:  Well, if he just gave her a

7  letter, why is that child molestation?

8          MR. WATKINS:  The definition, I would use, and

9  we're all struggling for this, is where Mr. Swarm has,

10  as some part of his motivation, sexual gratification,

11  which he talked about and some semblance of grooming

12  behavior, which he also admitted to, that he did that

13  with her.  He even looked into her eyes, I think, and

14  recognizes now that that is one of the triggers and that

15  is one of his grooming behaviors --

16          THE COURT:  So you say I should find that

17  child molestation is grooming somebody, setting them up

18  to be touched, but not touching them?

19          MR. WATKINS:  Um, I think the Court, in a very

20  expansive definition of "molestation," the Court could

21  consider that.  If they were stricter, they would go far

22  -- more back.  The only sexual molestation that is in

23  1994, and that involves Bobbie, I think that even though

24  she, on some level, did not seem to know it, at least at

25  the time of it, um, where he rubbed his penis against

1   her clothed body, um, underwear, that is certainly

2   molestation.  But even in an expansive view that

3   Mr. Swarm himself gives, he molested Kelly by doing

4   those grooming behaviors.

5        But I do want to delineate between molestation and

6   areas of concern to actual harm to children.  If you

7   asked of Kelly, and apparently as people did at that

8   time, "Did he do anything to you?"  The answer is "No,"

9   so there's no sexual -- there was nothing brought to the

10   police at that stage, there was nothing brought

11   forward.  And indeed what you hear time and time again

12   here in court and through the record is Mr. Swarm

13   telling you what he did, Mr. Swarm telling about the

14   victims that he had.  These are victims, um, in almost

15   all cases that do not know that they are victims to this

16   day, and that includes Kelly, Lenore and Stephanie, um,

17   people who never complained, whose parents never

18   complained, um, and certainly there was no penetration,

19   there was no physical design on them.  But Mr. Swarm has

20   been told, and I think it's quite right, that that is

21   molestation to have those thoughts and to begin

22   behaviors even if you don't follow through on some of

23   them.  So, under that broadened view of molestation,

24   1999 is really the last time.

25        The government makes much that nothing happened in

prison, um, in the years he was there.  As both experts

have told you, they frequently see that, um, in terms of

hypersexuality, in terms of people who cannot control

their behavior, that they will find an outlet in

prison.  There is absolutely no indication that that

happened with Mr. Swarm.

The government downplays the time that he was on

supervised release in the community, but nevertheless it

is serious time if Mr. Swarm were going to engage in the

kinds of activities that the government finds is so

concerning.  Could he have begun grooming children

outside of Mr. Pierce?  He certainly could have.  Could

he have just simply denied all of the allegations -- all

of his priors in the past and say, "I'm not a

pedophile," he could have done that, he could have been

in therapy, and he probably could have concluded

supervised release without doing any of that.  But what

he did was engage in treatment and to start recognizing

-- and one could use the term "epiphany."  And you hear

Mr. Swarm, um, talk about and you see that in

Ms. Walsh's records that the Children -- the Family and

Children's Society treatment was an epiphany for him.

You see it in the records where he does well, he's

making disclosures, despite his shyness, despite his

anxiety, which are very, very real issues and are dotted

1    throughout the records, not just by Mr. Swarm's, um,

2    self report.

3         So I think as far as a last instance of

4    molestation, um, the government can, um, make a really

5    unfounded speculation about anything, at least, but we

6    have not seen anything, um, that a child was aware of,

7    since 1994, and anything, even by Mr. Swarm's account, a

8    broad view of molestation, since 1999.  And that's

9    consistent with what both Dr. Mills and Dr. Saleh told

10   the Court, that it does remit.  Paraphelias -- um,

11   pedophilias do not often go away completely, very rarely

12   go away completely, but like all sexual activity it will

13   remit over the age of time.  And it is entirely

14   possible, and I think both experts agreed, that we are

15   starting to see that stage in Mr. Swarm.

16        Surely we are starting to see the stage where any

17   kinds of borderline personality issues are declining.  I

18   think the Court can make that observation just seeing

19   Mr. Swarm get up there and testify.  Um, he was quite

20   candid -- and I think the government and I agree on

21   this, that this might be the most important testimony

22   before the Court of all the witnesses.  Mr. Swarm was

23   quite candid about his past efforts, about what he's

24   doing currently and what he can do, of what the, um --

25   of what he got out of treatment, of what he participated

1   in.

2          What was most striking to me, and I think of

3   paramount importance to the Court, is he testified about

4   what he -- about what his unaccompanied contact with

5   minors consisted of.  There is absolutely no evidence to

6   dispute what he has said and, in fact, there's

7   corroborative evidence.  Mr. Pierce did an independent

8   investigation, he went to the places that Mr. Swarm

9   talked about, he interviewed people about what had

10  happened, and that was consistent with Mr. Swarm's, um,

11  testimony here, um, and consistent with the fact that

12  these were not grooming behaviors.  I think when you

13  heard, um, what was within the instances of the two

14  young girls whom he inadvertantly encountered, um, he

15  was there for two minutes.  With the --

16          THE COURT:  Um, I'm -- as with any witness, I

17  can accept all what he says, some of what he says, or

18  part of what he says.  I am skeptical that he was with

19  two strange children for two minutes and one of them

20  came and hugged him around his legs.  It might be true,

21  but, at the moment, that innocent an explanation -- I

22  just have a question about it.

23          MR. WATKINS:  Well, again, we heard from

24  Mr. Pierce.  Um, I asked him about the incidents

25  generally, if he had done an investigation, and he said

1    that he had.  Um, I don't know that I asked him specific

2    information about that.  I know that Mr. Swarm gave the

3    name of the person with whom he went to do this -- um,

4    collect this bathing suit there.  One assumes that

5    Mr. Pierce was looking, in his community caretaking

6    function, to find out if indeed something had happened

7    there and I think we would have heard -- we certainly

8    would have heard more of that if indeed it had

9    happened.  What Mr. Pierce testified to was that his

10   disclosures were consistent with what he later found

11   out.

12        We can all wonder, as we all do, sitting here in

13   court, about things that sound odd to us, but

14   nevertheless we don't, um, have anything to disabuse

15   that and despite any kind of, um --

16             THE COURT:  No, but it does seem undisputed --

17   what does seem undisputed is that he was with them for a

18   short time, that regardless of how it came about, it

19   involved a hug, and he controlled his urges sufficiently

20   to the extent he had any urges, to go out and sit in the

21   car, not to respond if the child initiated it or not to

22   take it further if he had initiated it.

23             MR. WATKINS:  I think that's quite correct and

24   I think that goes to both prongs, and I will turn to the

25   legal framework.

1          Of course, um, a mental impairment, a paraphilia

2     is not enough alone, it must be serious, and the Court

3     inquired of the experts on that point, and talked about

4     severity scales and indeed, as the Court has pointed out

5     it used with Dr. Saleh, um, Exhibit 30 -- um -- well,

6     yeah, Exhibit 39 where the -- at Page 5 where the --

7     well, Page 2 of the actual, um, publication, Page 5 of

8     the exhibit, talking about paraphilias, the range of

9     severity, and the different levels all the way up to,

10    um, individuals with significant sadistic homicidal

11    sexual fantasies, and I think that we all agree that

12    that is not where Mr. Swarm is, that there's absolutely

13    no indication of that.  Um, and that is, um, important

14    because, as the Court has pointed out, it is required to

15    be serious and that includes a volitional aspect of it.

16         And I think that is where the experts, in talking

17    about the release of conditions, and the Court can, um,

18    in considering the release of conditions, can go to that

19    volition.  If indeed, as both testified, that conditions

20    of release would reduce the risk where he would not have

21    serious difficulty in refraining, that is --

22              THE COURT:  Well, let me take a step back.  Is

23    it your argument that the pedophilia is not a serious

24    mental illness in Mr. Swarm's case now?

25              MR. WATKINS:  Yes, I would argue that it is

1  not a serious mental illness.

2          THE COURT:  Why not?

3          MR. WATKINS:  Why not?  Because it is in

4  remission to a stage.  As Dr. Saleh found out in his

5  most recent interview of him, Mr. Swarm has reported

6  success in moving away from the fantasies of children to

7  adults and that he's able to, um -- to move himself down

8  that severity scale.  What Dr. Saleh testified to was I

9  think the Court gave him a continuum, "Where would he

10  fall in that severity scale?"  "Somewhere in the

11  middle."  And I think again Dr. Mills' testimony was

12  much the same, "Not the worst person I've seen by any

13  means."  So, um, certainly not the worst of the worst.

14      So is paraphilia always serious?  I don't think

15  either of the experts --

16          THE COURT:  I don't think that paraphilia or

17  almost any mental illness that I've been exposed to in

18  court is always or inherently serious.  There are

19  degrees.  If I were persuaded that Mr. Swarm no longer

20  had fantasies about children and no longer masturbated

21  to those fantasies, then maybe I'd be persuaded it's no

22  longer serious.  I have a question about how credible

23  that testimony is.  I'll have to resolve it in my mind.

24          MR. WATKINS:  The Court would be right to be

25  skeptical about that testimony and I don't think that

1    that's where we are with this.  I'm not sure it requires

2    you to go all that way down to find that it's not a

3    serious mental illness.  As Dr. Saleh testified, I

4    believe, people can have these fantasies, they can

5    suffer from this pedophilia, but if they don't act out,

6    then that's not a serious mental illness.  Is that

7    Mr. Swarm?  It may be Mr. Swarm at this point.  Um, that

8    seems to be consistent with what he has said, that he's

9    had fantasies within recent times, not within the last

10   year or so, but that he's had fantasies within recent

11   times.  But has he acted out on them?  He has not.  And

12   it may be that he continues to have fantasies of

13   children along with his fantasies of adult women, but

14   that does not make it a serious mental illness.

15            THE COURT:  To me I might find that he has a

16   qualifying offense, that he has a serious mental illness

17   because these fantasies are enduring, but it makes the

18   decisive question whether he will have serious

19   difficulty in refraining from acting on these impulses

20   or whether he's going to be able to control them.

21            MR. WATKINS:  And I think the answer is -- I

22   mean, the burden is, of course, clear and convincing

23   that he won't be able to control them, that he'll have

24   difficulty refraining, and I think, um, there is -- not

25   only is there not clear and convincing evidence, but

1   there's evidence that he has been able to control them.

2        Even in the most serious of the cases of

3   molestation, um, with -- involving Bobbie, he sabotaged

4   himself.  We can disagree with whether that was the

5   right way to do it or whether there was judgment there,

6   but he sabotaged himself.  And that's important for two

7   reasons.  One, it shows the volitional nature of what he

8   was doing.  And I think he testified convincingly today

9   about, um, the way volition played in at the time.  It

10  was poor thinking, certainly, but was it thinking where

11  he was completely oblivious to the rights and wrongs of

12  what he was doing?  The answer, I think, is indisputably

13  no.  And the best information we have is that he was

14  able to sabotage any chance that he would be with Bobbie

15  by writing that note.

16       Even if we didn't have that, we have, over and

17  over, indicia that he has not gone far.  We -- there's

18  been no allegation anywhere that he's gotten to the

19  point where he's -- in his grooming patterns, where he's

20  taking, um, children's clothes off or he was thinking of

21  doing that.  He had intense fantasies about stuff, but

22  in the real world, when it came down to the real world,

23  he was scared to do anything and would not do anything

24  because of the consequences, not only for him, but for

25  the child.  And, again, um, the Court has had a chance

1    to hear and see Mr. Swarm to determine whether he's real

2    when he talks about that, but certainly I would argue

3    that he is credible when he talks about wanting to avoid

4    the hurt that his sister engaged in and he was able to

5    stop at all points.

6         Is he a risk?  Everybody is a risk, on some level,

7    to do something.  The intent of the Adam Walsh Act and

8    all commitment procedures was to take the worst of the

9    worst, the people who simply could not control

10   themselves.  That's best typified by **Hendricks** who had

11   engaged in serial abuse, physical abuse of children, and

12   upon his release would tell anybody who would listen,

13   "When I am released, I am going to reoffend again."  The

14   Supreme Court, in upholding sexual commitment, says that

15   is a risk, that is a person who's a risk and it does

16   behoove Kansas to keep him in custody, to get him into

17   treatment until that particular disorder is fixed.  But

18   that is not Mr. Swarm by any sense of the matter.  You

19   don't have the serious serial physical molestation.  You

20   have the intense fantasies.  You have his struggle with

21   it.

22        The government poo-poos Mr. Swarm's struggle with

23   it, but I have to say, to me, it would be incredible for

24   a person to say -- to get up here and say, "I don't have

25   it anymore," "I didn't really have it," "I had it for a

1  minute and it's gone," that's where it's incredible, or

2  "I've taken care of that.  I'm all better now."

3  Mr. Swarm is quite candid about that, talking about a

4  treatment and getting the treatment and the insights

5  treatment have given him, the insights he was looking

6  for, um, for quite a long time.

7      So I do want to -- the Court, at one time, raised

8  two questions, I think it was, yesterday, release

9  without the antiandrogens and release, um, with.

10  Clearly I think it's my position that the government has

11  not shown that he is at serious risk of, um -- of

12  refraining -- of a serious difficulty in refraining in

13  either situation.  I think Dr. Saleh and Dr. Mills

14  testified that he could be released out there on the

15  terms of supervised release and particularly the home

16  detention component.

17      I think the Government has misunderstood this idea

18  that somehow that is the be all and end all of the

19  treatment, for his release out there, was the home

20  detention.  What I heard and what I would expect to

21  happen is that Mr. Swarm be on a period of release for

22  four and a half years, for the first part of that on

23  home detention while he reengages in treatment and

24  therapy, and then the two things go hand and hand.  As

25  he improves in therapy, um, will he be able to get off

1   of electronic monitoring, get more privileges in order

2   to participate in the activities of daily life?

3        So there are two aspects of that home detention,

4   as we often do in the criminal sector, um, there is the

5   carrot and there is the stick.  Certainly the community

6   is helped by him being in home detention to make sure

7   that indeed the treatment has taken and that these last

8   few incidents where he's violated supervised release are

9   not an enduring matter, but at the same time he's going

10  through treatment and, um, making sure that that has its

11  desired effect, and, of course, the proof that he does

12  not place himself in positions where he can do the kind

13  of long-term grooming that, um, got him into trouble in

14  the first place.

15       I think that is going to be enough.  Given what

16  his improvement was while he was at the Family and

17  Children's Society, um, I think that given everything

18  the Court has heard, everything you heard from

19  Mr. Swarm, that improvement will continue there and

20  there will be continued reports of excellent progress as

21  time goes on and he will be a functioning member of the

22  community and he will not be of any difficulty

23  refraining.

24       He has expressed the desire, you've heard that

25  he's considered the effects of the antiandrogens, some

1    of the issues that would be brought forward there.  Um,

2    he is a person fully engaged in combating his, um -- the

3    problem that he has.  If that's what it takes, he will

4    do it.  He's asked for it.  He's on his own.  He showed

5    an intention to do it.

6            THE COURT:  Why should I find that it's

7    feasible if he's going to be supervised in the Northern

8    District of New York -- or is it the Western District of

9    New York?

10           MR. WATKINS:  It's the Northern District of

11   New York.

12           THE COURT:  -- in the Northern District of New

13   York and --

14           MR. WATKINS:  There is a medical center

15   associated with Syracuse University.  It's a major

16   medical center.  There are several other hospitals in

17   that area.  Dr. Saleh testified -- I think this was the

18   gist of his testimony, is "I or somebody can evaluate

19   him, somebody in my office can evaluate him, perhaps

20   even a psychiatrist or a psychologist -- a psychiatrist

21   at Devens could evaluate him for that treatment, and

22   then it is a matter of giving him a shot, of having a

23   physician monitor the levels."  So it's not terribly

24   difficult to accomplish once it's there.  It does

25   involve monitoring, as far as the physical aspects of

1   it, and I think that can be done up in Syracuse, which

2   is not terribly far away from where Mr. Swarm currently

3   lives.

4        The other half of that, of course, is the

5   monitoring of whether it works, whether it's reducing

6   the urge, whether it's helping in the overall treatment

7   mileau and that will be monitored by the treatment

8   providers.  They will be able to see very quickly

9   through group -- and there's no question to me that

10  Ms. Walsh will be -- if she accepts him back into that

11  program, will be hypervigilent for signs that Mr. Swarm

12  is doing well or doing poorly.  I think, um, Mr. Pierce

13  will hear back very quickly as will Judge Skullen.

14       So I think that, either way, there's no risk to

15  the community.  I -- there are issues.  I can't deny.  I

16  understand these drugs are expensive.  Whether Medicare

17  will cover them?  How that could be accomplished?  These

18  are the issues.  We certainly can look into it and I

19  think Mr. Swarm could look into them.  I don't think

20  it's required for the Court to find that the

21  government's not met its burden, that he's at serious

22  risk of reoffending, because I think he was not at a

23  serious risk of reoffending before and nothing has

24  changed in the time since he's been incarcerated in the

25  last four years.  And two more points and then I'll be

1   completely done.

2        There's really nothing we have learned, um, over

3   the course of four years at this trial that Judge

4   Skullen was not aware of when he sentenced him on

5   supervised release.  I know that is not determinative

6   whether somebody is a risk.  Um, I think it is indicia

7   that Mr. Pierce did not think he was the kind of risk at

8   that time that justified, um, institutionalization up to

9   the maximum sentence.  What was decided on was four

10  months and back into treatment.  So I think that is an

11  indication, at least, that, for the people who were

12  working with him and saw him in front of them, that that

13  was enough to take care of the risk at that time and I'm

14  not sure that much has changed.  Certainly we've gone

15  into far more detail, but I do not think, at any level,

16  that what the Court has heard has changed that

17  fundamental conclusion.

18       The thing I have to point out is, of course, the

19  alternative is committing him to Butner for the

20  commitment treatment program.  I think it's clear that

21  means that Mr. Swarm will be at least two years, perhaps

22  three or perhaps four years.  It is very, very, very,

23  very unclear about what happens even when he completes

24  all of the phases of that program.  That program will be

25  faced with the same thing that this court is, which is a

1   DSM statement that pedophilia does not ever go away and

2   I think that is going to bring consequences about

3   whether a person, a warden at Butner, is going to agree

4   to release Mr. Swarm.

5          Even if they do, I think what the Court can take

6   to the bank, as it were, is he -- they would be

7   considering exactly the same conditions that the Court

8   is now considering, once he is released out there.

9   Mr. Hernandez talked about right now that nobody knows,

10  but they expect that it will be probation supervising a

11  person in the community under conditions.  We, as you've

12  heard, we've talked a lot about all of the conditions,

13  and the developing conditions that probation has.

14  Certainly those will get better as we go along.  But in

15  three or four years we will be back before the Court

16  considering exactly the same question, perhaps after

17  Mr. Hernandez has had his -- started all over with

18  Mr. Swarm and gone through his entire program only to

19  find out that really Mr. Swarm is already ready for

20  those conditions of release.

21         In short, the Government has not met its burden

22  that he's a serious risk of reoffending.  I think the

23  Court can release him on the conditions that are there.

24  And I think the Court should find that he does not

25  qualify.

1          THE COURT:  Okay.  Ms. Connolly, is there

2     anything you'd like to say briefly?

3          MS. CONNOLLY:  No, your Honor, but thank you.

4          THE COURT:  All right.  Well, thank you.

5     You've all done a highly professional job in a

6     challenging case.  It's my goal to try to give very

7     careful attention to this tomorrow, despite everything

8     that competes for my attention, and to render a decision

9     orally, let's say at 11:00 on Friday morning.  We'll let

10    you know if something interferes with my ability to do

11    that.

12        Mr. Watkins, I assume you're not going to be back

13    from Arizona by then.  That's fine by me if it's fine

14    with you.

15         MR. WATKINS:  I would ask you to participate

16    by telephone, if I could?

17         THE COURT:  All right.  Leave a message.  And,

18    in fact, there's something I should ask the government.

19    Um, I haven't been asked to do this, but -- and I don't

20    suggest that Mr. Swarm be too encouraged by this

21    question, but if I find the government has not met its

22    burden, which is a high burden, um, then the question

23    will be when does Mr. Swarm get released?  And I could

24    order that he be released forthwith.

25        Sometimes -- well, if I decide it orally, you

1   won't have a written decision, and it will take a little

2   while for the transcript to be prepared, and sometimes I

3   convert it into a more formal memorandum and order, um

4   -- I guess this is for everybody.  I probably would

5   order that Mr. Swarm be released in two weeks or three

6   weeks, if it's my conclusion that he should be released,

7   to give the government the chance to ask me for a stay,

8   if it wanted a stay under certain standards that have to

9   be met, and if I denied a stay, go to the First Circuit,

10   so you're not frantically running around and trying to

11   deal with that.

12      Do the parties want to be heard on that approach?

13      MR. WATKINS:  I guess I expected, on some

14   level, that that would be the approach.  The government,

15   on every one of these cases, has requested time to

16   consider appeal, and it has to go up to Washington, of

17   course, so I do expect that there would be time built

18   in.

19      THE COURT:  Yeah, and what kind of time would

20   the government be asking for?

21      MS. CONNOLLY:  In the past, your Honor, we've

22   asked for thirty days, I understand.

23      THE COURT:  Okay, I'll look at that.  I guess

24   I'll also look at what I did in ***Wilkinson***.

25      All right.  Well, as I said, that question

1    shouldn't be read as any kind of indication, let alone

2    any reliable indication about how all of this will come

3    out, but if I find the government hasn't met its burden,

4    I would build in some time for the government to absorb

5    the decision, um, consider whether it wants to ask me

6    for a further stay, and if necessary ask the First

7    Circuit for a stay.

8         The Court is in recess until 11:00 on Friday

9    morning.

10              (Adjourned, 5:20 p.m.)

11

12              C E R T I F I C A T E

13

14        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

15   do hereby certify that the foregoing record is a true

16   and accurate transcription of my stenographic notes,

17   before Chief Judge Mark L. Wolf, on Wednesday, January

18   19, 2011, to the best of my skill and ability.

19

20

21

22

23   /s/ Richard H. Romanow 03-15-11
     _____
24   RICHARD H. ROMANOW   Date

25